IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 25-1845

CHRISTINE BIROS,
*Appellant,*

v.

SHANNI SNYDER, GEORGE SNYDER, KASH SNYDER, and J.
ALLEN ROTH,
*Appellees.*

VOL IV OF IV APPENDIX
OF APPELLANT, CHRISTINE BIROS

On Appeal from the March 31, 2025 Judgment and Order
of the United States District Court for the Western District of
Pennsylvania at Case No.2:23-cv-00297-RJC

Kirk B. Burkley, Esquire
Pa. I.D. No. 89511
Stuart C. Gaul, Jr., Esquire
Pa. I.D. No. 74529
BERNSTEIN-BURKLEY, P.C.
601 Grant Street, 9th Floor
Pittsburgh, PA 15219
(412) 456-8100  Telephone
(412) 456-8135  Facsimile
kburkley@bernsteinlaw.com
sgaul@bernsteinlaw.com

*Counsel for Appellant, Christine Biros*

## TABLE OF CONTENTS

#56 MOTION to Dismiss filed by J. Allen Roth 7/17/2024………….A890

#57 BRIEF in Support of Motion to Dismiss filed by J. Allen Roth
7/17/2024……………………………………………………………...A1080

#58 MOTION to Dismiss filed by George Snyder 7/17/2024……….A1135

#59 MOTION to Dismiss and Brief in Support filed by
Shanni Snyder 7/17/2024…………………………………………..A1143

#60 MOTION to Dismiss and Brief in Support filed by Kash Snyder
7/17/2024……………………………………………………………...A1140

#68 REPLY BRIEF in Support of the Motion to Dismiss Amended
Complaint, Motion for judgment on the Pleadings, and Motion to
Strike Redundant, Immaterial, Impertinent, or Scandalous Material
filed by J. Allen Roth 10/21/2024……………………………………A1193

# TABLE OF CONTENTS

## Volume I

Notice of Appeal (April 29, 2025)…………….....…………………  A1

Judgement Order (March 31,2025)……………………………….. A3

Order of Court (March 31, 2025…………………………………… A4

Memorandum Opinion (March 31, 2025)……………………….. A5

## Volume II

Docket Sheet for District Court Case No. 2:23-cv-00297-RJC……..  A30

#1 COMPLAINT against J. ALLEN ROTH, GEORGE SNYDER,
KASH SNYDER, SHANNI SNYDER filed 2/22/2023……………..… A40

#43 MEMORANDUM OPINION re Defendants Motions to
Dismiss [32], [34], [35], and [36] entered 3/29/2024……………….  A380

#44 ORDER re Defendants Motions to Dismiss [32], [34], [35],
and [36] entered 3/29/2024…………………………………………A390

## Volume III

#49 AMENDED COMPLAINT against J. ALLEN ROTH,
SHANNI SNYDER, George Snyder, Kash Snyder filed
5/15/2024…………………………………………………………A391

## Volume IV

#56 MOTION to Dismiss filed by J. Allen Roth 7/17/2024………….A890

#57 BRIEF in Support of Motion to Dismiss filed by J. Allen
Roth 7/17/2024……………………………………………………  A1080

#58 MOTION to Dismiss filed by George Snyder 7/17/2024.........A1135

#59 MOTION to Dismiss and Brief in Support filed by
Shanni Snyder 7/17/2024..................................................... A1143

#60 MOTION to Dismiss and Brief in Support filed by
Kash Snyder 7/17/2024......................................................A1140

#68 REPLY BRIEF in Support of the Motion to Dismiss Amended
Complaint, Motion for judgment on the Pleadings, and Motion
to Strike Redundant, Immaterial, Impertinent, or Scandalous
Material filed by J. Allen Roth 10/21/2024............................ A1193

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINE BIROS, | ) | |
| Plaintiff | ) | 2:23 cv 00297 |
| | ) | |
| v. | ) | |
| | ) | |
| SHANNI SNYDER et al, | ) | |
| Defendants. | ) | |

## MOTION TO DISMISS AMENDED COMPLAINT, MOTION FOR JUDGMENT ON THE PLEADINGS, AND MOTION TO STRIKE REDUNDANT, IMMATERIAL, IMPERTINENT, OR SCANDALOUS MATERIAL

AND NOW COMES the Defendant, J. Allen Roth, Esq., who moves this

Court pursuant to Federal Rule of Civil Procedure 12 to dismiss the Amended

Complaint, for judgment on the pleadings, and/or to strike redundant, immaterial,

impertinent, or scandalous material.

Respectfully submitted,

/s/ J. Allen Roth, Esq.
J. Allen Roth, Esq. (PA 30347)
805 S. Alexandria Street
Latrobe PA  15650
lawmatters@yahoo.com
(724) 537-0939

COUNSEL FOR DEFENDANT
J. ALLEN ROTH

A890

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINE BIROS, | ) | |
| Plaintiff | ) | 2:23 cv 00297 |
| | ) | |
| v. | ) | |
| | ) | |
| SHANNI SNYDER et al, | ) | |
| Defendants. | ) | |

## **ORDER**

AND NOW, this _____ day of _____, 2024, it is hereby ORDERED, ADJUDGED, and DECREED that the Amended Complaint is hereby DISMISSED WITH PREJUDICE for the reasons set forth in the brief filed by Defendant J. Allen Roth, Esq.

By the Court:

_____
U.S. District Judge

A891

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Case No. 22-20823-GLT |
| | : | Chapter 7 |
| **U LOCK, INC.,** | : | |
| | : | |
| *Debtor.* | : | Related to Dkt. Nos. 258, 277, 285, 291 |
| | : | |

| | |
|---|---|
| Robert S. Bernstein, Esq. | John B. Joyce, Esq. |
| Lara S. Martin, Esq. | Jeremy J. Kobeski, Esq. |
| Bernstein Berkley, P.C. | Grenen & Birsic, P.C. |
| Pittsburgh, PA | Pittsburgh, PA |
| *Attorneys for Christine Biros* | *Attorneys for Shanni Snyder* |
| | |
| Robert H. Slone, Esq. | J. Allen Roth, Esq. |
| Mahady & Mahady | J. Allen Roth, Attorney at Law |
| Greensburg, PA | Latrobe, PA |
| *Chapter 7 trustee* | *Attorney for the Debtor* |

## <u>MEMORANDUM OPINION</u>

"Pigs get fat, hogs get slaughtered." Clichéd as it is, the adage thrives in bankruptcy circles precisely because it is a stark warning against the perils of overreach. Case in point: creditor Christine Biros filed a motion ("Motion") requesting an allowed administrative expense claim under section 503(b)(1)(A) of the Bankruptcy Code[1] arising from the chapter 7 estate's use and occupancy of her commercial property in North Huntingdon, Pennsylvania ("Property").[2] An expected and conceptually appropriate request. But the *Motion* obscenely demands a payment of $144,000—an amount more than twice the present value of the entire estate. Unsurprisingly, the *Motion* elicited universal derision from the parties in interest.[3]

---

[1] Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as thereafter amended, 11 U.S.C. § 101, *et seq*. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[2] *Christine Biros' Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)*, Dkt. No. 258.

[3] <u>See</u> *Trustee's Response to Christine Biros' Motion for Allowance of Administrative Expense Claim Pursuant To 11 U.S.C. § 503(b)(1)*, Dkt. No. 277; *Shanni Snyder's Objections to Christine Biros' Motion*

A892

Because the administrative expense claim as asserted is a fanciful nonstarter, the Court will deny

the *Motion* without prejudice and cancel the self-scheduled hearing.  Still, for the reasons below,

the *Motion* is so plainly frivolous that the Court will require both Ms. Biros and her counsel,

Attorney Robert S. Bernstein, to show cause why the Court should not impose sanctions under

Bankruptcy Rule 9011.

## I.    BACKGROUND

The Property is essentially a junkyard on Route 30, littered with construction

debris, scrap piles, tire mounds, collapsed trailers, and inoperable vehicles.  It contains two

structures: a large, free-standing garage/warehouse and a rundown, single-story self-storage

building.  The Property is also subject to environmental contamination and was the site of a

literal garbage fire post-petition.[4]  Despite its present condition, the parties believe the Property

is a "diamond in the rough" given its potential for commercial development.  Indeed, the Debtor

estimated the Property's value in 2022 as $1.9 million.[5]  Frankly, the intense desire to reap those

unrealized rewards has often driven the parties towards vitriol and litigation beyond all sense and

reason for nominal, if not Pyrrhic, victories.

The Property was once owned by the Debtor and was its principal place of

business.  The Debtor purchased it in 2015 for $325,316 with funds advanced by Ms. Biros.[6]

Though the Debtor operated a self-storage facility on the Property, the business and its minimal

revenue (less than $1,500 per month) was incidental to the Debtor's aim to develop a retail plaza

---

*for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)*, Dkt. No. 285;
*Objections of George Snyder to Christine Biros' Motion for Allowance of Administrative Expense Claim
Pursuant to 11 U.S.C. 503(b)(1)*, Dkt. No. 291.

[4]     See, e.g., *Claim No. 4*.

[5]     See *Schedule A/B: Assets – Real and Personal Property*, Dkt. No. 60 at 6.  Notably, no one has ever offered
evidence in support of that valuation.

[6]     *Christine Biros' Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)*,
Dkt. No. 258 at ¶ 14.

A893

on the site.[7]  Yet, after years of litigation, Ms. Biros obtained the exclusive deeds to the Property through a final, non-appealable state court judgment in her favor.[8]  Then, creditor Shanni Snyder[9] filed an involuntary chapter 7 petition against the Debtor in April 2022,[10] and a default order for relief entered on June 17, 2022.[11]  As a result, the Debtor occupied the Property without a lease agreement at the commencement of this case.

On the petition date, the Property housed the estate's tangible assets, which consisted mostly of scrap of inconsequential value.[12]  For the last eight months, the estate remained in possession of the Property pending a sale of those assets.  The process was frustratingly protracted for two main reasons.  First, the sale of the tangibles became intwined with the estate's far more alluring intangible assets, including the right to bring a speculative avoidance action against Ms. Biros to recover the Property.  Second, many of the tangible assets had disappeared from the Property by the initial sale hearing, prompting an investigation.

The estate's possession of the Property has been constant but not exclusive.  In June 2022, Ms. Biros was granted limited stay relief to start environmental remediation activities and has had effective control of the Property ever since.[13]  Her exercise of control has raised concerns throughout this case.  For example, Ms. Biros allegedly barred the Debtor's tenants

---

[7]     See *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy*, Dkt. No. 65 at 17.

[8]     See Biros v. U Lock, Inc., 255 A.3d 489 (Pa. Super. Ct. 2021), reargument denied (July 28, 2021), appeal denied, 271 A.3d 875 (Pa. 2022) (affirming trial court order directing conveyance of the property to Biros). On January 20, 2022, the Court of Common Pleas of Westmoreland County, Pennsylvania issued an order directing the release of deeds to the Real Property to Biros. See Biros v. U Lock, Inc., No. 17CJ04886 (Pa. Ct. Comm. Pl. January 20, 2022).

[9]     In addition to being a creditor, Shanni Snyder is the sister of the Debtor's director and majority shareholder, George Snyder.

[10]    *Involuntary Petition Against a Non-Individual*, Dkt. No. 1.

[11]    *Order for Relief under Chapter 7*, Dkt. No. 42.

[12]    See *Schedule A/B: Assets – Real and Personal Property*, Dkt. No. 60 at 1-10.

[13]    See *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36.

A894

from removing their personal property from the storage facility as directed by the trustee.[14]  It is undisputed, however, that she removed estate assets from the Property to an undisclosed location before the sale without informing the chapter 7 trustee.[15]  Whether her conduct violated the automatic stay or improperly interfered with the sale of estate assets is the subject of a separate *Order to Show Cause*.[16]  The point here is twofold: (1) the extent of the estate's possession of the Property has been limited; and (2) Ms. Biros has seemingly extended the estate's possession by delaying the expeditious resolution of this case.

A sale of the tangible and intangible assets for $70,000 closed on December 28, 2022.[17]  As a practical matter, the tangible assets—which again, consisted largely of scrap— seemingly had only a modest impact on the ultimate sale price, as the prevailing bidder's initial bid of $63,500 excluded them.[18]  This conclusion is also supported by the assessment of a professional auctioneer who surveyed the tangible assets and declined to market them, as well as the lack of interest from salvage dealers.  In any event, the sale proceeds currently represent the only substantial asset of the estate, though the trustee collected some de minimis storage fees and is examining potential avoidance actions against the Debtor's principle, George Snyder.[19]

Days after the sale order entered, Attorney Bernstein filed the *Motion* on behalf of Ms. Biros.  As previewed, Ms. Biros asserts an administrative expense claim in the amount of $144,000, arguing that the estate's benefit from the post-petition use of the Property is beyond

---

[14]     See, e.g., *Objections of George Snyder to Christine Biros' Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 504(b)(1)*, Dkt. No. 291.

[15]     See *Verification of Christine Biros*, Dkt. No. 231.

[16]     See *Order to Show Cause*, Dkt. No. 249; *Amended Order to Show Cause*, Dkt. No. 278.

[17]     See *Report of Sale Regarding Tangible and Intangible Personal Property of the Estate*, Dkt. No. 266.

[18]     *Notice of Qualified Bids Regarding Sale of Tangible and Intangible Personal Property of the Estate under 11 U.S.C. Section 363(f) Free and Clear of All Liens, Claims and Encumbrances*, Dkt. No. 224 at Ex. A.

[19]     The winning bid also provided a carve-out for the estate to share in any chapter 5 recovery. Id.  While such a recovery is possible, it remains speculative as no avoidance actions have been filed or even articulated with any specificity.

4

A895

dispute.[20]  Employing a return-on-investment metric absent any lease, she contends that a reasonable value for the use of the Property is $18,000 per month.[21]  Although the *Motion* does not walk the Court through the arithmetic, it appears Ms. Biros assumes a return rate of 11.82% on a capital investment of $1.9 million.[22]

The *Motion* is particularly striking considering the Court's comments at the sale hearing.  As part of Ms. Biros' bid, the Court authorized a $10,000 administrative claim waiver, finding that roughly $1,500 a month was reasonable commercial rent.[23]  The Court subsequently refused to increase the credit bid, admonishing all parties for their "lack of common sense" in litigating without "any cognizable appreciation of what the value is of these assets."[24]  While the Court left determination of Ms. Biros' administrative claim for another day, the Court specifically cautioned her against making any hoggish demands.[25]

## II.    JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties under 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States District Court for the Western District of Pennsylvania on October 16, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B).

---

[20]    *Christine Biros' Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)*, Dkt. No. 258 at ¶¶ 39-42.

[21]    Id. at ¶¶ 20-22.

[22]    Id. at ¶¶ 23-30.

[23]    *Transcript of December 15, 2022 Hearing*, Dkt. No. 264 at 21:5-11.

[24]    Id. at 21:12-23:9.

[25]    Id. at 21:15-16.

A896

## III.    DISCUSSION

Section 503(b)(1)(A) of the Bankruptcy Code allows a first priority administrative expense claim for "the actual, necessary costs and expenses of preserving the estate . . . ."[26]  To qualify for priority treatment under this subsection, the expense must arise from a "post-petition transaction between the claimant and the estate" and have "yielded a benefit to the estate."[27] Requiring a benefit to the estate is "merely a way of testing whether a particular expense was truly 'necessary.'"[28]  Although the benefit need not be "readily calculable" in dollars and cents, it "must be *actual*, not hypothetical."[29]    Additionally, the "requested claims must be reasonable—as it is 'axiomatic that *unreasonable expenses . . . would never be necessary*.'"[30] Claimants "carry the heavy burden" of proving their entitlement to an administrative expense priority.[31]

The United States Court of Appeals for the Third Circuit has recognized that "the payment of rent for the use and occupancy of real estate ordinarily counts as an 'actual, necessary' cost to which a landlord, as a creditor, is entitled."[32]    But this comes with an important caveat: "a debtor is generally required to pay only a *reasonable value* for the use and

---

[26]      11 U.S.C. § 503(b)(1)(A).

[27]      In re Energy Future Holdings Corp., 990 F.3d 728, 741 (3d Cir. 2021).

[28]      Id. (quoting Nabors Offshore Corp. v. Whistler Energy II, LLC (In re Whistler Energy II, LLC), 931 F.3d 432, 443 (5th Cir. 2019)) (internal quotation marks omitted).

[29]      Id. at 742 (emphasis in original); see also In re Marcal Paper Mills, Inc., 650 F.3d 311, 315 (3d Cir. 2011) ("By limiting priority to those claims that are actual and necessary, the Code prevents the estate from being consumed by administrative expenses, and preserves the estate for the benefit of the creditors.").

[30]      In re Energy Future Holdings Corp., 990 F.3d at 742 (quoting In re Express One Int'l, Inc., 217 B.R. 207, 211 (Bankr. E.D. Tex. 1998)) (emphasis added).

[31]      See In re Marcal Paper Mills, Inc., 650 F.3d at 315; In re Goody's Fam. Clothing Inc., 610 F.3d 812, 818 (3d Cir. 2010); Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999).

[32]      Zagata Fabricators, Inc. v. Superior Air Prods., 893 F.2d 624, 627 (3d Cir. 1990).

A897

occupancy of the landlord's property."[33]  After all, an administrative expense is measured by the "benefit to the estate, *not* the loss to the creditor."[34]

From the outset, the Court notes that Ms. Biros is likely entitled to a reasonable administrative expense claim for the estate's post-petition use of the Property.  The tangible assets were (or at least should have been) kept at the Property while awaiting the sale.  They needed to be stored somewhere, and the estate enjoyed the added benefit of not having to move them.  This would appear to be a prototypical actual and necessary administrative expense under Third Circuit precedent.  Indeed, the Court authorized a $10,000 credit bid on account of Ms. Biros' prospective claim.  That said, an administrative expense claim in the amount of $144,000 is patently absurd.

The *Motion* suffers from a trifecta of problems.  First, a return-on-investment metric is obviously an inappropriate standard under section 503(b)(1)(A) because it ignores the actual fair market value of the benefit granted to the estate.  Instead, Ms. Biros simply demands a return on the alleged value of her investment.  This leads to the second issue: her calculation lacks a factual basis.  Ms. Biros' capital investment is $325,316, not the estimated $1.9 million, and the Property cannot be developed until she completes "costly" environmental remediation.[35] Finally, the claimed amount is grossly unreasonable.  At $144,000, Ms. Biros' administrative expense claim is more than double the sale proceeds and likely the total value of the estate.  Even a single monthly payment of $18,000 greatly exceeds the value of the tangible assets that were

---

[33]     Id. (emphasis added); see also In re Goody's Fam. Clothing Inc., 610 F.3d at 819 (collecting cases recognizing that landlords are entitled to the fair market value of a debtor's use and occupation of premises).

[34]     In re Energy Future Holdings Corp., 990 F.3d at 742 (quoting In re Whistler Energy II, LLC, 931 F.3d at 443) (internal quotation marks omitted, emphasis added); see also Am. Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S. A., 280 F.2d 119, 126 (2d Cir. 1960); In re C & L Country Mkt. of New Mkt., Inc., 52 B.R. 61, 63 (Bankr. E.D. Pa. 1985); In re Ram Mfg., Inc., 38 B.R. 252, 254 (Bankr. E.D. Pa. 1984).

[35]     See *Claim No. 4.*

A898

stored at the Property.  In fact, the Debtor's annual revenues were less than $18,000 prepetition,

to say nothing of the pittance the trustee's post-petition operation of the self-storage facility

yielded to the estate.  Given these numbers, neither Ms. Biros nor Attorney Bernstein could have

plausibly believed that $144,000 as requested by the *Motion* was an actual, necessary cost of

preserving the estate.

There lies the bigger concern.  On its face, the *Motion* seemingly implicates

several paragraphs of Bankruptcy Rule 9011(b).[36]  There was no basis in law for the return-on-

investment standard urged,[37] which should have been apparent from the authority cited in the

*Motion* itself.[38]  Nor was the calculation of the administrative expense well-grounded in fact.[39]

And, most egregiously, the amount of the claim is so beyond the pale that the Court cannot

fathom a proper, non-frivolous purpose to the *Motion*.[40]

Despite the Court's repeated warnings, the parties to these proceedings have

continuously pushed the boundaries of reasonable conduct, needlessly complicating and delaying

the administration of a modest estate.  The Court can only conclude that they have been

---

[36]    Bankruptcy Rule 9011(b) provides in relevant part:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . .

[37]    See Fed. R. Bankr. P. 9011(b)(2).

[38]    *Christine Biros' Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)*, Dkt. No. 258 at ¶¶ 33-38.

[39]    See Fed. R. Bankr. P. 9011(b)(3).

[40]    See Fed. R. Bankr. P. 9011(b)(1).

A899

emboldened by the lack of real consequences to date.  No more.  The Court will not waste time

hearing a defective motion.  If Ms. Biros wants an administrative expense claim for the estate's

use of the Property, she can file a reasonable request that satisfies applicable law.  Meanwhile,

Ms. Biros and Attorney Bernstein will have to answer for the *Motion*.

## IV.    CONCLUSION

In light of the foregoing, the *Motion* will be denied without prejudice to the filing

of a reasonable request for an administrative expense claim.  Additionally, the Court will order

Ms. Biros and Attorney Bernstein to show cause why they should not be sanctioned under Fed.

R. Bankr. P. 9011(b).  This opinion constitutes the Court's findings of fact and conclusions of

law in accordance with Fed. R. Bankr. P. 7052.  The Court will issue a separate order consistent

with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

Dated: January 17, 2023

_____

GREGORY L. TADDONIO
CHIEF UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
Christine Biros
Robert Bernstein, Esq.

A900

A901

FILED
6/24/24 2:03 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | : Case No. 22-20823-GLT |
| | : Chapter 7 |
| **U LOCK, INC.,** | : |
| | : |
| *Debtor.* | : Related to Dkt. Nos. 294, 304 |
| | : |

**<u>ORDER</u>**

Following the *sua sponte* denial of *Christine Biros' Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)* ("Motion")[1] as "plainly frivolous,"[2] the Court ordered her and her counsel, Attorney Robert S. Bernstein, to show cause why they should not be sanctioned under Bankruptcy Rule 9011.[3]  The Court "[could not] fathom a proper, non-frivolous purpose to the *Motion*" for three reasons.[4]  First, the administrative expense requested for the bankruptcy estate's use of Ms. Biros' property utilized a return-on-investment metric, ignoring the value the estate received.[5]  Second, the expense calculation lacked a factual basis.[6]  Third, at $144,000, the claim was more than twice the value of the estate (i.e., the sale proceeds of the tangible assets stored on the property) and 11 times the Debtor's prepetition annual

---

[1]    *Christine Biros' Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)*, Dkt. No. 258.  Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq.*  All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[2]    <u>See</u> <u>In re U Lock, Inc.</u>, No. 22-20823-GLT, 2023 WL 308210, at *4 (Bankr. W.D. Pa. Jan. 17, 2023).

[3]    *Order to Show Cause*, Dkt. No. 294.

[4]    <u>In re U Lock, Inc.</u>, 2023 WL 308210, at *4.

[5]    <u>Id.</u>

[6]    <u>Id.</u>

revenue.[7]  They timely filed a joint response,[8] and the Court held two hearings on the *Order to Show Cause*.[9]

Although Ms. Biros and Attorney Bernstein insist the *Motion* comports with Bankruptcy Rule 9011, the Court disagrees.  Unlike other claims, administrative expenses under section 503(b)(1)(A) are measured by the "benefit to the estate, *not* the loss to the creditor."[10]  The single unpublished decision cited (after the fact) to support a return-on-investment approach does not even involve valuing an administrative expense.[11]  More critically, no effort was made to defend the specific $144,000 request, leading the Court to conclude their refusal is a concession that it is indefensible.  Indeed, the only explanation offered—that it was merely a starting point with room for negotiation—points to an improper litigation tactic.

Ultimately, fault for the *Motion* lies with counsel, rather than client.  Attorney Bernstein (the attorney who signed the offending document) should have known the standard for administrative expenses under section 503(b)(1)(A) and that $144,000 was an absurd ask in this case.  That said, the Court is confident the lesson has been learned and will not be repeated.

---

[7]    Id.  Put differently, the proposed monthly rent substantially exceeded the Debtor's annual revenue.

[8]    *Response of Christine Biros and Robert S. Bernstein, Esq. to Order to Show Cause*, Dkt. No. 304.

[9]    See *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 52:17-68:24; *Transcript of April 13, 203 Hearing*, Dkt. No. 377 at 47:19-50:23.

[10]   In re Energy Future Holdings Corp., 990 F.3d 728, 742 (3d Cir. 2021) (quoting Nabors Offshore Corp. v. Whistler Energy II, LLC (In re Whistler Energy II, LLC), 931 F.3d 432, 443 (5th Cir. 2019)) (internal quotation marks omitted, emphasis added)).

[11]   See Geltzer v. Helen-May Holdings, LLC (In re Kollel Mateh Efraim, LLC), 2009 WL 2929430, at *1 (Bankr. S.D.N.Y. Aug. 18, 2009), aff'd, 456 B.R. 185 (S.D.N.Y. 2011).

A903

Therefore, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the *Order to Show Cause*

is **RELEASED**.

ENTERED at Pittsburgh, Pennsylvania.

Dated: June 24, 2024

GREGORY L. TADDONIO

CHIEF UNITED STATES BANKRUPTCY JUDGE

3

A904

FILED
6/24/24 5:13 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | : Case No. 22-20823-GLT |
|  | : Chapter 7 |
| **U LOCK, INC.,** | : |
|  | : |
| *Debtor*. | : Related to Dkt. Nos. 278, 298, 299, 301, 303 |
|  | : |

Robert S. Bernstein, Esq.                Robert H. Slone, Esq.
Lara S. Martin, Esq.                     Mahady & Mahady
Bernstein Berkley, P.C.                  Greensburg, PA
Pittsburgh, PA                           *Chapter 7 Trustee*

William E. Otto, Esq.
The Law Firm of William E. Otto
Murrysville, PA
*Attorneys for Christine Biros*

## <u>MEMORANDUM OPINION</u>

The most basic tenet of the Bankruptcy Code[1] is the inviolability of the

bankruptcy estate.[2] Yet prior to a scheduled auction under section 363(b), most of the scheduled

tangible assets of the debtor U Lock, Inc. disappeared from its business premises (the

"Property"). Further proceedings, including on-site inspections, revealed that both George

Snyder (U Lock's principal) and creditor Christine Biros (the owner of the Property) gained

possession of estate assets. Their actions appearing to be willful violations of the automatic stay,

an *Order to Show Cause* followed.[3] After considering the responses filed by Mr. Snyder and Ms.

---

[1]     Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to
        the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer
        Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq*. All
        references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[2]     <u>See</u> 11 U.S.C. §§ 541(a), 362(a).

[3]     <u>See</u> *Order to Show Cause*, Dkt. No. 249, <u>superseded by</u> *Amended Order to Show Cause*, Dkt. No. 278.

Biros,[4] the Court finds that his removal and possession of estate assets was authorized by the chapter 7 trustee ("Trustee"), but hers was not.  In fact, Ms. Biros' offers only post-facto justifications as a smokescreen to distract from her willful overreach after the Court denied her greater relief.  Therefore, the Court will release the *Order to Show Cause* as to Mr. Snyder and require Ms. Biros to pay damages as outlined below.

## I.    BACKGROUND

Narrow as the *Order to Show Cause* might appear, it is inextricably linked to the broader dispute between the Snyder and Biros families over the Property's fate.  For this reason, the litigation history and the parties' conduct prior to the alleged stay violations are relevant to assessing their knowledge and willfulness.  Importantly, Mr. Snyder and Ms. Biros have personally attended every hearing, though he appears pro se while she is accompanied by both bankruptcy counsel and her state court counsel, Attorney William E. Otto.

### A.    Prologue: U Lock and the Property

The Property is essentially a junkyard located on Route 30 in North Huntingdon, Pennsylvania with a run-down self-storage building.[5]  Though U Lock ostensibly ran a small self-storage business there, it was formed by Mr. Snyder and others to acquire and commercially develop the Property for profit.[6]  Mr. Snyder believed that Ms. Biros and her brother John were

---

[4]    See *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298; *Response to Amended Order to Show Cause (278)*, Dkt. No. 301; see also *Debtor U Lock's Reply to the Response of Christine Biros (Entry 298) to the Amended Order to Show Cause*, Dkt. No. 299; *Reply to the Response of Christine Biros (Entry 298) RE Show Cause*, Dkt. No. 303.

[5]    In re U Lock, Inc., No. 22-20823-GLT, 2023 WL 308210, at *1 (Bankr. W.D. Pa. Jan. 17, 2023) ("The Property is essentially a junkyard on Route 30, littered with construction debris, scrap piles, tire mounds, collapsed trailers, and inoperable vehicles. It contains two structures: a large, free-standing garage/warehouse and a rundown, single-story self-storage building. The Property is also subject to environmental contamination and was the site of a literal garbage fire post-petition.").

[6]    See generally, Biros v. U Lock Inc., 2021 PA Super 104, 255 A.3d 489, 492 (2021), re-argument denied (July 28, 2021), appeal denied, 271 A.3d 875 (Pa. 2022).

A906

partners in the real estate venture.[7]  She loaned the funds to purchase the Property while Mr.

Snyder and his brother Kash operated U Lock.[8]  According to Mr. Snyder, Ms. Biros was also to

fund the Property's development, but the project was in a "holding pattern" because the Biroses

were then under indictment.[9]  As is, U Lock only generated minimal revenue through the self-

storage facility on the Property.[10]

Two years later, Ms. Biros sued U Lock in the Court of Common Pleas of

Westmoreland County ("Trial Court") to recover the Property on account of the unpaid loan.[11]

Ultimately, the Trial Court imposed a constructive trust on the Property in favor of Ms. Biros due

to U Lock's insolvency, rendering her the equitable owner from the start.[12]  The Snyders'

appeals failed,[13] effectively cutting them out of the project before any benefits were realized.

They maintained this outcome was unfair because everyone agrees that the Property is worth at

least double the amount of Ms. Biros' loan.[14]

---

[7]   Id.

[8]   Id.  The Trial Court found the Snyders did not expect Ms. Biros to request a purchase-money repayment
agreement just prior to Property's closing but nonetheless agreed.  Id.  The handwritten note signed by U
Lock provided that if repayment terms were not mutually established within a month, Ms. Biros could set
them unilaterally.  Snyder v. Biros (In re U Lock, Inc.), 652 B.R. 456, 460 (Bankr. W.D. Pa. 2023).  As a
practical matter, this afforded her the ability to trigger a default at any time by imposing terms beyond U
Lock's capacity.

[9]   See In re U Lock, Inc., No. 22-20823-GLT, 2024 WL 878464, at *2 (Bankr. W.D. Pa. Feb. 29, 2024).

[10]  Id. ("The statement of financial affairs reflects prepetition gross revenue ranging from $8,400 to $13,200 in
the previous three years, which George testified was consistent with prior operations as well.") (footnotes
omitted).

[11]  Biros v. U Lock Inc., 255 A.3d at 492.  Before commencing litigation, Ms. Biros sent a letter to Mr. Snyder
increasing the principal amount of the loan and demanding, among other things, 9% interest, a mortgage,
personal guarantees, and a five-year repayment period.  Id.; In re U Lock, Inc., 652 B.R. at 460.

[12]  Id.; see also In re U Lock, Inc., 652 B.R. at 461 ("The accompanying order therefore states that 'Plaintiff
Christine Biros is the equitable owner of the Subject Property' and directs the execution of the appropriate
deeds to her.") (emphasis in original).

[13]  Biros v. U Lock Inc., 255 A.3d at 496-97; see also Biros v. U Lock Inc., 271 A.3d 875 (Pa. 2022) (denying
leave to appeal).

[14]  See, e.g., In re U Lock, Inc., 652 B.R. at 462 (Ms. Snyder asserting that Ms. Biros valued the Property
between $700,000 and $900,000); In re U Lock, Inc., 2023 WL 308210, at *1 (Debtor estimating the value
of the Property in 2022 as $1.9 million).

3

A907

When Ms. Biros was poised to gain possession of the Property, Shanni Snyder, Mr. Snyder's sister, filed an involuntary chapter 7 petition against U Lock in April 2022.[15] Unbeknownst to the Court at the time, the involuntary petition was part of a scheme to continue the litigation and recover the Property through an avoidance action.[16] As the Court later found, Ms. Snyder fraudulently obtained a default judgment against U Lock to cloud the title to the Property and establish a claim to commence the involuntary.[17]

Given this backdrop, it is unsurprising that this case has been unreasonably contentious and driven by personal animosity. That said, there are no angels here. Every party played a role in transforming an otherwise simple chapter 7 case that should have been fully administered within a few months into an endless slog of litigation.

B.    U Lock's Bankruptcy and Limited Stay Relief

From the get-go, Ms. Biros sought expedited dismissal of the involuntary or, in the alternative, stay relief.[18] Though she disputed Ms. Snyder's claim and asserted that the petition was filed in bad faith, she primarily wanted unfettered possession of the Property.[19] Before the hearing on her motion, Ms. Biros obtained a writ of possession from the Trial Court permitting her to, among other things, levy and sell U Lock's property.[20] And, in what proved to

---

[15]    In re U Lock, Inc., 2024 WL 878464, at *3-4.

[16]    Id. at *17.

[17]    Id. Ms. Snyder's claim has since been disallowed. Id. at *19.

[18]    See *Emergency Motion for Entry of an Order (I) Dismissing the Case and for Sanctions Against the Peitioning [sic] Creditor, or in the Alternative (II) Making a Determination that the Automatic Stay is Inapplicable to the State Court Action Pursuant to 11 U.S.C. § 362(b)(10), or in the Alternative (III) Granting Relief from the Automatic Stay to the Movant in Relation to the Movant's Property and the State Court Case, or in the Alternative (IV) Abandoning the Movant's Property* ("Motion to Dismiss"), Dkt. No. 14.

[19]    Id.

[20]    *Motion to Dismiss*, Dkt. No. 14 at ¶ 78; see also *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 8:13-19,11:22-12:1.

4

be an apt metaphor for subsequent proceedings, there was a literal garbage truck fire on the Property.[21]

The Court conducted an initial hearing in June 2022. It declined to consider dismissal until after U Lock answered the involuntary petition, noting that consent to an order for relief would seemingly moot Ms. Biros' challenges.[22] As to the writ of possession, Ms. Biros acknowledged that the Trial Court entered it post-petition with knowledge of the automatic stay.[23] Yet rather than admit the defect, she argued that the writ was valid because the Property was not property of the estate to which the stay applied.[24] Emphasizing the distinction between title and possession, as well as the writ of possession's authorization to levy and sell estate property, the Court held that it was void.[25] The Court reserved the question of the willfulness of the stay violation for another day.[26]

Undeterred, Ms. Biros urged the Court to grant her stay relief to dispossess U Lock from the Property and begin immediate environmental remediation.[27] In addition to the alleged soil contamination from the garbage truck fire, she cited the general features of the

---

[21]    See *Exhibit Disclosing Police Report*, Dkt. No. 27.

[22]    *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 32:10-33:6.

[23]    Id. at 6:17-7:17, 9:14-23.

[24]    Id. at 10:8-15.

[25]    See id. at 7:15-17, 10:16-11:2, 33:19-21; see also *Order*, Dkt. No. 143.

[26]    *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 33:24-34:3. Rather than wait for the Trustee to assess the claim, U Lock filed a complaint seeking damages for the alleged stay violation, which Ms. Snyder sought to join. See generally *U Lock, Inc. v. Biros*, Adv. Pro. No. 22-2048. Given their lack of standing, the Court dismissed it without prejudice and observed they likely violated the stay by usurping the estate's rights. See *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 27:16-23, 31:5-11. Both U Lock and Ms. Snyder have appealed that decision to the United States Court of Appeals for the Third Circuit after the United States District Court for the Western District of Pennsylvania affirmed. See *U Lock, Inc. v. Biros*, 2:22-cv-1222-NBF, Dkt. No. 15 (W.D. Pa. June 21, 2023). The Trustee has not since pursued any stay violations. See *Status Report*, Dkt. No. 173.

[27]    *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 17:15-18:3.

A909

junkyard, such as "broken down cars," tires, and other debris as environmental concerns.[28]  U

Lock maintained that the emergency was overstated and professed a desire to continue its own

clean-up efforts towards developing the Property despite the Trial Court's orders.[29]  Regardless,

the Court found that limited stay relief was appropriate to address what appeared to be "a

festering environmental issue."[30]  With the parties agreeing in principle that remedial efforts

should move forward, the Court gave them a chance to cooperate on a draft form of order.[31]

Unfortunately, a joint proposed order proved unworkable given Ms. Biros' desire

for exclusive possession of the Property and U Lock's refusal to accept the finality of her

ownership.[32]  The Court drafted its own order ("Limited Stay Relief Order") adopting the

parties' terminology and focus.[33]  It authorized Ms. Biros to begin environmental remediation

subject to the following caveats: (1) she could not restrict the access of U Lock or its tenants to

the Property;[34] (2) she was not to interfere with U Lock's ongoing operations;[35] (3) she could not

remove "any U Lock property that [did] not impede the environmental remediation efforts;"[36]

---

[28]  Id. at 5:19-6:16, 12:24-15:6.

[29]  See *Alleged Debtor U Lock's Response to the Emergency Motion Filed by Christine Biros*, Dkt. No. 22 at ¶ 2; *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 23:10-26:19.  U Lock contended that the Property's condition had not substantially changed since the purchase.  Id. at 27:16-18.

[30]  *Transcript of June 2, 2022 Hearing*, Dkt. No. 38 at 28:19-29:3, 31:17-32:7, 33:7-19.

[31]  Id.

[32]  See *Notice of Partial Non-Objection to Limited Relief from the Stay*, Dkt. No. 28; *Response to Notice of Partial Non-Objection to Limited Relief from the Stay*, Dkt. No. 29; *Reply to Response to Statement of Non-Objection*, Dkt. No. 32.

[33]  See *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36.  This point bears mentioning because the Court's understanding of the relevant issues stemmed entirely from the parties' representations and descriptions.

[34]  Id. at ¶ 1.

[35]  Id. at ¶¶ 1, 10.

[36]  Id. at ¶ 10.

A910

and (4) nothing in the order was to be construed as an ejectment of U Lock.[37]  As to abandoned

cars and trailers on the Property, the *Limited Stay Relief Order* expressly provided:

> U Lock shall remove all vehicles and trailers from the Property on
> or before the earlier of: (a) June 24, 2022, or (b) ten (10) days after
> the date the police place "tags" on the subject vehicles.  To the
> extent U Lock requires additional time, it may make a reasonable
> request for an extension from Ms. Biros that shall not be
> unreasonably denied.
>
> Any vehicles or trailers remaining on the Property after June 24,
> 2022 (or such additional time as agreed by Ms. Biros) may be
> removed and disposed of by Ms. Biros at her convenience.[38]

Similar removal provisions applied to tires and certain storage tanks,[39] but no other tangible

material was specifically identified.

Ultimately, U Lock did not contest the involuntary petition so an *Order for Relief

Under Chapter 7* entered two weeks later and the Trustee was appointed.[40]  Thereafter, Mr.

Snyder completed schedules on U Lock's behalf.[41]  In terms of tangible assets, U Lock only

listed about ten items consisting of inoperable trucks, trailers, and heavy equipment (including

excavators and front loaders).[42]  Notably, their descriptions were fairly rudimentary and, in some

cases, nonspecific.[43]  The Trustee, in consultation with a professional auctioneer, determined the

scheduled assets had minimal salvage value for the estate consistent with Mr. Snyder's

estimates.[44]  An individual named Glenn Mowry also informally claimed ownership of many (if

---

[37]   Id.

[38]   Id. at ¶¶ 5-6 (paragraph numbers omitted).

[39]   Id. at ¶¶ 7-8.

[40]   See *Order for Relief Under Chapter 7*, Dkt. No. 42; *Notice of Appointment of Trustee*, Dkt. No. 49.

[41]   See Dkt. Nos. 59-66.

[42]   See *Schedule A/B: Assets – Real and Personal Property*, Dkt. No. 60 at 3, 5, 9.

[43]   For example, *Schedule A/B* lists "4 trailers," a "GMC Flatbed," and a "Blue Ford with Snow Plow."
*Schedule A/B: Assets – Real and Personal Property*, Dkt. No. 60 at 5.

[44]   *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 5:22-6:4.

7

not all) of these items.[45]  He never filed a proof of claim or appeared in this case, but his alleged interests have been co-opted by various parties whenever it suits them.  Further complicating matters, the Property, as both a self-storage facility and *de facto* junkyard, contained a plethora of un-inventoried tangibles whose value and ownership were uncertain.[46]  The takeaway is that it was unclear exactly what U Lock owned, but *Schedule A/B* represented the only itemization of its personal property interests.  And given the lack of perceived value of the tangibles (both scheduled and not), no one expended the effort to define them with greater certainty.

The Court held several continued hearings in July and August 2022.  Much of it concerned bickering among U Lock, Mr. Snyder, and Ms. Biros regarding compliance with the *Limited Stay Relief Order* and whether greater relief was appropriate.  U Lock and Mr. Snyder argued that she was exceeding the limited relief granted and allegedly destroying valuable assets,[47] though apparently none that had been scheduled.[48]  Meanwhile, Ms. Biros accused him of impeding her access and "dumping" personal property,[49] both of which he denied.[50]  She repeatedly pressed for unconditional stay relief, asserting "it's difficult for her to want to invest funds . . . while U Lock remains in possession."[51]

Despite the histrionics, the Court maintained that the *Limited Stay Relief Order* appropriately balanced the estate's interests with Ms. Biros' immediate needs.  The Trustee first

---

[45]     See id. at 6:22-7:4; but see *Declaration of George Snyder in Reference to Certain Equipment*, Dkt. No. 108 at ¶¶ 6-11 (disputing Mr. Mowry's ownership).

[46]     As if to illustrate the adage that "one man's trash is another man's treasure," whether certain personal property was worthless garbage or valuable scrap was likely in the eyes of the beholder.

[47]     See *Debtor U Lock's Notice of Non-Compliance*, Dkt. No. 86; *Declaration of George Snyder*, Dkt. No. 100; *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 11:11-14.

[48]     See *Trustee's Response to Debtor U Lock's Notice of Non-Compliance*, Dkt. No. 96 at ¶ 1; *Response to Debtor U Lock's Notice of Non-Compliance*, Dkt. No. 97 at ¶¶ 6-8.

[49]     See *Transcript of July 6, 2022 Hearing*, Dkt. No. 88 at 7:22-9:12.

[50]     Id. at 12:9-17, 13:10-14:16; see also *Status Report*, Dkt. No. 55.

[51]     See *Transcript of July 6, 2022 Hearing*, Dkt. No. 88 at 35:5-15.

A912

required an opportunity to investigate the estate[52] and provide notice to U Lock's tenants, for which there were few records.[53]  Then, having received offers, he needed time to liquidate the estate's assets, including the estate's right to any claims or causes of action regarding the Property (i.e., an avoidance action).[54]  Accordingly, the Court denied Ms. Biros' request for dismissal without prejudice,[55] declined to enter broader stay relief, and advised her to work with the Trustee in the interim.[56]

### C.     The Sale and Renewed Bid for Possession

The sale process was needlessly protracted.  After receiving multiple offers, the Trustee ultimately moved to sell the estate's tangible and intangible assets to Ms. Biros in late September 2022.[57]  Her bid included a cash component, a partial waiver of post-petition rent, and an assumption of environmental liabilities backstopped by a substantial bond.[58]  U Lock and the Snyders objected, citing deficiencies in the sale notice and criticizing the use of disputed claims

---

[52]     See id. at 10:8-22, 40:7-13, 43:16-45:2; *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 33:13-22.

[53]     See *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 6:5-14.

[54]     *Transcript of August 25, 2022 Hearing*, Dkt. No. 139 at 4:15-5:2; see also *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 35:2-8 (stating that Ms. Biros would like an opportunity to purchase any assets or potential claims of the estate).

[55]     See *Text Order*, Dkt, No. 73.  The Court also denied U Lock's motion to convert to chapter 11, finding, *inter alia*, that a plan would merely pursue a tenuous claim to the Property rather than reorganize the existing business.  *Text Order*, Dkt. No. 110; *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 20:25-25:12.

[56]     See *Transcript of August 25, 2022 Hearing*, Dkt. No. 139 at 13:18-14:20.

[57]     *Trustee's Motion for Sale of All Tangible and Intangible Personal Property of the Estate*, Dkt. No. 175. This sale motion replaced two separate motions that had been filed a month earlier.

[58]     Id. at ¶ 13.  Ms. Biros also demanded that other bidders obtain a second $25,000 bond to reimburse her for the cost of disposing of any tangible assets not removed from the Property within 30 days.  Id. at ¶ 14.  The Court struck that term from the sale.  See *Amended Order*, Dkt. No. 213 at¶ 5(b)(v).

A913

and unnecessary bonds to artificially inflate the offer's perceived value.[59]  Ms. Biros disputed their allegations and standing.[60]

Roughly two weeks before the sale hearing, Ms. Biros and the Trustee filed a *Stipulated Order for Relief from Stay* ("Stipulated Order") under a Certification of Counsel.[61] "In order to efficiently facilitate the transfer of possession of the Property from the Estate to Biros," they agreed that she "shall have sole and legal possession of the Property" no later than 10 days following entry of the *Stipulated Order*.[62]  In other words, Ms. Biros wanted exclusive possession of the Property and the ability to exclude parties even before the sale was completed. The *Stipulated Order* also contemplated Ms. Biros unilaterally moving or disposing of the contents of the storage units.[63]  Predictably, U Lock and the Snyders objected.[64]

The Court heard both matters in early November 2022.  From the start, there is little doubt that Ms. Biros was trying to buy an end to the litigation with the Snyders and the estate's occupation of the Property.  And in the Trustee's haste to complete that sale (and the estate's administration), he neglected to provide adequate notice of what he was actually selling. Indeed, since fully defining the estate's property interests was impractical, the Trustee purported to sell them, whatever they were, without warranties or representations.  But the sale notice neither captured that nuance nor grounded the abstraction in something definitive like *Schedule*

---

[59]   *Debtor U Lock Inc.'s Objections to Trustee's Motion for Sale of All Tangible and Intangible Personal Property of the Estate*, Dkt. No. 183; *Petitioning Creditors Objection to the Motion for Sale*, Dkt. No. 184; *Objections of George Snyder to Motion for Sale*, Dkt. No. 185.

[60]   *Reply to Objection to Sale Motion and to Verification of Connections of Shanni Snyder*, Dkt. No. 202.

[61]   *Stipulated Order for Relief from Stay*, Dkt. No. 189-1.

[62]   Id. at ¶ 12(a).

[63]   Id. at ¶ 12(b)-(c).  The *Stipulated Order* states Ms. "Biros will cause the contents . . . to be evaluated," but that appears to be just a legalistic way of saying she will decide what to do with them.

[64]   *U Lock Inc.'s Objections to the Settlement and Certification of Counsel Regarding Stipulated Order for Relief from Stay*, Dkt. No. 200; *Petitioning Creditor's Objection to Consent Order*, Dkt. No. 205; *Objections of George Snyder to Consent Order*, Dkt. No. 206.

10

*A/B,* so it lacked sufficient detail to inform competitive third-party bidders.[65]   Thus, over Ms.

Biros' protest,[66] the Court directed the Trustee to re-notice the sale with "a schedule of assets

subject to the sale [compiled] from the best available information."[67]   The Court also established

an on-site due diligence period for prospective bidders to evaluate the tangible assets and the

environmental liabilities.[68]  An in-court auction was scheduled for December 1, 2022.[69]

Like Ms. Biros' prior attempts to gain possession of the Property through stay

relief, the *Stipulated Order* was denied in favor of maintaining the status quo.[70]  The Court found

that it was procedurally defective without the consent of all parties and an inappropriate

delegation of the Trustee's authority to Ms. Biros.[71]   It also seemed premature to enter any

storage units as the Trustee continued to accept rental payments.[72]    Between the perceived

overreach and "troublesome comments" about the alleged destruction and removal of tangibles,[73]

the Court entered an order reiterating the scope of the *Limited Stay Relief Order.*[74]  Specifically,

the Court observed that:

> [Ms.] Biros was authorized to remove

---

[65]     See *Amended Order*, Dkt. No. 213 at 3.

[66]     See *Audio Recording of November 10, 2022 Hearing* at 12:58:38-1:00:47 p.m.  Ms. Biros argued that despite the conceptual complexities, the sale was simplistic because the Snyders were the only other interested parties and should have had enough information to formulate bids.

[67]     *Amended Order,* Dkt. No. 213 at ¶ 1.

[68]     Id. at ¶ 4.

[69]     Id. at ¶ 6.

[70]     *Order Denying Stipulated Order for Relief from Stay*, Dkt. No. 211.

[71]     Id. at ¶ 1.  "By filing a [Certification of Counsel], attorneys or unrepresented parties represent to the Court that the revised or agreed form of order has been reviewed and approved by all parties affected by the order." See W.PA.LBR 9013-8(b).

[72]     See *Audio Recording of November 10, 2022 Hearing* at 1:40:25-1:45:04 p.m.  Without records or lease agreements, the rent checks were in some cases the only way to identify tenants.  This also raised the question of whether the payment was meant to satisfy an arrearage or represented a prospective rent.

[73]     Id. at 1:06:55-1:07:25 p.m.

[74]     *Order Denying Stipulated Order for Relief from Stay*, Dkt. No. 211 at ¶ 2(a).

A915

(i) "vehicles or trailers" (remaining after June 24, 2022);

(ii) "tires" (remaining after June 17, 2022 and with notice); and

(iii) "tanks identified as waste" (remaining after June 24, 2022 and with notice).

The Court further directed that "nothing in this order shall . . . be construed as an ejectment of U Lock [or] authorize the removal of any U Lock property that does not impede the environmental remediation efforts. Based on the foregoing, and after review of its docket, *the Court finds nothing in the record that authorizes [Ms.] Biros to remove or destroy any items other than those listed above*.[75]

The Court also admonished the Trustee to not take direction from Ms. Biros in the execution of his statutory duties.

    D.    <u>The Failed Auction and On-Site Inspections</u>

On December 1, 2022, the parties reconvened for a properly noticed auction of U Lock's assets.[76] Ms. Snyder submitted the only other qualified bid, though her offer was limited to the intangible assets.[77] As expected, the Snyders and U Lock renewed their objections to Ms. Biros' bid but also leveled a new accusation: Ms. Biros removed most tangible assets from the Property prior to the inspection period.[78] At the hearing, the Trustee confirmed that scheduled assets he had observed on the Property in August could not be located during the on-site inspections in October and November.[79]

---

[75] <u>Id.</u> (emphasis added, footnotes omitted).

[76] <u>See</u> *Trustee's Amended Motion for Sale of Tangible and Intangible Personal Property of the Estate under 11 U.S.C. Section 363(f) Free and Clear of All Liens, Claims, and Encumbrances*, Dkt. No. 217.

[77] *Exhibit A*, Dkt. No. 224-1 at ¶¶ A, D.

[78] <u>See</u> *Objections of George Snyder to Motion for Sale*, Dkt. No. 225 at 1-2; *U Lock's Objections to Motion for Sale*, Dkt. No. 226 at ¶¶ 7-9; *Shanni Snyder's Objection to Trustee's Amended Motion for Sale of Tangible and Intangible Personal Property of the Estate Under 11 U.S.C. Section 363(f) Free and Clear of All Liens, Claims, and Encumbrances*, Dkt. No. 227 at ¶¶ 19-20.

[79] *Audio Recording of December 1, 2022 Hearing* at 10:22:11-10:24:14 a.m.

A916

When the Court directly asked whether Ms. Biros removed assets from the Property, her bankruptcy counsel provided a meandering, yet affirmative response:

> These are serious allegations, obviously, taking assets from a bankruptcy estate. For the purposes of today's hearing, Ms. Snyder has made an offer to buy intangibles, not personal property. Ms. Biros has made an offer that buys tangible personal property also. We understand that there may be things that the Trustee thought were in the sale which are not in the sale because somebody moved them. Ms. Biros is prepared to go forward notwithstanding these fuzzy issues about where property is. I think Ms. Snyder is not interested in buying the personal property, so it should be less of an issue for her today. Notwithstanding, Ms. Biros tells me . . . the property that she has removed has been moved to storage. . . .[80]

At first, Ms. Biros asserted that she acted with the Trustee's blessing in furtherance of her clean-up efforts,[81] though he insisted that he only consented to moving things *within* the Property.[82] She then asserted it was necessary to secure the assets because "things kept disappearing off-site," while the Trustee noted that some tenants removed their property with his permission.[83] As a last-gasp, Ms. Biros argued that the estate had no legal right to be on the Property before she was reminded that her post-petition writ of possession was void.[84]

Asked the same question, Mr. Snyder acknowledged that he removed two scheduled water tanks from the Property prepetition but had removed nothing post-petition.[85] In

---

[80]   Id. at 10:26:28-10:27:35 a.m.

[81]   Id. at 10:27:45-10:27:56 a.m.

[82]   Id. at 10:28:03-10:28:17 a.m.

[83]   Id. at 10:29:10-10:30:46 a.m.

[84]   Id. at 10:59:20-10:59:53 a.m.

[85]   Id. at 10:31:50-10:32:35 a.m.

A917

fact, he maintained that Ms. Biros had barred him from the Property, even during the due diligence period.[86]

Although Ms. Biros originally pressed to complete the sale, she reversed course when the Court suggested severing the tangible assets and proceeding to auction only the intangibles.[87]  The objecting parties also opposed moving forward for a variety of reasons. Stymied, the Court undertook two measures to resolve all doubts as to the location of the scheduled tangible assets.  First, it ordered Ms. Biros, Mr. Snyder, and Ms. Snyder to immediately file sworn statements signed under 28 U.S.C. § 1746 identifying: (1) any assets they removed from the Property; (2) the current location of any removed assets; and (3) the authority by which the assets were removed.[88]  Second, the Court scheduled on-site inspections of each disclosed location the next day to confirm the whereabouts and existence of the sale assets.

Consistent with their in-court disclosures, both Ms. Biros and Mr. Snyder filed affidavits admitting they were in possession of scheduled estate assets, while Ms. Snyder swore that she was not.[89]  The Court, accompanied by staff and a mandatory security escort, then traveled to three sites with all parties in attendance.  The first, located in McKeesport, Pennsylvania (approximately seven miles from the Property), was controlled by the Biros family and was notably adjacent to a scrap recycling center ("McKeesport Property").[90]  During the McKeesport Property inspection, the parties observed eight pieces of scheduled heavy equipment—one more than Ms. Biros had admitted to relocating.  Next, the Court viewed the

---

[86]     Id. at 10:45:11-10:45:25 a.m.  Mr. Snyder also alleged that Ms. Biros destroyed his personal property, which, even if true, is not relevant to the matters before the Court.

[87]     Id. at 10:58:07-11:01:29 a.m.

[88]     Text Order, Dkt. No. 237.

[89]     See Affidavit of Shanni Snyder, Dkt. No. 230; Verification of Christine Biros, Dkt. No. 231; Declaration of George Snyder in Reference to Certain Equipment, Dkt. No. 233; Supplemental Declaration of George Snyder in Reference to Certain Equipment, Dkt. No. 234.

[90]     See Status Report with Address for December 2, 2022 Site Meeting, Dkt. No. 236.

14

A918

Property, where additional scheduled assets were found, albeit with some difficulty.[91]  Finally,

the Court went to Mr. Snyder's site (located a half mile from the Property) and observed two

scheduled water tanks.[92]

      E.     <u>The Order to Show Cause</u>

         A sale of the tangible and intangible assets was finally completed on December

15, 2022, with Ms. Snyder as the prevailing bidder.  Comparing her initial bid for just the

intangibles and her final bid for both, the scheduled assets added no more than $6,500 of value to

the sale.[93]  A day later, the Court ordered Ms. Biros and Mr. Snyder to show cause why sanctions

should not be imposed against them for exercising control over property of the estate in violation

of the automatic stay and for interfering with the sale of estate assets.[94]  Both filed timely

responses.[95]  The Court conducted a hearing on the *Order to Show Cause* in late January 2023, at

which time Mr. Snyder, Ms. Biros, the Trustee, and Attorney Otto testified.

         Contrary to his prior representation, Mr. Snyder's written response and testimony

revealed that he had removed estate assets from the Property post-petition after all.[96]  The catch,

he explained, was that the *Limited Stay Relief Order* required him to do so.[97]  Mr. Snyder

---

[91]     For example, the "Ford F250 Custom Green and Red" identified on *Schedule A/B* turned out to be blue and orange and was located at the base of an embankment in the rear of the Property on what appeared to be an overgrown fire trail.

[92]     <u>See</u> *Declaration of George Snyder in Reference to Certain Equipment*, Dkt. No. 233 at ¶ 6(b).

[93]     <u>See</u> <u>In re U Lock, Inc.</u>, 2023 WL 308210, at *2 ("A sale of the tangible and intangible assets for $70,000 closed on December 28, 2022. As a practical matter, the tangible assets—which again, consisted largely of scrap—seemingly had only a modest impact on the ultimate sale price, as the prevailing bidder's initial bid of $63,500 excluded them." (footnotes omitted)).

[94]     *Order to Show Cause*, Dkt. No. 249, <u>superseded by</u> *Amended Order to Show Cause*, Dkt. No. 278.  The initial order neglected to set a deadline for written responses.  Given the severity of the circumstances, the Court did not wait for the Trustee to initiate proceedings himself.

[95]     <u>See</u> *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298; *Response to Amended Order to Show Cause (278)*, Dkt. No. 301.

[96]     *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 73:7-74:5.

[97]     <u>Id.</u>; *Response to Amended Order to Show Cause (278)*, Dkt. No. 301 at ¶¶ 3-5, 12.

A919

testified that he took the two water tanks and some unauthorized vehicles in early June because U Lock was directed to remove them by June 24, 2022.[98]  Upon the Trustee's appointment,  Mr. Snyder disclosed the water tanks' location to him and turned over the salvage proceeds of the unauthorized vehicles.[99]  The Trustee not only confirmed Mr. Snyder's account, but testified that he instructed Mr. Snyder to "leave [the water tanks] where they are."[100]  Mr. Snyder also admitted to removing his personal property, including the trailers referenced in the *Limited Stay Relief Order*, with the Trustee's knowledge.[101]

In comparison, Ms. Biros' defense presented as a series of after-the-fact justifications.  First, she contended that she could not have violated the automatic stay by relocating scheduled assets because they belonged to Mr. Mowry, not the estate.[102]  Second, Ms. Biros asserted that she understood the *Limited Stay Relief Order* to authorize her to remove things from the Property in furtherance of a "wider clean-up."[103]  Third, she argued that she reasonably secured the scheduled assets from Mr. Snyder after the Trustee failed to act as Attorney Otto urged.[104]

The Trustee denied knowledge that Ms. Biros moved anything off-site until he read her declaration.[105]  Ms. Biros contests this.  She testified that Attorney Otto spoke to him

---

[98]    Id.; see *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36 at ¶¶ 3-8.

[99]    *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 75:19-76:7.

[100]    Id.

[101]    *Response to Amended Order to Show Cause (278)*, Dkt. No. 301 at ¶¶ 4, 6-11.

[102]    *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 77:2-78:10.  In support, she offered seven exhibits purporting to establish Mr. Mowry's ownership of the assets she removed.  See *Bench Exhibits*, Dkt. No. 308.  The Trustee provided these documents to Ms. Biros long before the sale to disclose the scheduled assets' contested ownership.  See *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 85:6-86:10, 93:7-19.

[103]    *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 78:11-79:1.

[104]    Id. at 79:2-5; 82:13-83:10.

[105]    Id. at 93:2-6.

16

and believed "[the Trustee] knew I was moving [the scheduled assets] to another site" because "[i]t was the only way I could secure it."[106]  For his part, Attorney Otto insisted he told this to the Trustee many times and even offered to return the assets to the Property if necessary.[107]  He did not, however, tell the Trustee their location.[108]  Attorney Otto also recalled that the "Trustee told [Mr. Mowry] to go ahead and take his stuff off the site,"[109] which seems at odds with the Trustee's apparent sale efforts.  In contrast, Ms. Biros testified that Mr. Mowry was not given the same opportunity to collect his personal property as other tenants.[110]

When asked why Ms. Biros, knowing that the scheduled assets were gone, silently allowed the Court to schedule a futile due diligence period for bidders in November, her bankruptcy counsel suggested:

> The only answer I can give is that the process has been so messy because of all of the accusations and moving things and being unclear whose is what, that it just, *Ms. Biros just didn't feel that that was a clarification that needed to be made*.[111]

During his testimony, Attorney Otto added:

> The only thing I can say about a failure to disclose it in November when we had that discussion, was that there was a focus on the site and since there was only at the time either Mr. Snyder or Ms. Snyder were going to bid on it and they, obviously, knew that the equipment existed.[112]

Ms. Biros did not address this point during her testimony, leaving her counsels' statements as the only answer to the Court's inquiry.

---

[106]     Id. at 84:14-17.

[107]     Id. at 83:4-10.

[108]     *Exhibit C*, Dkt. No. 298-3 at 1.

[109]     *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 82:23-83:1.

[110]     Id. at 86:11-87:9.

[111]     Id. at 80:1-5 (emphasis added).

[112]     Id. at 83:13-17.

A921

Ultimately, Ms. Biros acknowledged that her actions "inconvenienced" everyone and caused "difficulty and confusion," but otherwise insisted the estate and sale process were unharmed.[113]  At the end of the hearing, the Court took the matter under advisement.

Although the *Order to Show Cause* was fully briefed and argued some time ago, the Court prioritized resolving the steady flow of substantive matters impeding the administration of the estate.  This has afforded the Court added perspective.  At present, the estate is administratively insolvent,[114] though that may change.[115]  In addition to the Trustee's fees and Mr. Snyder's *de minimis* claim for insurance reimbursement, Ms. Biros holds an allowed administrative expense of $18,000 for post-petition rent.[116]  The Snyders' general unsecured claims have been disallowed,[117] and Ms. Biros' unsecured claims seeking roughly half a million dollars were withdrawn without prejudice given the dim prospect of a distribution.[118]  The only other claimant is the Internal Revenue Service, asserting a claim for estimated corporate income taxes.[119]  At this point, the administration of the estate is all but complete, subject to the outcome of the various pending appeals and any derivative proceedings.

## II.    JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties under 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States

---

[113]    Id. at 79:5-9, 80:9-12.

[114]    See *Status Report*, Dkt. No. 477 at ¶¶ 1-3.

[115]    Following the denial of Ms. Snyder's claim, the Court ordered her to show cause why it should not impose monetary sanctions against her for asserting a fraudulent claim and lying under oath.  See *Order to Show Cause*, Dkt. No. 561.  This matter is stayed indefinitely pending the exhaustion of Ms. Snyder's appellate rights.

[116]    See *Order*, Dkt. No. 523 at ¶ 2(A).

[117]    See In re U Lock, Inc., 2024 WL 878464, at *1; *Order of Court*, Dkt. No. 366.

[118]    See *Motion to Withdraw Claims Without Prejudice or, in the Alternative, to Continue Hearings on Objections Indefinitely, Until Further Order of Court*, Dkt. No. 530; *Order of Court*, Dkt. No. 552.

[119]    See *Clam No. 6-2.*

A922

District Court for the Western District of Pennsylvania on October 16, 1984.  This is a core
proceeding under 28 U.S.C. § 157(b)(2)(A).

## III.  DISCUSSION

A.    The Automatic Stay

As recognized by the United States Court of Appeals for the Third Circuit, "[t]he
automatic stay is one of the fundamental debtor protections supplied by the Bankruptcy
Code."[120]  The automatic stay is a series of statutory injunctions codified in section 362(a) which
arise automatically—that is, without a formal order—upon the commencement of a bankruptcy
case.[121]  In general, these injunctions are broad[122] and collectively bar acts to "obtain property of
the debtor or property of the bankruptcy estate."[123]  "It is designed to effect an immediate freeze
of the *status quo*"[124] to, among other things, "replace the 'unfair race to the courthouse' with [an]
orderly liquidation that treats all creditors equally."[125]

Pertinent here, section 362(a)(3) operates as a stay of "any act to obtain
possession of property of the estate or of property from the estate or *to exercise control over*
*property of the estate*."[126]  This provision prevents the "'dismemberment' of the bankruptcy
estate until the bankruptcy process permits either a financial reorganization of the debtor or an

---

[120]    Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1074 (3d Cir. 1992) (citing Cuffee v.
Atl. Bus. & Cmty. Dev. Corp. (In re Atl. Bus. & Cmty. Dev. Corp.), 901 F.2d 325, 327 (3d Cir. 1990)).

[121]    11 U.S.C. § 362(a)(1)-(8).

[122]    ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252, 259 (3d Cir. 2006).

[123]    Wingard v. Altoona Reg. Health Sys. (In re Wingard), 382 B.R. 892, 899 (Bankr. W.D. Pa. 2008).

[124]    Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 585 (9th Cir. 1993).

[125]    In re Univ. Med. Ctr., 973 F.2d at 1074. (citing United States v. Nicolet, Inc., 857 F.2d 202, 207 (3d Cir.
1988)).

[126]    11 U.S.C. § 362(a)(3) (emphasis added).

19

orderly liquidation of the assets of the bankruptcy estate."[127]  "Property of the estate," in turn,

broadly encompasses "all legal or equitable interests of the debtor in property as of the

commencement of the case."[128]

Under section 362(k), "an individual injured by any willful violation of a stay . . .

shall recover actual damages, including costs and attorneys' fees."[129]  Under Third Circuit

precedent, an "individual" includes a corporate debtor and a bankruptcy trustee operating in a

representative capacity for the estate.[130]  A stay violation is "willful" if the creditor commits an

intentional act that violates the stay with knowledge that a bankruptcy petition has been filed.[131]

No specific intent to violate the stay is required.[132]  Thus, to recover damages under section

362(k), one must establish three elements by a preponderance of the evidence: (1) a stay

violation occurred; (2) the act giving rise to the violation was willful; and (3) the violation

caused injury.[133]

---

[127]    Allentown Ambassadors, Inc. v. NE. Am. Baseball, LLC (In re Allentown Ambassadors, Inc.), 361 B.R. 422, 435–36 (Bankr. E.D. Pa. 2007); see In re Trump Ent. Resorts, Inc., 534 B.R. 93, 102 (Bankr. D. Del. 2015).

[128]    11 U.S.C. § 541(a)(1); see United States v. Whiting Pools, Inc., 462 U.S. 198, 204-05, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) ("The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad."); Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233, 241 (3d Cir. 2001) ("§ 541(a)'s legislative history demonstrates that the language of this provision was intended to sweep broadly . . . .").

[129]    11 U.S.C. § 362(k)(1).  This provision was previously codified as section 362(h) but re-codified in 2005 as section 362(k)(1) as part of BAPCPA.  Because the provisions are identical, prior caselaw regarding section 362(h) is remains relevant to the application of section 362(k)(1).  In re Wingard, 382 B.R. at 900 n.5.

[130]    In re Atl. Bus. & Cmty. Corp., 901 F.2d at 329; Roberts v. Vara (In re Roberts), No. 21-20618-JAD, 2024 WL 2050561, at *11 n.11 (Bankr. W.D. Pa. May 8, 2024); AUA Private Equity Partners, LLC v. Kind Operations, Inc. (In re Pa Co-Man, Inc.), 654 B.R. 92, 96 (Bankr. W.D. Pa. 2023); Prithvi Catalytic, Inc. v. Microsoft Corp. (In re Prithvi Catalytic, Inc.), 571 B.R. 105, 143 n. 220 (Bankr. W.D. Pa. 2017); Böhm v. Howard (In re Howard), 428 B.R. 335, 338 (Bankr. W.D. Pa. 2010), aff'd, No. 2:10CV962, 2011 WL 578777 (W.D. Pa. Feb. 9, 2011).

[131]    Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 320 n.8 (3d Cir. 2003); In re Univ. Med. Ctr., 973 F.2d at 1088.

[132]    In re Atl. Bus. & Cmty. Corp., 901 F.2d at 329 (quoting Goichman v. Bloom (In re Bloom), 875 F.2d 224, 227 (9th Cir. 1989)).

[133]    In re Prithvi Catalytic, Inc., 571 B.R. at 143; In re Wingard, 382 B.R. at 900.

A924

Section 362(k) also authorizes an award of punitive damages "in appropriate circumstances."[134]  "[P]unitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes."[135]  They "are especially appropriate when a party has acted in 'arrogant defiance' of the Bankruptcy Code."[136]  And because stay "[v]iolations . . . threaten the foundation of the protections afforded by the Bankruptcy Code,"[137] the need to deter others from similarly outrageous conduct in the future is a valid consideration.[138]  "The decision whether to award punitive damages is left to the sound discretion of the bankruptcy court,"[139] but is typically informed by: "(1) the defendants' conduct; (2) their motives; (3) any provocation by the debtor; and (4) each individual defendant's ability to pay."[140]  While "an award of punitive damages must bear some reasonable relationship to the amount of harm suffered,"[141] there are "no rigid benchmarks that a punitive damages award may

---

[134]    11 U.S.C. § 362(k)(1).

[135]    In re Howard, 2011 WL 578777, at *13 (quoting Wagner v. Ivory (In re Wagner), 74 B.R. 898, 903 (Bankr. E.D. Pa. 1987)); see Lansaw v. Zokaites (In re Lansaw), No. 06-23936-TPA, 2015 WL 224093, at *12 (Bankr. W.D. Pa. Jan. 14, 2015), aff'd sub nom. Zokaites v. Lansaw, No. 2:15CV404, 2016 WL 1012597 (W.D. Pa. Mar. 15, 2016), aff'd sub nom. In re Lansaw, 853 F.3d 657 (3d Cir. 2017); Iskric v. Commonwealth Fin. Sys., Inc. (In re Iskric), 496 B.R. 355, 365 (Bankr. M.D. Pa. 2013); Frankel v. Strayer (In re Frankel), 391 B.R. 266, 275 (Bankr. M.D. Pa. 2008).

[136]    In re Frankel, 391 B.R. at 275; see In re Howard, 2011 WL 578777, at *13; In re Lansaw, 2015 WL 224093, at *12; Curtis v. LaSalle Nat'l Bank (In re Curtis), 322 B.R. 470, 486 (Bankr. D. Mass. 2005); Walker v. Midland Mortg. Co. (In re Medlin), 201 B.R. 188, 194 (Bankr. E.D. Tenn. 1996).

[137]    Slaughter v. VA Pittsburgh Emp. Fed. Credit Union (In re Slaughter), No. 09-20221-GLT, 2014 WL 4960881, at *10 (Bankr. W.D. Pa. Sept. 30, 2014).

[138]    See In re Iskric, 496 B.R. at 365; In re Frankel, 391 B.R. at 275.

[139]    In re Lansaw, 2015 WL 224093, at *13.  Appeals courts "consider three guideposts" when reviewing punitive damage awards: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases."  In re Lansaw, 853 F.3d at 671 (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417, 123 S. Ct. 1513, 1520, 155 L. Ed. 2d 585 (2003)).

[140]    In re Howard, 2011 WL 578777, at *13.

[141]    In re Lansaw, 2015 WL 224093, at *13.

A925

not surpass."[142]   Higher ratios of punitive-to-actual damages may be necessary "where 'a

particularly egregious act has resulted in only a small amount of economic damages.'"[143]

Yet "a stay violation is not just a private injury. It strikes at the entire bankruptcy

system and all parties for whom it was designed."[144]   Since the automatic stay is an "injunction

with the force of an order," a stay violation "may give rise to civil contempt."[145]   Bankruptcy

courts are empowered to remedy civil contempt through section 105(a) and the court's inherent

power.[146]   Proof of civil contempt requires: "(1) that a valid court order existed; (2) that the

alleged contemnor knew of the order; and (3) that the contemnor disobeyed the order."[147]   "A

finding of civil contempt must be supported by clear and convincing evidence."[148]   The standard

is generally objective, though subjective intent may be relevant to determining an appropriate

sanction for the contemptuous conduct.[149]   In other words, "good faith is not a defense to civil

contempt."[150]

---

[142]   State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425

[143]   Id. (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 582, 116 S. Ct. 1589, 1602, 134 L. Ed. 2d 809 (1996)).

[144]   Rushing v. Green Tree Serv., LLC (In re Rushing), 443 B.R. 85, 97–98 (Bankr. E.D. Tex. 2010).

[145]   Patti v. Fred Ehrlich, PC, 304 B.R. 182, 187 (E.D. Pa. 2003); see In re Stephen W. Grosse, P.C., 84 B.R. 377, 383–84 (Bankr. E.D. Pa. 1988), aff'd sub nom. In re Grosse, 96 B.R. 29 (E.D. Pa. 1989), aff'd sub nom. Dubin v. Jakobowski, 879 F.2d 856 (3d Cir. 1989), and aff'd sub nom. In re Stephen W. Grosse, P.C., 879 F.2d 857 (3d Cir. 1989); see also Walker v. Got'cha Towing & Recovery (In re Walker), 551 B.R. 679, 692 (Bankr. M.D. Ga. 2016) ("a violation of the automatic stay constitutes contempt of the court").

[146]   See Minech v. Clearview Fed. Credit Union (In re Minech), 632 B.R. 274, 280 (Bankr. W.D. Pa. 2021); Winnecour v. Ocwen Loan Serv. (In re Ransom), 599 B.R. 791, 802 (Bankr. W.D. Pa. 2019); Englert v. Ocwen Loan Serv., LLC (In re Englert), 495 B.R. 266, 271 (Bankr. W.D. Pa. 2013); Walsh v. Free (In re Free), 466 B.R. 48, 57 (Bankr. W.D. Pa. 2012).

[147]   In re Minech, 632 B.R. at 280; see F.T.C. v. Lane Labs-USA, Inc., 624 F.3d 575, 582 (3d Cir. 2010); Harris v. City of Phila., 47 F.3d 1311, 1326 (3d Cir. 1995).

[148]   Harris v. City of Phila., 47 F.3d at 1321.

[149]   Taggart v. Lorenzen, 139 S. Ct. 1795, 1802, 204 L. Ed. 2d 129 (2019).

[150]   Robin Woods Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994).

A926

Sanctions for civil contempt must be either remedial or coercive.[151]  As explained

by the Third Circuit:

> Remedial or compensatory actions are essentially backward
> looking, seeking to compensate the complainant through the
> payment of money for damages caused by past acts of
> disobedience. Coercive sanctions, in contrast, look to the future
> and are designed to aid the plaintiff by bringing a defiant party into
> compliance with the court order or by assuring that a potentially
> contumacious party adheres to an injunction by setting forth in
> advance the penalties the court will impose if the party deviates
> from the path of obedience.[152]

In contrast, punitive sanctions that serve "to vindicate the authority of the court" are criminal in

nature[153] and beyond the contempt power of the bankruptcy court.[154]

      B.     <u>Mr. Snyder</u>

On this record, the Court finds that Mr. Snyder did not violate the automatic stay,

let alone willfully or contemptuously.  The analysis starts from the simple premise that the stay

only applies to property of the estate.[155]  Debtors identify their property interests by filing a

schedule of assets,[156] which U Lock did, listing less than a dozen tangible items in which it

asserted an interest.[157]  Of those *scheduled assets*, it is undisputed that Mr. Snyder was in

---

[151]    See <u>In re Free</u>, 466 B.R. at 58.

[152]    <u>Latrobe Steel Co. v. United Steelworkers of Am., AFL-CIO</u>, 545 F.2d 1336, 1344 (3d Cir. 1976) (footnotes omitted).

[153]    <u>Id.</u> at 1343 (citing, e.g., <u>United States v. United Mine Workers of Am.</u>, 330 U.S. 258, 302, 67 S. Ct. 677, 700, 91 L. Ed. 884 (1947)).

[154]    See <u>Burtch v. Masiz (In re Vaso Active Pharms., Inc.)</u>, 514 B.R. 416, 421 (Bankr. D. Del. 2014); <u>Matter of Kennedy</u>, 80 B.R. 673, 674 (Bankr. D. Del. 1987).

[155]    See 11 U.S.C. § 362(a).

[156]    See 11 U.S.C. § 521(a)(1)(B)(i); Fed. R. Bankr. P. 1007(b)(1)(A).

[157]    See *Schedule A/B: Assets – Real and Personal Property*, Dkt. No. 60 at 3, 5, 9.

23

possession of only two water tanks.[158]   Therefore, whatever else he may have taken from the

Property is simply irrelevant to the automatic stay and the *Order to Show Cause*.[159]

Next, the Court must consider why Mr. Snyder was in possession of scheduled

assets since acts to obtain possession or control over property of the estate violate the stay.[160]   He

contends that he merely complied with the *Limited Stay Relief Order*.   Specifically, it directed

that "[a]ll unused and salvageable tanks located on the Property *shall be removed by U Lock* on

or before June 24, 2022."[161]   Upon review, the Court agrees that the stay was modified under that

provision to not only permit but *require* Mr. Snyder's relocation of the water tanks.   After that,

he promptly disclosed their existence and location to the Trustee, who instructed him to "just

leave them there where they are."[162]   Mr. Snyder's compliance with the Trustee's mandate

obviously cannot be viewed as possession or control of estate property in a manner inconsistent

with the stay.   Accordingly, the Court will release the *Order to Show Cause* against him.

C.   <u>Ms. Biros</u>

Despite Ms. Biros' protests, the Court finds that she willfully and contemptuously

violated the automatic stay by removing scheduled assets from the Property.   Again, the Court

---

[158]   See *Response to Amended Order to Show Cause (278)*, Dkt. No. 301 at ¶¶ 3-5, 12.

[159]   Ms. Biros complains that Mr. Snyder removed nearly all the "trailers and containers" from the Property without proving his ownership.   *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶¶ 6-7.   She misses the point, however, because U Lock did not assert an interest in those assets. Moreover, the *Limited Stay Relief Order* required U Lock to remove all trailers from the Property to facilitate Ms. Biros' environmental remediation.   See *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36 at ¶ 3.

[160]   See 11 U.S.C. § 362(a)(3).

[161]   *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36 at ¶ 8.   Although the trailers and unauthorized vehicles were not scheduled assets, Mr. Snyder also removed them as required by the *Limited Stay Relief Order* and turned over salvage proceeds to the Trustee.

[162]   *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 75:19-76:1.   In hindsight, if the Trustee knew the water tanks were at Mr. Snyder's property rather than at the Property, the sale notice should have said so.

24

emphasizes that the stay only applies to property of the estate,[163] so any other tangible property she may have removed or destroyed is not relevant to the *Order to Show Cause*.

There is no dispute that Ms. Biros removed scheduled assets from the Property, yet she denies that they were property of the estate subject to the stay.  Instead, Ms. Biros argues that Mr. Mowry indisputably owned all the items she relocated to the McKeesport Property.[164] Not so.  U Lock asserted an interest in all tangible assets listed on *Schedule A/B*, including the ones she relocated.[165]  And the Trustee, despite receiving some documentation from Mr. Mowry, opted to sell those interests (albeit without representations) rather than allow Mr. Mowry to recover his alleged property.[166]  Mr. Mowry (and Ms. Biros) may dispute the estate's interests, but he neither pressed a claim, nor objected to the sale, nor appeared and testified at any hearing.[167]  So Mr. Mowry's alleged interest in the scheduled assets is neither undisputed nor proven.  But even if the estate's interests were subject to a bona fide dispute, the stay would apply to the scheduled assets pending its resolution.[168]

---

[163]     See 11 U.S.C. § 362(a).

[164]     *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶ 19.

[165]     See *Schedule A/B: Assets – Real and Personal Property*, Dkt. No. 60 at 3, 5, 9.

[166]     See *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 83:7-25.

[167]     For this reason, the exhibits purporting to demonstrate Mr. Mowry's ownership of the scheduled assets are hearsay.

[168]     See In re Grooms, 599 B.R. 155, 165 (Bankr. W.D. Okla. 2019) ("There has developed a doctrine that the stay should continue to apply when the ownership of the estate property is in *bona fide* dispute."); In re Stringer, 586 B.R. 435, 443–44 (Bankr. S.D. Ohio 2018), aff'd, No. 2:18-CV-563, 2019 WL 13259280 (S.D. Ohio Sept. 12, 2019), aff'd sub nom. Squire v. Stringer, 820 F. App'x 429 (6th Cir. 2020) ("But the law is clear that a belief that property is not included in the bankruptcy estate does not obviate compliance with § 362."); Franco v. Franco (In re Franco), 574 B.R. 730, 736 (Bankr. D.N.M. 2017) ("where the estate's ownership of property is in bona fide dispute, it is reasonable to hold that the stay applies, pending resolution of the dispute."); In re Daya Medicals, Inc., 560 B.R. 855, 858 (Bankr. S.D. Fla. 2016) ("a dispute as to a debtor's property rights does not obviate the effect of the automatic stay. To the contrary, where it is unclear whether a debtor in bankruptcy has an interest in property, parties must act with caution."); In re Pickel, 487 B.R. 289, 295 (Bankr. D.N.M. 2013) ("where, as here, the debtor has demonstrated a bona fide dispute with a creditor regarding whether property is property of the estate, it seems reasonable to hold that the stay applies."); In re Levenstein, 371 B.R. 45, 47 (Bankr. S.D.N.Y. 2007) ("Where the debtor claims an interest in property, the secured creditor may not make its own, unilateral determination of property rights after the debtor has invoked the jurisdiction of the Bankruptcy Court and

Next, Ms. Biros contends that her possession and control of the scheduled assets was authorized. She points to paragraph six of the *Limited Stay Relief Order*,[169] which permits her to "remove[] and dispose[]" of "[a]ny vehicles or trailers remaining on the Property after June 24, 2022."[170] Ms. Biros, however, moved *heavy equipment*, not vehicles or trailers. Context matters. At the hearing preceding the *Limited Stay Relief Order*, the parties' focus was abandoned "broken down cars,"[171] which is why it refers to the police "tagging" unauthorized vehicles.[172] Given that background, and the fact that the Court used their proposed terminology, there is no objective basis to read "vehicles" so broadly. The Court also notes that the *Limited Stay Relief Order* entered prior to the *Order for Relief* and *Schedule A/B*. As such, it is unreasonable to construe limited relief in a manner that would permit the removal and destruction of estate property before it was identified by the debtor.

Alternatively, Ms. Biros argues that she reasonably acted to protect the estate with the express or implied authority of the Trustee.[173] As an affirmative defense, it was incumbent upon her to establish that the Trustee's blessing was plainly given. Of course, there is no documentary evidence of either express or implied permission, which is notable given how many attorneys were involved.[174] All Ms. Biros points to is a timeline of contacts between Attorney

---

with it the protection of the automatic stay. It is for the Bankruptcy Court, not the secured creditor, to determine whether the debtor has a sufficient interest in property to implicate the automatic stay, even if the debtor's claimed interest in property may turn out to be groundless.").

[169] *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶ 10.

[170] *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36 at ¶ 6.

[171] *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 12:24-14:7, 27:24-28:4, 29:9-15, 30:10-23, 31:3-4.

[172] *Order Granting Christine Biros Limited Relief from the Stay*, Dkt. No. 36 at ¶ 4-5.

[173] *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶ 11-13.

[174] After all, it is common practice to memorialize important verbal discussions or agreements by a follow-up letter or email to create a "paper trail."

26

Otto and the Trustee.[175]  Attorney Otto's testimony largely described one-sided expressions of concern about securing the Property without suggesting anything the Trustee said or did that implied assent to Ms. Biros' actions.[176]  It is undisputed that Attorney Otto did not tell the Trustee where the scheduled assets were relocated,[177] and the Court does not believe that he clearly informed the Trustee that scheduled assets had been moved off-site.[178]  The relocation of nearly all estate assets is out of the ordinary and therefore memorable, particularly when coupled with an equally unusual offer to return them if necessary.[179]  But the Trustee denied all of it and has no reason to lie.[180]  Accordingly, the Court finds that Ms. Biros has not shown that her conduct was cloaked with any express or implied authority.

Having dispensed with those contrivances, moving scheduled assets to an undisclosed location and restricting access are obviously prohibited acts to obtain possession and exercise control over property of the estate.[181]  As was concealing it.  There is also no doubt that Ms. Biros' conduct was willful because she intentionally removed the scheduled assets from the Property with knowledge of the automatic stay.  Indeed, her knowledge of the stay is patent from the months she spent seeking relief.  Therefore, the next question under section 362(k) is whether Ms. Biros' willful stay violation caused an in injury.[182]

---

[175]    See *Exhibit C*, Dkt. No. 298-3.

[176]    See *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 82:13-83:10.

[177]    *Exhibit C*, Dkt. No. 298-3 at 1 ("I did not tell him where it was, but I told him it was on property owned by the Biros family and he could either see it or have it returned any time.").

[178]    *Transcript of January 27, 2023 Hearing*, Dkt. No. 316 at 83:4-10.

[179]    Id.

[180]    The Trustee already admitted that he knew the water tanks were at Mr. Snyder's facility even though he did not disclose it in the sale notice.

[181]    See 11 U.S.C. § 362(a)(3).

[182]    See 11 U.S.C. § 362(k)(1).

27

As Ms. Biros sees it, moving the scheduled assets to "a safer location in McKeesport" protected them from dissipation at no cost to the estate.[183]  In the Court's view, any purported benefit is speculative because it assumes the scheduled assets would have been stolen prior to the sale.[184]  Beyond that, she argues that her stay violation ultimately did not impact the outcome of the December 15, 2022 auction.[185]  On this last point the Court agrees, which is why the sale was approved.  Still, Ms. Biros ignores the obvious: *the auction should have taken place two weeks earlier without the need for site visits*.

To be clear, Ms. Biros' removal and concealment of the scheduled assets caused more than just inconvenience and delay.  That implies the auction merely happened later than originally scheduled.  The reality is that Ms. Biros caused the unnecessary expenditure of additional time and resources.  The on-site due diligence was worthless without the scheduled assets on the Property.  As a result, she not only thwarted efforts to resolve outstanding objections to the sale but prompted new ones.  The December 1, 2022 sale hearing then devolved into a lengthy waste of time as the Court charted a path forward.  And but for Ms. Biros' actions (including her incomplete disclosure), the Court, Trustee, and parties would not have spent hours traveling to three sites in a quest to find the scheduled assets.  "Time," as they say, "is money," so professional fees and costs are real economic losses attributable to her conduct.  And though neither the Court nor the U.S. Marshal are "individuals" under section 362(k)(1), the Court observes that both were forced to incur extraordinary costs to facilitate the site inspections.  Put simply, Ms. Biros' willful stay violation resulted in injuries.

---

[183]    *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶¶ 6, 11-12, 17.

[184]    The Court is thoroughly unimpressed with Ms. Biros' offer not to seek an administrative expense for the cost of relocating and preserving the scheduled assets.  It should go without saying that a creditor who takes possession of estate property in violation of the automatic stay cannot seek the costs of preserving those assets.

[185]    *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶¶ 14-16.

A932

While specific intent to violate the stay is not required under section 362(k), a party's conduct and motive are relevant considerations to an award of damages. Ms. Biros applies a positive gloss to her stay violation, grossly mischaracterizing her conduct as reasonable and beneficial to the estate. A more accurate assessment is that she, in a stunning display of overreach, usurped the authority of the Trustee and unilaterally exercised control over property of the estate. Even viewed in the best light possible, Ms. Biros supplanted the Trustee's judgment with her own because he purportedly failed to heed her warnings about tangibles disappearing from the Property. It is also difficult to see past the hypocrisy of her preemptively snatching the scheduled assets (apparently worth no more than $6,500) to prevent them from being pilfered by Mr. Snyder.[186]

Of course, the Court has already found that Mr. Snyder did not remove any estate assets from the Property without authorization and notice to the Trustee. In fact, the suspicious activity that Ms. Biros cites in her written response—the removal of cars and trailers in June 2022—was mandated by the *Limited Stay Relief Order*.[187] Obviously, lobbing accusations over measures explicitly allowed by a court order undermines her credibility and indicates how carefully she and counsel read it. The Court also notes that other "disappearances" might have been attributable to tenants removing their personal property as instructed by the Trustee, which would explain his lack of concern. And notably, the Trustee did not dispute Mr. Snyder's ownership of the personal property he took and openly stored essentially across the street.

---

[186]    See Section III.B, *supra*. In this vein, Ms. Biros seemingly borrows the plot line from the film, *National Treasure,* where the protagonist, Benjamin Franklin Gates concludes that "the only way to protect the Declaration [of Independence] is to steal it." NATIONAL TREASURE (Walt Disney Pictures, November 19, 2004).

[187]    See *Christine Biros' Response to Amended Order to Show Cause*, Dkt. No. 298 at ¶ 11(a)-(b).

29

A933

Ultimately, the Court finds Ms. Biros' "estate protection" justification nothing more than an effort to muddy the waters and create a false equivalence for her transgressions.

Frankly, the Court is unconvinced that Ms. Biros was motivated by altruism. Viewing the record of this case as a whole, her actions have all been in service of one goal: expediting the commercial development of the Property. Ms. Biros aggressively sought unfettered possession of the Property from the start, often beyond what was reasonable or permissible under the circumstances. Recall that she asserted the validity of a writ of possession obtained post-petition in violation of the automatic stay. And impatient with the speed of the bankruptcy process, Ms. Biros then repeatedly demanded unconditional stay relief prior to the administration of the estate. From this perspective, the Court is confident that her motivation in acquiring any tangibles was simply to end the estate's use of the Property and remove impediments to its development.[188] Therefore, the Court concludes that Ms. Biros improperly removed the scheduled assets to accelerate her efforts to clean-up the Property.[189]

Ms. Biros removed the scheduled assets from the Property sometime between August and early November 2022. As explained above, it was not objectively reasonable to believe the *Limited Stay Relief Order* gave her blanket authority over scheduled estate property. And considering that Ms. Biros clings to ambiguities in the order to defend her conduct yet ignores those plain terms covering Mr. Snyder's actions, she demonstrates a remarkable indifference to the provisions of the order. The Court infers that she "jumped the gun," assuming

---

[188]    The Court's conclusion is supported by the contradictory positions articulated in Ms. Biros' written response. On the one hand, she professed concern that Mr. Snyder's alleged removal of assets would erode the value of the estate and diminish the benefit of her future purchase. Id. at ¶ 7. On the other, she asserted that Mr. Mowry's claim to the scheduled assets was undisputed. Id. at ¶ 19. Put together, Ms. Biros wanted to purchase things she thought the estate did not own and could not transfer. It seems far more likely that the scheduled assets were physically in the way of her efforts.

[189]    It is strangely coincidental that the scheduled assets, which consisted of scrap, were moved to a location adjacent to a scrap recycling center.

A934

that her bid for the estate's assets (amply cushioned with substantial bonds and assumed environmental liabilities) would prevail. The *Stipulated Order* reflected a similar premature sense of victory by proposing to grant Ms. Biros exclusive possession of the Property and authority over the tenants' belongings before a completed sale.

Ms. Biros doubled-down on her stay violation at the hearing in early November 2022. When the Court scheduled on-site due diligence for prospective bidders, she knew or should have known that the Court and parties expected the scheduled assets to be on the Property. Yet Ms. Biros said nothing even though she knew that most scheduled assets were already relocated to the McKeesport Property.[190] Her silence is telling, as is her decision to not explain it. Ms. Biros could not have reasonably believed at that point that the removal of the scheduled assets was proper. And lest there were any lingering doubts, the Court reiterated the scope of the *Limited Stay Relief Order* in denying the *Stipulated Order*: "the Court finds nothing in the record that authorizes [Ms.] Biros to remove or destroy any items other than [(i) "vehicles or trailers"; (ii) "tires"; and (iii) "tanks identified as waste"]."[191]

It is surprising that Ms. Biros did not undertake any remedial measures—even disclosure—before the on-site due diligence window opened since the scheduled assets' absence would be noticed. After all, Ms. Snyder was allowed on the Property to view them even though Mr. Snyder was not. Ms. Biros probably figured that her stay violation still had a chance of escaping detection. The Court also suspects she was emboldened by her substantial claims, her

---

[190]    It is now apparent that Attorney Otto was aware in early November that Ms. Biros relocated the scheduled assets. Because Attorney Otto was not ordered to show cause, the Court is currently not in a position to examine whether his silence during the Court's scheduling of a futile due diligence period is compatible with his duty of candor. See Pa. Rules of Prof'l Conduct 3.3(a). "[W]hen an attorney learns that a client has engaged in fraudulent or unauthorized conduct, they must take reasonable remedial measures, including, if necessary, disclosure to the tribunal." In re Bush, No. 22-10043-GLT, 2023 WL 6543194, at *6 (Bankr. W.D. Pa. Oct. 6, 2023).

[191]    *Order Denying Stipulated Order for Relief from Stay*, Dkt. No. 211 at ¶ 2(a) (footnotes omitted).

A935

view that she was the only legitimate creditor, and the likelihood that she would prevail at auction. In fact, Ms. Biros only came clean when the Court directly asked whether she had removed scheduled assets from the Property.

In sum, the Court finds by clear and convincing evidence that Ms. Biros' conduct not only willfully violated the stay but did so in "arrogant defiance" of the Code. For all the same reasons, the Court necessarily finds that she is in contempt of the automatic stay. To repeat: the stay is "an injunction with the force of an order," Ms. Biros was aware of it, and knowingly violated it.[192] And finally, independent of the stay violation, the Court also finds that her willful and contemptuous conduct knowingly interfered with the sale process and the administration of the estate.[193]

As explained above, section 362(k) requires the Court to award actual damages, including attorneys' fees and costs, to any individual injured by a willful stay violation.[194] In terms of actual damages, Ms. Biros' willful stay violation unnecessarily increased the estate's administrative burden. Therefore, those costs must be shifted to her to make the estate whole.

By delaying the auction (and therefore the sale's closing), Ms. Biros forced the estate to remain in possession of the Property and incur additional use charges to her. Had this not occurred, she could have obtained unconditional stay relief by the end of December 2022, rather than January 2023. Since the Court previously awarded her an $18,000 administrative expense for nine months of post-petition use, a $2,000 reduction is appropriate to account for the delay she caused.

---

[192]    Patti v. Fred Ehrlich, PC, 304 B.R. at 187.

[193]    See, e.g., In re Primel, 629 B.R. 790, 802 (Bankr. W.D. Pa. 2021).

[194]    11 U.S.C. § 362(k)(1).

A936

Next, Ms. Biros' removal and concealment of the scheduled assets unnecessarily multiplied the proceedings and the estate should not be burdened by the resulting professional fees and costs.  Time wasted at the on-site due diligence, the early December sale hearing, and the Court-supervised site inspections are *solely* attributable to her conduct.  Notwithstanding the brief visit to Mr. Snyder's land, his possession of only two estate assets was known and authorized by the Trustee.  In contrast, Ms. Biros' unauthorized removal of the scheduled assets from the Property and subsequent incomplete disclosure when called to account created the need to locate them.  The Court estimates approximately 6.5 hours was misspent on these activities.

The Trustee, who serves as his own counsel, bills "attorney time" at $425 per hour.[195]  Nevertheless, the Court is mindful that "trustee time" is not compensated that way.  To prevent him from individually suffering any out-of-pocket loss recoverable under section 362(k), the Court will apply his attorney rate for the entire period.  This is warranted given that Ms. Biros' violation was not only willful, but arrogantly defiant.  This results in an award of $2,762.50 in fees, which the Court will round up to $2,800 for reasonable costs.  To prevent any undue benefit as an administrative creditor, Ms. Biros will be required to pay this directly to the Trustee rather than the estate.

Beyond the Trustee, the Court declines to award professional fees to any other parties.  Mr. Snyder incurred none.  U Lock, however, lacked standing to object to the sale, casting doubt on the reasonableness of any fees.  Ms. Snyder may have incurred modest attorneys' fees, but the Court cannot ignore her bad faith in filing this involuntary.[196]  Her provocation and unclean hands are valid considerations in this context.  Thus, the Court finds

---

[195]     See *Application for Unpaid Administrative Fees*, Dkt. No. 583 at ¶ 12.

[196]     See In re U Lock, Inc., 2024 WL 878464, at *14-19.

A937

that Ms. Snyder has forfeited any right to attorneys' fees stemming from Ms. Biros' stay violation.

The Court reiterates that both it and the U.S. Marshals needlessly incurred extraordinary expenses related to the site inspections. Though not "individuals" entitled to reimbursement under section 362(k), the Court may use civil contempt powers to redress these injuries with a compensatory sanction. Accordingly, the Court will order Ms. Biros to pay $1,000 to the U.S. Marshals to reimburse the cost of the security escort. The Court will also impose a $500 fine payable to the Clerk of Court to both cover needless costs arising from the inspections and to discourage future disobedience with Court orders.

Given Ms. Biros' outrageous conduct and her arrogant defiance of the Code, the bankruptcy process, and orders of this Court, these modest compensatory awards are inadequate. Especially so as she may have factored these foreseeable damages into her calculus and decided to nonetheless "take the foul." A larger coercive sanction is unavailable at this late stage because there is no longer an opportunity to repeat this conduct or meaningfully interfere with the administration of the estate. That said, the Court may award punitive damages to the estate under section 362(k) without the need for criminal contempt powers.[197]

The egregiousness of Ms. Biros' contemptuous interference with estate property and its sale requires a penalty that will be felt despite her significant administrative expense and unsecured claims. Punitive damages must "bear some reasonable relationship" to the actual damages,[198] but "particularly egregious act[s]" resulting in only a small economic harm justify a higher ratio of punitive-to-actual damages.[199] Here, the Court awarded compensatory damages

---

[197]   See 11 U.S.C. § 362(k)(1).

[198]   In re Lansaw, 2015 WL 224093, at *13.

[199]   State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425.

34

A938

totaling $6,300, though the actual damages are probably slightly higher since the Court equitably denied Ms. Snyder her attorneys' fees. The Court concludes a punitive award of $15,000 payable to the estate without setoff is justified. This represents roughly a 2-to-1 ratio between the punitive and actual damages, which is in line with what has been approved in other cases.[200]

## IV.    CONCLUSION

In light of the foregoing, the Court will release the *Order to Show Cause* against Mr. Snyder and order Ms. Biros to pay damages as outlined above. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. The Court will issue a separate order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

Dated: June 24, 2024                        GREGORY L. TADDONIO
                                            CHIEF UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
George Snyder

---

[200]    See id.; see also In re Lansaw, 853 F.3d at 671.

35

A939

FILED
2/1/23 4:24 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                        .     Case No. 22-20823-GLT
                              .
                              .
U LOCK INC,                   .     5414 U.S. Steel Tower
                              .     600 Grant Street
                              .     Pittsburgh, PA 15219
          Debtor.            .
                              .     January 27, 2023
. . . . . . . . . . . . ..         10:00 a.m.

   TRANSCRIPT OF #249 AND #278 HEARING ON ORDER TO SHOW CAUSE:
  # 230 - AFFIDAVIT FILED BY SHANNI SNYDER; #231 - AFFIDAVIT
FILED BY CHRISTINE BIROS; #233 - DECLARATION OF GEORGE SNYDER;
   #234 - SUPPLEMENTAL DECLARATION OF GEORGE SNYDER; #235 -
   DECLARATION OF GEORGE SNYDER; #236 - STATUS REPORT FILED BY
  CHRISTINE BIROS; #294 HEARING ON ORDER TO SHOW CAUSE: #258
       APPLICATION FOR ADMINISTRATIVE EXPENSES FILED BY
 CREDITOR CHRISTINE BIROS; #228 STIPULATION BY SHANNI SNYDER AND
       BETWEEN CHARLES O. ZEBLEY, JR., CHAPTER 7 TRUSTEE, AND
 ROBERT H. SLONE, CHAPTER 7 TRUSTEE; #255 MOTION FOR RELIEF FROM
   STAY FILED BY CHRISTINE BIROS; #274 MOTION TO ENFORCE ORDER
 CONFIRMING SALE OF TANGIBLE AND INTANGIBLE PERSONAL PROPERTY OF
 THE ESTATE UNDER 11 U.S.C. SECTION 363(F) FREE AND CLEAR OF ALL
    LIENS, CLAIMS AND ENCUMBRANCES FILED BY SHANNI SNYDER
            BEFORE HONORABLE GREGORY L. TADDONIO
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Law Office of J. Allen Roth
                         By:  J. ALLEN ROTH, ESQ.
                         805 S Alexandria Street
                         Latrobe, PA 15650


ECRO:                    Hayley Smith

 Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@jjcourt.com

(609) 586-2311      Fax No. (609) 587-3599

A940

APPEARANCES (Cont'd):

| For Shanni Snyder, | Grenen & Birsic, P.C. |
| Petitioning Creditor: | By:  JOHN B. JOYCE, ESQ. |
| | JEREMY J. KOBESKI, ESQ. |
| | One Gateway Center, Suite 9W |
| | Pittsburgh, PA 15222 |

For Shanni Snyder,          Grenen & Birsic, P.C.
Petitioning Creditor:       By:  JOHN B. JOYCE, ESQ.
                                 JEREMY J. KOBESKI, ESQ.
                            One Gateway Center, Suite 9W
                            Pittsburgh, PA 15222

For Christine Biros:        Bernstein-Burkley, P.C.
                            By:  ROBERT S. BERNSTEIN, ESQ.
                                 LARA S. MARTIN, ESQ.
                            601 Grant Street, 9th Floor
                            Pittsburgh, PA 15219

For Christine Biros,        The Law Firm of William E. Otto
Lead Counsel in the         By:  WILLIAM E. OTTO, ESQ.
State Court Action:         4027 Old William Penn Highway
                            P.O. Box 701
                            Murrysville, PA 15668

TELEPHONIC APPEARANCES:

Chapter 7 Trustee:          Mahady & Mahady
                            By:  ROBERT H. SLONE, ESQ.
                            223 South Maple Avenue
                            Greensburg, PA 15601

Chapter 7 Trustee in        Zebley Mehalov & White, P.C.
Shanni Snyder case:         By:  CHARLES O. ZEBLEY, ESQ.
                            18 Mill Street Square
                            P.O. Box 2124
                            Uniontown, PA 15401

- - -

A941

3

# I N D E X

|  | PAGE |
|---|---|
| **WITNESS STATEMENTS** | |
| GEORGE SNYDER | 73 |
| ROBERT SLONE | 75 |
| WILLIAM OTTO | 82 |
| CHRISTINE BIROS | 84 |

| **EXHIBITS** | ID. | EVD. |
|---|---|---|
| 1 through 7 | 89 | 92 |

**WWW.JJCOURT.COM**

A942

4

1          ECRO:  The Court may now come to order.  The

2     Honorable Gregory L. Taddonio presiding.

3          THE COURT:  All right.  Good morning, again,

4     everyone.  This is the United States Bankruptcy Court for the

5     Western District of Pennsylvania, and this is the time set for

6     the hearing on Case Number 22-20823, U LOCK INC.

7          I'll begin by taking appearances here in the

8     courtroom.  Start over here.

9          MR. ROTH:  Allen Roth on behalf of U LOCK.

10          THE COURT:  All right.  Good morning.

11          MR. SNYDER:  George Snyder.

12          THE COURT:  All right.  Good morning.

13          MR. JOYCE:  Good morning, Your Honor, John Joyce on

14     behalf of Ms. Shanni Snyder, and Ms. Snyder is present here in

15     the courtroom today.

16          MR. KOBESKI:  And good morning, Your Honor.  Jeremy

17     Kobeski as co-counsel with Mr. Joyce.

18          THE COURT:  All right.  Good morning.

19          MR. BERNSTEIN:  Good morning, Your Honor.  Robert

20     Bernstein, Bernstein-Burkley, on behalf of Christine Biros.

21     With me, attorney Martin.

22          THE COURT:  Okay.  Good morning.

23          MR. OTTO:  William Otto, counsel for Christine Biros.

24          THE COURT:  All right.  Good morning.

25          MR. BERNSTEIN:  And, Your Honor, Christine Biros is

A943

1  here in the courtroom.

2          THE COURT:  All right.  Good morning.

3          All right.  That covers all the appearances here in

4  the courtroom.  I'll take any additional appearances by Zoom.

5          MR. SLONE:  Robert Slone for the Chapter 7 Trustee,

6  Your Honor.

7          THE COURT:  All right.  Good morning.

8          MR. ZEBLEY:  Charles Zebley.  I'm Trustee in the

9  Shanni Snyder case.  Your Honor, I'm having trouble getting my

10 video to work.  I don't know if it's working for you, but I may

11 leave and re-enter the meeting.

12         THE COURT:  All right.  Well, I'll note your

13 appearance, and if you want to sort that out, you can do so

14 during the context of the hearing.

15         All right.  Any other appearances?

16                  (No audible response)

17         THE COURT:  All right.  We have several matters set

18 for the Court today.  I've got two Orders to Show Cause.  I

19 have a Proposed Stipulation between Shanni Snyder and the two

20 Chapter 7 Trustees involved in these cases.  I have a Motion

21 for Stay Relief filed by Christine Biros, and I have a Motion

22 to Enforce Sale Order filed by Shanni Snyder.

23         Before I begin, I thought it would be helpful to add

24 some preliminary comments for the parties and give you a road

25 map of where I intend to proceed and how I intend to proceed

**WWW.JJCOURT.COM**

A944

6

1  here today.  As you are all aware, sale of substantially all of

2  the Debtor's assets occurred, and it was reported to me that

3  that sale closed on December 28th, and the Bankruptcy Estate

4  received approximately $70,000 from that sale.

5          So, we are now entering a new phase for this case,

6  and so I want to set the table at this point as to what my

7  expectations are going forward so there can be no question and

8  no doubt in anyone's mind of what the expectations are going

9  forward.  At the outset of this case, it was apparent that

10  after years of State Court litigation, all of you had built an

11  extreme level of animosity and bitterness towards each other

12  and, unfortunately, that continued to spill over in this

13  bankruptcy case.

14          And a pattern has developed where consensus,

15  reasonableness and perspective was lost, and every minute issue

16  or detail was vigorously contested.  Each party claiming to be

17  the victim of the other party's actions and some of it was

18  justified, some of it seemingly not.  And during this time, it

19  seems that each side has been trying to play the -- trying to

20  game the system with what the Court has perceived as "gotcha,"

21  legal arguments and strategies that may have crossed the line

22  over permissive conduct.

23          And while it is expected that sometimes the parties

24  will be emotionally carried away with their cases, it is up to

25  the attorneys to be the tempering and calming influence,

A945

7

1   zealously representing their clients, but mindful as their role

2   as officers of the Court and subject to the rules of this Court

3   and the rules of professional conduct, they are held to a high

4   standard of conduct and doing so within the bounds of

5   professionalism, civility and the rule of law.  And despite the

6   Court's repeated admonitions and warnings, this activity has

7   not stopped, and to the contrary the litigation has

8   proliferated, and the arguments are becoming far more

9   irrelevant and tenuous.

10          And as I reflect back on the past six months of this

11  case, I question how we reached this point.  And as a judge, I

12  think you've found that I am not an excitable person,

13  and though through trying cases and hearings, and believe me

14  this one does qualify under that category, I try to maintain my

15  temperament with the parties.  And I'm not one to yell, scream

16  or raise my voice, but perhaps in not doing so, the parties

17  have gotten the wrong message, and, well, we are clearing that

18  up today.

19          I trust that you've all seen my Memorandum Opinion

20  from last week.  And the takeaway I'd like you to all have is

21  that my patience with this case has been exhausted.  And

22  Bankruptcy Rule 9011 is very much in play going forward.  And,

23  put simply, I'm done with the animosity.  I'm done with the

24  senseless vitriol, I'm done with the irrational tactics and I'm

25  done with the vexatious litigation.  And lest there be any

1  confusion, I'm talking to all parties here.  No one is being

2  singled out.  In the Court's view, there are no white hats in

3  this case, and make no mistake about it, I am completely done

4  with this nonsense.  Done.  And there will be consequences.

5         All right.  There are several matters pending before

6  the Court this morning.  And, historically, as you're all

7  well-aware, this case has had hearings that have been

8  needlessly long for three reasons.  First, a substantial part

9  of every hearing has been spent bickering about matters that

10  are tangential to what is before the Court.  And, indeed, even

11  today a number of the objections raised seemingly have little

12  to do with the actual relief requested.  And oral arguments

13  tend to devolve into nothing more than alternating accusations

14  and aspersions, and the parties are so wrapped up in their own

15  perspective that they hear what they want to hear instead of

16  listening to the Court.

17         So, to avoid these problems, I am adopting a

18  different tact for this hearing.  And rather than starting with

19  oral arguments for each matter, I am going to inform the

20  parties of my view, and indicate what I'm inclined to rule and

21  why.  And afterward, the relevant parties will have an

22  opportunity to respond to the Court's comments.  And if you

23  agree with my comments, I caution you to quit while you're

24  ahead, simply state your agreement and sit down.  And if the

25  arguments go in irrelevant directions, you can expect I'm going

1  to shut it down.  I'm going to ask you to move on, or sit down.
2  And the Court will assume that any perceived attacks are
3  disputed, and discourage parties from rising to answer them.
4       So, those are our ground rules for today.  Everyone
5  understand?
6       MS. MARTIN:  Yes, sir.
7       MR. BERNSTEIN:  Yes, Your Honor.
8       MR. OTTO:  Yes.
9       THE COURT:  All right.  The first matter we have is
10  the Stipulation between Shanni Snyder, Trustee Slone and
11  Trustee Zebley.  And this is filed at Docket Number 228.  And
12  the background is that Trustee Zebley has reached an
13  arrangement that was filed in Shanni Snyder's personal
14  bankruptcy case in which he will receive the first 32,500 from
15  the U LOCK Estate distributions and convey standing to Shanni
16  Snyder to pursue any claims that the Estate might have against
17  U LOCK, her personal Estate.
18       The Stipulation, while filed in the case before Judge
19  Bohm is under consideration here because Trustee Slone entered
20  into it for the purpose of binding the U LOCK Estate, and it
21  contains representations addressing the treatment of Shanni
22  Snyder's claim, Claim Number 1-1.  And for the purposes of this
23  Estate, I do note a couple of provisions from there.  Quote,
24  Snyder acknowledges that the judgment claim she filed in the
25  U LOCK case is not secured in tangible and intangible assets of

A948

1  U LOCK.  That's at Paragraphs 16 and 30.  And she did not

2  assert a lien on the assets being sold.

3          So, based on that, what I gather from the Stipulation

4  and the operation that we've used going through the sale

5  process is that Shanni Snyder has an unsecured claim, and that

6  was an alleged claim under Section 28 U.S.C. 3201.  At that

7  time the judgment was filed, U LOCK did not have title to the

8  real property.  And the sole response and objection to the

9  Stipulation I received was from Christine Biros.  She contends

10 that Shanni's claim against U LOCK is fraudulent and avoidable.

11 But I would note that in the eight plus months or so that this

12 case is active, no one has sought to object to Shanni Snyder's

13 claim.

14         And so as the parties are aware, I'm not sure --

15 well, the lawyers are aware, I'm not sure the parties are

16 aware, that under Section 502(a), the Court's hands are tied.

17 A claim is deemed allowed unless a party in interest objects.

18 So, as to the claim itself, the Court has not been shy about

19 expressing its concerns about the nature of the claim, but at

20 this point, no one has filed an objection to it.  So, that's

21 where we are at this point.

22         So, I am prepared, given that this Stipulation

23 cleared the way for some of the issues that were potentially

24 going to arise in the Sale Hearing, to approve the Stipulation

25 with a reservation of rights.  First off, that it makes no

1  findings here that are binding on Judge Bohm or Shanni Snyder's

2  personal bankruptcy estate.  And, as an aside, I just want to

3  tell the parties, I am considering whether I should ask Judge

4  Bohm to transfer that case to me rather than have another Judge

5  get up to speed on the facts and circumstances of this case.

6          But, secondly, that approving the Stipulation would

7  not make any findings as to the propriety of Shanni's claim

8  against U LOCK, other than notwithstanding its designation as

9  secure that the claim will be treated as a general unsecured

10 claim in this bankruptcy case.  And, further, approval of a

11 Stipulation is without prejudice to any other rights, claims or

12 defenses to the Shanni Snyder claim.

13         So, based on that, I'll start with the objecting

14 party, Christine Biros, and ask if there is any issue with the

15 Court approving the Stipulation with those reservations?

16         MR. BERNSTEIN:  Thank you, Your Honor.  It's

17 important to us that this does not determine the validity of

18 the claim.  And I heard -- I'm pretty sure I heard Your Honor

19 say there's no finding as to the propriety of the claim.  Just

20 note for the Court that we have wanted to file an objection,

21 and we've hesitated because it's alleged that that claim is

22 property of the Shanni Snyder Estate.

23         We have a Motion pending before Judge Bohm to lift

24 the Stay to the extent the Stay would apply to that and allow

25 us to object to that claim here.  We expect before the hearing,

12

 1  the continued hearing on that on February 22nd, to have a

 2  Stipulation with Trustee Zebley or an agreement with Trustee

 3  Zebley that will allow that to go forward.  But that's an

 4  explanation as to why, although we've maintained since the

 5  beginning that the claim shouldn't be here, we have not filed

 6  an objection because we didn't want to risk creating another

 7  argument about the Stay.

 8           THE COURT:  Okay.

 9           MR. BERNSTEIN:  With the Court's comments then, we

10  would have no objection to the approval of the Stipulation.

11           THE COURT:  All right.  Thank you.

12           All right, Mr. Joyce, anything further from you?

13           MR. JOYCE:  Just a scrivener's error, Your Honor,

14  that I want to point out in the Stipulation so that everybody

15  is aware.  Beginning in Paragraph 24, the Stipulation that was

16  reached with Mr. Zebley when we cut and pasted over into here,

17  the word "Debtor" in Paragraph 24, the capitalized term Debtor,

18  I don't want that to be confused with the U LOCK Debtor.

19  That's the Snyder Debtor in her bankruptcy and that --

20  unfortunately, that scrivener's error carries over into

21  Paragraphs 26, 27, 28 and 29.

22           So, with that notation, I would just note that for

23  the record, and however the Court wants to handle that.  We

24  would be open to addressing it whatever way you feel is

25  appropriate.

A951

13

1    THE COURT:  I'm satisfied with allowing the colloquy

2  on the Court record to stand as clarification of that.  But

3  that's certainly how I read the Stipulation, was that even

4  though it used the word Debtor it was referring to Shanni

5  Snyder as being the Debtor in her personal bankruptcy case, as

6  opposed to U LOCK.

7    Any issues with that, Mr Bernstein?

8    MR. BERNSTEIN:  No, Your Honor.

9    THE COURT:  All right.  Anything further from the two

10  Trustees with respect to the Stipulation?

11    MR. ZEBLEY:  Your Honor, Charles Zebley.  Nothing to

12  add.  I'm agreeable with what you proposed.

13    MR. SLONE:  Robert Slone.  I'm agreeable, Your Honor.

14    THE COURT:  All right.  Thank you.

15    All right.  Then I will approve the Stipulation with

16  those caveats.

17    All right.  The next matter on the agenda is the

18  Motion for Stay Relief.  And this is the Motion for Relief from

19  the Automatic Stay filed by Ms. Biros at Docket Number 255, and

20  I have objections filed by Shanni Snyder and George Snyder at

21  Docket -- it's Number 284 and 292.

22    So, my preliminary findings with respect to that

23  Motion is as follows.  While some of the allegations of the

24  Motion are questionable, particularly the Estate's continued

25  usage, is causing trash to accumulate or the real estate to

**WWW.JJCOURT.COM**

14

1 depreciate in value which, by the way would seemingly cut

2 against claims made in other Motions.  Ms. Biros's entitlement

3 to Stay Relief would seem to be an easy call.

4        The Estate has remained in possession of the property

5 inasmuch as the tangible assets were, or they should have been

6 stored there pending their sale.  The Trustee also continued to

7 minimally operate the storage facility by collecting storage

8 fees and at this point the tangible assets have been sold and

9 are no longer the Estate's concern.  And the tenants have been

10 instructed to remove their property.

11        Moreover, Biros has not received any rental or

12 adequate protection payments from the Estate, and given its

13 limited resources, it does not have the financial wherewithal

14 to pay taxes or maintain insurance.  Accordingly, there is

15 cause for Stay Relief under 362(d)(1).  And, in addition, the

16 Court recognizes and acknowledges the State Court Orders which

17 determine that Biros is the owner of the real property.

18 Accordingly, U LOCK has no equity in the property, and given

19 that this is a Chapter 7 case, it is not necessary for a

20 reorganization.  So, relief under Section 362(d)(2) would also

21 seem to be appropriate.

22        Put simply, the Estate no longer has any need of the

23 property so there's no reason to prevent Ms. Biros from taking

24 full exclusive possession consistent with her rights as its

25 owner.

**WWW.JJCOURT.COM**

A953

1      As far as the objections, they seemingly ignore the

2  Estate's current lack of interest in or need for the property

3  and, instead, raise grievances about Ms. Biros's past conduct

4  and what she may do in the future.  And whether Ms. Biros has

5  violated Stay, or this Court's Orders, in the past has nothing

6  to do with whether Stay Relief should be granted today.  Nor

7  does granting Stay Relief prevent this Court or Judge Bohm from

8  addressing those matters in an appropriate procedural posture.

9  And to the extent that there is any question on that, I will

10 make that part of my findings here today.

11      Furthermore, granting Stay Relief does not

12 resuscitate the State Court's June 28, 2022 Order -- I'm sorry

13 -- the May 2022 Order which I previously found to have been

14 entered while the Stay was in effect.  Any amorphous concerns

15 about inappropriate actions Ms. Biros might undertake in the

16 future is not a basis to deny her Stay Relief today.

17 Similarly, if and when those concerns materialize into

18 something concrete that is within the Court's jurisdiction,

19 then it can be addressed through the appropriate procedural

20 mechanism.

21      Rest assured, while the Court is anxious to conclude

22 the administration of this Estate, it will retain jurisdiction

23 to address some of the conduct which has occurred in this case.

24 So, although the Court will expand upon this point later in the

25 context of the Motion to Enforce the Sale Order, Ms. Snyder's

A954

Case 2:22-23425-LTB Doc 1345 Doc Filed Doc 08/20/1 Page File of 101/13/18 18:26:26 2025 Desc Main
Document    Page 16 of 101

16

acquisition of the Estate's rights to bring speculative

avoidance actions, which have yet to be filed, is not a basis

to prevent Ms. Biros from taking any and all actions consistent

with her rights as the property's owner.  Nor does the grant of

Stay Relief to Biros cut off Bankruptcy Court jurisdiction for

any claims Ms. Snyder allegedly acquired from the U LOCK

Estate.

To the extent that Ms. Snyder (sic) raises concerns

about the destruction or conversion of -- I'm sorry -- to the

extent George Snyder raises concerns about destruction or

conversion of his personal property, that would appear to be a

third-party dispute that can be resolved in another forum.

And, in addition, Shanni Snyder purchased whatever

rights U LOCK had to the assets on the property, and at 30 days

following the sale to remove them from their current locations.

And to the extent tenants have a Cause of Action against Biros

for restricting them from the property, that remains an option

in a viable forum, but it does not justify a denial of Stay

Relief under these circumstances.

To the extent Mr. Snyder asserts that there are

U LOCK business records at the property, those do need to be

turned over to the Trustee, and that shouldn't be complicated

to arrange.  Either Ms. Biros can collect them and turn them

over to Mr. Slone, or Mr. Slone can go there and get them

himself.

A955

1      But, in short, the Estate's use of the property is

2 not indefinite, and the time has now passed.  And so, for these

3 reasons, the Court is inclined to grant Stay Relief to Ms.

4 Biros subject to the release of the Debtor's business records

5 to Trustee Slone for the purpose of completing the Estate's tax

6 returns.

7      So, with that, I'll turn to the objecting parties to

8 tell me why that is not an appropriate finding with respect to

9 the Motion for Stay Relief.  So, I'll start with Mr. Joyce.

10      MR. JOYCE:  Kobeski will cover this.

11      THE COURT:  Kobeski.

12      MR. KOBESKI:  Your Honor, we're in agreement with

13 Your Honor's findings.  And we have no objection to what you've

14 proposed in regards to ruling on that Motion.

15      THE COURT:  Okay.  Thank you.

16      Mr. Snyder, you filed a response?

17      MR. SNYDER:  Yes.  A couple things.  I agree with you

18 for the most part.  My objection was some of the tenants that

19 needed to get their things.  One tenant is current still and

20 another tenant was only given nine days to get out.

21      The other thing I wanted to point out with the

22 business records there, there may not be a need for the

23 transfer.  I had access while they were working there.  The

24 place that the business records were, there was some -- we

25 recovered two boxes.  There was four boxes of flashdrives and

A956

18

1  some files missing.  In the event, once we leave, they would

2  find something there that we overlooked, then if those could be

3  returned to us.

4          THE COURT:  Okay.  Thank you.

5          Mr. Bernstein, the business records -- you and your

6  client are consenting to turn those over to the extent that

7  they are still on the property at this point?

8          MR. BERNSTEIN:  Yes, Your Honor.  We have no

9  knowledge of business records, but we'll certainly cooperate

10  with the Trustee.  Our understanding is that at the end of the

11  day today, there is no reason for anybody, other than the

12  Trustee, to be on that property.  I'm a little bit concerned

13  that Mr. Snyder has talked about he took some records, but he

14  didn't take all the records.  It's confusing, but we will

15  cooperate with the Trustee.  When we go to the property later

16  today, presumably after the Court enters its Order, we will

17  explore whether we find any records, but we will certainly

18  cooperate with the Trustee if he wants to come and look for

19  records.

20          THE COURT:  All right.  Thank you.

21          MR. SNYDER:  I can maybe clear that up.

22          THE COURT:  What's that?

23          MR. SNYDER:  I can maybe clear that up.

24          THE COURT:  All right.

25          MR. SNYDER:  I don't believe there are any more

A957

19

1  records there.  I don't think I have any need to get back on

2  the property.

3          THE COURT:  All right.  So, there are no further

4  records?  You have what you need to prepare the tax returns

5  then?

6          MR. SNYDER:  Well, there are some missing, but the

7  file drawers are empty, so I don't feel that they're anywhere

8  else on the property.

9          THE COURT:  Okay.  All right.  And, Mr. Slone, is

10 there anything further you wanted to address with respect to

11 the records or anything related to the Stay Relief Motion?

12         MR. SLONE:  No, sir.  I think it should be entered.

13         THE COURT:  All right.  Thank you.

14         All right.  Well, then, with the statements made on

15 the record and incorporating the Court's findings that I

16 indicated on a tentative basis, I will incorporate that into a

17 final ruling and grant Stay Relief for the reasons I've stated

18 on the record here today.

19         MR. BERNSTEIN:  I'm sorry, Your Honor, one question.

20 Does the Court have an intention with respect to when that is

21 effective because we are coming into the weekend and we want to

22 make sure that we begin to protect the property, get insurance

23 et cetera?

24         THE COURT:  I know that there was a request to waive

25 the 14-day period.  I didn't see anyone in the objections raise

A958

20

1  an issue specifically to that, but given the passage of time

2  and also mindful of the fact that this Stay Relief Motion was

3  scheduled for a hearing last week and I pushed it to this week

4  to make it consistent, I have no issue waiving the 14-day Stay

5  and having the Order effective when it's entered today.

6      MR. JOYCE:  Your Honor, just for clarification, if I

7  may.  Ms. Snyder, under the Court's prior Order approving the

8  sale, has through today to remove all property, and she has

9  removed substantially everything she's purchased.  The only

10 thing she has is some dumpsters that she had to rent to put on

11 the site.  So, they're there today.  So, I just would note for

12 the Court, I believe she's permitted, pursuant to the Court's

13 prior Order, to complete her removal activities through today.

14     THE COURT:  Okay.

15     MR. BERNSTEIN:  No objection at all to that, Your

16 Honor, through today.

17     THE COURT:  All right.  Thank you.

18     MR. SNYDER:  Am I allowed to remove my -- I left two

19 trailers down there I was going to remove today.

20     THE COURT:  That's a separate issue between you and

21 Ms. Biros as to your personal property at this point.  As I

22 told you before, I'm concerned about where we are with the

23 Estate assets at this point.  Okay?

24     MR. SNYDER:  Because I could have those out by five

25 o'clock today if you would allow.

A959

21

1          THE COURT:  Well, again, I indicated before, Ms.
2     Snyder ostensibly bought whatever rights and interest the
3     Estate had in the property.  If that's inclusive of what you
4     might make a claim for, then that can be resolved that way.
5          But let me ask a clarifying question.  So, the
6     property that was on the third-party site in McKeesport, has
7     that been removed?
8          MS. SNYDER:  That's been removed.
9          MR. JACKSON:  There's one excavator I have to move
10    today.
11         THE COURT:  I'm sorry, is that --
12         MR. JOYCE:  Sir, if you may?  That's fine.  That is
13    Mr. Nicholas Jackson.  He was a contractor that Ms. Snyder
14    engaged to remove the property from both locations?
15         MS. SNYDER:  Yes.
16         MR. JOYCE:  Both locations, as well as another
17    contractor.  Mr. Jackson was able to do that, his part of the
18    job, but we were advised this morning that the one excavator
19    that had the tracks removed, if the Court remembers, down on
20    the McKeesport property, that is still on the Biros property.
21    So, Mr. Jackson is indicating that that's still there, but will
22    be removed today?
23         MR. JACKSON:  Yes.
24         MR. JOYCE:  So, yes.  The Court's question, I think,
25    was, is everything removed from the Biros/McKeesport property?

A960

1  And the answer is, yes, all but what I just said.

2         THE COURT:  All right.

3         MR. BERNSTEIN:  And, Your Honor, we have no objection

4  to that effort continuing through today.  We also have no

5  objection to Ms. Snyder taking whatever she thinks she bought

6  off of the U LOCK property.  And we would hope that, perhaps,

7  she and Mr. Snyder could cooperate, and if there are things

8  there that he claims, we don't really care about them.  We

9  would just as soon Ms. Snyder use her purchasing power to

10  remove them for Mr. Snyder today.

11         THE COURT:  Okay.  Does that give you sufficient

12  clarity, Mr. Snyder?

13         MR. SNYDER:  Sounds fair, Your Honor.

14         THE COURT:  All right.  So, today's the day to remove

15  whatever remaining assets exist, and then we move on from

16  there.  So, I think that's a clarification that nothing from

17  the Court's entry of this Stay Relief Order should impede the

18  continuation of the process of removing the assets today, and

19  then tomorrow it's a new set of circumstances.

20         THE COURT:  All right.  Very good.  Let's move

21  forward to the next item, then.  That is Shanni Snyder's Motion

22  to Enforce the Sale Order, which is at Docket Number 274.

23         This is her Motion to Enforce the Order that I

24  entered in December confirming the sale of the tangible and

25  intangible personal property of the Estate under 11 U.S.C.

A961

1    Section 363(f), free and clear of all liens, claims and

2    encumbrances.

3         I have a pending objection to that filed by Ms. Biros

4    and, basically, this Motion was triggered by Ms. Biros filing

5    an Action to Quiet Title against Shanni Snyder in the Court of

6    Common Pleas of Westmoreland County.  The State Court action

7    seeks to strike a Lis Pendens filed against the property by Ms.

8    Snyder in April of 2022, and enjoin Ms. Snyder from claiming

9    any adverse right to the property.

10        Ms. Snyder subsequently removed the action to the

11   Bankruptcy Court, and I note that the matter has been docketed

12   as being related to the U LOCK Chapter 7, but I do have a query

13   whether it's more appropriately related to Ms. Snyder's Chapter

14   7 case.  But, again, if both matters are brought before this

15   Court, I don't know that that's a distinction with much of a

16   difference, other than how it's categorized and processed

17   moving forward.  But I'd also note that yesterday, Ms. Biros

18   has moved for entry of a default based on Ms. Snyder's failure

19   to answer or defend.

20        In any event, through the Motion, Ms. Snyder seeks an

21   Order enjoining Ms. Biros from asking for relief against her

22   relating to the property in the State Court.  And in broad

23   strokes, Ms. Biros denies that the Action to Quiet Title

24   violated the Stay and the Sale Order, and objects to the

25   breadth of relief Ms. Snyder requests.  She also contends that

A962

24

 1  this is yet another example of Ms. Snyder's vexatious

 2  litigation practices.

 3          In the Court's view, the Lis Pendens should be

 4  withdrawn with consent.  The initial question is, what rights

 5  did Shanni Snyder have as against the property as of April of

 6  2022?  And to the extent the State Court ruled that U LOCK

 7  never owned the property, Ms. Snyder's judgment against U LOCK

 8  could not have attached to the property.  At best, she could

 9  have attached to U LOCK's potential right to seek recovery of

10  the property, a right she now owns, but Shanni herself did not

11  acquire such rights until December of 2022.

12          Critically, however, Ms. Snyder acknowledged in

13  Paragraph 30 of the Stipulation that her judgment is not

14  secured by either the tangible or intangible assets of U LOCK,

15  and without any such security, there is no basis for the Lis

16  Pendens.

17          So, for those reasons, I'm inclined to strike that,

18  or authorize that to occur.  Although, procedurally, it's not

19  set before me, but I think in the spirit of turning over a new

20  leaf, that is one area where I think there should be

21  concessions made by the parties to narrow issues.

22          Beyond that, the Court is not yet convinced at this

23  time that Ms. Biros violated the Sale Order or Automatic Stay

24  with respect to the Quiet Title Action.  From the outset,

25  whether Ms. Biros violated Ms. Snyder's Automatic Stay would

A963

Case 2:22-cv-23251-LD45 Doc Document Doc 20201 Page Filed 07/31/23 Entered 07/31/23 16:37:08 Desc Main
Document     Page 25 of 101

25

1 seem to be an issue for Judge Bohm, but, notably, Ms. Snyder

2 has been discharged, and the case was closed, albeit there is

3 an issue of the undisclosed asset and the reopening of the

4 case.  So, those are issues that would be set before Judge

5 Bohm.

6      With respect to the Sale Order, the fact that Ms.

7 Snyder can, potentially, bring an Avoidance Action against Ms.

8 Biros in this Court would not in and of itself bar Ms. Biros

9 from taking all actions against Ms. Snyder in the State Courts.

10 Although the Court cannot say for certain that Ms. Snyder's

11 Avoidance Action could be brought in the State Courts,

12 primarily because no one has articulated the basis for such a

13 claim with any specificity.

14      Ms. Biros is correct that the permissive language of

15 the Sale Order which says, quote, shall be permitted to bring,

16 end quote, neither bars litigation in any other Court, nor

17 deprives the State Courts of their jurisdiction to hear any

18 other matters.

19      To the extent that the action to Quiet Title fell

20 within the Bankruptcy Court's retained jurisdiction, it was

21 appropriately removed, and Ms. Snyder was not harmed.

22 Ultimately, like many other arguments today, the Motion

23 prioritizes a sideshow rather than advancing the main event.

24      Put differently, why hasn't the alleged Avoidance

25 Action been filed and, frankly, how can Ms. Biros interfere

A964

26

1  with rights that Ms. Snyder has not yet asserted, and may never

2  assert?  In fairness, the Court appreciates that Ms. Snyder's

3  concern that Ms. Biros would seek to undermine the rights that

4  she acquired from the Estate.

5       The Action to Quiet Title arguably sought to press

6  the issue in a different forum which, in a best case scenario,

7  does nothing but to multiply the litigation.  And although the

8  Court does not think much of the Lis Pendens, the timing of Ms.

9  Biros's Action to Quiet Title so soon after the sale of the

10 intangible assets is not lost on the Court.  But Ms. Snyder can

11 protect herself from these potential issues by commencing her

12 Avoidance Action, and once filed there will be little question

13 about what is before the Court and what actions inappropriately

14 interfered with it.

15      So, for all those reasons, the Court is inclined to

16 deny the Motion to Enforce the Sale Order.  Nevertheless, I do

17 have a question regarding the Quiet Title Action and its

18 reference to a June 28, 2022 State Court Order issued by the

19 Court of Common Pleas that held that, quote, all title held by

20 U LOCK had been in trust for the benefit of Christine Biros.

21      I'm not aware of when that Order was issued.  I'm not

22 aware of whether that Order has ever been referenced in these

23 proceedings.  In my review for today's proceedings, it appeared

24 to be something new, and that leads me to questions as to how

25 it came about and what prompted it.

A965

1          MR. OTTO:  Your Honor --

2          THE COURT:  Well, I'll give you an opportunity.

3   That's ancillary to the Motion at hand on the Motion to Enforce

4   the Sale.

5          So, to the extent I deny this Motion to Enforce the

6   Sale Order, I would do so without prejudice.  And that the

7   Court would inquire further into the circumstances leading to

8   the State Court's entry of the June 28, 2022 Order.

9          So, let's get an explanation on that Order first and

10  then --

11         MR. BERNSTEIN:  Mr. Otto will do it.

12         MR. OTTO:  Your Honor, I have to confess, first of

13  all, I have not gone back and checked all the dates and all the

14  circumstances but, for your information, after the petition was

15  filed, both Shanni Snyder -- Ms. Snyder, and Mark Mycka entered

16  their appearances in the Biros versus U LOCK matter that had

17  already been decided by the Pennsylvania Supreme Court and was

18  back down before Judge Smail in Westmoreland County Court of

19  Common Pleas.  They then filed appeals to Superior Court, and

20  in Response to that Judge Smail issued a 1925 Order, or

21  Opinion, in which he said Ms. Shanni's -- or Ms. Biros's title

22  goes all the way back to 2015 in trust.  I don't have a copy of

23  the Order.  I'd be happy to provide it, but that was issued --

24         THE COURT:  Well, Judge Smail was aware of the

25  bankruptcy.

A966

28

1          MR. OTTO:  I'm sorry?

2          THE COURT:  Judge Smail was aware of the bankruptcy.

3          MR. OTTO:  Oh, yes, sir.

4          THE COURT:  And yet this Order was still issued and

5    it was prompted by the parties?

6          MR. OTTO:  It was prompted by the filing of both Mark

7    Mycka and Shanni Snyder post-petition.  They filed appeals to

8    Superior Court post-petition.

9          THE COURT:  Why did no one alert Judge Smail of the

10   fact that the Stay impacted that proceeding?

11         MR. OTTO:  First of all, Your Honor, he --

12         THE COURT:  That should have been put on ice.

13         MR. OTTO:  He knew about the bankruptcy, but he was

14   required by Superior Court to issue the Order.

15         THE COURT:  I want to give you a preview of coming

16   attractions here.  And maybe this is moot because I see that

17   there was the consent to entry of a final Order by Ms. Biros to

18   the removed action, but given what's happened in the State

19   Court, and I'm not -- don't take this as casting dispersions on

20   Judge Smail, but somewhere along the line there is a complete

21   misperception of how the Stay works, and I don't know what has

22   prompted that, but that gives me all the more reason for

23   wanting to have a lot of those issues resolved here than in

24   State Court.

25         I mean, that has not given me any confidence of

**WWW.JJCOURT.COM**

1  what's going on there and, quite frankly, it seems that the

2  decisions were already made well before this -- the decisions

3  that this Court needs to rely on in order to determine the

4  substantive State Court rights of the parties have already been

5  determined before this involuntary petition was even filed.

6          Mr. Otto?

7          MR. OTTO:  Just so you understand, I want to make it

8  very clear to the Court, the appearances that were entered by

9  both Ms. Snyder and Mr. Mycka, we never -- once this case

10  started, we did not object, or oppose, or take any action with

11  request of their entry.  They did not receive permission from

12  Judge Smail to enter the case, and we did not file anything

13  with respect to their appeals to Superior Court.  We've taken

14  no action with respect to that.  So, whatever has happened is

15  with Ms. Snyder, Mr. Mycka and the action of Superior Court and

16  Judge Smail, but we've had nothing to do with it, Your Honor.

17          THE COURT:  All right.  Well, again, this is an issue

18  that I need to delve into more deeply.  I don't want to spend

19  more time on it at this point given that it is extraneous to

20  the Motion at hand.  But with that said, I'm going to want a

21  copy filed, Mr. Otto, of the State Court docket of any entries

22  that occurred after April 27, 2022 when the involuntary

23  petition was filed and the Stay went into effect, and copies of

24  any pleadings that were filed.

25          In addition, I want each of the parties to provide me

A968

1   with an affidavit, certified under penalty of perjury,

2   identifying any and all communications that they may have had

3   with the State Court after April 27, 2022.  That includes

4   letters, e-mails, phone calls, whatever.  That's from either

5   attorney, staff members, whatever and I want those within 14

6   days.  Because from my view, there's way too much activity that

7   occurred in State Court.

8           And, furthermore, we had a long discussion about this

9   on June 2nd or 3rd -- I can't remember the date where I raised

10  these concerns.  I indicated that I thought the May 2022 Order

11  was void and I issued an Order to that effect subsequently.

12  But there's no basis that I am aware of at this point, and I'm

13  happy to be corrected on how the State Court could have

14  proceeded on this and, quite frankly, given my experience with

15  how other Courts deal with Stay issues, it would seem to me

16  that that would have only occurred if there was some prompting

17  or urging by any party.

18          So, 14 days for all parties to file an affidavit of

19  any communications that they had with the State Court after

20  April 27, 2022, and then I'm requiring Mr. Otto to also file a

21  copy of the State Court docket and any papers that were filed

22  in the State Court after April 27th.

23          MR. BERNSTEIN:  Your Honor, two clarifying questions

24  on the notice or the affidavit.  If there were no

25  communications, do you still want an affidavit?

1          THE COURT:  I want an affidavit saying there were no
2     communications.

3          MR. BERNSTEIN:  And I assume that you're talking
4     about communications with regard to the U LOCK matter that was
5     before that --

6          THE COURT:  Yes.  I'm sorry that I did not clarify
7     that, but that is specific, yes.  Any communications with the
8     State Court as to the U LOCK matter.  Obviously, lawyers
9     probably have many other cases.

10         All right.  Any questions on that before I turn back
11    to the Motion to Enforce the Sale Order?

12                   (No audible response)

13         THE COURT:  Okay.  So, then, given the way I am in my
14    predetermination to deny the Motion to Enforce the Sale Order
15    and since that's filed by Shanni Snyder, Mr. Joyce or Mr.
16    Kobeski, wish to address that?

17         MR. KOBESKI:  Yes, Your Honor.  We have listened to
18    what Your Honor has indicated it's your position and your
19    suggestion regarding potential agreement to withdraw the Lis
20    Pendens which is something we will discuss with Ms. Snyder.
21    It's not something that we had considered prior to today.

22         And, you know, relative to Your Honor's statement
23    regarding the State Court Orders, you know, since any
24    determination of the Motion to Enforce would take those rulings
25    into account or potential resolutions, we understand Your

A970

32

 1  Honor's position on the Motion.  Our major concern was the
 2  language included in the Quiet Title Action that sought to
 3  permanently enjoin Ms. Snyder from asserting any claim against
 4  the property.

 5         And then the fact that a ruling to that effect could
 6  somehow impact what she had purchased pursuant to the Trustee
 7  sale in this case.  It's our understanding that Ms. Snyder
 8  intends to proceed with pursuing the actions she purchased but
 9  we don't have a timeline in terms of when that may be initiated
10  but we understand --

11         THE COURT:  Well, I mean, why isn't there a timeline?
12  I mean, you purchased the assets.  I'm not inclined to sit and
13  wait for this thing forever.  And while I indicated the
14  Bankruptcy Court would retain jurisdiction, that's not an open
15  book.  In fact, I'm thinking that I'm in a position that if you
16  want to use Bankruptcy Court jurisdiction to bring the
17  Avoidance Action, I'll give you 30 days to file it.  And if
18  it's not filed within 30 days, I'm going to turn to just having
19  Mr. Slone close up the Estate, close up this case and if you
20  have an Avoidance Action, you can bring it in State Court.

21         MR. KOBESKI:  Understood, Your Honor.  And I believe
22  that timeline would be sufficient based upon Ms. Snyder's
23  intentions.  And certainly she did take action to remove the
24  State Court case to the Bankruptcy Court and we've only been
25  monitoring that from the sidelines.  It was her position that

A971

33

1   the Automatic Stay in her individual case, potentially, applies

2   to any action which -- and that matter is till before Judge

3   Bohm.

4            There's a pending Motion for Relief filed by Ms.

5   Biros which won't be determined for some time -- for several

6   weeks.  But in the meantime, we will discuss with Ms. Snyder

7   the potential for agreeing to release that Lis Pendens, you

8   know, based upon actions she plans to take in terms of filing

9   the Avoidance Action in this case.

10           THE COURT:  Well, let me ask this question.  Is there

11  any objection to granting Ms. Biros Stay Relief in the Shanni

12  Snyder personal case for the purpose of bringing the claim

13  objection in this case?  I mean, there would be no attempt to

14  enforce.  It would not be collection of assets.  It would

15  merely be a determination on the validity of the claim.

16           MR. KOBESKI:  Our only issue with Ms. Biros's filings

17  in the individual action are the fact that she is not a

18  creditor in that case.  She hasn't filed a proof of claim.

19  It's a no asset -- or it was -- it is an asset case.  The

20  claims bar date has passed.  Ms. Biros participated in that

21  action at length but has failed to file a proof of claim.

22           THE COURT:  Okay.  But the question though is she is

23  seeking -- she is seeking Stay Relief in order to file a claim

24  objection in this case, so whether she is a creditor or not in

25  that case wouldn't she be entitled to ask for Stay Relief for

A972

34

1  that purpose?  And if not, are you willing to concede that it

2  would not be a Stay violation for her to file a claim objection

3  in this case?

4          MR. KOBESKI:  Academically speaking, I mean, it's our

5  position that in this case I think Ms. Biros is entitled to

6  anything she is entitled to under the Code and the Rules of

7  Court.  However, there is still the potential issue that that

8  claim, that judgment itself is Estate property in the

9  individual Shanni Snyder case.  So, that does, I think,

10  implicate the need for Stay Relief in that regard because that

11  Estate does still have an interest up to 32,500 --

12          THE COURT:  Okay.  Well, I understand that.  But, I

13  mean, Trustee Zebley has delegated authority to pursue the

14  claims of your client, and has made an arrangement under the

15  Stipulation to accept the first 32,000 and change from that.

16  So, there are, you know, obviously in order to effectuate any

17  distribution in this Estate I have to have a claims allowance

18  process.  There has been stated intent that there is a desire

19  to object to the claim.  So, why are we dealing with procedural

20  hurdles here?  Why can't we just get to the merits and have a

21  claim objection?

22          MR. KOBESKI:  And eventually I think that would be

23  the end result, so, I mean, in that regard --

24          THE COURT:  Well, eventually -- this is what I'm

25  trying to say from the beginning of the case.  Let's cut

A973

1  through these things that are wasting time, effort, and causing

2  additional fees.

3          So, what I come back to is why not either consent to

4  Stay Relief or admit that pursuing the claim objection in this

5  case does not violate the Stay in her personal bankruptcy case?

6          MR. KOBESKI:  And I think those are things we could

7  discuss with our client.

8          THE COURT:  Where is the prejudice?  Where is the

9  prejudice?  That's what I want to know.

10          MR. KOBESKI:  We can discuss that with Ms. Snyder and

11  see if she would be in agreement with reaching those agreements

12  with Ms. Biros.  But those are not things we did discuss prior

13  to this morning.

14          THE COURT:  All right.  Well, I'm going to give you

15  time to discuss that, but I am going to want an answer on that

16  before we conclude the hearings today.

17          MR. ZEBLEY:  Your Honor, this is Trustee Zebley in

18  the Snyder case.  If I could weigh in?

19          THE COURT:  Go ahead.

20          MR. ZEBLEY:  I have no objection to the lifting of

21  the Stay.  I think what you observed is we have -- because I'm

22  going to get the -- whatever money that's going to come in,

23  which I'm dubious.  But we can't get any money into the Snyder

24  Estate until Mr. Slone can wrap up his Estate.  And holding

25  that hostage doesn't make any sense whatsoever.  I don't think

A974

36

1  there's anything to talk about, frankly.  Anyway, that's my

2  position.

3         THE COURT:  Thank you.  If you need time to discuss

4  it I will give you time to do that, but let me just circle back

5  on where we are first.  So, as I understand it you have no

6  objection to the Court denying the Motion to Enforce the Sale

7  Order provided that you are given 30 days to bring the

8  Avoidance Action or to have it in jurisdiction in the

9  Bankruptcy Court.

10        You're going to also discuss with your client the

11 consensual withdrawal of the Lis Pendens, and the understanding

12 is that notwithstanding -- and I'm going to come back to Ms.

13 Biros's counsel on this.  But from my viewpoint it would seem

14 that whatever relief Ms. Biros is seeking in the State Court

15 may bar Ms. Snyder as to whatever positions she had against the

16 property before the bankruptcy was filed, but it should not

17 impact any rights that she accrued from U LOCK in the sale or

18 the right to pursue the Avoidance Action per se.  So, I will

19 start with you on that.

20        MR. KOBESKI:  Your Honor, with that description of

21 the position, that certainly does provide some relief to the

22 concerns we had, which was the basis for the Motion, and the

23 time line suggested by Your Honor should be acceptable, and

24 allow Ms. Snyder to proceed, which would -- you know, once that

25 action is filed it -- this whole concern is rendered moot, so I

A975

37

1  think that's a proper way to proceed.

2            THE COURT:  All right.  Thank you.  Mr. Bernstein?

3            MR. BERNSTEIN:  Your Honor, that was a very important

4  point, the time line on what rights Ms. Snyder is asserting and

5  when.  The Lis Pendens is a pre U LOCK petition claim of Ms.

6  Snyder's that has nothing to do with U LOCK.  And it's separate

7  from whatever rights she purchased from the Estate.  So, we

8  appreciate the Court putting some limits on that.

9            In terms of streamlining we also appreciate the

10 Court's suggestion on the Lis Pendens.  I am unclear, and I

11 need to ask with respect to the removal, because the removal is

12 related to the Lis Pendens, which was apparently -- which was

13 the basis for the Quiet Title, which was the basis for the

14 Motion that counsel filed on behalf of Ms. Snyder.  Are they --

15 this may be a professionalism in ethics question.  I don't know

16 if they are counsel for Ms. Snyder in the removal, or just

17 enforcing her rights here in the main case.  It's unclear, and

18 it is a meaningful question for future reference.

19            THE COURT:  Okay.  Well, I think that's a valid

20 point.  Ms. Snyder is here.  So, I indicated I would give

21 counsel an opportunity to consult with her.  So, what I am

22 expecting is that after you consult here I will get an answer

23 that pertains to not only whatever matters you are representing

24 her on as counsel, but also anything that she might be

25 proceeding on pro se.  Is that understood?

A976

1        MR. KOBESKI:  Yes.

2        THE COURT:  Okay.  All right.  How much time do you

3   need to address that?

4        MR. KOBESKI:  Like ten -- I was going to say five,

5   but ten minutes would be safer.  More than five, just to step

6   outside and talk with her.

7        THE COURT:  All right.  Why don't we take a ten

8   minute recess.  We'll come back on the record at five after 11.

9        MR. KOBESKI:  Thank you, Your Honor.

10       THE COURT:  Thank you.  All right.  The Court will

11  stand in recess, and we'll reconvene at 11:05.

12                       (Off the record)

13       ECRO:  All rise.

14       THE COURT:  Thank you.

15                       (Pause)

16       MR. KOBESKI:  Your Honor, could we have a few more

17  minutes, like five?

18       THE COURT:  Yes.  Please.

19                       (Off the record)

20       THE COURT:  All right.  Let's go back on the record

21  on Case Number 22-20823, U LOCK Incorporated.  We had a short

22  recess to allow counsel to discuss with Shanni Snyder some of

23  the comments the Court raised with respect to the Motion to

24  Enforce.

25       I had one other thing that I thought about as I went

A977

39

1  back into chambers, and that is I also question whether or not

2  in the <u>Shanni Snyder</u> bankruptcy whether there would be a Stay

3  issue implicated given that this is an action where Shanni

4  Snyder is the claimant, and therefore the plaintiff.

5           So, with that said, Mr. Kobeski, have you had an

6  opportunity to review and --

7           MR. KOBESKI:  Yes, Your Honor.  And initially --

8           THE COURT:  -- tell me where you are on this?

9           MR. KOBESKI:  -- thank you for the time to allow us

10  to address these issues with Ms. Snyder.  We discussed the Lis

11  Pendens, which we learned also goes along with th Writ of

12  Summons that was filed in Westmoreland County, which we had not

13  been aware of.  But we are comfortable, and Ms. Snyder is

14  comfortable with agreeing to voluntarily withdraw the Lis

15  Pendens and the Writ of Summons after 30 days, which would

16  coincide with or follow her filing of her intended avoidance

17  claim in this case -- in this Court.

18           And that would then, in our position resolve the

19  pending Quiet Title Action, which has been removed to this

20  case, as well.  So, I don't know if Your Honor would consider

21  staying that pending action for 30 days to allow the time for

22  Ms. Snyder to proceed in bringing those avoidance actions,

23  which would then in essence resolve that pending litigation, in

24  our opinion.

25           And in terms of the Stay Relief that Ms. Biros

**WWW.JJCOURT.COM**

A978

 1  asserts that she needs to pursue or file an objection to Ms.

 2  Snyder's claim, we have no problem consenting to relief insofar

 3  as that would allow them to proceed in that regard.

 4          Currently, there's two matters pending in Judge

 5  Bohm's courtroom in the individual case, which is the Motion

 6  for Relief and also the Motion to Settle involving Trustee

 7  Zebley.  Ms. Snyder would like nothing more than to resolve

 8  both of those amicably, and she currently is in the process of

 9  potentially retaining counsel in that regard.

10          But if Ms. Biros is also interested in resolving

11  those without the necessity to proceed with litigation, Ms.

12  Snyder is certainly interested in doing that.  So I don't know

13  if there's other outstanding issues that Your Honor --

14          THE COURT:  Well, related to that, I mean, if the Lis

15  Pendens has no basis at this point why are we waiting 30 days

16  for it to be withdrawn?

17          MR. KOBESKI:  Well, Ms. Snyder apparently has filed a

18  Writ of Summons --

19          THE COURT:  Right.

20          MR. KOBESKI:  -- in the context of a Declaratory

21  Judgment Action, concurrent with the Lis Pendens.  So the Lis

22  Pendens --

23          THE COURT:  But the Lis Pendens has --

24          MR. KOBESKI:  -- relates to that --

25          THE COURT:  -- no foundational legal support, from

A979

41

 1  what I gather.  So, how can that support a Writ of Summons?

 2          MR. KOBESKI:  The legal basis, Your Honor, just, you

 3  know, in a summary, is that there is a judgment lien that was

 4  entered in the Western District --

 5          THE COURT:  Right.

 6          MR. KOBESKI:  -- but also in the State Court in

 7  Westmoreland County, and then subsequent to that judgment lien

 8  there was a mortgage entered against the property by Ms. Biros,

 9  and I believe a life insurance trust, or something along those

10  lines.  So, there is -- there remains a question as to the lien

11  priority regarding that judgment lien --

12          THE COURT:  Okay.  Well, let's just be clear again.

13  Let's not get down a slippery slope.  U LOCK, based on State

14  Court Orders, did not have title to the property when the Lis

15  Pendens was filed.  You have already stipulated in this case

16  that she does not have a secure claim and did not have a lien

17  on the assets.  So why are we even having this argument on the

18  Lis Pendens at this point?

19          MR. KOBESKI:  Your Honor, when the judgment was

20  entered in the Western District title to the property was in U

21  LOCK's name, and the State Court Orders transferred title of

22  that property subject to any liens and subject to any mortgages

23  or judgments.  So, arguably Ms. Snyder's judgment lien remains

24  in place and it's valid.

25          There's also -- I mean, there's also a question of

A980

 1  there's duplicate deeds that were recorded from the original

 2  prior owner.  Some of those deeds remain of record.  The State

 3  Court action only struck one set of deeds.  So there's an

 4  extraneous set of deeds to U LOCK that remains in place, you

 5  know, on the title in Westmoreland County, and the transfer of

 6  that property pursuant to the constructive trust by Judge

 7  Smail's own Order was subject to liens and encumbrances.  So

 8  arguably Ms. Snyder's lien has not been stricken from the

 9  property.  At the time it was entered U LOCK was the title

10  record owner of that real estate.

11           MR. BERNSTEIN:  Your Honor, just for the record, we

12  dispute those facts.  With respect to when the judgment was

13  entered the title was not in the name of U LOCK at the time.

14  There was no lien by Ms. Snyder against U LOCK, whether in

15  Federal Court or State Court, and if they are trying to layer

16  on top of this Lis Pendens the whole argument about whether the

17  deeds were valid, I don't know what we're going to get to

18  today.

19           THE COURT:  Yes.  I --

20           MR. BERNSTEIN:  Again, it raises a question of who is

21  representing -- I mean, who is making this argument?  Is it Ms.

22  Snyder?  Is it her counsel?

23           THE COURT:  Okay.  Here is what I am going back to.

24  Two issues.  One is, first, there's an agreement to withdraw

25  the Lis Pendens subject only to the commencement of the

1  avoidance action.  I don't know that that changes anything, so

2  why don't we just cut to the chase and you have -- it's a

3  metric that's within your control.  You can file the avoidance

4  action in 30 days.  You can file the avoidance action tomorrow.

5         So, with that said, while I have all the parties

6  here, and while everyone has committed the time and resources,

7  let's just make the determination now on the Lis Pendens and be

8  done with it?  If we start to go down as to the merits of the

9  Lis Pendens I can tell you again I'm going to hold parties to

10 the standards here, and what's already in my record.  The

11 question of whether or not U LOCK had title to the property on

12 the one hand, or alternatively a Stipulation that Ms. Snyder

13 does not have a secured claim in this case, and no lien against

14 U LOCK.  So, those are disconcerting.

15        So, let's not put form over substance here.  Let's

16 just deal with what we're dealing with.  And so, if there is no

17 issue to go forward with the Lis Pendens in 30 days there's no

18 reason to go forward with the Lis Pendens now.  I have already

19 indicated that I am going to protect Ms. Snyder's right to

20 bring the avoidance action if she wishes to do so in that 30-

21 day period, but let's not overreach.

22        MR. KOBESKI:  Your Honor, Ms. Snyder will concede to

23 volunteering to withdraw the Lis Pendens.

24        THE COURT:  Okay.  All right.  Very good.  Then on

25 that basis what I am going to do is a couple of things.  And --

1    I lost my place with my notes.  But -- so what I understand is

2    we have got consent to 30 days to bring the avoidance actions

3    if you wish to bring them in the Bankruptcy Court, a consent to

4    release of the Lis Pendens, and furthermore consent that, you

5    know, that resolves the Quiet Title Action to the extent that

6    Ms. Snyder was claiming an interest in the property in her own

7    name separate and apart from whatever right she accrued from U

8    LOCK.  Nothing will impact her ability to bring the avoidance

9    action against U LOCK based on this ruling.

10          And third, there is consent to whatever stay relief

11   is necessary to allow an objection to the Shanni Snyder claim

12   to proceed in this U LOCK bankruptcy case.  All right?  Is that

13   the understanding?

14          MR. KOBESKI:  Yes, Your Honor.  And once again, I

15   would just reiterate for the benefit of the Court and Ms.

16   Biros, Ms. Shanni Snyder would be interested in settling all

17   the matters pending in Judge Bohm's courtroom.

18          THE COURT:  Okay.  Well, actually, I'll circle back

19   on that in just a minute.

20          MR. KOBESKI:  Thank you.

21          THE COURT:  But you agree to that?

22          MR. KOBESKI:  Yes, Your Honor.

23          THE COURT:  All right.  Ms. Snyder, you personally

24   agree to that, as well?

25          MS. SNYDER:  Yes.

A983

1          THE COURT:  All right.  So, returning to Ms. Biros.

2   So, on the first aspect any issue with what I have set forth

3   there?

4          MR. BERNSTEIN:  No, Your Honor.  That's the 30-day

5   issue?

6          THE COURT:  Well, 30 days to bring the avoidance

7   action if they wish to pursue it in Bankruptcy Court.  It will

8   resolve the removal action by the release of the Lis Pendens,

9   and that there is no further rights that Ms. Snyder has as to

10  the property that accrued to her personally before she acquired

11  the rights from U LOCK.  And third, consent to stay relief to

12  any claim objection that would be necessary in this case.

13         MR. BERNSTEIN:  No objection, Your Honor.  And to

14  clarify, if Ms. Snyder withdraws the Lis Pendens and terminates

15  the Writ of Summons, there is no reason for the Quiet Title

16  Action to exist.

17         THE COURT:  Okay.

18         MR. BERNSTEIN:  And we would --

19         THE COURT:  Then we'll resolve it today.

20         MR. BERNSTEIN:  -- make that disappear.

21         THE COURT:  Okay.  And then the third thing is, I'm

22  now doing Judge Bohm's work for -- as to the Stipulation,

23  because I think that's the only other thing that's pending in

24  her case, is there any issue with the Stipulation being

25  approved in her case subject to the same caveats which I have

1 raised here before that it would -- it would be approved

2 notwithstanding any objection that you would have to the merits

3 of the claim?

4         MR. BERNSTEIN:  Well, as happens when you have the

5 lack of clarity as to an individual representing themselves and

6 having counsel, there is another matter pending with Judge

7 Bohm.  Ms. Snyder, on her own apparently, filed a Motion to --

8 Motion for Sanctions against Ms. Biros and Mr. Otto for

9 essentially filing the Quiet Title Action, so there is another

10 pending matter in that Court.

11         As to the Stipulation, my partner, Mr. Burkley, has

12 been working on that matter with Mr. Zebley.  I know that

13 Burkley has told me that he is very confident that there would

14 be an agreement with Mr. Zebley before Judge Bohm's deadline of

15 February 7th.  So, I would say it's likely to be resolved,

16 especially in light of the Court's pronouncements today with

17 respect to the Stipulation.  I just can't commit to it, but I

18 can say it's very likely that that can be resolved.

19         THE COURT:  All right.  I'm not aware of what the

20 Motion for Sanctions is.  It's not something that I have

21 reviewed.  And again, it's not on my docket, so I'm not going

22 to go down that path at this point because I feel like I made a

23 lot of progress at the beginning of the hearing, and I don't

24 want to go off the rails at this point.

25         So, I'm going to take what we've got at this point

A985

47

1  and move forward.  So, Mr. Kobeski --

2          MR. KOBESKI:  Your Honor, the only thing I wanted to

3  add regarding your statements regarding Ms. Shanni's -- or Ms.

4  Snyder's interest in that property, and have there been any

5  findings today, or is it your intention to make any findings

6  regarding the underlying Civil Court judgment that is in place

7  both in the Western District, as well --

8          THE COURT:  Well, I think we've cut to the chase on

9  that because Mr. Bernstein has said that if the Lis Pendens is

10 withdrawn and the Writ of Summons is withdrawn, then that

11 resolves the Quiet Title Action, so we're done.  Okay?

12         MR. KOBESKI:  But the -- I mean, obviously Ms.

13 Snyder's position is her judgment remains in place?

14         THE COURT:  The judgment remains in place.  I don't

15 know what it means, or what impact it has at this point.  I've

16 told you my thoughts on it.

17         MR. KOBESKI:  Right.

18         THE COURT:  But beyond that we can take it up at the

19 claims objection.  But I -- again, I want to be -- the parties

20 be mindful of the inconsistencies of any arguments or positions

21 they may take based on where they were before.  Okay?

22         MR. BERNSTEIN:  And speaking of that, Your Honor, we

23 do intend to file the objection quickly.  I just want to make

24 sure that we're not going to get caught in the Court not having

25 -- not feeling that it has the ability to impact that claim

A986

48

1 because it's the subject of a judgment that Judge Coville

2 entered.  And that's actually why we were seeking relief from

3 stay with Judge Bohm, so that we could intervene in the civil

4 action to seek a Rule 60 Motion to avoid -- to eliminate that

5 judgment, which is the basis for the claim.  So we are happy to

6 file it here and have Your Honor deal with it if Your Honor

7 feels that that's appropriate.

8 　　　　　THE COURT:  I'm fine with having it filed here.  I

9 think it makes the most sense.  But, you know, it -- the

10 judgment will be something that's part of the examination if

11 there's a claims objection.  So I will deal with it at the

12 appropriate time.

13 　　　　　MR. BERNSTEIN:  Thank you.

14 　　　　　THE COURT:  All right.  Anything further?

15 　　　　　MR. KOBESKI:  No.  I mean, just to clarify, Ms.

16 Snyder's judgment has a lien against that real property, or the

17 lien is not being waived, or without prejudice to her to assert

18 that in the event that becomes --

19 　　　　　THE COURT:  Okay.  Well, I want to be very clear,

20 again.  The Stipulation says she has no --

21 　　　　　MR. KOBESKI:  Right.  And that's based upon --

22 　　　　　THE COURT:  -- no lien in the assets being sold.

23 　　　　　MR. KOBESKI:  Right.  And the assets that were sold

24 were --

25 　　　　　THE COURT:  And that includes all tangible and

**WWW.JJCOURT.COM**

A987

49

1 | intangible assets of U LOCK.

2 |       MR. KOBESKI:  Correct.

3 |       THE COURT:  And that includes --

4 |       MR. KOBESKI:  Right.  And the assets that were sold

5 | were --

6 |       THE COURT:  -- all tangible and intangible assets of

7 | U LOCK.

8 |       MR. KOBESKI:  Correct.  And at the time the

9 | bankruptcy was filed U LOCK was not the record owner of the

10 | real property.  I mean, she acknowledges that, so her --

11 |       THE COURT:  We're walking in circles, Mr. Kobeski.

12 |       MR. KOBESKI:  I understand.  But, I mean, we're

13 | making determinations regarding a Quiet Title Action that was

14 | filed in State Court, you know, sort of on the fly here, so

15 | we're just trying to make sure that we're understanding that

16 | we're not making any concession regarding the status of her

17 | civil judgment that remains in place both in Westmoreland

18 | County, as well as --

19 |       THE COURT:  The judgment remains in place.  Whether

20 | or not it's a lien is a different matter at this point.

21 |       MR. KOBESKI:  That's fine, Your Honor.  We understand

22 | --

23 |       THE COURT:  All right.

24 |       MR. KOBESKI:  -- I think the clarification that

25 | you're making --

A988

1          THE COURT:  Well, like I said, I'm going to take what

2     we've done here so far and call it a victory, and move on to

3     the next matter.  So -- wait a minute.  Before I forget --

4          MR. KOBESKI:  So, Your --

5          THE COURT:  Let me see if there's -- okay.  Yes.  So,

6     Christine Biros is the only objecting party to that request.

7     Mr. Kobeski, one final thing?

8          MR. KOBESKI:  I'm sorry, Your Honor.  But final

9     clarification.  Your Honor, you are not making a determination

10    that the judgment is a lien, but Ms. Snyder wouldn't be

11    prejudiced from presenting an argument that might make that

12    argument in the right context in the event --

13         THE COURT:  Again, this is -- this is something that

14    everybody has been doing in this case.  I thought I had been

15    pretty clear on what I viewed as the position, and I thought I

16    stated it clearly, and yet people are hearing what they want to

17    hear.  She has a judgment.  What I don't see at this point is

18    that she has a judgment lien based on the fact that either U

19    LOCK did not have title to the property, or it was stipulated

20    that she does not have a lien against the tangible and

21    intangible assets.

22         Because I can tell you, I mean, the Court would have

23    had some more concerns with the Stipulation because, again,

24    this was a judgment -- let's be mindful, this was a judgment

25    that was obtained on April -- I'm sorry.  When was the --

**WWW.JJCOURT.COM**

51

1   sorry, the Lis Pendens was filed in April.  The judgment was
2   filed within the one year look-back period for an insider
3   transaction.
4        And commensurate with that the Trustee ostensibly
5   gave up whatever right he had to avoid that judgment under the
6   avoiding powers pursuant to the Stipulation.  And the way the
7   Court understood it was he was doing so because there was an
8   acknowledgment that there was no lien against U LOCK.  So, if
9   we're trying to argue against our own Stipulation here, I
10  advise you to tread very carefully.  But I really want to move
11  on, so what's the final word on this?
12       MR. KOBESKI:  I mean, I think -- Your Honor, we are
13  in agreement.  I mean, as set forth in Paragraph 30 and 31 of
14  the Stipulation Ms. Snyder acknowledged that the judgment was
15  not a secured lien against the tangible or intangible assets of
16  U LOCK.
17       THE COURT:  Right.
18       MR. KOBESKI:  Which was personal property, which is
19  what she purchased.
20       THE COURT:  No.  It doesn't say personal property.
21  It says tangible and intangible assets.  Generally accepted
22  accounting principles, a tangible asset includes real property.
23       MR. KOBESKI:  And at the time, I mean, U LOCK, and
24  even now U LOCK has no real property.  I mean, it --
25       THE COURT:  Point taken.

A990

52

1          MR. KOBESKI:  We concede.  We concede.

2          THE COURT:  So, there's no lien.

3          MR. KOBESKI:  Right.  There's no lien against U LOCK

4    is our position.

5          THE COURT:  All right.  Fine.  We're stopping there.

6    But this is the problem that I am having with this.  All right?

7    And it's not -- you know, I'm getting irritable with Mr.

8    Kobeski here, but I have had the same things on this side, too.

9    But it's -- we're trying to circle around and play games with

10   things, and argue cutesy points that just distract us and do

11   not serve any productive purpose other than to try to get some

12   sort of minimal litigation advantage, and it's not reflected as

13   to the facts and records before this Court.

14         So, from that standpoint I am going to deny the

15   Motion to Enforce the Sale Order for the reasons I have stated,

16   and based on the modifications of the record here.  All right?

17         Moving on.  All right.  The next matter I have is a

18   Show Cause Order that was entered against Christine Biros and

19   Attorney Bernstein to show cause why the Court should not

20   impose sanctions against them for filing Christine Biros's

21   Motion for Allowance of Administrative Expense Claim under

22   503(b)(1) in violation of Bankruptcy Rule 9011(b)(1) through

23   (3).

24         By way of background Ms. Biros filed the Motion For

25   an Administrative Expense on December 22nd, 2022, requesting

A991

53

payment of an administrative expense claim in the amount of
$144,000 for the Estate's use and occupancy of the property
post-petition.  The Motion prompted objections from the Chapter
7 Trustee, Ms. Snyder and Mr. Snyder.  And on January 17th I
issued a Memorandum Opinion sua sponte denying the Motion
without prejudice after finding that the Motion was patently
frivolous.

Specifically, the Court found that although Ms. Biros
was likely entitled to administrative expense claim for the
post-petition use of her property the Motion suffered from
three flaws.

First, her use of a return on investment metric
calculated to her claim was inappropriate under Section
503(b)(1)(A) because it ignored the fair market value benefit
of the benefit to the Estate, which is the standard under Third
Circuit precedent.

Second, her calculation lacked a factual basis, and
seemingly relied on dubious assumptions, such as a capital
investment of $1.9 million, and the current value of the
property.

And, lastly, at $144,000 Ms. Biros's claim is more
than twice the value of the bankruptcy estate, i.e., the sale
proceeds.  It grossly exceeds the value of the tangible assets
stored on the property, and represents a monthly rental
obligation that far exceeds the annual revenue of the Debtor's

A992

1  pre-petition business.

2       Because the Motion appeared unsustainable under fact

3  and law and was so unreasonable that the Court could not

4  conceive of a proper purpose, the Court ordered both Ms. Biros

5  and Attorney Bernstein to show cause.  I have reviewed the

6  joint response filed by Ms. Biros and Attorney Bernstein at

7  Docket 304, and again, to expedite matters I am going to offer

8  initial impressions of the response before asking the parties

9  how they would like to proceed.

10       Note that although the response insists that the

11  Motion did not violate Bankruptcy Rule 9011, its reasons are

12  thin, and offers no real defense to the specific assertion of a

13  $144,000 claim.  In fact, it pays no attention to that number

14  at all.

15       The response argues, correctly, that Ms. Biros is

16  entitled to request administrative expense for the Estate's

17  usage of he property.  The Court has never quibbled with the

18  propriety of seeking an administrative claim but her conceptual

19  entitlement does not insulate her specific ask, and by that I

20  mean the text of the Motion from liability under Bankruptcy

21  Rule 9011.

22       The response defends the Motion by suggesting it was

23  the opening volley to spark negotiations of her claim as

24  happens in other cases.  And in so doing she essentially admits

25  the Motion was a litigation tactic so the propriety of the

1  purpose boils down to the defensibility of the amount requested

2  in the first instance.

3         The response contends that the return on investment

4  as a basis for Ms. Biros's administrative expense claim is

5  supported by law and specifically point to <u>Geltzer v. Helen-May</u>

6  <u>Holdings, LLC (In re Kollel Mateh Efraim, LLC)</u>, which is 2009

7  Westlaw 2929430 at Star 1.  It's a Bankruptcy Court decision

8  from the Southern District of New York dated August 18th, 2009,

9  affirmed at 456 B.R. 185, Decision of the Southern District of

10 New York from 2011, which is an unpublished decision from the

11 Southern District of New York.

12        Initially the Court observes that the <u>Geltzer</u> case

13 was not cited in the Motion for an administrative expense,

14 raising the question of when counsel was aware of this

15 authority.  Upon a full reading, including the subsequent

16 Bankruptcy Court decision and the District Court decision, the

17 case appears inapposite for a number of reasons.  The facts are

18 somewhat convoluted.  You need to pull them from a series of

19 decisions, but it can be distilled as follows.  The Debtor in

20 that case was the assignee of a contract to acquire real

21 property from Helen-May for $1.4 million in 2004.  The property

22 consisted of a resort hotel located on approximately 77 acres.

23 And when closing did not occur promptly the Debtor, Helen-May

24 -- the Debtor and Helen-May entered into extension agreements

25 by which the Debtor was permitted to occupy and operate the

A994

1    resort.  In fact, the Debtor's operations produced net revenue

2    of $1.4 million between 2004 and 2007.  And ultimately a

3    closing never occurred and the bankruptcy petition followed.

4         Once again, the facts of that case get convoluted,

5    but the point is that the response wants me to focus on is that

6    the Court ordered the Debtor to pay Helen-May adequate

7    protection payments for quote, unquote, use and occupancy based

8    on an uncontested expert testimony that a ten percent ROI on

9    1.4 million plus taxes was a reasonable annual rental value.

10        And notably in a later decision the Court found that

11   Helen-May failed to prove an administrative expense claim in

12   that amount.  See 2010 Westlaw 3782050, which is from the

13   Bankruptcy Court of the Southern District of New York,

14   September 21st, 2010, affirmed at 456 B.R. 185, Southern

15   District of New York, 2011.

16        Importantly, Geltzer does not provide any support for

17   Ms. Biros's position.  Starting with the facts, among the

18   reasons the ten percent ROI on the sale price was found to be a

19   reasonable rental value was that it was the equivalent to ten

20   percent of the Debtor's net revenue for the period of its

21   occupancy.  Again, ten percent of the Debtor's net revenue.

22        In other words, the reasonable rent was not simply an

23   ROI, but ten percent of the Debtor's profits from operating the

24   resort on Helen-May's property.

25        In the present case Ms. Biro's ROI calculation

57

produces a monthly obligation exceeding U LOCK's annual gross
revenues, not to mention any profit.  Next, <u>Geltzer</u> involved an
adequate protection payment for a going concern, not an
administrative expense under Section 503(b)(1).

The response notes that although Helen-May did not
prove an administrative expense, the Court did not repudiate
ROI as a reasonable monthly rental value.  That dismisses the
bigger point.  Although it may have been reasonable monthly
rental value, reasonable monthly rental value does not
automatically equal an administrative expense.  Ironically, the
<u>Geltzer</u> opinion emphasizes what would seem to be a critical
flaw in Ms. Biros's calculation.  <u>Geltzer</u> involved the use and
occupancy of a profitable resort.  In this sense there was an
identity of value and function between both the seller and the
Debtor.  Here let's call the property for what it is, a largely
undeveloped parcel containing a shed and a single rather
dilapidated self-storage facility.  The rest of the property
contains piles of junk.

The Debtor seemingly operated a self-storage facility
on only a portion of the land, yet despite these facts Ms.
Biros is seeking to capture an ROI based on a developed, fully-
functional retail plaza.

In the end the response insists the Court was
premature in denying Ms. Biros's claim and argues that Ms.
Biros could present evidence in support of her claim given the

A996

1  opportunity.  Admittedly, the Court is dubious for several

2  reasons, including the question is not whether she can prove

3  her ROI, but whether ROI is an appropriate measure of the

4  Estate's benefit.  And for that to be true Ms. Biros would need

5  to justify how the Estate could receive a benefit far in excess

6  of the property value that was preserved.

7       Frankly, at $18,000 a month it is hard to imagine

8  that it would have been cheaper to move the tangible assets

9  offsite.

10      The Court also finds it telling that neither the

11 Motion nor the response explain even in summary fashion how the

12 Estate benefitted to the tune of $144,000.

13      Finally, and perhaps most damning of all, Biros's

14 administrative expense calculations are undercut by her own

15 proof of claim.  That claim seeks payment of pre-petition rent

16 based on monthly rent of $5,000 a month, roughly 27 percent of

17 her post-petition monthly rent claim.

18      Giving her the benefit of the doubt, the claim

19 suggests the top end rent number could be as high as $10,000,

20 which is still $64,000 less than the aggregate which is claimed

21 in the Motion.

22      I question whether this proof of claim was even

23 reviewed before the Motion was filed.

24      That all said, the Court denied the Motion for an

25 administrative expense without prejudice to the filing of a

Case 22-06822-115-455 Doc 260 Filed 01/24/01 Page Entered 07/24/01 Page 63/24/2025 15:36 Desc Main
Document     Page 59 of 101

59

1  Motion seeking a reasonable request for administrative claim.

2  So, with the benefit of the Court's added perspective on this

3  matter and my thoughts I just relayed, I leave two options on

4  the table for Ms. Biros and Attorney Bernstein.  You can either

5  have seven days leave to file an amended Motion for an

6  administrative expense claim, or if you truly believe the

7  Motion was meritorious on all counts, in essence you want to

8  double down, then I will set it for an evidentiary hearing

9  where you can put on whatever record you wish.  The choice is

10  yours.

11           In any event, I am going to continue the Order to

12  Show Cause to run parallel to the hearing on either the

13  original Motion for the evidentiary hearing or on the amended

14  Motion.  So, Mr. Bernstein?

15           MR. BERNSTEIN:  May I have a moment?

16           THE COURT:  You may.

17           MR. BERNSTEIN:  Your Honor, I was in some sense

18  looking forward to the opportunity today to provide some

19  additional thoughts and reaction to the Memorandum Opinion.  In

20  light of the Court's pronouncements earlier about cutting to

21  the chase and trying to get to the end of things, I am probably

22  not going to say all the things that I was prepared to say.

23  The answer -- we came in today assuming that the Motion was

24  dismissed pursuant to the Order, and considering when to file a

25  renewed Motion, based on the status of the case at any

A998

1  particular time.  I will say that before I get to the answer to

2  the Court's question the filing of the Motion was to some

3  extent driven -- the timing of the filing was to some extent

4  driven by the Court's comments at one or more of the sale

5  hearings about ending the case.  And understanding that we

6  needed to get to the end of the administrative claims in order

7  for the Trustee to be able to close the case.

8         We will certainly file an amended Motion.  Well, let

9  me say we are likely to file an amended Motion.  I don't want

10  to foreclose the possibility that based on the facts of the

11  case and the other claims that are out there that Ms. Biros may

12  decide not to spend the time or effort filing a 503 request,

13  but it is likely that we will file one.

14         What we file will be informed significantly by the

15  Court's Memorandum Opinion and by the comments that the Court

16  made today, as well as by the significant research that we have

17  done since the Memorandum Opinion, and our hope is that the

18  Court sees that Motion for what it is a property owner's

19  attempt to get a reasonable claim for the Trustee's having used

20  her property for eight or ten months, whatever the time period

21  is, through today, when the Trustee gave it up.

22         There was nothing more to it than that.  It was not a

23  litigation tactic except to the extent that any request for a

24  claim is a litigation tactic when there are other people in the

25  case fighting for the same pot of money.  We have heard what

A999

1  the Court said.  We've read what the Court wrote.  I hope that

2  I have heard it the way it was intended to be conveyed, and

3  that I listened carefully.  And I know that what I have heard

4  and read will inform further action.  I don't know what the

5  Court intends to do.  It sounded like the Court was just going

6  to continue the Order to Show Cause to a future point related

7  to the new Motion.  Honestly I'd like the Court to discharge

8  the Order to Show Cause and end that sword of Damocles.  It's

9  personally and professionally distressing, and I would prefer

10 that it no longer be there.  If there is a sanction that the

11 Court believes is appropriate the Court should impose that

12 sanction.  I don't think that if the Court is waiting to see

13 whether we file a Motion that the Court doesn't like again,

14 then I guess I have no choice.

15         THE COURT:  Well, I guess where I am is this.  No

16 one, and I have been clear on this in the Opinion, and I was

17 clear on it today in my remarks, and I've been clear on that at

18 the last couple of hearings, that I had no opposition and think

19 that Ms. Biros is certainly entitled to request a reasonable

20 amount of rent for the use of the property during the time that

21 the Estate had possession.  And in fact, the critical issue is

22 what is reasonable?  And as I mentioned in the Opinion, and as

23 I noted and used the exact same phrase in one of the hearings,

24 was that the request needs to be reasonable, and in fact,

25 reasonableness is inherent in the legal standard.  And despite

A1000

62

1  those admonitions I got this.  So, where I am left with is if

2  you are going to, as I said, double down and stay with this

3  Motion, then we will have an evidentiary hearing on it.  I will

4  consider it to still be a live Motion at that point because

5  you've asked for the ability to have the evidentiary hearing.

6  And I'll continue the Show Cause to that date.  If you are not

7  sure yet whether you will file an amended Motion, then that

8  puts me in a quandary of what I do with the Show Cause at this

9  point.  So, that's --

10      MR. BERNSTEIN:  Likely we will file another Motion,

11  Your Honor.  I just haven't had time to consider all this, that

12  Ms. Biros is happy that the Court decided today to terminate

13  the Stay and that she gets her property back, and is happy with

14  several of the other things that happened today, and that may

15  inform the ultimate decision.

16      I think -- I mean, to be very frank, I get that the

17  Court was perturbed, upset with the $144,000 request.  I

18  understand that.  I've heard that.  It's not at all unusual for

19  a party seeking a claim, especially when there are other

20  parties looking for the same pot, to push the limits.  I

21  understand that the Court thinks we went past the limits in

22  this case.  I think that the Court's focus on the size of the

23  Estate is useful but not determinative.  We fight everyday over

24  small estates, trying to get our clients their share, whatever

25  share the Court determines.  In this situation I think I hear

A1001

1  the Court troubled by the use of a metric that came up with a

2  number that the Court just thinks was much too high, outside

3  the range of reasonableness, and I honestly don't -- don't know

4  how to represent Ms. Biros in the prosecution of a claim under

5  503 in light of the animosity and litigation posture of the

6  other parties in the case without proposing a number which is

7  high, because we're going to have a fight with other parties,

8  and I think in our response we suggested that had we even used

9  the $1,500 that the Court mentioned with regard to the bid,

10 that we certainly would have had objections by one or more of

11 the Snyders.  In fact, the Trustee kind of hinted, and it was

12 based on a conversation he and I had, that $1,500 would

13 certainly be okay with him, 5,000 is probably not outside the

14 range for him.

15         So, it was the --

16         THE COURT:  Was that before or after the Motion was

17 filed?

18         MR. BERNSTEIN:  The discussion with the Trustee was

19 after the Motion was filed, before the Trustee filed his

20 response.  And I don't remember exactly, but I think I called

21 him just to talk with him about what his position might be.

22 And I think we had some discussion, and I said, well, we can

23 come to an understanding, but we can't make an agreement

24 because we still have other parties who will be objecting, and

25 so thanks for the information, we'll see what happens at the

**WWW.JJCOURT.COM**

A1002

1  hearing.

2        It was as -- and I don't want the Court to think I'm

3  trying to hide behind, well, everybody does it.  It does happen

4  regularly that Motions seeking -- Motions seeking, let's call

5  them big claims, are filed, expecting there to be responses

6  that may bring new information, negotiations that may bring new

7  information, hearings that might bring new information.  And in

8  the end that's how we bring to the Court either a solution or

9  enough facts and argument to get a reasonable decision.

10       Faced with this question again, not having the

11  benefit of the Court's Memorandum and statements here, facing

12  this question again I am not sure that 99 out of 100 lawyers in

13  this district would not file the same sort of Motion.  It's --

14  when I say it's the beginning I don't want to say that it's --

15  you know, it was an unreasonable demand to spark negotiation.

16  We had to start somewhere.  And --

17       THE COURT:  Okay.  Well, let's just get back to --

18  cut to the chase then.

19       MR. BERNSTEIN:  Yes, sir.

20       THE COURT:  It comes down to a justification of the

21  $144,000.  I have an estate that generated a value of no more

22  than 70,000.  I have a Debtor who, in its best case never

23  generated annual income of more than $13,000.  So, if you want

24  to stand by the one forty-four, then give me your best defense

25  as to why that was a justifiable and reasonable number under

**WWW.JJCOURT.COM**

1  these sets of circumstances, because I can tell you again, it

2  is so far beyond the pale, it's not just puffing the claim a

3  little bit.  It is way, way off the ledge.  I would not have

4  gone to the trouble of writing a Memorandum Opinion -- and

5  believe me, I don't take lightly issuing a 9011 Order.  I think

6  this is only the second one I've ever done in ten years.  But

7  it's gotten to the point where enough is enough, and so I need

8  to say what I need to say on this.

9        So, if you want to justify the one forty-four, please

10  do so.

11        MR. BERNSTEIN:  Well, I'm not sure that anything I

12  can say today --

13        THE COURT:  I'll give you full range to do whatever

14  you want to do to justify the number and defend the Motion

15  against the show cause.

16        MR. BERNSTEIN:  Well, I would love to have this

17  discussion about justifying that number.  It sounds like my

18  doing that is -- is challenging the Court and is making a

19  decision that --

20        THE COURT:  Well --

21        MR. BERNSTEIN:  -- we can't -- we can't seek a

22  different amount, that we're stuck with this.

23        THE COURT:  What I am trying to do is I'm trying to

24  give you the benefit of my read, the benefit of my view of the

25  case, and the view of the case law, so that you can adjust

66

1   accordingly in your response to that, and we can have a fully

2   informed and engaged discussion about it, and then at that

3   point I can make a determination.

4          MR. BERNSTEIN:  Excuse me.  The only thing I can say

5   with regard to the one forty-four is that it was our attempt at

6   coming to a calculation that the Court and the parties could

7   then use to be modified by the actual facts to be -- to be

8   developed, what exact percentage of the property the Trustee

9   used, what equipment was on there.  All of those things which

10  modified -- which allow the Court, and which the Court is

11  required to look at to get to a reasonable rent.  That is, in a

12  nutshell, how we justify the one forty-four.  I mean, maybe it

13  cuts against my argument, but nobody expected we would end up

14  with a one forty-four claim.  We expected that the parties

15  would bring their positions to it, the Court would ultimately

16  either approve a consent agreement or make a decision based on

17  all the facts.  That's what I'd say in support of putting a one

18  forty-four number in there.

19         We do not want to proceed with the dismissed Motion.

20  I am not challenging the Court in that regard.  We have now the

21  benefit of this ten days of review of the Memorandum Opinion

22  and the Court's comments, and our research, and I don't think I

23  need to, but I can assure the Court that the next Motion we

24  file, assuming we file one, is going to be significantly

25  different in terms of perhaps number, certainly support within

**WWW.JJCOURT.COM**

1 the document, and getting -- and following the necessary flow

2 down through a conclusion of what we think is a reasonable

3 number.

4        I know the Court may have mentioned giving us seven

5 days to do that.  I'd rather have more time.  It gives me an

6 opportunity to -- once we get the property back, take another

7 look at it, talk with the Trustee in the light of day about

8 what exactly happened without the worry about the various

9 Motions that were pending, and it just -- I would like more

10 time.  Having said that, I would rather not have the Order to

11 Show Cause outstanding.  It is very uncomfortable for me.

12        With regard to Ms. Biros, the -- I realize that she

13 is there because she is the client, and she authorized the

14 pleading and she authorized and signed the response.  She was

15 listening to our advice.  And I don't -- I mean, I'd give her

16 the opportunity to say anything else.  I don't think there's --

17 she has anything to add to what I've said, Your Honor.

18        THE COURT:  All right.  So how much time are you

19 asking for to file an amended Motion?

20        MR. BERNSTEIN:  Thirty days.

21        THE COURT:  All right.  And, Ms. Biros, you're

22 incorporating the comments of your counsel.  Do you have

23 anything further you want to add?

24        MS. BIROS:  No, Your Honor.

25        MR. BERNSTEIN:  No, you're agreeing with what I am

A1006

68

1   saying?

2          MS. BIROS:  No.  I was answering his second question.

3   I have no more to add.

4          THE COURT:  She has nothing further to add.

5          MR. BERNSTEIN:  All right.

6          THE COURT:  All right.  Okay.  And -- all right.  Mr.

7   Bernstein, anything further you wish to address on this

8   subject?

9          MR. BERNSTEIN:  No, Your Honor.

10         THE COURT:  All right.  Well, then, I will give you a

11  30-day period to file an amended Motion, but I am not in a

12  position to vacate the Show Cause at this point.  I will

13  continue it over to the hearing on that Motion on the

14  administrative expense if an amended Motion is filed.  It gives

15  you up to 30 days, but you can certainly file it sooner if you

16  wish.

17         MR. BERNSTEIN:  Yes, Your Honor.  One question.  And

18  I am not a litigator, so I don't know quite all the rules.  But

19  I note that in the memorandum there were specifically findings

20  and conclusions, and I have been told that we need to, if we

21  have concerns about those findings and conclusions, we need to

22  file a Motion to amend or request for an extension of time to

23  move to amend.  Could we have the same 30 days --

24         THE COURT:  Yes.

25         MR. BERNSTEIN:  -- for that?  Thank you, Your Honor.

A1007

1          THE COURT:  All right.  Does anyone need a break at

2   this point?

3          MR. SNYDER:  Yes, please.  Just a quick bathroom

4   break.

5          THE COURT:  All right.  Why don't we take a ten-

6   minute break, a recess, and we will convene on the record at 25

7   after?  Court will now stand in -- adjourn, and we will

8   reconvene at 12:25.

9                     (Recess)

10         ECRO:  All rise.

11         THE COURT:  Be seated.  We are back on the record in

12  Case Number 22-20823, U LOCK, Inc.  We have made some headway

13  through the pending matters, and now, according to my score

14  sheet, the only remaining items that we have at this point are

15  the amended Show Cause Order issued by the Court at Docket

16  Number 278.  That is an Order to Show Cause that this Court

17  issued on December 16th, 2022, directed to George Snyder and

18  Christine Biros, requiring them to appear and show cause as to

19  why the Court should not impose sanctions against them, for

20  exercising control over property of the Estate in violation of

21  the Stay, and also interfering with the Trustee's sale of

22  assets.  The Order was amended on January 6th, 2023, solely for

23  the purpose of establishing a response deadline.  And the show

24  cause arose out of a December 1, 2022 hearing on the Trustee's

25  Motion to sell assets.

A1008

1        Although the Court was prepared to proceed with the

2   sale Motion these efforts were thwarted by the revelation that

3   many of the Debtor's tangible personal property, including

4   assets specifically listed for sale by the Trustee, had been

5   removed from the Debtor's business premises.  The parties then

6   accused the other of surreptitiously moving the assets.

7        As the sale could not proceed until the location and

8   identity of the assets has been secured the Court implemented

9   two measures.  First, I required George Snyder, Shanni Snyder

10  and Christine Biros to each file a sworn affidavit under 28

11  U.S.C. Section 1746 identifying, A, any assets they removed

12  from the Debtor's place of business, B, the current location of

13  any removed assets, and C, the authority by which those assets

14  were removed.  Second, the Court took the rare step of

15  conducting a site visit on December 2nd, 2022, to visit the

16  three locations where the assets were allegedly situated in an

17  effort to confirm the whereabouts of each item listed in the

18  sale Motion, and that precisely occurred because the parties

19  could not reach any consensus whatsoever as to what assets were

20  located where and who took what.

21       Shanni Snyder filed an affidavit indicating she was

22  not in possession of any assets, while both George Snyder and

23  Christine Biros admitted that they were in possession of Estate

24  assets, and during the site inspection it was allegedly

25  indicated that a gentleman by the name of Glenn Mowry may have

A1009

1   also removed certain assets listed on the Debtor's bankruptcy

2   schedules and retained possession of them, although at this

3   point he has not entered an appearance in the case, and so the

4   Court deferred any further proceedings against Mr. Mowry to the

5   discretion of the Chapter 7 Trustee.

6         I have responses from both George Snyder and

7   Christine Biros to the pending Show Cause Order.  At this point

8   I have reviewed those responses.  I have had an opportunity to

9   understand what the parties' positions are, and so at this

10   point I am going to offer an opportunity for the parties to

11   supplement the record if there is anything further they want

12   the Court to consider, either in terms of legal argument or

13   evidence they may be prepared to do so.  So, with that said I

14   will begin with Mr. Snyder.  Mr. Snyder, is there anything

15   further you wish to say or present in terms of the Order to

16   Show Cause?

17         MR. SNYDER:  Did you want Mr. Roth to speak first on

18   behalf of U LOCK?  Or me for my personal --

19         THE COURT:  This is a Show Cause Order issued against

20   you.

21         MR. SNYDER:  Okay.

22         THE COURT:  It does not have anything to do with U

23   LOCK itself.

24         MR. SNYDER:  Okay.  Let me ask you one other question

25   you gave in the instructions when you came here.  You said you

A1010

72

1  were trying to streamline things, and you said that you don't

2  necessarily want to hear defenses to the accusations, it's just

3  assumed that I am defending certain things?

4          THE COURT:  No.  I want to hear whatever you want to

5  present as your defense to the Show Cause Order.  What I don't

6  want to do is to get into a screaming match between you and the

7  Biros parties as to who did what.  I just want to hear your

8  side of the case and hear what you have to offer at this point.

9          MR. SNYDER:  Okay.  Then I will just keep it really

10  brief because most of it is in my --

11          THE COURT:  Okay.  Because I was going to say this is

12  -- the floor is yours.  You can enter and put in whatever you

13  wish the Court to consider.

14          MR. SNYDER:  Um, I didn't --

15          THE COURT:  And I'll tell you what, while we're doing

16  this, let me also go through this.  I'm going to have whoever

17  is going to be addressing the Court and raising any factual

18  issues to be sworn.  So -- and I'll do the same thing on the

19  Christine Biros side, too.  So, you'll be testifying, anyone

20  else over here?

21          MS. BIROS:  I'm not sure yet.

22          THE COURT:  Ms. Biros?

23          MS. BIROS:  Not sure.

24          THE COURT:  Okay.  So, I would ask that you both

25  please rise and be sworn, and I ask Ms. Smith to please swear

**WWW.JJCOURT.COM**

A1011

1  the witnesses.

2              GEORGE SNYDER, WITNESS, SWORN

3              CHRISTINE BIROS, WITNESS SWORN

4         ECRO:  Thank you.

5         THE COURT:  All right, thank you.  All right, Mr.

6  Snyder, you may proceed.

7         MR. SNYDER:  Okay.  Regarding anything I've taken off

8  of there, I was in touch with Mr. Slone the whole time.  I

9  didn't remove any assets -- I'm sorry, I didn't remove anything

10 that was on the schedule.  I did remove the two big white tanks

11 that were assets of the Estate that I believe I would be

12 putting on the amended schedule once we amended it.  But I

13 removed those with Mr. Slone's knowledge.  And also, according

14 to your June 3rd, I believe, Court Order, it said to remove all

15 the tanks from the property by a certain date and all the

16 vehicles on the property by a certain date.  So, I believe I

17 moved that stuff with the authority of the Court and with Mr.

18 Slone's permission and knowledge.  And at all times he was

19 aware of where they were at, they weren't hidden.  You could

20 actually see them right from the red light at the highway.  And

21 as you saw, it's a quarter mile away from the site that they

22 were on.

23         So, the Court Order also said that if they were sold

24 to give that money to the -- you know, parse that money to Mr.

25 Slone.  Those tanks weren't sold, they were just preserved

A1012

1    there until the outcome of this.

2         As far as the vehicles go, meaning the abandoned

3    cars, I have -- those were salvaged according to the, I think

4    it was a June 3rd Court Order and I brought money orders with

5    me today.  I believe the Court has them already, though.

6         THE COURT:  Are those the ones that were attached to

7    your response?

8         MR. SNYDER:  Yes.

9         THE COURT:  Okay, I do have those.

10        MR. SNYDER:  One is for $500 and one is for 475.

11   That was the total of any car that was scraped there.  And that

12   was provided to Mr. Slone and he received that money.

13        Then the other items that you saw on the site visit,

14   there was a couple pallets of shelving, there was a red or a

15   yellow tri-axial trailer, real old trailer and some unistrut

16   pallet, those were all my personal items, and also the shipping

17   containers too, I'm sorry, and the shipping containers were my

18   personal items.  So, I didn't remove anything, any other

19   scheduled items.  And the only assets of the Estate were those

20   two white water tanks.  And that's pretty much it.

21        THE COURT:  All right, nothing further?

22        MR. SNYDER:  No.  And, I guess just in the event that

23   you would find I did something wrong, I would just like to say

24   I apologize and just put it on the mercy of the Court to

25   sanction me how you feel it necessary.

**WWW.JJCOURT.COM**

A1013

1          THE COURT:  All right, thank you.  Do we still have

2    Trustee Slone on the line?

3          MR. SLONE:  Yes, I'm still here.

4          THE COURT:  Is you video working?

5          MR. SLONE:  Apparently not.  Every time I press it,

6    it says failed to start video camera, please select another

7    video camera.  I don't have any other video camera.

8          THE COURT:  All right.  I'm going to ask that you

9    also be sworn, Mr. Slone.  So, I'm going to accept your

10   representation that you are raising your right hand and you are

11   agreeing to be sworn.

12         MR. SLONE:  I am, sir.

13         THE COURT:  All right, Ms. Smith.

14              ROBERT SLONE, WITNESS, SWORN

15         ECRO:  Thank you.

16         THE COURT:  All right.  Mr. Slone, anything that you

17   wish to inform the Court with respect to Mr. Snyder's Show

18   Cause about removal of the items that he has mentioned today?

19         MR. SLONE:  Not too much.  A lot of the stuff was

20   removed before I became Trustee.  He did give me the two checks

21   for scrap value of car salvage.  One was for $475 and one was

22   for 500.  I deposited those on July 12th, 2022.

23         The two white water tanks I was aware of, he probably

24   had moved those prior to my being appointed and then I said,

25   just leave them where they are.  I knew they were on his

A1014

1  property.  And it was difficult in this case to ascertain what
2  property actually was U LOCK'S.  We only had what was on the
3  schedules.  There was no back-up, there were no tax returns
4  filed, it was very difficult to ascertain exactly what.  I took
5  Mr. Mark Ferry down, we went through with George Snyder, he
6  pointed out some other items.  That's about all I can say, Your
7  Honor.

8          THE COURT:  All right, thank you.  Mr. Snyder,
9  anything further that you wish to say in response to what the
10 Trustee has indicated?

11         MR. SNYDER:  No, that was it.  Just, I agree with
12 him, it was a little difficult and I apologize for that, but
13 when we first, I think, when the limited Relief of Stay was I
14 think the first time the Biros were on the property was July
15 12th, I was only on there for a matter of weeks, then I was
16 banned from the property and so, from that point until about a
17 week ago I wasn't on the property, so I was unable to make a
18 complete inventory like I would like to.  So, I discussed that
19 with Mr. Slone, he wanted the complete inventory but couldn't
20 get me on the property so that was what the delay was all
21 about.  That's all.

22         THE COURT:  All right, thank you.  All right, I'm
23 going to consider that Order to Show Cause to be under
24 submission then, and I will take that under advisement.

25         With respect to the portion of the Show Cause Order

**WWW.JJCOURT.COM**

1   as to Christine Biros, Mr. Bernstein.

2        MR. BERNSTEIN: Thank you, Your Honor. Just

3 preliminarily, I think in our response, Ms. Biros's response,

4 she tried to focus on her actions and, unfortunately, the

5 actions that she took were based on things she saw and things

6 she heard, and so, it bled over into what may have seemed like

7 accusations about other parties. We do try to focus on the

8 seven items that she moved and I've outlined in the response

9 the bases on which she moved those things, the reason that she

10 thought she was authorized to move those things and by way of

11 other defenses, of course, we've outlined that we don't think

12 that any of the seven were property of the Estate. We have

13 since developed and Mr. Otto could testify about that since he

14 pulled them together, we've developed evidence from Mr. Mowry

15 as to the ownership of six of the items. Mr. Otto has, as to

16 the trailer, that was the item discovered on the morning of the

17 -- or during the site visit, Mr. Otto has, by obtaining the

18 vehicle identification number, he's had that traced and it is

19 owned by another party. We don't have any other evidence of --

20        THE COURT: Well, let me ask you something there. I

21 mean, you know, these items were listed on the schedules. So,

22 irrespective of whether or not you believe the Estate really

23 owned those items, does that give you the ability to move them?

24        MR. BERNSTEIN: Well, I guess the question is, what

25 is it that Ms. Biros is accused of violating? And if it is

A1016

1  dealing with property of the Estate, then we have to examine

2  whether it was, in fact, property of the Estate.  And I

3  understand that 541, concept of property of the Estate, is

4  pretty broad.  One could argue that U LOCK listing them on the

5  schedules was an assertion that the Estate had an interest in

6  it which might make it property of the Estate, we're suggesting

7  that, in fact, U LOCK did not have an interest in it.  Whether

8  U LOCK said they did or didn't, if the ultimate finding is that

9  it was owned by somebody else, then it never belonged to U

10  LOCK.  And that's one of our defenses.

11       The second, of course, is that in the June 3rd Order

12  Ms. Biros was given leave to clean up the property, to take

13  things off the property.  That, in combination with her concern

14  about items that could have value disappearing, led her to take

15  the action to move them to the McKeesport site.

16       THE COURT:  So, what in the June 3rd Order gave Ms.

17  Biros the belief that there was authority?  I mean, the

18  response mentions the vehicles and trailers provision.

19       MR. BERNSTEIN:  Yes, that section.

20       THE COURT:  But I thought it was pretty clear from

21  the discussion that was had on the record at the hearing that

22  occurred on June 2nd, that what we were talking about at that

23  time were vehicles that were actually titled automobiles not

24  heavy equipment.

25       MR. BERNSTEIN:  I don't think that was Ms. Biros's

1  understanding, that it was more of a wider cleanup provision.

2       In any event, whether that was a legitimate basis for

3  her to believe that she had the right to remove them or not, in

4  fact, the removal of them did protect them.  They became

5  available to be at the sale.  It certainly inconvenienced

6  everybody and the Court to continue that sale hearing and make

7  the site visit.  We know in the end those things really didn't

8  make a difference to the sale price or the sale process, so we

9  don't think there was any actual harm to the Estate.

10      THE COURT:  Well, why was it that when I set the due

11  diligence date or the site inspection date, where people could

12  come onto the property to look at the assets, which I'm trying

13  to remember the date of that.

14      MR. JOYCE:  November 10th, Your Honor, is that --

15      THE COURT:  I think it was actually November 21st.

16      MR. JOYCE:  Oh, the due diligence date was the 21st,

17  the hearing was the 10th.

18      THE COURT:  Okay, thank you.  I had a hearing on

19  November 10th, and I set a due diligence date of November 21st

20  for parties to go to the property and look at the assets.  And

21  my understanding is from the papers, that the assets had

22  already been moved by November 10th.  So, why was nothing ever

23  said at that hearing that the assets had been moved and if we

24  went to the site you weren't going to see everything that was

25  ostensibly property of the Estate?

1    MR. BERNSTEIN:  The only answer I can give is that

2 the process has been so messy because of all of the accusations

3 and moving things and being unclear whose is what, that it

4 just, Ms. Biros just didn't feel that that was a clarification

5 that needed to be made.  I don't -- I'm sure that's not a

6 satisfactory response, she may have a different response to

7 make personally, but that's my understanding in talking to her

8 and Mr. Otto.

9    And she understands that now, what she did caused

10 difficulty and confusion.  Again, in the end we don't think

11 that it made a difference to the quality of the sale and we

12 think the Court found that  --

13    THE COURT:  Well, irrespective of if it affected the

14 outcome of the sale, it definitely delayed the sale hearing

15 because it required me to have an additional sale hearing.

16    MR. BERNSTEIN:  Yes.

17    THE COURT:  It required me to have a site visit, it

18 required me to bring two U.S. Marshals out there, it required

19 all the professionals to be there, spending I don't know how

20 many hours we did that and, furthermore, it delayed when the

21 closing of the sale could occur.  Is there any issue with that

22 outcome or what resulted from the action of moving those

23 assets?

24    MR. BERNSTEIN:  If she was not justified and she was

25 not authorized to take the steps that she did, then certainly

A1019

1   those costs could follow from her actions.  They would, in our

2   view, be shared to the extent there's responsibility for that

3   with Mr. Snyder, who was involved in moving things at the same

4   time and at the same -- we learned of it at the same hearing.

5   So, that's sort of a mitigation argument.  She knows it

6   shouldn't have been done.  It should have been done more

7   cleanly and --

8           THE COURT:  Well, not only should it not have been

9   done, I'm also struggling with the fact that there was no

10  candor or admission to it when the opportunity to do so

11  presented itself at the November 10th hearing.  I had to find

12  out about this because of accusations from the other parties.

13  There was never an affirmative representation and I'm willing

14  to hear from Mr. Slone about this, but from my understanding of

15  the transcript and, again, Ms. Biros can correct me if I'm

16  wrong, you can correct me if I'm wrong, and Mr. Slone can

17  correct me if I'm wrong, my understanding was the Trustee

18  thought the assets were being moved within the property.  He

19  did not have an understanding they were being moved off

20  property.

21          MR. BERNSTEIN:  Well, my understanding is different,

22  Your Honor.

23          THE COURT:  Okay.  Well, then here's what I want to

24  know then.  Again, whatever other record you want to establish

25  with respect to this, I'll give you the opportunity to do so,

**WWW.JJCOURT.COM**

1  you mentioned having Mr. Otto speak to this, I'm not sure if

2  you're going to have Ms. Biros say anything further but

3  whatever you want to have the Court consider in relation to

4  this, this is your opportunity to set that record.

5          MR. BERNSTEIN:  So, I think Mr. Otto would like to

6  give the Court some information and he should probably be

7  sworn.

8          THE COURT:  All right, let's have Mr. Otto sworn,

9  please.

10          WILLIAM OTTO, WITNESS, SWORN

11          ECRO:  Thank you.

12          THE COURT:  You may be seated, Mr. Otto.

13          MR. OTTO:  Your Honor, when this case first started

14  and the Trustee was appointed, I called the Trustee.  I didn't

15  know him, but I talked to Mr. Bernstein and he suggested I call

16  him directly, so I did.  And I strongly urged him to secure the

17  site from the beginning.  And in the period of time from when

18  he was first retained until the November time frame, I met with

19  him among other people at the site six times.  And over those

20  site visits things kept disappearing.  And I told him on a

21  number of occasions that he needed to take better control of

22  the site.  I can't speak to his actions, but I can tell you

23  things kept disappearing.  And at some point in time, Mr. Mowry

24  submitted two affidavits to the Trustee as to equipment he

25  claimed he owned and it's my recollection that at one point a

83

1  Trustee told him to go ahead and take his stuff off the site.

2  I know Mr. Snyder has complained that that was done and that's

3  my understanding, as well.

4        I told the Trustee over a number of phone calls and

5  visits and conversations, that Ms. Biros had moved some of the

6  equipment.  That the reason that she moved it was because other

7  things that were on the site had been moved or taken and that

8  he would be welcomed to either inspect it or we would  return

9  it if he deemed that was necessary and he never asked either to

10 see it or to have it returned.

11       THE COURT:  All right.  Anything further at this

12 point?

13       MR. OTTO:  The only thing I can say about a failure

14 to disclose it in November when we had that discussion, was

15 that there was a focus on the site and since there was only at

16 the time either Mr. Snyder or Ms. Snyder were going to bid on

17 it and they, obviously, knew that the equipment existed.  Ms.

18 Biros never did anything other than move it to another site to

19 make sure that it would be available for whoever bought it.

20 She didn't sell it, she didn't scrap it, she didn't damage it,

21 she just had it moved.

22       THE COURT:  What about the allegations made in the

23 response that the equipment was damaged when it was moved?

24       MR. OTTO:  That the equipment was damaged?  Your

25 Honor, none of it, it was all scrap.  It wasn't usable.

A1022

84

```
 1          THE COURT:  Okay.  But the allegation is that it was
 2   originally put on the property, the one piece of machinery, was
 3   on its side and then it was made to be upright by the time of
 4   the site visit.
 5          MR. OTTO:  Your Honor, it's my understanding that
 6   this gentleman here is the one who moved it and he can speak to
 7   the condition.  I never saw it on the McKeesport site.
 8          THE COURT:  Okay.  All right.  Anything further from
 9   Ms. Biros's side?
10          MS. BIROS:  Yes.  Your Honor, when I had the property
11   removed, I believe I went through my attorney.
12          THE COURT:  You can be seated, if you wish.  If
13   you're more comfortable.
14          MS. BIROS:  Okay, thank you.  I went through my
15   attorney, Mr. Otto, to speak to Mr. Slone.  It was my
16   understanding he knew I was moving it to another site.  It was
17   the only way I could secure it.  I never scraped it, destroyed
18   it purposely.  If in the move or it was damaged it was still
19   scrap.  He could testify to its scrap.  There was no value.
20   That stuff has been there, on that property before 2015.  Mr.
21   Mowry says he's had it there for years.  He was the person who
22   was supposed to buy the property.  I don't want to get off
23   track.  But, I have all of the paperwork from Mr. Mowry, it was
24   never U LOCK'S possession.  I mean, it might have been in their
25   possession, it was never their ownership of anything I took.
```

**WWW.JJCOURT.COM**

1  There was also a red trailer there that belonged to a company

2  that we tracked back to Morris Landscaping, a Mary Morris of

3  North Versailles.  She's never claimed the trailer, we've tried

4  to contact her, I even asked the police to try to contact her,

5  to return her items to her.  Nobody could do anything or help.

6         THE COURT:  And when did you get the information from

7  Mr. Mowry that suggests that he is the owner of some of the

8  equipment?

9         MS. BIROS:  The first time I met Mr. Mowry he came to

10 the site with Mr. Slone was there, Nick Jackson was there.

11 There were a few other people and Mr. Mowry stated that he was

12 the owner of a lot of this heavy equipment.

13        THE COURT:  And when was that?

14        MS. BIROS:  What's that, sir?

15        THE COURT:  When was that?

16        MS. BIROS:  You were there.

17        THE COURT:  I'll --

18        MS. BIROS:  It was one of the visits --

19        THE COURT:  Was it prior to November?

20        MS. BIROS:  Oh, yes.

21        THE COURT:  Was it over the summer?

22        MS. BIROS:  We have so many, we have six listings of

23 site visits so I don't want you to pin me down to a date that I

24 can't back up then.  But he came, I forgot what I was saying.

25 But Mr. Mowry came to the site with his attorney, Mr. Bird

86

 1  (phonetic), I believe and then he also came to the site visit

 2  with you and claimed that.  He told me he spoke with Trustee

 3  Slone and Trustee Slone told him he didn't have to be at any of

 4  the hearings.  He submitted Trustee Slone his ownership of

 5  those things.

 6       THE COURT:  And when did that occur, do you know?

 7  The exchange of whatever ownership documents?  If it was given

 8  directly to Trustee Slone, I'll ask Trustee Slone.

 9       MS. BIROS:  I have no idea.

10       THE COURT:  Okay.

11       MS. BIROS:  When we were in Court, I don't know if it

12  was the last time or the time before that, I don't know the

13  opposing counsel's name I'm sorry, Mr. Joyce, stated that  Ms.

14  Snyder would not object to anyone taking their personal

15  property off of the U LOCK and all their personal things.

16  Although Mr. Mowry was not given the same opportunity to take

17  his stuff.  But we were at that site, Mr. Snyder, Your Honor,

18  and Mr. Mowry made a comment he had a piece of equipment there

19  as well and August 4th, he turned in an affidavit of all his

20  stuff,  I'm sorry, Your Honor, of 2022.

21       THE COURT:  All right.  So, I want to be clear.  So,

22  August 4th was not the meeting with Mr. Mowry, or was it?

23       MR. OTTO:  That's correct, Your Honor.

24       MS. BIROS:  That's correct, but he --

25       THE COURT:  Okay, so you met with Mr. Mowry on the

A1025

1  site on August 4th?

2       MS. BIROS:  No, no, no.

3       MR. OTTO:  No, Your Honor.  On August, I believe,

4  18th --

5       MS. BIROS:  Well, let me just finish my one thought,

6  Your Honor.  The site visit that you attended, we went to Mr.

7  Snyder's and Mr. Mowry expressed interest in a piece of

8  equipment he also had there.  He's tried to obtain back since

9  that date and Mr. Snyder will not let him have his stuff.

10      MR. OTTO:  We had a site visit on August 18th, with

11  the Trustee.

12      THE COURT:  Okay.  So, August 18th, was the site

13  visit and that's when Mr. Mowry first appeared?

14      MR. OTTO:  To the best of our recollection, yes, Your

15  Honor.

16      THE COURT:  Okay.  And then when was it the --

17      MR. OTTO:  The affidavit that he provided to the

18  Trustee --

19      THE COURT:  -- ownership materials provided?

20      MR. OTTO:  -- was August 4th.

21      THE COURT:  August 4th?

22      MR. OTTO:  Yes.

23      THE COURT:  So, he provided ownership materials

24  before he actually saw the items?

25      MR. OTTO:  I believe he had visited the site prior.

1  And, in fact, he had been on the site for some time.

2          THE COURT:  All right.  Anything further that you

3  wish to add at this point?

4          MR. BERNSTEIN:  Your Honor, Mr. Otto did bring with

5  him documentation matching each of the seven items that were in

6  question, that were moved, two documents from Mr. Mowry and

7  he's prepared to present those.  We have copies for the other

8  parties.  We don't have, these were statements from Mr. Mowry,

9  so we don't have Mr. Mowry here, but Mr. Otto can tell the

10  Court what he's done with them and submit them.  I don't know

11  how you want to proceed with that.

12          THE COURT:  If you wish to proceed by submitting

13  those to the record, you can do so.  So, if you want to hand

14  them up.

15          MR. JOYCE:  I guess I'd note an objection, that's

16  hearsay.

17          THE COURT:  Well, my understanding is that it's being

18  submitted that there was some sort of ownership document

19  presented, it's not as to the truth of the matter whether or

20  not it actually is an ownership interest.  Quite frankly, you

21  know, I'll accept it, but I want to be clear on one thing.  You

22  know, these are assets that were listed on the schedules as

23  property of the Estate.  And in my view that makes it

24  sacrosanct for the purposes of the Stay.  So, whether someone

25  else has claimed an ownership interest in it, it doesn't

1  necessarily give the right to move the asset absent Court Order

2  or absent some other type of authority.  And so, you know, I

3  will review that but I can tell you as I sit here right now, I

4  don't know that that necessarily carries the day, so I will

5  look at it for what it is and for what Ms. Biros understood to

6  be the competing claim to ownership for Mr. Mowry.  Whether or

7  not that's true or accurate or not is of no difference.  So,

8  I'm going to overrule the objection on that basis.  So, if

9  you'd like to bring that forward.

10       MR. OTTO:  If I may hand these up and then I'll give

11  them to the parties.

12       THE COURT:  So, I'm going to mark this as Exhibit 1,

13  Exhibit 2 --

14       MR. OTTO:  Your Honor, those -- excuse me.  Those

15  exhibit numbers correspond to the exhibit numbers in Ms.

16  Biros's affidavit that she submitted in connection with those

17  originally.

18       THE COURT:  Okay.  We have Exhibits 1, 2, 3, 4, 5, 6

19  and then I've got an Exhibit A, which I'll just call Exhibit 7.

20       MR. BERNSTEIN:  These weren't collated before, Your

21  Honor.

22       THE COURT:  All right, that's fine.  Anyone else wish

23  to be hear with respect to the Court's determination to admit

24  these as exhibits to this Show Cause?

25       MR. JOYCE:  Your Honor, something came to my

1  attention two days ago that I wanted to bring to the Court's

2  attention because I think it's important.  This week we were

3  conferring with our client Ms. Snyder about her removal of the

4  purchased assets that she acquired.  And in that process, she

5  engaged Mr. Nicholas Jackson, who is present in the courtroom

6  here today, to do that, help her with it.

7          And in the course of that and she's never met him

8  before or worked with him before, I should say in any way, but

9  in the course of that process Mr. Jackson said, hey, I didn't

10  get paid for moving the equipment that Christine Biros -- and

11  he could testify to this, I'm just letting the Court know what

12  I understand his testimony would  be, that he was asked by Ms.

13  Biros to move the equipment.

14          And he was told, I believe, that she owned the

15  equipment, that she would pay him and some of the equipment was

16  even moved after the November 10th hearing, I believe on

17  November 11th.  Some was moved by Mr. Jackson November 3rd and

18  5th and then after our hearing here on November 10th, when it

19  wasn't disclosed that it had been moved, he was asked to move

20  equipment on November 11th, down to the McKeesport site.

21          And he will -- you can call him and question him, or

22  I could do so.  He was told that she owned the equipment and

23  she would pay him, she hasn't paid him and I believe in her

24  proffer to the Court, her  affidavit to the Court, she said she

25  incurred costs on the move.  She hasn't paid him at least those

1  costs, and he also was told that, you know, in exchange for

2  payment, she'll just give him the equipment.

3          MR. BERNSTEIN:  Your Honor, can I object to this as

4  hearsay, counsel testifying.  And I'm not sure what interest

5  Ms. Snyder has in this proceeding.

6          MR. JOYCE:  I think we have an interest for our fees

7  being incurred on all these, you know, running around the

8  sites.

9          THE COURT:  Well, I mean, here's the one thing I'm

10 going to say.  You did file a -- well, actually --

11         MR. JOYCE:  I didn't file a response.

12         THE COURT:  -- you didn't file a response.  So, I

13 really don't see you having standing onto this issue.  And so,

14 I'm not going to hear any further on this.

15         MR. BERNSTEIN:  Yeah, he can testify to it.

16         MR. ROTH:  Your Honor, I would like  to call Mr.

17 Jackson as a witness is what I'd like to do.

18         THE COURT:  Okay.  Well, Mr. Roth, I previously ruled

19 that your client does not have standing in this matter and I'm

20 incorporating that ruling from the sale hearing into this as

21 well.  And the third thing I would say is, although Mr. Snyder

22 filed a response, I'm basically finding it's not germane for

23 the other parties to weigh in on a Show Cause Order that was

24 directed to one party.  This is a Court initiated thing.  You

25 know, I'm going to consider my record.  Ms. Biros has mentioned

A1030

1 having Mr. Nicholas speak to the Court and if that is the case,

2 then he's free to do so in the context of her presentation.

3 But, I'm not going to open this up to have the other parties

4 weigh in.  I did not ask any of the parties to weigh in on the

5 Show Cause Order that was issued against Mr. Snyder and I'm not

6 going to do the same here and certainly not in a case where

7 someone did not even file a pleading or response to it.  So,

8 with that, I'm back to these exhibits.

9          I didn't hear any objection other than the one from

10 Mr. Joyce, so I am considering them part of the record here.

11 Mr. Bernstein, anything further that you wanted to address with

12 respect to these exhibits, or anything else you want to offer

13 for the record at this point?

14          MR. BERNSTEIN:  No, Your Honor.

15          THE COURT:  All right.  And is there any inclination

16 from Ms. Biros to have Mr. -- is it Jackson? -- Mr. Jackson

17 address the Court?

18          MS. BIROS:  No.

19          MR. BERNSTEIN:  No, Your Honor.

20          THE COURT:  All right.  So, I do want to hear from

21 the Trustee on this because there is a discrepancy, I think, in

22 the facts as to whether or not the Trustee did authorize Ms.

23 Biros to move the equipment.  So, Mr. Slone, can you tell me

24 from your perspective of whether or not you authorized or were

25 aware of Ms. Biros's efforts to relocate the equipment from the

93

1  Debtor's premises?

2         MR. SLONE:  Your Honor, my recollection is I was told

3  that when they were doing their remediation work, she could

4  move equipment on the property only.  I wasn't aware that it

5  went to the McKeesport location until pleadings were filed in

6  the Court.

7         THE COURT:  All right.  And there's also an

8  indication that you received documents from Mr. Mowry with

9  respect to his claim to ownership interests, is that accurate?

10        MR. SLONE:  Yes, it is.  Mr. Mowry and his attorney,

11 Larry Burns (phonetic), came to my office and sat in the

12 conference room and put those papers -- and gave me those

13 papers.

14        THE COURT:  And when did that occur?

15        MR. SLONE:  I don't know exactly, Your Honor.  I

16 think it was August or September.  I don't have my time sheets

17 in front of me or I don't even know if I put that on.  But they

18 came to my office, both of them, and I gave those papers to

19 both parties, to the Biros side and to the Snyder side.

20        THE COURT:  And was there anything further done from

21 the Trustee's perspective on the claims of ownership to those

22 assets?

23        MR. SLONE:  Just telling both parties that Glenn

24 Mowry was claiming ownership in those properties and that's why

25 we listed it in the original sale Motion Your Honor.


**WWW.JJCOURT.COM**

A1032

94

1          THE COURT:  All right.  Anything further you wish to

2   add, Mr. Slone?

3          MR. SLONE:  No, sir.

4          THE COURT:  All right, Mr. Bernstein anything further

5   from Ms. Biros?

6          MR. BERNSTEIN:  No, Your Honor.

7          THE COURT:  All right.  Well, then I'll consider this

8   mater to be under submission as well and I will take it under

9   advisement and review the record that's been submitted today as

10  well as the record that's been established in these core

11  proceedings.

12         Again, I, obviously, would not have issued a Show

13  Cause Order if I did not take this seriously and view this as a

14  significant breach of potentially what would be a principle

15  duty of parties, which is to observe the propriety of property

16  of the Estate and to not move or relocate property without the

17  knowledge or consent of the Trustee.  And, furthermore, to not

18  do so in the middle of the sale process in which the parties

19  were aware that it was ongoing and recognizing what the down

20  field implications would be of doing so when a due diligence

21  period and site visit was scheduled.  So, I will consider these

22  matters and then issue a ruling in the near future as to how I

23  see the Show Cause Order shaking out.

24         So, with that I think we have addressed all pending

25  items on the agenda at this point, although, I do have one

A1033

1 ancillary item that I do need to address and this is somewhat

2 tangentially related and, again, getting -- running afoul of my

3 own admonition of not moving far afield from the matters at

4 hand, but one thing that was raised that has been also

5 troubling to the Court, is in the pleadings and the papers

6 there was a reference to the involvement of the North

7 Huntington Police Department at some point.

8        And there was a representation made that one of my

9 proceeding memos was given to the police department for the

10 purpose of expanding upon or explaining what was meant by the

11 Court's Order or in view of some sort of interpretation of what

12 that Order was.  And, so, because that involves an allegation

13 against Mr. Otto, I'd like to hear from Mr. Otto with respect

14 to the circumstances there.

15        And by doing so, I want to remind Mr. Otto, to the

16 extent he's not aware, this is available on my website, is that

17 proceeding memos are not to be construed as orders of the

18 Court, they are not even to be construed as transcripts of what

19 happened in the Court, it is merely for the convenience of the

20 parties and the convenience of the Court to have a general

21 sense of what was discussed for the purpose of identifying

22 where documents and things may be worthy of further

23 examination.  But, to the extent that there is a need for a

24 transcript the parties are directed to get the transcript

25 itself.

A1034

96

1          So, another concern I have is the use of a proceeding

2    memo and the suggestion that somehow that was viewed to be an

3    Order of the Court, or reflected upon the Court's authority of

4    what was and was not permitted.  Can you address that for me?

5          MR. OTTO:  Your Honor, I believe that what you're

6    referring to is a police report that Ms. Biros and I attempted

7    to file against an individual who was removing a video monitor

8    from the property.  This was at a time after which you had

9    given control of the property to Ms. Biros, as well as the

10   Trustee and the Trustee did not give this individual

11   authorization to be on the site.

12         Ms. Biros has been accused throughout this proceeding

13   of either stealing Mr. Snyder's property or destroying it or

14   doing something with it and since this individual did not have

15   permission from either the Trustee, so far as I was able to

16   ascertain or from Ms. Biros, to be on the site.  And we had the

17   license plate of his car, we did not know at that point who it

18   was but we reported it the following Monday to the North

19   Huntington Township Police.  To my knowledge they took no

20   action other than an investigation.  But, there was a question

21   of what authority did we have to control the site and that was

22   what I used your Opinion, or your transcript or the proceeding

23   memo.

24         THE COURT:  So, you gave a copy of the proceeding

25   memo to the police.

**WWW.JJCOURT.COM**

A1035

1           MR. OTTO:  Thank you.  Yes.

2           THE COURT:  Okay.  And for what purpose was it given?

3           MR. OTTO:  Because the North Huntington police

4    questioned why they should get involved in it.  And because

5    they had been told by other people involved in this case that

6    Ms. Biros didn't own the property, didn't have the right to

7    keep people out and what was in that proceeding memo, in

8    essence, asserted that Ms. Biros did have that authority.

9           THE COURT:  Okay.  So, you used the proceeding memo

10   with an officer of the law to suggest that Ms. Biros had a

11   legal right to something.

12          MR. OTTO:  I would say that's correct, yes, Your

13   Honor.

14          THE COURT:  Okay.  All right.

15          MR. OTTO:  Your Honor, and I say this not as an

16   excuse, but I was not aware of the policy of this Court as to

17   proceeding memos.  I will keep that in mind at all times

18   hereafter.

19          THE COURT:  But, you've been represented by local

20   counsel throughout this entire time.

21          MR. OTTO:  I understand that, Your Honor.

22          THE COURT:  And you, when you practice and appear

23   before a Court, you are expected to be mindful of what the

24   rules of the Court are and what the Court's procedures are, are

25   you not?

**WWW.JJCOURT.COM**

1          MR. OTTO:  I understand that, Your Honor.

2          THE COURT:  All right, thank you.

3          MS. BIROS:  Your Honor, may I ask you a question?

4    I'm sorry.

5          THE COURT:  Go ahead.

6          MS. BIROS:  The North Huntington Police Department

7    told us they had no authority in anything overseeing this.

8    They told us personally that they spoke to you.

9          THE COURT:  I did not speak with the police

10   department.

11         MS. BIROS:  They spoke to you --

12         THE COURT:  They called my office --

13         MS. BIROS:  Okay.

14         THE COURT:  -- and the response from my office was,

15   as would be standard in any action, is that the Court's Orders

16   speak for themselves.

17         MS. BIROS:  Okay.

18         THE COURT:  But when we say that, we mean the Court's

19   Orders, not proceeding memos.

20         MS. BIROS:  Okay.

21         THE COURT:  And I'm very clear that proceeding memos

22   have no effect and no relevance, whatsoever, to anything and

23   should not be used in any fashion to suggest that they are

24   something beyond which they are, which is the simple notes of

25   the hearing.

**WWW.JJCOURT.COM**

1      All right.  I think that concludes everything that's

2 set on the Court's agenda for today.  Is there any other

3 matters that the parties want to raise with the Court at this

4 point?

5      All right.  So, based on the following, I have

6 indicated that I will enter the Stipulation between Shanni

7 Snyder and Trustee Zebley and Trustee Slone, with the caveats

8 noted on the record.  I will grant the Stay Relief Motion filed

9 by Christine Biros as indicated on the record.  I will deny the

10 Motion to Enforce the Order confirming the sale of property

11 that is also subject to consent to Stay Relief for the purposes

12 of having a claim objection to the extent Ms. Biros seeks to do

13 one, against the Shanni Snyder claim and that will also

14 otherwise resolve the pending removed action.

15      I have the Order to Show Cause related to the Rule

16 9011 issues.  That is going to be continued to a future date.

17 I've outlined what I think my initial reactions are to the

18 Motion to give the benefit of the Court's insights but I expect

19 that it's incumbent upon Ms. Biros and Mr. Bernstein to justify

20 the number why $144,000 was reasonable and if it is reasonable

21 to tell me why in the context of this case and the proof of

22 claim and, furthermore, why any possible objections that might

23 exist from other parties would be relevant to that discussion,

24 particularly if the Trustee could consent to a number that

25 would otherwise be considered by the Court.  So, that will be

1  set for a future date.

2          And then with respect to the two Show Cause Orders,

3  I'm sorry, one Show Cause Order but it's issued against George

4  Snyder and Christine Biros, I have my record at this point, so

5  I'll take another look at that and issue an Order based on

6  those considerations.

7          So, with that, I appreciate the parties hanging in

8  there for what has been a prolonged day but I think

9  notwithstanding that we have consolidated a number of issues,

10  made some progress which is more than I can say in other

11  instances with this case, but I'm going to end with what I

12  started, which is, I want folks to think twice about what they

13  file, what they do and how they proceed in this matter because

14  I'm not tolerating any more shenanigans and I'm not tolerating

15  any items that go beyond what is permissible in these actions.

16  That has prolonged this case too long and too far and cost too

17  much in expenses and I think from the Show Cause Orders the

18  Court has set the tone at this point that to the extent

19  necessary, I will address these issues vigorously going

20  forward.  So, with that we will consider the matter to be

21  concluded.  The Court will now stand adjourned and we will

22  close the record.  Thank you for your participation again, have

23  a good weekend.

24          ALL:  Thank you, Your Honor.

25                    * * * * *

101

# C E R T I F I C A T I O N

WE, ALYCE H. STINE, TAMMY DeRISI and ELAINE HOWELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.


/s/ Alyce H. Stine          /s/ Tammy DeRisi

ALYCE H. STINE             TAMMY DeRISI


/s/ Elaine Howell

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.   DATE:  January 31, 2023

A1040

FILED
6/23/23 4:34 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                      .      Case No. 22-20823-GLT
                            .
                            .
U LOCK INC,                 .      5414 U.S. Steel Tower
                            .      600 Grant Street
                            .      Pittsburgh, PA 15219
          Debtor.           .
                            .      June 5, 2023
. . . . . . . . . . . . ..          12:02 p.m.


TRANSCRIPT OF #398 EMERGENCY MOTION TO STAY SUBPOENA HEARING OR
   REQUEST FOR EXPEDITED HEARING FILED BY USAAG SYSTEMS CO.

        BEFORE HONORABLE GREGORY L. TADDONIO
        UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:          Law Office of J. Allen Roth
                         By:  J. ALLEN ROTH, ESQ.
                         805 S. Alexandria Street
                         Latrobe, PA 15650

For Christine Biros:     Bernstein-Burkley, P.C.
                         By:  STUART C. GAUL, JR., ESQ.
                         601 Grant Street, 9th Floor
                         Pittsburgh, PA 15219

TELEPHONIC APPEARANCES:

For USAAG Systems Co.:   Santicola, Steel & Fedeles, P.C.
                         By:  MICHAEL F. SANTICOLA, ESQ.
                         722 Turnpike Street
                         Beaver, PA 15009


ECRO:                    Hayley Smith

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

A1041

TELEPHONIC APPEARANCES (Cont'd):

For Shanni Snyder:        The Lynch Law Group LLC
                          By:  JOHN PATRICK LACHER, ESQ.
                          501 Smith Drive, Suite 3
                          Cranberry Twp, PA 16066

                              - - -

 1          ECRO:  Court may now come to order.  The Honorable
 2  Gregory L. Taddonio presiding.
 3          THE COURT:  All right.  Good afternoon, everyone.
 4  This is the United States Bankruptcy Court for the Western
 5  District of Pennsylvania and this is the time set for a hearing
 6  on Case Number 22-20823, U LOCK INCORPORATED.
 7          I'll begin by taking appearances.  I'll start first
 8  with the moving party, USAAG Systems Company.
 9          MR. SANTICOLA:  Your Honor, Michael Santicola on
10  behalf of USAAG.
11          THE COURT:  All right.  Mr. Santicola, if you can
12  just speak up because you're coming across rather faintly.  I
13  don't know if you've got anything obstructing your microphone,
14  or at least move closer to your microphone when you are
15  addressing the Court.  That would be appreciated.
16          MR. SANTICOLA:  I will do that, Your Honor.
17          THE COURT:  Thank you.  All right.  I will take
18  appearances for the responding parties.  First, Christine
19  Biros.
20          MR. GAUL:  Your Honor, Stuart Gaul of
21  Bernstein-Burkley on behalf of Ms. Biros.
22          THE COURT:  All right.  Good morning -- or good
23  afternoon.
24          MR. GAUL:  Good afternoon.
25          THE COURT:  All right.  And then I'll take a

A1043

1  appearance for responding party Shanni Snyder.

2          MR. LACHER:  Good morning, Your Honor.  John Lacher

3  on behalf of Shanni Snyder.

4          THE COURT:  All right.  And I'll take additional

5  appearances, although there's no other parties that filed

6  responsive documents, but I'll start here in the courtroom.

7          MR. ROTH:  Allen Roth on behalf of U LOCK.

8          THE COURT:  All right.  Good afternoon.

9          MR. SNYDER:  George Snyder.

10          THE COURT:  All right.  Good afternoon.

11          And is there anyone else on the Zoom call who wishes

12  to enter an appearance?

13                          (No audible response)

14          THE COURT:  All right.

15          This is a Hearing on a Request to Stay a Subpoena or

16  Request a Protective Order with respect to a Subpoena that was

17  issued to Citizens Bank requesting account information for a

18  bank account held by USAAG, a non-party to this Bankruptcy

19  action.

20          I've got responses in opposition by USAAG, and a

21  joinder from Shanni Snyder.

22          I've had an opportunity to review the papers, and I

23  have made some initial impressions on this and, quite frankly,

24  I need some clarification or explaining from Ms. Biros' side on

25  this because I can tell you, I'm not really seeing the

1  relevance of this.

2          This seems like a significant overreach, and based on

3  what I understand this Subpoena to be related to, which is the

4  Evidentiary Hearing that I have scheduled on Shanni Snyder's

5  Claim and the Objection to that Claim, I have no clue or

6  concept of how this remotely relates to that.

7          So, I'm inclined right now to grant the Motion and

8  issue a Protective Order, and tell me why I am wrong in

9  reaching that conclusion.

10          MR. GAUL:  Your Honor, the issue before you at that

11  Hearing is going to be whether Ms. Snyder's Claim is fraudulent

12  or is false.  Whether her Claim that she worked the hours, the

13  60 hours a week, seven days a week for five years that she

14  claims to have worked is actually true.

15          We, of course, maintain that she did not do that

16  work.  As Your Honor is aware, we have in the past pointed to

17  documents that Ms. Snyder herself has filed under penalty of

18  perjury with this Court.

19          But we've also contended for months that one of the

20  motivations for Ms. Snyder to make these claims is that there

21  is a larger agreement going on among Ms. Snyder, her brothers

22  who are the managers of U LOCK, and potentially other persons,

23  with regard to the purpose for this.  And that the real purpose

24  of Ms. Snyder's Claim --

25          THE COURT:  Okay.  So, that's all related to your

6

 1 | RICO Claim that's pending.

 2 |    MR. GAUL:  That is related to a RICO Claim, Your
 3 | Honor, but it's also related --

 4 |    THE COURT:  And you're counsel to the RICO Claim,
 5 | right?

 6 |    MR. GAUL:  That's correct, Your Honor.  But it is
 7 | also related here.

 8 |    THE COURT:  Okay.  So, should I draw any significance
 9 | to the fact that you are here arguing this Motion and not the
10 | Bankruptcy counsel that's been here on prior instances?

11 |    MR. GAUL:  I don't think you should, Your Honor.  I
12 | think in some respects I'm here because I was the last person
13 | stuck in the office on the Friday before Memorial Day.

14 |    THE COURT:  Okay.

15 |    MR. GAUL:  But there is no question that some of the
16 | information that would come up here would also be relevant to
17 | the RICO proceeding.  There is no question about that.

18 |    THE COURT:  All right.  Well let me start with this.
19 | Whatever I've been saying on this is germane to this
20 | Bankruptcy.  I'm not making any determination as to whether
21 | it's relevant in the RICO action.  It may very well be relevant
22 | in the RICO action.  But I'm questioning how it was issued in
23 | this case and has any bearing to this case whatsoever.  Because
24 | if you were operating under the guise of credibility, well that
25 | seems to open up Pandora's Box and you could ask for whatever

A1046

1  you want.

2          MR. GAUL:  Right.  But in this situation, Your Honor,

3  we're dealing with a case in which USAAG has actually in this

4  case offered money both to U LOCK and to Ms. Snyder, which

5  raises a logical inference that if there is some sort of

6  conspiracy, which we think would make it less likely that Ms.

7  Snyder actually performed the work she claims, if there is a

8  conspiracy then somehow there must be some connection between U

9  LOCK offering money to both the Debtor and the person with the

10  Claim against the Estate who purchased the assets of the

11  Estate.

12          Under this situation we did take a measured approach

13  to see what was going on.  We issued, as Your Honor is aware,

14  the first Subpoena just to find out a little bit more

15  information, if we could, about one of the U LOCK accounts.

16          THE COURT:  All right.  Let me stop you there.

17  "Measured approach" was your words.  And I'm aware that there

18  has now been a new Motion to Quash a Subpoena and seek a

19  Protective Order with respect to a Subpoena that your office

20  issued to the Catholic School System for records involving Ms.

21  Snyder's son.

22          MR. GAUL:  All we're looking for in that, Your Honor,

23  is whether, in fact --

24          THE COURT:  Well, let's start with that.

25          MR. GAUL:  Sure.

1          THE COURT:  How is that measured?

2          MR. GAUL:  Well, first of all, let me back up because

3   the specifics of the Subpoena are that we asked for information

4   that she filed -- we asked for information with regard to any

5   financial aid applications that she filed.  And our concern

6   with that is that what we wanted to see --

7          THE COURT:  You're looking for information about

8   where he lives?

9          MR. GAUL:  I'm sorry?

10         THE COURT:  You're looking for information on where

11  he lives?

12         MR. GAUL:  I think we're looking for information, we

13  may have been looking for information on her addresses.  I

14  don't recall that we were looking for information on his.

15         THE COURT:  Documents sufficient to show the

16  residence of any of the minor children at any time during the

17  requested period.

18         MR. GAUL:  Your Honor, we're also in that course of

19  that looking for information about financial aid applications

20  because those are going to show whether she claimed that she

21  was working during that period.  And I understand Your Honor's

22  concerns about overbreadth on that Subpoena.

23         THE COURT:  Oh, I think we're way beyond overbreadth

24  now.  I think the wheels have completely fallen off on this.  I

25  mean, going after the minor child of a party in this litigation

A1048

1   is beyond the pale.

2        MR. GAUL:  But, again, Your Honor, we're not -- and I

3   understand that, but we still think that the financial aide

4   information on that Motion is particularly relevant.

5        THE COURT:  How is that relevant to whether or not

6   she has an allowed Claim?

7        MR. GAUL:  Because her allowed Claim is based on her

8   having a job and performing a job during that period.

9        THE COURT:  Okay.

10       MR. GAUL:  If she asserted --

11       THE COURT:  But her allegation is, she wasn't paid

12  for that job.  So, it actually would seem to be consistent.

13       MR. GAUL:  But the question is, is there --

14       THE COURT:  Now, you've quoted that I've --

15       MR. GAUL:  I'm sorry.

16       THE COURT:  -- I've found Ms. Snyder's Claims and

17  allegations to be quite dubious.  And I have said that, and I'm

18  interested in seeing the proof in support of this Claim.

19       But I've got to tell you, I mean, you're not doing

20  yourself any favors with this stuff.  This is ridiculous.  And

21  again you know if you find information -- let's just go down,

22  and again, this is a Motion that is not even heard in front of

23  me today, but I just --

24       MR. GAUL:  Sure.

25       THE COURT:  I can't get my head around it because

A1049

1   it's informative as to there is no limitation on what's being

2   sought at this point in this litigation.  And we've lost all

3   concept of reality of what we're going to try in July.  And I'm

4   starting to think I'm going to have to put some pretty tight

5   guide rails on the parties, or else this hearing is going to

6   get completely out of hand.

7         But you know let's assume for sake of argument you

8   get -- I mean, I'm assuming you must think for some reason that

9   she got some sort of financial assistance through the school

10   system?

11         MR. GAUL:  We think that.  Yeah, we are concerned

12   about that.

13         THE COURT:  Okay.  So, if she did, it seems to be

14   that might be consistent with her allegation that she had a job

15   and wasn't paid for four years.

16         MR. GAUL:  It is, but --

17         THE COURT:  So, I don't know how that helps support

18   your Claim but -- or your defense here.  But, again, I just --

19   I come back to, this is really personal, and beyond what would

20   seem to be any semblance of relevance as to whether or not she

21   worked for U LOCK, whether she actually incurred the hours that

22   she did, and whether she is entitled to the wages that she's

23   asserted.  I just don't see how this moves at all forward in

24   any way.  But, again, that's that Motion.

25         Let's turn back to this Motion.  If there is a

A1050

1  conspiracy, you know, again, assuming the facts that you've

2  alleged in the District Court Complaint are true, I still don't

3  know how that has any bearing on whether or not Shanni Snyder

4  has an allowed Claim in this Estate.

5          MR. GAUL:  The question at that point, Your Honor, is

6  who is involved in the conspiracy?  Is there any connection

7  between USAAG on the one hand and Ms. Snyder -- and the

8  property that Ms. Snyder owns in North Huntingdon.

9          THE COURT:  Okay.  But, again, these are all --

10          MR. GAUL:  I'm sorry.  That Ms. Biros owns in North

11  Huntingdon.

12          THE COURT:  Well, these are all RICO issues.  These

13  have nothing to do with the Claim allowance.  You know, I

14  agree, if there is a conspiracy there and these parties are

15  working in concert with each other to cause the involuntary and

16  shift money around and do all these things, that may be

17  perfectly fine in a RICO action, but it doesn't relate to this.

18          MR. GAUL:  But it makes it less likely that she

19  actually did the work that she claims to have done here.  And

20  that's the work that gives rise to both her Claim in this case

21  and her Judgment in the Bankruptcy which she has used in this

22  action, as well.

23          THE COURT:  How many Subpoenas did you issue?

24          MR. GAUL:  I believe two to Citizens Bank and one to

25  the Diocese.

A1051

1           THE COURT:  That's it?

2           MR. GAUL:  That is it, that I remember, and when I

3    get back I will check and promptly inform the Court if there

4    are any more.

5           THE COURT:  All right.  Anything further you want to

6    say at this point?

7           MR. GAUL:  Nothing, Your Honor.  Thank you.

8           THE COURT:  Thank you.  Mr. Santicola, anything you

9    wish to raise at this point?

10          MR. SANTICOLA:  Your Honor, I think that the Court

11   understands our position.  And I can, you know, for sake of

12   time just rely on what we've put into our Motion.  You know to

13   me, I'm not sure how you would prove a conspiracy from 2016 to

14   2021 with records from '22 and '23.  I mean, this Motion asks

15   for -- I mean, they want USA -- or my client's confidential

16   commercial information, every financial transaction, every

17   transferee, officer's identification, and signature cards.  I

18   mean, none of that is relevant.

19          So, I think the Court understands our position.  I

20   don't need to talk just for the sake of hearing my voice.  So,

21   you know, we believe the Subpoena should be quashed.

22          THE COURT:  All right.  Thank you.  Mr. Lacher,

23   anything further from you?

24          MR. LACHER:  Yes, Your Honor.  Thank you.

25          I certainly agree with everything Mr. Santicola just

Case 2:22-cv-23450-D...-...-Document...Filed 00/00/23 Page Entered 00/00/23 Page 225 2025 Desc Main
Document    Page 13 of 23

13

1  set forth.

2          I have some additional matters to bring to the

3  attention of the Court which touch on what we're dealing with

4  here today.

5          Your Honor issued an Order regarding the Evidentiary

6  Hearing on Biros' Objection to Ms. Snyder's Claim.  In that

7  Order you specifically wrote, "Matters to be addressed are

8  limited to the merits of Claim Number 1 filed by Shanni

9  Snyder."  You also put that Order that, "Prior to the

10  Evidentiary Hearing the parties shall meet and confer to

11  discuss a resolution of the case."

12          I would suggest, Your Honor, I don't believe the

13  Biros side is adhering to that Order, and I think the Court

14  should know what's going on out here.  And to do that I'd just

15  like to set forth a couple of time lines for you, and I think

16  this will be instructive.

17          As far as the Subpoena time lines, on April 21st I

18  received a copy of something called a Notice of Subpoena.

19  There was no Subpoena attached to it, no reference to USAAG.

20          So, on April 24th I called Attorney Lindsay at the

21  Bernstein Law Office and asked for a copy of the Subpoena

22  itself.

23          On April 26th I sent a follow-up email to Attorney

24  Lindsay regarding my request for the copy of the Subpoena.

25          On May 2nd Attorney Lindsay sent me a Subpoena

1  exhibit, still not the Subpoena itself.  The exhibit makes no

2  mention of USAAG.  It just lists Citizens Bank and account

3  numbers.  So, there's no way for me to tell who the accounts

4  are.

5       I will tell the Court the truth.  I assumed they were

6  somehow U LOCK accounts, and they were trying to track money in

7  and out of U LOCK, but I didn't know.

8       On May 12th we received discovery requests to Shanni

9  Snyder.  In those discovery requests, you know in the beginning

10 we give parties instructions and deadlines, they put in there

11 that we had 14 days to respond to the discovery requests.  I

12 think that's contrary to the Rules.  Of course the Court can

13 order a shorter time or the parties can stipulate to a shorter

14 time, but to unilaterally give a 14-day response period is

15 improper.

16      On May 24th I received a second set of discovery

17 responses to Ms. Snyder and again it provided a 14-day

18 discovery period.

19      On May 26th Mr. Fuchs sent a letter to the Bernstein

20 Office -- Mr. Fuchs being my co-counsel -- objecting to the

21 14-day response time and asking for all Subpoenas to be -- that

22 had been issued, copies of the full Subpoenas.

23      On May 26 copies of Subpoenas were provided, and then

24 that was the first time we saw that they had contacted the

25 Greensburg Catholic School System to get information on Ms.

A1054

1 Snyder's minor children.

2 So, I would argue that the discovery that they have

3 set forth in the Subpoenas and, and we'll get to that later in

4 the case, but the requests from Ms. Snyder herself are beyond

5 the scope of discovery, in violation of the Rules, they're

6 late, they're incomplete, and they're improper.

7 As to the other part of your Order, Your Honor. This

8 is I'll call it the Settlement time line. I won't get into

9 details of the Settlement, but I want you to know what's going

10 on out here.

11 You issued your Order on April 14th. On April 17th I

12 got a call from Trustee Slone asking about my willingness to

13 settle the Claim. I said that I was very much in favor of it

14 because as Mr. Slone explained there was no money in the Estate

15 to pay the Claim anyway.

16 I conveyed to Mr. Slone an offer which Mr. Slone

17 himself, I wish he was on the line, but I've got his consent to

18 say this to the Court, Mr. Slone thought it was a good faith

19 offer and likely to result in a Settlement of the matter under

20 ordinary circumstances.

21 As far as I know, and I don't know, the Bernstein

22 Office never responded to Mr. Slone's reach outs on this

23 Settlement matter.

24 So, after I did a follow-up call to Trustee Slone on

25 April 24th, I called Attorney Lindsay directly and conveyed the

A1055

1  offer that I had given to Mr. Slone.

2         Again, on April 26th I followed up with an e-mail

3  seeking an update on my Settlement proposal.

4         By May 12th with me having not received any response,

5  I called Attorney Robert Bernstein directly to inquire

6  regarding the response.  I wanted to make sure it was conveyed,

7  the parties were considering it.

8         To Mr. Bernstein's credit I will say that he

9  responded quickly on May 15th.  That's the good news.  The bad

10 news is the offer was just rejected out of hand, with no real

11 counteroffer, you know it was essentially surrender.  That's

12 the counter offer.

13        On May 31st I called Mr. Bernstein back, and I tried

14 to rekindle the resolution.  I would call that phone call very

15 promising and productive.  We put a lot of details together

16 that might make my Settlement Offer even more attractive.

17        However, later that very same day, I got an e-mail

18 from Mr. Bernstein that kind of disavowed our discussion

19 telling me that he would not be the person to talk to anymore

20 regarding Settlement, and that all future discussions were to

21 be held with Attorney Burkley in the Bernstein Office.

22        On June 2nd I called Mr. Burkley and left a voicemail

23 message.  I have not heard back from him.

24        Your Honor, I will not get into the details of the

25 Settlement, but I will say this at the risk of anyone getting

A1056

1  mad at me.  If Your Honor knew what we were willing to do with

2  regard to this Settlement and you heard that Biros was pushing

3  for this hearing, I think the Court would be angry.  And my

4  speculation is that they're keeping this alive simply to do

5  this kind of expansive discovery as Your Honor pointed out to

6  maybe assist in the RICO case or get a head start on it.  So, I

7  just wanted the Court to know.

8           I also asked if they would be willing to go to

9  mediation on this matter, which I think would be completely

10 appropriate.  They, basically, said well if the Court orders it

11 fine, but we're not consenting to it.  So, I tried to get

12 consent to a mediation.

13          Your Honor, this matter should be settled.  There is

14 no money in the Estate.  We've -- you know this is kind of

15 silly and I'm doing everything I can to bring people to the

16 table, and of course the Court can't make people settle, and

17 neither can I.

18          But I will tell Your Honor we're making good faith

19 proposals and getting stonewalled.  So, again, on this matter I

20 agree with USAAG.  I think their Motion is well-filed and

21 that's why we've joined them.  Thank you, Your Honor.

22          THE COURT:  All right.  So, it sounds like there have

23 been meet and confer efforts, it just has not yielded any

24 progress though.

25          MR. LACHER:  Well, I would agree with Your Honor, but

 1  you know, it goes like two weeks without a response, I have to

 2  follow-up, I have to do this.  I've tried to wrap the Trustee

 3  into it.  They haven't talked to the Trustee.  I just think

 4  this is -- I know the Court encourages discussions and

 5  Settlements.  We're really trying, and I don't believe we're

 6  being responded to in total good faith.

 7          And again, I have a lot of respect for the Bernstein

 8  Firm, Mr. Bernstein.  We had wonderful discussions, but I'm

 9  getting nowhere fast, and I just don't think they're following

10  the spirit of your Order, Your Honor.

11          THE COURT:  Well I don't want to get into Settlement

12  discussions.  But what I envision is unique to this is that

13  instead of having a compromise, this goes to an issue of

14  standing that if there is no Claim then there is no standing

15  for the case, and I'm assuming that's why Ms. Biros is taking a

16  tough stand on this, as opposed to being willing to negotiate

17  some sort of resolution or a compromise.  But, again, that is

18  what it is.

19          Bottom line is, this case has never made any logical

20  sense in any dimension.  The assets have simply not justified

21  the amount of time, expense and lawyering that has gone into

22  this case, and this has been a complete disaster on all

23  accounts.

24          And I had thought that I was pretty clear with the

25  parties on my expectations going forward, that I wasn't going

**WWW.JJCOURT.COM**

1 to put up with any more nonsense.  I thought I took some pretty

2 strong steps, some strong language as to what the Court was not

3 going to tolerate.

4          And, in fact, I remind everyone I still have two Show

5 Cause Orders that are under advisement that I may have to

6 reevaluate a little bit in light of where we are.  But it seems

7 like the parties' actions has not adjusted in any way.  We are

8 still proceeding down a path of scorched earth that really has

9 no semblance or rational relation to what the issues are that

10 the Court needs to decide.  And you know if my prior warnings

11 weren't strong enough, then perhaps I need to go even further.

12          All right.  Anything else from the parties at this

13 point?

14          MR. LACHER:  No, Your Honor.

15          MR. GAUL:  Nothing, Your Honor.

16          THE COURT:  All right.  Well, here's where I am.  I

17 think this Subpoena, the one that's in front of me today as to

18 the Citizens Bank and the USAAG account, it's RICO discovery

19 disguised as discovery in this Bankruptcy proceeding.  It has

20 no relevance that I can see to the Claim Objection.  I don't

21 know what a conspiracy has to do with whether she has an

22 allowed Claim.  I don't know what information in a third

23 party's bank statement has to do -- a third party bank

24 statement that's several years after the Claim events accrued

25 has any relation to whether or not she has an allowed Claim

1  dating back from 2016 to 2020.

2         And this is a Subpoena directed to nine parties.

3  It's just breathlessly over-broad, asking for every transaction

4  that this third party has engaged in.  It just boggles my mind

5  that this could even remotely be considered related to the

6  Shanni Snyder Claim Objection.  And just simply labeling it as,

7  it goes to her credibility, that simply doesn't fly here

8  because that would open the door to anything.

9         So, I am going to grant the Motion, issue a

10  Protective Order, and finding that there is no further

11  obligation for Citizens Bank to respond to the Subpoena, I'm

12  going to Quash the Subpoena.

13         And, relatedly, you know, we can have a Hearing on

14  this Expedited Motion on the Greensburg Diocese Subpoena, but

15  I'm going to caution you that I don't think it's necessary.  In

16  fact, I'm ready to rule on that right now.  I'll give Ms. Biros

17  an opportunity to respond to it, but I'm inclined to just issue

18  a similar Order with respect to that.  Again, you know, if it's

19  relevant to the RICO action that may be different, but it

20  certainly has no place here.

21         And I'm going to require the Bernstein Firm to

22  disclose any and all Subpoenas that have been issued in this

23  Bankruptcy case related to this Claim Objection, and to

24  disclose that within the next seven days.

25         But, again, I want to be crystal clear on this, Mr.

**WWW.JJCOURT.COM**

1  Gaul.  This is your first time in front of me on this case, so

2  you do not have the benefit of hearing it from me.  I'm sure

3  you've heard it from your colleagues.  But your firm needs to

4  definitely have a self-introspection on what it's doing in this

5  case because it's not moving the ball forward for Ms. Biros in

6  any semblance.

7         I am continuously engaged in exercises such as this

8  which are a complete waste of the Court's time, the parties'

9  time, it's a waste of your client's resources, it's driving up

10  the expense for an Estate that has no value to it.  And you

11  know I've got to be candid, I think this is doing damage to

12  your firm's reputation.

13         I don't know if this is being internally generated by

14  your firm or if it's at the insistence of your client, but

15  think long and hard about what this is going to do to your firm

16  long-term in view of credibility and reasonableness because

17  this is certainly not a measured approach.  This is scorched

18  earth.  This is beyond the pale.

19         And as I said, I issued a Rule 11 Opinion before and

20  if that didn't dissuade folks from going down this path, then

21  you know I can't apologize for what might happen next.

22         MR. GAUL:  Understood, Your Honor.

23         THE COURT:  All right.  Mr. Lacher raised the issue

24  about the meet and confer.  Again I would encourage the parties

25  to continue to work together, but I'm not holding out any hope

1  that that's going to resolve in any true Settlement.  I could

2  be proven wrong, but the parties are just too entrenched and

3  hate each other too much to do that.

4          And the other thing I would just advise the parties.

5  I think it's clear from how we're proceeding, but I want to

6  make sure Mr. Lacher is aware of this.  I had mentioned this

7  before in a prior hearing.  But I know there's been the Motion

8  to Withdraw the Reference as to the Claim Objection, and that's

9  being transmitted to the District Court, and the District Court

10  will hear that when it hears it.

11          But, in the meantime, I just want to make sure we're

12  clear.  I still intend to proceed forward until the District

13  Court rules on that Motion.  So, there's no misconceptions from

14  the parties on how we're going to proceed, is that understood?

15          MR. LACHER:  One hundred percent, Your Honor, it's

16  understood.  And as you know, I brought this up at the last

17  hearing, it's limited to this matter, and it's only because the

18  District Court held it in the first place, and I hope the Court

19  doesn't take it as any kind of sleight.  It's absolutely --

20          THE COURT:  I have pretty thick skin when it comes to

21  this stuff.

22          MR. LACHER:  I believe that's where it should be.

23          THE COURT:  So, I don't take it that way, and the

24  parties are entitled to exercise whatever rights they wish to

25  exercise.  But where I do take personally is that the parties

A1062

23

 1 do not heed the warnings and statements that I've given time

 2 and time again on this case.  So I want this message taken back

 3 to your firm, Mr. Gaul.  This is not acceptable tactics.  This

 4 is not how I expect these cases to proceed.  And this does

 5 nothing to move the case forward.

 6         All right.  So, with that, I will issue an Order to

 7 the effect for the reasons stated on the record here today and

 8 we'll see how things unfold in the coming days.  Unless there's

 9 anything else, parties?

10         MR. SANTICOLA:  No, Your Honor.

11         THE COURT:  Very good.

12         MR. LACHER:  Thank you, Your Honor.

13         THE COURT:  I will consider this matter to be

14 concluded.  The Court will now stand adjourned and we will

15 close the record.  Thank you, everyone.

16                    * * * * *

17              **C E R T I F I C A T I O N**

18         I, JANET D. PERSONS, court approved transcriber,

19 certify that the foregoing is a correct transcript from the

20 official electronic sound recording of the proceedings in the

21 above-entitled matter and to the best of my ability.

22

23 /s/ Janet D. Persons

24 JANET D. PERSONS

25 J&J COURT TRANSCRIBERS, INC.    DATE:  June 23, 2023

**WWW.JJCOURT.COM**

FILED
6/6/23 2:54 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Case No. 22-20823-GLT |
| | : | |
| **U LOCK INC.,** | : | Chapter 7 |
| | : | |
| *Debtor.* | : | |
| | : | |
| **USAAG SYSTEMS CO.,** | : | |
| | : | |
| *Movant,* | : | Related to Dkt. No. 398 |
| | : | |
| v. | : | |
| | : | |
| **CHRISTINE BIROS**, | : | |
| | : | |
| *Respondent.* | : | |
| | : | |

**<u>ORDER OF COURT</u>**

This matter came before the Court upon consideration of the *Request for Expedited Hearing or Emergency Motion to Stay Subpoena Pending Hearing; Motion for a Protective Order; Motion to Quash Subpoena; or, in the Alternative, Motion to Specify Conditions of Subpoena; and, Motion to Direct Disclosure of Prior Subpoena* [Dkt. No. 398].  On June 5, 2023, the Court conducted an expedited hearing on the matter.  For reasons stated on the record at the June 5 hearing, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that:

1.     Pursuant to Federal Rule of Civil Procedure 45(d)(3)(B) and Bankruptcy Rule 9016, the subpoena issued to Citizens Bank dated May 24, 2023, and returnable June 5, 2023, for USAAG Systems Co.'s financial records is **QUASHED**.

2.     Pursuant to Federal Rule of Civil Procedure 26(c), a protective Order is entered as to the financial records of USAAG Systems Co.  No further request shall be made, or subpoenas issued, without leave of Court.  The prior request is **QUASHED**.

A1064

3.      On or before **June 20, 2023**, a copy of the prior subpoena shall be provided to the parties.

4.      On or before **June 20, 2023**, all records obtained from the prior subpoena shall be returned to counsel for USAAG Systems Co., and the parties shall not maintain copies of them.

Dated: June 6, 2023

_____ cgr
GREGORY L. TADDONIO
CHIEF UNITED STATES BANKRUPTCY JUDGE

<u>Case administrator to mail to</u>:
Debtor
USAAG Systems Co.
Christine Biros

2

A1065

FILED
6/6/23 2:53 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | Case No. 22-20823-GLT |
|  | : |  |
| **U LOCK INC.,** | : | Chapter 7 |
|  | : |  |
| *Debtor.* | : |  |
|  | : |  |
| **EMANUEL SNYDER**, | : |  |
|  | : |  |
| *Movant*, | : | Related to Dkt. No. 409 |
|  | : |  |
| v. | : |  |
|  | : |  |
| **MAC BOOKER, CHRISTINE BIROS,** | : |  |
| and **CATHOLIC SCHOOL SYSTEM** | : |  |
| **GREENSBURG CATHOLIC DIOCESE,** | : |  |
|  | : |  |
| *Respondents.* | : |  |

### ORDER OF COURT

This matter came before the Court upon consideration of the *Request for Expedited Hearing, Motion for a Protective Order or to Quash or Modify Subpoena* [Dkt. No. 409].  The Court preliminarily discussed the matter at a hearing conducted on June 5, 2023.  For reasons stated on the record at the June 5 hearing, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that:

1.      Following discussion of the matter at the June 5 hearing, the Court deems it unnecessary to schedule a hearing at this time.

2.      Pursuant to Federal Rule of Civil Procedure 45(d)(3)(B) and Bankruptcy Rule 9016, the subpoena issued on May 26, 2023 to the Catholic School System, seeking documents relating to the attendance of minor children related to Shanni Snyder, is **QUASHED**.

A1066

3.    To the extent Christine Biros believes the subpoena should not be quashed,

the Court grants her leave to file an appropriate response requesting reinstatement of the subpoena

on or before **June 20, 2023**.

cgr

Dated: June 6, 2023                    GREGORY L. TADDONIO
                                       CHIEF UNITED STATES BANKRUPTCY JUDGE

<u>Case administrator to mail to</u>:
Debtor
Emanuel Snyder
Christine Biros
Catholic School System, Greensburg Catholic Diocese

A1067

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Bankruptcy No. 18-21983 |
| SHANNI SUE SNYDER, | Chapter 7 |
| Debtor. | |
| CHRISTINE BIROS, | |
| Movant, | |
| v. | |
| SHANNI SUE SNYDER, CHARLES O. ZEBLEY, as Trustee to the Debtor, | |
| Respondents. | |

**EXPEDITED MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

CHRISTINE BIROS ("Biros" or "Movant"), by and through Bernstein-Burkley, P.C., its attorneys, files this *Expedited Motion for Relief from the Automatic Stay* (this "Motion"), and in support of this Motion states as follows:

**JURISDICTION AND VENUE**

1. The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. These matters are core proceedings pursuant to 28 U.S.C. § 157.

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief sought in this Motion are sections 105 and 362 of title 11 of the United States Bankruptcy Code (11 U.S.C. § 101, *et seq*., the "***Bankruptcy Code***"), and Rules 4001, 6007 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

A1068

## PROCEDURAL BACKGROUND

4.  Shanni Sue Snyder ("Shanni" or "Debtor") filed a voluntary petition for relief under Chapter 7 of title 11 of the United States Code on May 15, 2018 at bankruptcy case number 18-21983 (the "Case").

5.  On May 31, 2019, the Debtor received her Chapter 7 discharge and on July 31, 2019, Debtor's case was closed.

6.  The Debtor is the sister of Kash Snyder and George Snyder, the majority shareholders and parties in control of U-Lock Inc. ("U-Lock"), a Chapter 7 debtor whose case is currently pending before this Honorable Court at bankruptcy case number 22-20823 (the "U-Lock Bankruptcy Case").

7.  On April 27, 2022, as a purported creditor of U-Lock, the Debtor filed the involuntary petition against U-Lock commencing the U-Lock Bankruptcy Case. On July 7, 2022, this Case was reopened as a result of a Motion to Reopen filed by Charles O. Zebley, Jr., the Debtor's trustee (the "Trustee") based on a Federal judgment (the "Federal Court Judgment") Debtor obtained for a claim against U Lock which Debtor failed to disclose in her own bankruptcy.

8.  During this hearing on the U-Lock Motion to Dismiss, Debtor admitted she had omitted this claim from her schedule of assets. The Trustee's Motion to Reopen followed and was approved by the Court.

9.  Debtor and Movant both assert interests in the non-residential real property owned by Biros from which U-Lock operated, located at 14140 Route 30, North Huntington, Westmoreland County, PA, with Westmoreland County Tax Map Number of 54-03019-0-103 (the "Property").

10.  Debtor's basis for her interest in the Property is a judgment lien transferred to Westmoreland County in connection with her Federal Court Judgment against U Lock. Although Debtor has no claim

against Movant, Debtor filed a praecipe to index *lis pendens* against the Property on or around March 18, 2022 in Westmoreland County (the "*Lis Pendens*").

11.    As discussed *infra,* Movant asserts that this *Lis Pendens* is improper.

12.    Movant is the owner of the Property.

13.    On December 22, 2022, Biros filed a Motion for Relief from the Automatic Stay with respect to the Property in the U-Lock Bankruptcy Case (the "U-Lock Motion for Relief") on the basis that, *inter alia,* cause exists to grant Biros relief from the automatic stay under both sections 362(d)(1) and (2) of the Bankruptcy Code since Biros is the owner of the Property, is not receiving adequate protection payments for the Property and the Debtor has no equity in the Property.  The Trustee has no need for possession of the Property now that all of the assets of U-Lock have been sold.

14.    The U-Lock Motion for Relief is currently pending and is scheduled to be heard on January 20, 2023.

## FACTUAL BACKGROUND

15.    Movant advanced the funds for U-Lock to purchase the Property from the prior owners for the aggregate price of $325,316.00 on or around July 16, 2015.

16.    On or around July 16, 2015, U-Lock began to operate its business as a storage facility on the Property.

17.    Movant filed a Complaint in Civil Action for Declaratory Judgment and Equitable Action to Convey Title, to Quiet Title, and for an Accounting against U-Lock and the prior owners of the Property in the Court of Common Pleas of Westmoreland County (the "State Court") Pennsylvania at No. #4486 of 2017 (the "U-Lock State Court Case").

18.    On August 23, 2019, after a trial, the State Court entered a non-jury trial opinion and order (the "August 23 Opinion") which held, in pertinent part, that (I) the Movant is the equitable owner of the

Property and (II) that the imposition of an equitable trust in favor of the Movant and the conveyance of the Property to the Movant was the only equitable solution.

19.     On December 9, 2019, the State Court issued another opinion and order (the "December 9 Opinion") to address and correct two factual matters relating to the transfer of the deeds and corrective deeds to U-Lock and to make clear that the Property was never lawfully conveyed to U-Lock. The December 9 Opinion also struck "scandalous and impertinent" allegations from U-Lock's post-trial motion.

20.     On May 21, 2021, the Superior Court of Pennsylvania affirmed the decision of the State Court. *See Biros v. U-Lock Inc*., 255 A.3d 489 (Pa. Super. Ct. 2021).

21.     U-Lock filed a petition for allowance of appeal from the order of the Superior Court and, on January 19, 2022, the Pennsylvania Supreme Court denied U-Lock's petition. *See Biros v. U-Lock*, No. 259 WAL 2021, 2022 Pa. LEXIS 77* (Pa. Jan. 19, 2022).

22.     The deeds conveying legal title to Movant, dated in May, 2019, which had been held in escrow by the State Court since May, 2019, were released to the Movant by order of the State Court on January 24, 2022 following the Pennsylvania Supreme Court's denial of the appeal and were recorded by the Movant on January 25, 2022. (the "January 24 Order"). A true and correct copy of the January 24, 2022 Order is attached hereto and incorporated herein as **Exhibit A.**

23.     In the Debtor's schedule I, she indicated that she was unemployed. In the Debtor's schedule A, the Debtor's only claim "against third parties, whether or not [the Petitioner had] filed a lawsuit or made a demand for payment" was against North Huntington Police Officers in relation to an eviction. *See*, Debtor's Petition, Doc. No. 1.

24.     Notwithstanding the Debtor's Voluntary Petition asserting that she was unemployed at least in 2018 and had no potential claims against U-Lock, the Debtor filed a lawsuit on July 14, 2021, in the United States District Court for the Western District of Pennsylvania at case number 21-cv-00904 alleging

that she was owed back wages from U Lock totaling more than $130,000 for alleged shifts worked by the Debtor for U-Lock's business from January 1, 2016 through February 15, 2020 for ten hours a day "each day" and for 7 days a week, mostly spent overnight, monitoring video cameras for U-Lock (the "Federal Court Suit"). The Federal Court Suit included claims for "wages" for periods prior to and including Debtor's Case. A true and correct copy of the Debtor's complaint in the Federal Court Suit is attached hereto as **Exhibit B**.

25.     The Federal Court Suit was the first time that there had been any allegations by the Debtor that she had ever even worked for U-Lock.

26.     Again, even while having testified that there was no involvement of the Debtor and that she was owed no money by U-Lock, U-Lock failed to respond despite having been served, and the Debtor received default judgment against U-Lock in the Federal Court Suit on October 18, 2021 in the total amount of $263,104.00.

27.     During the State Court Case, George Snyder and Kash Snyder provided evidence and testimony that U Lock had no employees and specifically that Debtor was not involved in U Lock's operations. Consequently, it is clear that the Federal Court Suit was improper and contained claims that should have been disputed by U-Lock. Further, U-Lock's 341 meeting held on September 9, 2022 raised more questions than answers as to why U-Lock did not respond to the Debtor's Federal Court Suit and indicated a strong likelihood of collusion between the Debtor and U-Lock's principals, George Snyder and Kash Snyder (who are the siblings of the Debtor).

28.     Following the default judgment against U-Lock, the Debtor filed a praecipe to index *lis pendens* on the Property – property owned by the Movant and unlawfully occupied by U-Lock. A true and correct copy of this praecipe to index *lis pendens* is attached hereto as **Exhibit C**.

29.     The Debtor was aware of the dispute over who owned the Property and her *Lis Pendens* was a strategy to further muddy the waters in the court system with the intent to harass the Movant.

30.     Prior to Debtor filing an involuntary petition for the U-Lock Bankruptcy Case, the Movant filed two Motions in the State Court Case: one for sanctions against U-Lock and its counsel and another for a writ of possession of the Property since U-Lock had failed to vacate the Property.

31.     The State Court held a hearing on April 22, 2022 – five days before the Debtor filed the U-Lock Bankruptcy Case – during which the State Court criticized the position taken by U-Lock in relation to the Property, and there was discussion on the record regarding the questionable nature of the Debtor's "claim" against U-Lock. A true and correct copy of the transcript of the April 22, 2022 hearing is attached hereto as **Exhibit __**.

32.     A follow-up hearing was scheduled for May 13, 2022 but was cancelled following the Debtor's filing of the involuntary petition in the U-Lock Bankruptcy Case and her filing of a suggestion of bankruptcy in the State Court Case on May 12, 2022.

33.     Movant has filed this Motion for Relief from Stay to seek to vacate the Judgment received by the Debtor against U-Lock and to object to the Debtor's claim against U-Lock.

34.     Movant recently filed an Action to Quiet Title in the Court of Common Pleas of Westmoreland County to remove the *Lis Pendens* held by the Debtor. There has been no assertion in the Debtor's case that her estate holds any claim against Movant and the *Lis Pendens* was filed long after the Debtor's case was closed, so no stay exists to prevent Movant's Quiet Title action.

35.     Accordingly, Movant requests relief from the automatic stay to take the necessary action to vacate the Judgment obtained by the Debtor against U-Lock and to object to Debtor's claim in the U-Lock case.

## RELIEF REQUESTED

36.     Through this Motion, Biros seeks the entry of an order granting her relief from the automatic stay to (a) seek to vacate the Judgment and (b) object to Debtor's claim in the U-Lock case.

37.     Section 362(a) of the Bankruptcy Code defines the scope of the automatic stay and provides, in pertinent part:

> [A] petition filed under…this title…operates as a stay…of –
>
> (1)     The commencement…of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> * * *
>
> (3)     Any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

11 U.S.C. § 362(a)(1),(3).

38.     Section 362(d) of the Bankruptcy Code provides, in pertinent part:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay –
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a), if –
>> (A) the debtor does not have an equity in such property; and
>> (B) Such property is not necessary to an effective reorganization[.]

11 U.S.C. §362(d).

39.     Section 362(d) of the Bankruptcy Code is written in the disjunctive and authorizes relief from stay if a secured creditor can either show cause or establish that the debtor has no equity in the property and that the property is not necessary to an effective reorganization. *See Nazareth National Bank v. Trina-Dee, Inc.*, 731 F.2d 170, 171 (3d Cir.1984). "Cause" under section 362(d)(1) of the Bankruptcy Code is not defined, so courts must decide what constitutes cause on a case-by-case basis. *See In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992).

40.     Biros asserts that the Debtor's fraudulent actions warrant cause to grant relief from stay to pursue the necessary actions against the Debtor. This is especially true in light of the fact that the *Trustee's Motion to Approve Settlement of the Exemption of Debtor's Assets* [Doc. No. 66] (the "Trustee's Motion") seeks to provide the Debtor with a windfall and reward her for her lack of candor with this Court while also limiting Trustee's ability to pursue certain avenues for payment to the Debtor's creditors.

41.     Biros is a claimant of U-Lock and the Debtor's attempted recovery against U-Lock has a direct impact on Biros.

42.     Additionally, the facts and circumstances set forth above and within Biros' response in opposition to the Trustee's Motion, which will be filed simultaneously herewith, demonstrate the importance of further investigation of the Federal Court Judgment obtained by the Debtor against U-Lock.

43.     To deny Biros from seeking to vacate that Federal Court Judgment would enable the Debtor and her family to continue to benefit from years of a carefully crafted web of fraud.

44.     The Debtor's misfeasance and continued post-petition harassment of Biros, in conjunction with the evidence of rampant fraud, amounts to cause for relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code.

45.     Therefore, Movant respectfully requests that the Court grant it relief from the automatic stay to pursue her claims in State Court, void the *Lis Pendens*, and take the necessary action to vacate the Judgment obtained by the Debtor against U-Lock.

**WAIVER OF 14-DAY STAY OF EFFECTIVENESS OF THE ORDER**

46.     Movant also requests that the Court waive the fourteen (14) day stay imposed by Bankruptcy Rule 4001(a)(3) because the Debtor has already received a substantial benefit from the stay and the Debtor's

A1075

continued harassment of Biros gives rise to a need to act quickly to minimize further damage caused by the Debtor.

47.     Bankruptcy Rule 4001(a)(3) provides that "[a]n order granting a motion for relief from an automatic stay…is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 4001(a)(3).

## REQUEST FOR EXPEDITED HEARING

48.     Pursuant to Local Bankruptcy rule 9013-2, the Movant respectfully requests that this Court schedule a hearing on the within Motion on an expedited basis.

49.     Cause exists to expedite the hearing as the *Trustee's Motion to Approve Settlement of the Exemption of Debtor's Assets* [Doc. No. 66] (the "Trustee Motion") is set for hearing on January 17, 2023 at 1:30 pm. This Motion and the Movant's response in opposition to the Trustee Motion have significant overlap in facts and hearing the matters together will preserve resources of the Debtor, the Trustee, and this Court such that hearing this Motion at the same time as the Trustee Motion is the most practical approach. Additionally, setting the hearing for January 17, 2023 provides the respondents with adequate time to respond to the Motion and prepare for a hearing.

50.     If this Motion is not heard at the same time as the Trustee Motion, the Court and the parties in interest will be required to spend additional time and resources in addressing substantially similar issues and facts.

51.     The need to expedite the hearing on the within Motion is through no fault of the Movant or her attorneys, but has been brought about by the Trustee Motion and the implications of the same.

A1076

## RESERVATION OF RIGHTS

52.     Movant specifically reserves her rights to request approval and payment of any claims, including administrative claim(s) pursuant to section 503(b) of the Bankruptcy Code, and to seek any other relief available under, *inter alia*, the Bankruptcy Code, or applicable non-bankruptcy law.

WHEREFORE, Christine Biros respectfully requests the entry of an Order (i) setting the Motion for Hearing on January 17, 2023 at 1:30 pm, and (ii) granting the relief requested in this Motion.

Dated: December 27, 2022                       BERNSTEIN-BURKLEY, P.C.

By:  */s/ Robert S. Bernstein*
      Robert S. Bernstein (PA ID No. 34308)
      Lara S. Martin (PA ID No. 307272)
      601 Grant Street, Floor 9
      Pittsburgh, PA 15219
      Telephone: (412) 456-8108
      Facsimile: (412) 456-8135
      rbernstein@bernsteinlaw.com
      lmartin@bernsteinlaw.com

      *Counsel for Christine Biros*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Bankruptcy No. 18-21983 |
| SHANNI SUE SNYDER, <br>      Debtor. | Chapter 7 |
| CHRISTINE BIROS, <br>      Movant, | Related Doc. Nos. 72, 104, 107 |
| v. | |
| SHANNI SUE SNYDER, CHARLES O. <br> ZEBLEY, as Trustee to the Debtor, <br>      Respondents. | |

## ORDER GRANTING MOTION FOR RELIEF FROM THE AUTOMATIC STAY

AND NOW, to wit, this <u>14th</u> day of <u>February, 2023</u>, upon due consideration of the foregoing *Expedited Motion For Relief From the Automatic Stay* (hereinafter, the "Motion")[1], filed by Christine Biros, it is hereby ORDERED, ADJUDGED and DECREED:

1) The Motion is GRANTED; and

2) *The Trustee consents to granting* Christine Biros relief from the automatic stay *(to the extent there is an automatic stay in effect) in this case, including but not limited to,* (a) seek*ing* to vacate the Judgment and (b) object*ing* to Debtor's claim in the U-Lock Bankruptcy Case.\*\*\*

Prepared By:

By: /s/ Kirk B. Burkley
Kirk B. Burkley, Esq., PA I.D. #89511
kburkley@bernsteinlaw.com
BERNSTEIN-BURKLEY, P.C.
601 Grant Street, 9th Floor
Pittsburgh, PA 15219
Phone (412) 456-8108
Fax: (412) 456-8135
*Counsel for Christine Biros*

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Consented to By:

By: /s/ Charles O. Zebley, Jr.
Charles O. Zebley, Jr., Esq.
PA I.D. #28980
COZ@Zeblaw.com
ZEBLEY MEHALOV & WHITE, P.C.
P.O. Box 2124
Uniontown, PA 15401
Phone (724) 439-9200
*Chapter 7 Trustee*

**Dated: February 14, 2023**                    **BY THE COURT:**

**Honorable Carlota Böhm**
**United States Bankruptcy Judge**

\*\*\* The objections of Shanni Snyder to the form of this Order are overruled as stated on the record at the hearing held on this date. The evidentiary hearing on February 22, 2023, is CANCELLED.

**COPY MAILED TO:**
Shanni Snyder
14390 US Rt 30
Unit H
North Huntingdon, PA 15642

FILED
2/14/23 3:47 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

A1079

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTINE BIROS,                    )
                    Plaintiff       )    2:23 cv 00297
                                    )
        v.                          )
                                    )
SHANNI SNYDER et al,                )
                    Defendants.     )

**BRIEF IN SUPPORT OF THE MOTION TO DISMISS AMENDED COMPLAINT,
MOTION FOR JUDGMENT ON THE PLEADINGS, AND MOTION TO STRIKE
REDUNDANT, IMMATERIAL, IMPERTINENT, OR SCANDALOUS MATERIAL**

AND NOW COMES Defendant J. Allen Roth, Esq., and files this, his Brief

in Support of the Motion to Dismiss, Motion for Judgment on the Pleadings, or, in

the alternative, Motion to Strike redundant, immaterial, impertinent, or

scandalous matter.

**I.  THIS COURT MUST END WHAT THE BANKRUPTCY COURT
    DESCRIBED AS AN "ENDLESS SLOG OF LITIGATION" AND DISMISS
    THE AMENDED RICO SUIT FOR UNCLEAN HANDS BECAUSE
    CHRISTINE BIROS ENGAGED IN THE EXACT SAME CONDUCT THAT
    SHE ALLEGES THE DEFENDANTS ENGAGED IN.**

Before we begin with the deficiencies found in the Amended RICO lawsuit

filed by Christine Biros, this Court must consider whether to allow the lawsuit to

proceed considering the equitable doctrine of unclean hands and the fact that the

bankruptcy court rendered multiple decisions – none of which Biros appealed

and which are now *res judicata* – declaring that she engaged in the precise

misconduct that she sues for.

A1080

Suing legal professionals for RICO without their having ownership in or managing the enterprise fails, *see Muskegan Hotels, LLC v. Patel,* 986 F.3d 692 (7th Cir. 2021)*,* and filing lawsuits and even submitting false declarations do not give rise to RICO.  *See Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) and *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016).

Even without this general prohibitions to this type of RICO, allowing Biros' suit to move forward will invite duelling RICOs to be filed by the parties and the possibility of a trial where the jury is asked to determine which party is bad, which party is badder, and which party is the baddest.

Biros moreless uses this case to reimburse her attorney fees in the bankruptcy, but as the bankruptcy court explained, "*there are no angels here. Every party played a role in transforming an otherwise simple chapter 7 case that should have been fully administered within a few months into an endless slog of litigation*." *In re:  U Lock*, 2024 WL 3154602 at *2 (Bk. W. Pa. June 24, 2024). This novel RICO case continues that "endless slog of litigation" and if allowed to proceed will necessarily result in additional RICOs to offset Biros' claims and more "slog of litigation."

The crux of Biros' claim is that Shanni Snyder lodged a false and exaggerated bankruptcy claim in the *In re: U Lock*, 22-20823 (Bk. W.Pa.), but if there was a conspiracy why would U Lock need Snyder to file an involuntary bankruptcy when it could just file itself?  As the bankruptcy court recognized at 2024 WL 3154602**,** *3, it declined to consider dismissal until after U Lock

answered the involuntary petition, noting that "consent to an order for relief would seemingly moot Ms. Biros' challenges" to Shanni Snyder's alleged bad faith petition.

In addition, Biros' RICO claim asserts that various alleged misrepresentations to the bankruptcy court by Shanni Snyder and George Snyder constituted RICO predicates for corruptly obstructing the proceeding. As shown below, Biros indisputably did exactly the same – and not just once.

As to so-called fraudulent bankruptcy claims, the Bankruptcy Court *sua sponte* issued a Rule 9011 show cause and declared that Biros filed an exaggerated administrative claim for $144,000.[1] *In re: U Lock*, 2023 WL 308210 (Jan. 17, 2023); Exhibit 1. The Order explained at *4 that, "an administrative expense claim in the amount of $144,000 is patently absurd." The Court held, "the claimed amount is grossly unreasonable. * * * neither Ms. Biros nor Attorney Bernstein could have plausibly believed that $144,000 as requested by the *Motion* was an actual, necessary cost of preserving the estate." *Id.*

On June 24, 2024, the bankruptcy court sustained its finding that the $144,000 claim was grossly exaggerated, but found its opinion and findings were enough and that Biros' counsel caused the inflation, so further money sanctions were not appropriate. *In re: U Lock*, 22-20823, Entry 593 (Exhibit 2). Biros did not appeal the findings of a grossly inflated claim and it is now *res judicata*.

---

[1] The difference between Biros' claim and Shanni Snyder's is Biros' claim would receive partial payout since it was an administrative claim and Shanni Snyder's claim was unsecured and would receive nothing due to an insolvent estate.

Ironically, it is the same law firm that encouraged the fraudulently inflated claim and took responsibility for it that now prosecutes this RICO.

The situation is much worse than a single inflated claim. On June 24, 2024, the bankruptcy court sanctioned Christine Biros for egregious conduct and taking the Estate assets and moving them. The court awarded $15,000 in punitive damages to the trustee, required Biros to reimburse the United States Marshals Service $1,000, pay a $500 fine to the Clerk of Court, reduced her administrative claim (the one that was inflated at $144,000 but was ultimately reduced to $18,000) by $2,000, and directed payment of compensatory damages of $2,800 for the trustee's time. *In re: U Lock*, 2024 WL 3154602 (June 24, 2024). *See* Exhibit 3. Biros did not appeal this Order and it constitutes *res judicata*.

In that instance, the Bankruptcy Court found that Biros "that she willfully and contemptuously violated the automatic stay by *removing scheduled assets from the Property*." *Id* at *14. Ms. Biros fraudulently concealed this information from the court. *Id* at *10; *17 ("When the Court scheduled on-site due diligence for prospective bidders, [Biros] knew or should have known that the Court and parties expected the scheduled assets to be on the Property. Yet Ms. Biros said nothing even though she knew that most scheduled assets were already relocated to the McKeesport Property. Her silence is telling, as is her decision to not explain it"). At *18, the court explained, "Ms. Biros probably figured that her stay violation still had a chance of escaping detection. The Court also

A1083

suspects she was emboldened by her substantial claims, her view that she was the only legitimate creditor, and the likelihood that she would prevail at auction. In fact, Ms. Biros only came clean when the Court directly asked whether she had removed scheduled assets from the Property."

At footnote 190, the bankruptcy court found that, "It is now apparent that Attorney Otto was aware in early November [2022] that Ms. Biros relocated the scheduled assets," and broached without finding the possibility he violated his ethical duties of candor to the Bankruptcy Court, meaning her counsel most probably abetted these fraudulent concealments.

Biros provided testimony and responses to the court under oath.  The court found that her "lobbing accusations over measures explicitly allowed by a court order undermines her credibility and indicates how carefully she and counsel read [the Court Order]."  The court stated, "Ultimately, the Court finds Ms. Biros' 'estate protection' justification nothing more than an effort to muddy the waters and create a false equivalence for her transgressions."  *Id* at *16.

In additional litigation misconduct the bankruptcy court found to be "beyond the pale," Biros misused the discovery process in the bankruptcy and sought school records of Shanni Snyder's minor children and bank records of third parties, resulting in Court Orders prohibiting her from using subpoenas without leave of court.  See Exhibit 5 pages 8-9 ("Oh, I think we're way beyond overbreadth now.  I think the wheels have completely fallen off on this.  I mean, going after the minor child of a party in this litigation is beyond the pale"); *Id* page

21 ("I am continuously engaged in exercises such as this which are a complete waste of the Court's time, the parties' time, it's a waste of your client's resources, it's driving up the expense for an Estate that has no value to it. And you know I've got to be candid, I think this is doing damage to your firm's reputation. I don't know if this is being internally generated by your firm or if it's at the insistence of your client, but think long and hard about what this is going to do to your firm long-term in view of credibility and reasonableness because this is certainly not a measured approach. *This is scorched earth. This is beyond the pale*"); Exhibit 6 (Order Quashing Subpoena and Directing Biros to Return All Records Acquired), and Exhibit 7 (Quashing Subpoena to education institution).

But again, this RICO seeks damages of attorney fees incurred during the bankruptcy – a litigation Biros engaged in abusive "beyond the pale" waste of her own resources. This RICO action continues the "scorched earth" litigation plan.

Another instance of time wasting and misconduct, Biros misused the bankruptcy court's proceeding notes to gain an upper advantage calling the police on a tenant, which the court rebuked her counsel for doing and had to make it clear that litigation notes were not Court Orders. *See* Exhibit 4, pages 95-98.

This matter must be ended. "[H]e who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The defense "applies when the party seeking relief is guilty of fraud, unconscionable conduct, or bad faith directly related to the matter at issue

that injures the other party and affects the balance of equities." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 n.12 (3d Cir. 1999).

In this case, the entire premise of Biros' lawsuit – both the federal and state claims – are to sue for attorney fees in a case where she engaged in misconduct deliberately running up her own bill. The "predicate acts" all involve alleged inflated claims filed and misleading testimony and wrongful conduct primarily in the bankruptcy case. Yet, Biros engaged in the same conduct, filing inflated claims, providing misleading information and concealment, and providing non-credible testimony to support them. Biros never appealed these determinations and they are *res judicata*. *They affect the same proceeding and the same parties.*

Biros substitutes this RICO action for a motion for sanctions in those cases, yet acted no differently in the bankruptcy proceedings and engaged in similar conduct to what she alleges the defendants did. She invites the Snyder defendants to file RICO counterclaim for the same identical shenanigans.

This Court must stop this paper war, all of which serves only to provide an avenue for the parties to eventually obtain a judicial declaration of who the baddest litigant is that cost the other party more attorney fees and time.

Therefore, at the outset, this Court needs to end Biros' "endless slog of litigation" as this RICO litigation is just a continuation of her gripes in the bankruptcy court – gripes and frivolousness that apply equally against her

conduct.  In other words, Biros cannot distinguish herself and her misconduct from what she alleges Shanni Snyder did.

## II.  <u>THE AMENDED COMPLAINT</u>

Christine Biros ("Biros") filed an Amended Complaint in response to this Court's Order dismissing her RICO lawsuit without prejudice.  The Complaint mirrors the prior one except she added allegations of an "enterprise" consisting not of businesses or money-making activity but  litigations filed by members of the Snyder family that she avers creates a litigation enterprise:

- Biros points out that "thirteen years ago" Shanni Snyder "advised" this Court that she had already "filed over 90 state and federal lawsuits."  *Amended Complaint, ¶228.*

- In 1996 and 1998, Shanni, Kash and Mark (but not George) Snyder executed various promissory notes, defaulted in 2003, filed bankruptcies in 2003 and 2004, and then attempted to invoke 11 USC 362's automatic stay provisions to delay state court foreclosures.  *Amended Complaint, ¶¶231-263.*

- In 1988 – while Shanni was a minor child and Kash and George just turned 18 – their parents challenged certain tax assessments using arguments found incredible.  As a result, the parents of the defendants were assessed millions of dollars in taxes and penalties.  *Amended Complaint, ¶¶264-286.*

- Shanni Snyder included an alleged equitable interest in a property formerly owned by her parents in bankruptcy schedules filed in 2022 and when a purchaser of the property from a Sheriff's deed filed a motion for relief from stay, Shanni did contest the motion.

These cited motions and proceedings are not related and would constitute wholly separate enterprises – of they constituted an "enterprise" at all. The participants are completely different.  Litigations and personal individual disputes themselves are not a profit-creating enterprises, the RICO predicate offenses are neither cognizable nor adequately alleged, are barred by claim and issue preclusion, and worse, Biros herself is engaging in the exact same conduct that she sues for inviting duelling RICO actions and endless litigation that serves no purpose other than to do just that– litigate endlessly.

III. **<u>STANDARD OF REVIEW</u>**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must make allegations with sufficient factual detail under Rule 8(a) that, if those allegations were assumed to be true, the Court could reasonably infer liability. See *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombl*y, 550 U.S. 544, 556, 570 (2007)). Dismissal is appropriate if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556); *see also Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (requiring a complaint to set forth information from which each element of a claim may be inferred).

 "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal,* 129 S. Ct. at 1949 (*citing Twombly*, 550 U.S. at 557);

A complaint that alleges mere "'labels and conclusions,'" "'a formulaic recitation of the elements of a cause of action,'" or "'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal,* 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. 555, 557).

In deciding a motion to dismiss, the Court properly considers the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc*., 998 F.2d 1192, 1196 (3d Cir. 1993).

The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, see *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions,'" *Morse v. Lower Merion Sch. Dis*t., 132 F.3d 902, 906 (3d Cir. 1997) (*quoting In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1429-30 (3d Cir. 1997)). "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." Iqbal, 129 S. Ct. at 1950.

As to allegations of fraud, which this RICO action primarily consists of, require allegations with particularity pursuant to Fed. R. Civ. Proc. 9(b). *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *see also Lum v. Bank of Am.*,

361 F.3d 217, 223 (3d Cir. 2004) ("Where, as here, plaintiffs rely on mail and wire fraud as a basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity."), *abrogation on other grounds recognized by In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3d Cir. 2010).

A RICO conspiracy claim cannot survive where the plaintiff fails to provide evidence of "'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense.'" In re Ins. Brokerage, 618 F.3d at 373 (quoting Salinas, 522 U.S. at 65) (alteration in the original); see also Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993).

IV.   **DISCUSSION**

### A. THE AMENDED COMPLAINT FAILS TO SHOW A RICO ENTERPRISE

Count I of the Amended Complaint is *only* against Shanni Snyder.  The new litigations cited by Biros do not show any form of continuous RICO Enterprise, let alone a continuous Enterprise.  Rather, Biros merely places her own spin on various civil disputes and legal cases that she located through the PACER.  Biros cite litigation not involving the defendants, but their parents, occurring when the Snyder Defendants were either minor children or just turned 18 years old.  Biros cites a civil rights 42 USC 1983 lawsuit to show that Shanni Snyder *personally* filed over 90 lawsuits, state and federal, and that (prior to new rules stating that a *pro se* litigant need not disclose so-called legal drafter

attorneys) the judge ordered her to disclose any attorneys, but that is not an "enterprise" but an individual situation. Biros cites a property jointly owned by family members (but not George Snyder) where non-parties to this action *individually* filed *personal* bankruptcies in 2003 and 2004. These actions are all *individual*, not a separate RICO enterprise. This is why Count I is against Shanni Snyder only. Because she is Shanni Snyder, but she is not an Enterprise.

As this Court recognized, Biros must show a RICO Enterprise, see *Biros v. Snyder,* 2024 WL 1346691 at *4 (*W.D.Pa. Mar. 29, 2024). Yet Biros fails to do that, grasping at lawsuits from generations ago.

The Amended Complaint lacks particularized facts about the decision-making structure of the alleged enterprise. Yet such factual detail is required for a valid RICO enterprise. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 728 (5th Cir. 2019). The enterprise is not the pattern of racketeering activity. Plaintiffs must plead specific facts, not mere conclusory allegations which establish the enterprise. *Id.*

A RICO "enterprise" must constitute an entity distinct from the RICO "person." The United States Supreme Court has held that "to establish liability under § 1962 one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001). In other words, Defendant must be the "person" who conducts the "enterprise's" affairs through a pattern of racketeering activity, and the

person/defendant must be separate and distinct from the "enterprise." *Schwartz v. Lawyers Title Ins. Co*., 680 F.Supp.2d 690,704 (E.D.Pa. 2010).  The alleged "person" who is "subject to liability [for a RICO violation] cannot be the same entity as the 'enterprise.'  *Gordon v. Pasquarello*, No. CV 22-1565, 2023 WL 2505538 *16 (E.D. Pa. Mar. 14, 2023).

Courts may "'reasonably assume that individuals and corporations have an organizational structure, are continuous, and have an existence separate and apart from any alleged pattern of racketeering activity.'" *Freedom Medical v. Gillespie,* 634 F. Supp. 2d 490, 504 (E.D. Pa. 2007) (quoting *Price v. Amerus Annuity Group Co.,* MDL No. 1712, 2006 U.S. Dist. LEXIS 35980, at *9 (E.D. Pa. June 2, 2006)). If, however, the alleged RICO enterprise has no legal existence and is instead an association-in-fact, it "cannot reasonably be assumed to satisfy the elements of an enterprise and the allegations of the complaint must therefore receive greater scrutiny." *Id*. at 505.

A review of the Amended Complaint makes it clear that every predicate act involve legal filings made by Shanni Snyder or testimony in support of them.  If successful, as Biros states, only Shanni Snyder would receive the benefit of the lien instrument.  Therefore, it is clear that no enterprise exists, only Shanni Snyder exists. Similarly, the past wholly separate enterprises were not enterprises but individual actions.

"[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.' "

*Boyle v. United States,* 129 S.Ct. 2237, 2245  (2009).  If, for example, "several individuals, *independently and without coordination,* engaged in a pattern of crimes listed as RICO predicates [,] ... [p]roof of these patterns would not be enough to show that the individuals were members of an enterprise." *Id.* (emphasis added). Nor would proof of a conspiracy to commit a RICO predicate offense "necessarily establish that the defendant[s] participated in the affairs of an ... enterprise through a pattern of ... crimes." *Id.* at 2246. Individuals' separate and uncoordinated commission of RICO predicate acts does not automatically create an enterprise.  *Id*, n. 4.

While "a conspiracy is an inchoate crime that may be completed in the brief period needed for the formation of the agreement and the commission of a single overt act in furtherance of the conspiracy," § 1962(c) "demands much more: the creation of an 'enterprise'—a group with a common purpose and course of conduct—and the actual commission of a pattern of predicate offenses." *Id.*

### A(1).  BIROS' NEW ALLEGATIONS FAIL BECAUSE OF THE LACK OF CONTINUITY AND NO PATTERN OF RACKETEERING

In the Amended RICO Complaint, Biros alleges sporadic events starting with the parents of the Snyder Defendants who had a tax issues when they were still minor children or just became adults.  The tax case certainly has nothing to do with nothing.  Then Shanni Snyder advised this Court over thirteen years ago that she filed over ninety (90) legal cases.  This has nothing to do with nothing.

Between 2003 and 2005– that's right, over 20 years ago– there existed a

note from 1996 or 1998 on the family house and the family members allegedly filed bankruptcy to try to delay foreclosure.

And as an honorable mention, Shanni Snyder recently included that she may maintain an equitable interest on a tax foreclosed house, but did not challenge a buyer's motion for relief from the automatic stay.

These are not enterprises, but litigations. Even if they were frivolous, fraudulent, or baseless litigations, "allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act." *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018); see also *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016).

Biros simply fails to allege any continuity in the enterprise or a long term business. In its opinion in *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229 (1989), the Supreme Court set out its second analysis of the requirements of civil RICO. The Court examined the statute and its legislative history in an attempt to determine the elements of the pattern requirement. From this review, the Court concluded that "to prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239.

Under the first, or "relatedness," requirement of the RICO statute, as interpreted in *H.J. Inc.,* predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated

events." *Id.* at 240, 109 S.Ct. at 2901.

As for the second, or "continuity," prong of the analysis, the Court in *H.J. Inc.* attempted to promulgate a somewhat flexible approach, based upon a "commonsense, everyday understanding of RICO's language and Congress' gloss on it." *Id.* at 241, 109 S.Ct. at 2902. With this analytical approach in mind, the Court decided that "[w]hat a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter.*" *Id.*

In explicating how a plaintiff could make this continuity showing, the Court described continuity as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* "It is, in either case, centrally a temporal concept," *id.* at 241–42, 109 S.Ct. at 2902, so that a party may establish continuity as a closed-ended concept by "proving a series of related predicates extending over a *substantial* period of time." *Id.* at 242, 109 S.Ct. at 2902 (emphasis added).

Thus, *H.J. Inc.* makes clear that the continuity requirement can be met by establishing long-term criminal conduct but does not define what length of time qualifies as "substantial" for this purpose. The Court in *H.J. Inc.* also gave examples of how the threat of continued racketeering activity might be demonstrated. One example is that of a hoodlum who sells "insurance" to storekeepers to prevent the breaking of their shop windows. *Id.*

Since *H.J. Inc.,* the Third Circuit faced the question of continued

racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for closed-ended continuity. *See Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 610–11 (3d Cir.1991) (fraudulent conduct lasting twelve months does not establish closed-ended continuity); *Hindes v. Castle,* 937 F.2d 868, 875 (3d Cir.1991) (eight month period of predicate acts without a threat of future criminal conduct does not satisfy continuity requirement); *Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1413 (3d Cir.1991) (same); *Banks v. Wolk,* 918 F.2d 418, 422–23 (3d Cir.1990) (same); *Marshall–Silver Constr. Co. v. Mendel,* 894 F.2d 593 (3d Cir.1990) (seven month single-victim, single-injury scheme does not satisfy continuity requirement).

The Third Circuit concluded that a scheme lasting over three years extends over a "substantial" period of time and therefore constitutes the type of "long-term criminal conduct" that RICO was enacted to address. *See United States v. Pelullo,* 964 F.2d 193, 209 (3d Cir.1992) (holding that a jury could find a nineteen month period of racketeering activity sufficient to satisfy continuity requirement).

The Supreme Court cautions, however, in *H.J. Inc.,* that the existence of continuity may not always be apparent. 492 U.S. at 243, 109 S.Ct. at 2902–03. For example, the statutory definition of pattern is "at least two acts of racketeering activity" within a ten year period. 18 U.S.C. § 1961(5). It is clear that ten years is a period of long duration. Indeed, Justice White noted in a footnote that, while § 1961(5) defines a pattern of racketeering activity as requiring at

least two acts of racketeering activity, two acts may not be sufficient. *Id.* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

In *H.J. Inc.* the Court states that open-ended continuity is established when the commission of the predicate acts is "a regular way of conducting defendant's ongoing legitimate business." 492 U.S. at 243, 109 S.Ct. at 2902.

In the present case, the alleged actions of Shanni Snyder in filing Court documents does not appear to be the pattern of racketeering, but single isolated occurrences and not a business at all.

As the Supreme Court noted in *Boyle v. United Statees,* 556 US 938 (2019), an enterprise necessarily must have "'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity.'" 556 U.S. at 946 (quoting 18 U.S.C. § 1962(c)). *Boyle* confirmed that, although a pattern of illegal activity may be sufficient to satisfy both the enterprise and racketeering elements of a RICO claim, "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" 556 U.S. at 947.

Certainly, it appears evidence that Biros failed to demonstrate continuity and a pattern of racketeering.

### A(2). **BIROS CANNOT SHOW RICO WHEN THE SOLE PURPOSE OF THE PRESENT ENTERPRISE WAS TO DEFRAUD HER**

Biros can repackage it with stories of other litigations from the 1980s and 1990s, but the only *current* enterprise is the allegation that Shanni Snyder

A1097

somehow tried to beat Biros to courthouse to preserve her claims and which Biros suggests was based on embellished claims.

A RICO enterprise requires that the common activities of the enterprise extend beyond the minimal association necessary to sustain the pattern of racketeering. *Diamonds Plus, Inc. v. Kolber,* 960 F.2d 765, 770 (8th Cir.1992) ("The focus of the inquiry is whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense.").

"[A]n enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts." *Stephens, Inc. v. Geldermann,* Inc., 962 F.2d 808, 815 (8th Cir.1992) (citation omitted) (holding that plaintiff insufficiently pled a RICO enterprise because although "each member of th[e] group carried on other legitimate activities, these activities were not in furtherance of the common or shared purpose of the enterprise, and thus, were not acts of the enterprise"). That each member of a group carries on activities distinct from the pattern of racketeering is insufficient; *the group as a whole must have a common link other than the racketeering activity. McDonough v. National Home Ins. Co.,* 108 F.3d 174,177 (8th Cir.1997) (citations omitted) (emphasis added).

 "Proof the enterprise conducts lawful activity unrelated to the pattern of racketeering will often serve to prove the enterprise is separate from the pattern of racketeering." *Diamonds Plus, Inc.,* 960 F.2d at 770, 770 n. 5 (citations omitted).

A1098

"In deciding whether an alleged RICO enterprise has an ascertainable structure distinct from the pattern of racketeering activity," the court must "determine if the enterprise would still exist were the predicate acts removed from the equation." *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 354-355 (8th Cir. 2011) (quoting *Handeen v. Lemaire,* 112 F.3d 1339, 1352 (8th Cir.1997)).

As the Eighth Circuit noted in *Crest Constr. II,* where "the only common factor that linked" the individually named defendants "and defined them as a distinct group was their direct or indirect participation" in a scheme to defraud the plaintiff, plaintiff had not adequately pled a RICO enterprise, 660 F.3d at 355 (citing *Stephens,* 962 F.2d at 815–16).

For this reason, Biros' RICO claim that alleged the enterprise consisted of nothing but an alleged plan to defraud her fails to allege a RICO enterprise.

Therefore, the Complaint at Counts I and II fail because Biros failed to show an association in fact or that the enterprise was distinct from Shanni Snyder.

### B. RICO CANNOT BE USED TO COLLATERALLY ATTACK THE ORDER FOR RELIEF ENTERED IN THE BANKRUPTCY COURT AND BIROS FAILED TO INTERVENE IN THE DISTRICT COURT LABOR ACTION TO PURSUE A RULE 60 MOTION

Paragraph 338 of the Amended Complaint states "Shanni committed a predicate act of fraud connected with a case under Title 11 of the United States Code on April 27, 2022, when she filed the Involuntary Petition." However, prior to Shanni's involuntary petition being ruled on by the bankruptcy court, Biros

appeared, objected based on the validity of Shanni's claim, and moved to dismiss.  The bankruptcy court expressly granted Shanni's bankruptcy petition and issued an Order for Relief.  This Order for Relief constitutes *res judicata* and would require a collateral attack.  The Order for Relief constituted a final judgment on the merits of Snyder's claim and nobody, including Biros, appealed or sought reconsideration. Therefore, it is *res judicata* as to Biros who was before the bankruptcy court.  See *Gratiot County State Bank v. Johnson*, 249 U.S. 246 (1919)(Order for Relief *res judicata)*.  An Order for Relief is an appealable adjudication requiring Rule 60-type relief to vacate it. *In re:  Robert J. Mason*, 709 F2d 1313 (9th Cir. 1983).  It is also noted that the bankruptcy court recognized that Biros challenged the filing of the involuntary petition, but explained that it declined consider dismissal until after U Lock answered the involuntary petition, noting that "consent to an order for relief would seemingly moot Ms. Biros' challenges" to Shanni Snyder's alleged bad faith petition.  *See In re: U Lock,* 2024 WL 3154602**,** *3.  This holding is fairly simple to understand, U Lock did not need Snyder to file bankruptcy.  U Lock could have filed at any time.

Biros did not appeal the Order for Relief and, therefore, it constitutes an unassailable adjudication eliminating any collateral attack in this RICO case.

As to the predicate act at paragraph 336 averring that the July 14, 2021, filing of a Civil Complaint constituted wire fraud, Biros cannot use RICO to collaterally attack the judgment.  The proper method is for Biros to intervene and file a Rule 60 motion.  Biros knows this because, as shown by Exhibit 8, she

specifically stated that she intended to do just that. *See In re: Shanni Snyder*, 18-21983 (Bk. W.D.Pa.), Entry 72 ("33. Movant has filed this Motion for Relief from Stay to seek to vacate the Judgment received by the [Shanni Snyder] against U-Lock * * * 35. Accordingly, Movant requests relief from the automatic stay to take the necessary action to vacate the Judgment obtained by [Shanni Snyder] against U-Lock [...]").

However, as a matter of litigation strategy, and despite timeliness of a Rule 60 motion being important, she chose to use this RICO to collaterally attack the judgment. This is not the proper procedure. Biros, unless she waited too long, has a right to file a Rule 60 motion in the *U Lock* civil action before this Court if her "interests are strongly affected." *Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 940 (6th Cir. 2013)(collecting cases showing that a non-party can file a Rule 60 motion); *Grace v. Bank Leumi Tr. Co. of N.Y.*, 443 F.3d 180, 188 (2d Cir. 2006)(same).

It is improper to use RICO to collaterally attack judgments and, prior to suing for these two predicate acts because Biros first needs to have the decisions vacated.

## C. THE PREDICATE ACTS DO NOT INCLUDE THE NECESSARY ELEMENTS

In a RICO Conspiracy, Biros is required to present a viable claim under another subsection of 18 USC 1962.  *Howard v. American Online Inc.*, 208 F.3d 741, 751 (9th Cir.), cert. denied, 531 U.S. 828 (2000).  To state a claim for RICO conspiracy, one must successfully allege all the elements of a RICO violation, as well as an illicit agreement to violate the substantive RICO provision.  *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 806 (6th Cir. 2016).  Parties cannot be found guilty of conspiring to commit an act that is not itself against the law. *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1220 (11th Cir. 2020).

Biros' Count II simply refers to Count I and implies the conspiracy, except she adds one additional predicate act of alleged violations of corrupt obstruction in violation of 18 USC 1503.  These predicate acts all fail.

### C(1).  VIOLATIONS OF 18 USC 157 ARE EXEMPT FROM RICO

As to Count I, Biros cites as predicate acts at Paragraphs 338 and 339 that Shanni "committed a predicate act of fraud connected with a case under Title 11 of the United States Code."  Biros does not reveal the statute that forms the offense.  Rather, she just states, "fraud under Title 11."  Biros must plead fraud with particularity, not simply claim some unknown "offense" of fraud.  F.R.Cv.P. 9(b).

Congress included bankruptcy crimes to stop people who, like Biros, took the physical scrap property of the Estate and moved it to her own property near a

scrap yard. What Congress did not want was people suing people for filing claims in bankruptcy cases or alleging that the bankruptcy petitions were fraud. Therefore, Congress specifically exempted any predicate act derived from 18 USC 157. The statute states RICO offenses include, "any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title)." The first bankruptcy predicate act is allegedly committing fraud by filing the involuntary petition. This is specifically exempted as it is found at 18 USC 157(1). Next, Biros claims that Shanni committed an act through filing her proof of claim. But that would fall under 18 USC 157(2) and (3) and are exempt from RICO.

Perhaps this is why Biros cited no specific bankruptcy offense and just states "fraud." Regardless of the reason, as the alleged conduct falls within 18 USC 157, it cannot form the basis of a RICO offense.

### C(2). BIROS FAILS TO PLEAD FEDERAL WIRE FRAUD

First, Biros is subject to the heightened pleading standard under Rule 9, Fed. R. Civ. Proc. as to her wire fraud claims. The sole basis of the wire fraud predicate act is that Shanni Snyder filed a lawsuit against U Lock Inc.

Paragraph 336 of the Amended Complaint states:

Shanni committed a predicate act of wire fraud pursuant to 18 U.S.C. 1343 on July 14, 2021, when, with the intent to defraud or with intent to obtain property by means of false or fraudulent pretenses, she used the internet to transmit her complaint in the Wage Case to the District Court. Pursuant to Rule 11 of the Federal Rules of Civil Procedure, her signing and filing

"that complaint constituted her certification that the allegations of her complaint had factual support. In fact and on information and belief, many of Shanni's allegations were false and had no evidentiary support. These allegations included Shanni's assertion that she had been an employee of U Lock, that she had performed work for U Lock ten hours per day, every day, for more than four years, that U Lock had agreed to pay her for this work, and that she was entitled to payment of wages, straight and overtime, for this non-existent work."

However, The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud. *See* 18 U.S.C. §§ 1341, 1343. *Lum v. Bank of Am.*, 361 F.3d 217 223 (3d Cir. 2004) .

The mail and wire fraud statutes require a fraud to the ordinary property rights to an individual. The statutes do not protect intangible rights, the so-called "right to control" assets theory, the right to honest services, or the right to information. *Ciminelli v. United States,* 598 US 306 (2023). Biros fails to explain how filing a lawsuit meets the *Ciminelli* requirement that the statute be used only for depriving one of their property.

Moreover, Biros fails to allege any use of interstate commerce in Shanni uploading a document from her residence in Pennsylvania to a court in Pennsylvania. *See* e.g., *Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988) (affirming dismissal of RICO claim where there were no interstate telephone calls alleged in support of wire fraud predicate act); *McCoy v. Goldberg*, 748 F. Supp. 146, 154 (S.D.N.Y. 1990) (dismissing RICO claim where there were no interstate

telephone calls alleged in support of wire fraud predicate act); *Hall v. Tressic*, 381 F. Supp. 2d 101, 109 (N.D.N.Y. 2005) (same); *Meier v. Musburger*, 588 F. Supp. 2d 883, 907 (N.D. Ill. 2008) (same).

Finally, Biros simply cannot sue under RICO wire fraud on the basis of what she believes are baseless civil complaints. *See Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) and *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016).

Biros cites Rule 11, Fed. R. Civ. Proc., to justify the wire fraud claim. However, that rule does not equate to wire fraud, and Biros has no standing to enforce compliance with this statute.

### C(3). BIROS FAILED TO PLEAD FACTS TO SUPPORT VIOLATIONS OF 18 USC 1503

Biros lodges claims at paragraph 337 and 340 of the Amended Complaint that Shanni Snyder violated 18 U.S.C. 1503 by testifying falsely. In addition, in Count II, at Paragraph 352, Biros alleges that George and Kash Snyder violated 18 U.S.C. 1503 by testifying falsely.

Congress specifically excluded perjury from the RICO offenses. *See* 18 USC 1961(1) because it did not want this type of case. So Biros invokes 18 U.S.C. 1503 that prohibits "corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede" judicial officers or the administration of justice.

Biros does not explain the element of "corruptly" in her RICO lawsuit when, in reality, she is merely stating that Shanni Snyder somehow committed perjury or exaggerated her claim.

The term "corruptly" implies that this statute prohibits bribery.  Recently, the Supreme Court decided *Snyder v. United States*, 144 S.Ct. 1947,1959 (2024).  In that case, the Supreme Court repeatedly referred to the term "corruptly" and noted that it is used in bribery statutes.  Biros cites no facts to support her suggestion that Shanni Snyder or Kash and George Snyder acted "corruptly" in the proceeding.

In *Fischer v. United States,* 144 S.Ct. 2176, 2188 (2024), the Supreme Court made it clear that the term corruptly constitutes part of the mens rea of the offense.  It distinguished between mere "wrongful" and "corruptly."  In the present case, Biros offers no explanation and no facts – of which she must comply with Rule 9 – to explain how the alleged misrepresentations rise to the level of "corruptly."

Moreover, Biros offers no clear facts to show that the testimony constituted a falsehood.  Rather, a bankruptcy judge simply did not believe Shanni Snyder's testimony because she was fidgety and arrogant.  He found it implausible that Ms. Snyder watched a video ten (10) hours a day.  However, this seems to contradict the *Fair Labor Standards Act*.  There clearly was no smoking gun evidence that showed Ms. Snyder – or George and Kash to the extent they supported the argument – actually lied.  Even though the bankruptcy opinion

states, "She lied," in the body it appears that he found that the work she did just did not give rise to a full-time employment because she only sporadically watched the cameras. The bankruptcy court then engaged in speculation about Ms. Snyder's knowledge of *lis pendens* proceedings and noted that nobody – including the judge – bothered to ask her.

It is noted that the bankruptcy court is an inferior court and this Court indeed witnessed the testimony of Ms. Snyder and concluded her allegations were sufficient to enter the judgment it did. This differing result does not give rise to the element of "corruptly" influencing this Court.

This Court should remember, proof of perjury alone is insufficient to sustain a section 1503 violation. *United States v. Perkins,* 748 F.2d 1519, 1528 (11th Cir. 1984). In this case, we have merely a suspicion of perjury by a bankruptcy judge improperly reviewing the decision of a district judge.

Perjury is governed by 18 USC 1621. Certainly, 18 USC 1503, with its "corruptly" requirement as an element, needs more. Congress excluded perjury from RICO for a reason, and simply stating a person may have committed perjury does not rise to the level required.

The term corruptly requires some form of coercive action. *United States v. Farrell,* 126 F.3d 484, 486 (3d Cir. 1997) (in interpreting 18 USC 1512, holding "corrupt persuasion" does not apply to acts that are noncoercive in nature).

Therefore, Biros' failure to distinguish between mere perjury and actual corrupt influence of a judge is fatal to her RICO claims.

### C(4). BIROS FAILS TO ALLEGE BANKRUPTCY FRAUD

Biros fails to allege any form of bankruptcy fraud not found in 18 USC 157. She cannot merely allege that "some" unknown statute was violated and there existed a "fraud." Congress specifically exempted Section 157's conduct to avoid this type of action, yet that statute is what Biros – assuming she could prove it – alleges was violated.

### D. BIROS LACKS RICO STANDING TO BRING A RICO ACTION FOR DERIVATIVE CLAIMS AGAINST U LOCK BECAUSE SHE FAILED TO SHOW PROXIMATE CAUSE FOR ANY INJURY

Biros' lawsuit asserts indirect damage in that she avers she has been "deprived of the possessory interest in her real property. She has been denied the ability to enjoy that property. The Defendants' scheme delayed her ability to record her title to the Subject Property. Since Biros recorded that title, the Defendants' scheme has forced her to expend money and other resources to defend her interests in the Subject Property against the Defendants' attacks." *See* RICO Case Statement, Entry 50, Page 8.

The documents attached by Biros indicate she received an obviously objectionable *ex parte* Order to receive the deeds on January 20, 2022. She filed the deeds on January 25, 2022. It appears unclear how any of the predicate acts "delayed" her ability to record her title considering she did. The post-January 25, 2022, actions merely attacked the legality of her actions. With respect to Biros taking possession, the United States Bankruptcy Court

specifically granted Shanni Snyder's bankruptcy petition and Biros received partial possession through that proceeding.

Biros' claims are merely speculative and infer only a lost opportunity. See *In re Taxable Mun. Bond Securities Litigation*, 51 F.3d 518, 521-522 (5th Cir. 1995)(farmer's "lost opportunity" to obtain loan insufficient to constitute injury for RICO standing); *First Nationwide Bank v. Gelt Funding Corp*, 27 F.3d 763, 768-70 (2d Cir. 1994) ("risk of loss" is not injury ripe for RICO claim); *Grantham & Mann, Inc. v. Am. Safety Prods., Inc.*, 831 F.2d 596, 604-06 (6th Cir. 1987) (plaintiff failed to show actual lost profits).

Indeed, to have standing under § 1964(c), a plaintiff must allege: (1) "that his alleged harm qualifies as injury to his business or property;" and (2) "that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

In connection with the first requirement, the necessary injury to business or property requires tangible and concrete financial loss, rather than speculative or uncertain harm. *Guerrero v. Gates*, 442 F.3d 697, 707 (9th Cir. 2006); *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 71 (9th Cir. 1994). With respect to causation, "[t]he civil RICO statute requires plaintiffs 'to show that a RICO predicate offense not only was a 'but for' cause of [their] injury, but was the proximate cause as well.' " *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 349 F. Supp. 3d 881, 905 (N.D. Cal. 2018) (quoting *Hemi Grp., LLC v. City of*

*New York*, 559 U.S. 1, 9 (2010)), *aff'd*, 842 F. App'x 112 (9th Cir. 2021). Reliance "on an 'attenuated chain of conjecture' " is insufficient to support proximate causation under § 1964(c). *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1228 (9th Cir. 2008) (citation omitted). The "central question" a court must ask when evaluating proximate causation with respect to RICO claims is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

In this case, Biros moreless avers that if Shanni Snyder did not obtain a judgment and file an involuntary bankruptcy petition, she would not have been affected by the automatic stay and would have had access to her property sooner. However, U Lock could have filed its own bankruptcy and the bankruptcy court repeatedly upheld the propriety of keeping the automatic stay in place. The bankruptcy court held, "consent to an order for relief would seemingly moot Ms. Biros' challenges" to Shanni Snyder's alleged bad faith petition. *See In re: U Lock,* 2024 WL 3154602**,** *3.

Biros' position that the automatic stay would not have occurred and that she would have had the property sooner is conjecture and nothing more than a "a highly attenuated chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), that are insufficient for Article III standing and requiring dismissal under Rule 12(b)(1).

Biros must plead sufficient facts for proximate causation to obtain RICO standing. *In re Taxable Mun. Bond Secs. Litig.,* 51 F.3d 518, 521 (5th Cir. 1995) (for RICO standing one must plead facts sufficient for proximate causation).

Biros "lacks standing to assert a fraud on the court claim based on a secondary effect of an injury to the Debtors (pre-petition) or their estates (post-petition). *In re SunEdison, Inc.*, Case No. 16-10992 (SMB), 2019 WL 2572250, *6 (Bankr. S.D.N.Y. June 21, 2019).   By asserting such derivative claims, Biros lacks prudential standing and dismissal under Rule 12(b)(6) is appropriate. *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009).

Biros primarily alleges a personal injury – she avers that the Defendants engaged in an abuse of process, malicious prosecution, or a misuse of civil proceedings causing her to incur attorney fees.   Biros bootstraps that – despite having a full and fair opportunity to litigate against the automatic stay in the bankruptcy case, it constituted some harm to her.   As to the automatic stay, the bankruptcy court has explained, repeatedly, that it sustained the automatic stay over Biros' objections and that  *In re: U Lock,* 2024 WL 3154602 .  Biros never appealed these findings.  Thus, the claims she has are for attorney fees is a personal injury type lawsuit, not a direct injury to her business or property.

RICO permits a plaintiff "injured in his business or property by reason of" the defendant's racketeering activity to sue for treble damages and attorneys'

fees. 18 U.S.C. § 1964(c).  That "business or property" requirement "exclud[es] … personal injuries." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 350 (2016).

Because only plaintiffs "injured in [their] business or property by reason of a violation of section 1962" may sue civilly. 18 U.S.C. § 1964(c). Though courts sometimes refer to that requirement as "RICO standing," it is simply an element of civil RICO claims. *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 129-30 (2d Cir. 2003).

Recognizing that Congress did not impose boundless liability, the Supreme Court Court has cautioned against giving RICO an overly "expansive reading." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266 (1992). Thus, the Court held that a RICO plaintiff's injury must have been proximately caused by—i.e., "by reason of"—the defendant's RICO violation. Id. at 268. And, of particular relevance here, the Supreme Court has recognized that the phrase "business or property" "cabin[s] RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries." *RJR Nabisco*, 579 U.S. at 350.

As the en banc Sixth Circuit has warned, permitting such lawsuits would deprive RICO's "business or property" requirement of "restrictive significance." *Jackson v. Sedgwick Claims Mgmt. Servs*., 731 F.3d 556, 565 (6th Cir. 2013) (en banc).

"Lost earnings or wages are not recoverable" in a civil RICO suit "if they flow from a personal injury." *Jackson*, 731 F.3d at 565-66; *Evans v. City of Chicago*, 434 F.3d 916, 926-27 (7th Cir. 2006), overruled on other

grounds by *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013); and *Grogan v. Platt*, 835 F.2d 844, 848 (11th Cir. 1988)).

"The terms 'business or property' are, of course, words of limitation which preclude recovery for personal injuries and the pecuniary losses incurred therefrom." *Doe v. Roe*, 958 F.2d 763, 767 (7th Cir. 1992); accord Ryder v. Hyles, 27 F.4th 1253, 1257 (7th Cir. 2022); Evans, 434 F.3d at 925-26. "Most personal injuries … will entail some pecuniary consequences," that court explained. Doe, 958 F.2d at 770.  Thus, treating "the economic aspects of such injuries … as injuries to 'business or property'" would evade RICO's limitation on qualifying injuries. Id.

 The Seventh Circuit denied civil RICO recovery for "malicious prosecution and false imprisonment"—"traditional tort claims which result in a personal injury." Evans, 434 F.3d at 927. While that plaintiff focused his claim on "[t]he loss of income as a result of being unable to pursue employment opportunities while allegedly falsely imprisoned," that lost income was "an indirect, or secondary effect, of the personal injuries." Id. at 926-27. So the lost income was not "a cognizable injury to 'business or property'" under RICO. Id. at 927.

The Eleventh Circuit also precludes "recovery for the economic aspects of personal injuries." *Grogan*, 835 F.2d at 845; accord *Blevins v. Aksut,* 849 F.3d 1016, 1021 (11th Cir. 2017); *Pilkington v. United Airlines*, 112 F.3d 1532, 1536 (11th Cir. 1997). As that court has explained, "the ordinary meaning of the phrase

'injured in his business or property' excludes personal injuries, including the pecuniary losses therefrom." *Grogan*, 835 F.2d at 847. Had Congress wanted to cover all financial losses, Congress "could have enacted a statute referring to injury generally, without any restrictive language." Id. (citation omitted). Instead, Congress limited civil RICO's reach to injuries in "business or property." Id. at 846.

An "injury" is a "wrong or damage done to another, either in his person, rights, reputation, or property." Black's Law Dictionary 924 (Rev. 4th ed. 1968). "Business" includes "means of material being and livelihood." Id. at 248. And "property" is an "exclusive right" "guaranteed and protected by the government." Id. at 1382. As the Supreme Court has noted in the context of the Clayton Act, the phrase "business or property" is thus "restrictive." *Reiter v. Sonotone Corp*., 442 U.S. 330, 338 (1979). That language necessarily excludes "particular kinds of injur[ies]," including "personal injuries." *RJR Nabisco*, 579 U.S. at 350.

To decide whether a plaintiff has suffered a qualifying injury, courts do not look at "the injury … in isolation."  *Yegiazaryan v. Smagin*, 599 U.S. 533, 545 (2023). They examine "the circumstances surrounding the injury," including how it "arose." *Id.*

Here, Plaintiff merely avers that she has been civilly wronged being subject to the effects of litigation (not against her, but against U Lock).  Her damages are attorney fees and speculation that she would not have been subject to an automatic stay.  This does not provide her with RICO standing.

## E. THE AMENDED COMPLAINT CONTAINS ONLY INFERENCES AS TO KNOWLEDGE AND AGREEMENT

To allege a RICO conspiracy, the complaint must allege facts to support both the defendant's agreement and his or her knowledge. *Glessner v. Kenny*, 952 F.2d 702, 714 (3d Cir. 1991), *overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.,* 46 F.3d 258, 260-261 (3d Cir. 1995*).* Thus, in *Glessner* the Court upheld the dismissal of the plaintiffs' § 1962(d) claims where the plaintiffs did not allege agreement and knowledge, but instead argued that agreement and knowledge could be inferred. *Id.* In other words, the plaintiff must show that a defendant in a RICO conspiracy action "was aware of the essential nature and scope of the enterprise and intended to participate in it." *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir. 1988).

In this case, it is alleged that Shanni Snyder committed various RICO predicate acts by filing legal papers. However, the alleged conspiracy contains no factual support, only inferences. Bald and unsupported allegations do not satisfy the pleading requirements for a RICO conspiracy. See *Glessne*r, 952 F.2d at 714.

Most of the paragraphs are on "information and belief" without citing any source of the information. "Belief" certainly is not acceptable in this type of RICO case. A pleading offering vague or ambiguous assertions based upon "information and belief"—as in this Complaint— does not legally suffice.

*Shannon v. Hamm*, No. 5:15-CV-082-C, 2015 WL 13185992, at *5 (N.D. Tex.

May 5, 2015).

As to the undersigned, the only allegations about participation in the

purported enterprise is:

> 322.  Roth participated in the Fake Lien Scheme in several ways: a) by, on
> information and belief, participating in the planning and organization of the
> same; b) by, on information and belief, advising George, Kash, and U Lock
> not to respond to Shanni's complaint in the Wage Case; c) by filing U
> Lock's application to the Supreme Court of Pennsylvania to stay remand of
> the Ownership Action even though he knew that U Lock did not intend to
> seek review in the U.S. Supreme Court; d) by filing and arguing the Petition
> to Strike in the Ownership Action and arguing to the Westmoreland County
> Court that it should not have released to Biros the deeds to the Subject
> Property and that the Westmoreland County Court should instead follow a
> procedure that would have exposed the Subject Property to the Fake Lien
> but could not under any circumstances have left his client with title to the
> Subject Property; e) by delaying the filing of the notice of bankruptcy in the
> Ownership Action for three weeks after Shanni filed the Involuntary Petition
> and commenced the U Lock Bankruptcy Proceeding; and f) by delaying the
> filing of that notice until two minutes after Shanni had entered her
> appearance in the Ownership Action and filed her notice of appeal in that
> action to the Superior Court. 323. On information and belief, Roth thereby
> continued the role of the legal face of the Snyder Family Enterprise that
> Crawford had previously filled.

All of the "on information and belief" conjecture of privileged conversations

and work product constitutes nothing but an inference and is certainly not

sufficient.

There is absolutely not a single fact that implies that legal counsel

participated in any planning of Shanni Snyder's litigations – U Lock could have

filed its own bankruptcy at any time.  U Lock had no obligation to file a Notice of

Bankruptcy – that obligation was on Biros as creditor to stop her legal actions.

As to paragraph 323, it appears to be cut and pasted from a different RICO litigation.  U Lock's reason for not filing the certiorari was not because of some vast conspiracy, but was a decision of the client AFTER learning that Biros already received the deeds pursuant to an *ex parte*  communication with the state judge.  The theory that Shanni Snyder and the undersigned drove to the courthouse together is logistically absurd as the courthouse is in Greensburg, Snyder lives West of Greensburg (North Huntingdon), Roth's offices are East of Greensburg (Latrobe).  Such a car pool would turn the five-minute filing into an all day affair.

The absurdity of this vast conspiracy theory is that U Lock could have filed a voluntary bankruptcy at any time under Chapter 7.  It did not need Shanni Snyder to do it. Nobody needed to enter into the dreamed up conspiracy.

Similarly, the bankruptcy could have been filed earlier by U Lock and it would have achieved the goals Biros alleges could have happened.  In other words, if U Lock filed bankruptcy in December 2021, or even on January 16, 2023, it would have reorganized and it would have the property.  The alleged conspiracy only served to help Biros.

There exists no factual allegations in the Complaint to support the inference and conjecture that the undersigned told U Lock's officers not to respond to the labor Complaint.  Rather, as the officers stated after being goaded into providing attorney-client communications that it not admissible, is that the non-specific question as to pricing of a federal suit would be at least $10,000 to

defend. This allegation, if true, does not support the inference that the undersigned told the client not to respond or that a vast RICO conspiracy existed.

"Lawyers look at allegations every time they are engaged to respond to a lawsuit. They are not obliged to treat those allegations as true; to the contrary, they recognize that a plaintiff is asserting only that it proposes to prove them, and they evaluate the complaint to see what kind of a defense can be raised." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 480 (7th Cir. 2017) . The *Domanus* Court stated, "Faced with a similar situation, the D.C. Circuit reached this commonsense conclusion in a case in which the plaintiff alleged that a defendant law firm knew about its client's wrongdoing. *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043 (D.C. Cir. 2012). There the plaintiff had alleged that the law firm knew about its client's bribery conspiracy from news reports about the bribery and embezzlement scheme, the client's reputation for wrongdoing, and a prior criminal conviction. *Id.* at 1048–50. The court concluded that '[t]hese allegations are insufficient to establish a plausible inference that [the defendant law firm] was aware of anything corrupt relevant to its provision of legal services…' *Id.* at 1050."

"The fact that someone should have known about a scheme or fraudulent activity is not enough to show that the person actually knew. *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 870–71 (7th Cir. 2001).

An inference of knowledge through willful blindness requires that the defendant "believe that there is a high probability that a fact exists" and "take

deliberate actions to avoid learning of that fact." *Global–Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769, (2011). Only a subjective belief that there is a high probability that the fact is true, coupled with deliberate steps to avoid learning the fact, is equivalent to knowledge. See *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 240 (5th Cir. 2010) ("Neither awareness of *some* probability of illegal conduct nor a showing that the defendant *should* have known is enough" to constitute the legal equivalent of knowledge).

Even if there existed some knowledge, there would need to be an agreement. The Complaint is also deficient on the question of agreement—a critical element of a RICO conspiracy case. See *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000).

In order to raise an allegation of a conspiracy prohibited by section 1962(d), the plaintiff must allege (1) that the defendant agreed to conduct or participate in the affairs of an "enterprise," and (2) that he agreed to the commission of two predicate acts. *Frost Nat. Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 869(7th Cir. 2001). *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998), *holding modified by Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000). The absence of either of these is fatal to the claim.

Claims that lawyers have conspired with their clients are insufficient in the absence of allegations that the arrangement involves more than standard legal

representation. See *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP,* 682 F.3d 1043, 1051-1052 (D.C. Cir. 2012).

The allegations in the Complaint, subject to Rule 9's requirement of specificity, fail to allege knowledge and agreement needed to move forward on a RICO or RICO conspiracy claim.

### F. THE RICO CONSPIRACY LACKS THE REQUIRED INTERSTATE COMMERCE NEXUS

Count II is a conspiracy claim against the undersigned and others. 18 USC 1962(d) prohibits a conspiracy to violate the RICO provisions of 18 USC 1962(c) apparently what was set out in Count I. However, 18 USC 1962(c) explains that, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

As this Court recognized in *Biros v. Snyder,* 2024 WL 1346691 at *4 (W.D.Pa. Mar. 29, 2024), the person sued must be associated with an enterprise engaged in interstate commerce.

The word "interstate" is not used in the Amended Complaint.

In the RICO Case Statement, Biros states:

> The Subject Property contains a self-storage space which, on information and belief, rents space to individuals residing in multiple states. Further, the Subject Property is ripe for further development

that would affect commerce, including interstate commerce, if it were in the hands of Biros, its proper legal owner. This commerce has been prevented by the predicate acts and pattern of racketeering engaged in by the Defendants.

First, the property, and the self-storage business, is not the enterprise that Biros alleges that the defendant engage in.  Second, Biros made no claim that the actions affected the self-storage business of U Lock.  Third, Biros had a full and fair opportunity to litigate the automatic stay from the bankruptcy court and, as shown, subverted it.  *U Lock*, 2024 WL 3154602 (Pa. W. Bank. June 24, 2024).  Once the stay ended, Biros maintained the ability to develop the property in any manner she wanted.

 However, these allegations do not involve the so-called lien enterprise, they involve the U Lock and Biros enterprises which are not alleged enterprise that forms the basis of the conspiracy.

On the contrary, the statute requires the enterprise to specifically engage in or have activities of which affect interstate commerce. By Biros' own admissions, the sole activity of the enterprise was to file documents with various courts all located in Pennsylvania.

Indeed, Biros need to allege specific facts which "must show that the conspiracy, if completed, would involve an enterprise that affected interstate or foreign commerce." *United States v. Ernst*, 502 F. Supp. 3d 637, 658 (D. Mass. 2020).  To state that Biros might, if they possessed the property, engage in interstate commerce appears merely speculative.

### G.  PURSUANT TO RULE 12(f) THIS COURT MUST STRIKE THE ALLEGATIONS PERTAINING TO THE "LEGAL DRAFTERS"

Throughout Biros' Amended Complaint, she repeatedly alleges that "Legal Drafters" may have assisted Shanni in drafting various legal documents.  *See Amended Complaint,* at ¶¶72, 96, 110, 123, 126, 142, 171, 326, 327, 329.  This is nothing but Biros seeking an opportunity to obtain discovery and interfere with the work product of all of the parties by opening the door to having someone testify about every step they took in drafting legal papers.  Indeed, in the related bankruptcy documents, Biros' counsel subjected her to various questions about the software she uses, the databases she accesses, etc.  Worse, George Snyder and Kash Snyder have pointedly been asked about their conversations with the undersigned, why certain legal decisions were made, and other protected matters.  This must stop because in Pennsylvania so-called "legal drafters" without disclosure to the Court is authorized.

In Pennsylvania, *pro se* litigants may receive help with legal research and drafting legal pleadings from attorneys without any disclosure to the parties or the Court.  *See Pennsylvania Bar Association Committee on Legal Ethics and Professional Responsibility and Philadelphia Bar Association Professional Guidance Committee Joint Formal Opinion* 2011-100.  In that opinion, the Committee held that, "A Lawyer Is Not Required Under the Rules of Professional

Conduct to Disclose a Limited Scope Engagement to an Opposing Party or to the Court in a Litigation Matter."

This practice of anonymously drafting documents for pro se litigants is called "legal ghostwriting," and the American Bar Association (ABA) Standing Committee on Ethics and Professional Responsibility has recognized it as a form of "unbundling" of legal services, or limited scope representation. *ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Op.* 07-447 (2007). The committee stated that "[l]itigants ordinarily have the right to proceed without representation and <u>may do so without revealing that they have received legal assistance in the absence of a law or rule requiring disclosure.</u>" Id. at 2.

The Amended Comples goes so far as to directly infer wrongdoing by Shanni Snyder through not disclosing any help or advice– which is her work product – notwithstanding the ethical opinions from Pennsylvania since 2011 that specifically hold that disclosure to the other parties is not necessary.

For these reasons, a RICO lawsuit certainly is not the place to test the validity of advice provided by ethics committees within Pennsylvania that both attorneys and litigants are entitled to reasonably rely upon.

This Court needs to strike these paragraphs to take how a person writes their legal pleadings out of the inquiry.

## H. BIROS FAILS TO STATE A CLAIM AS TO SLANDER TO TITLE OR CONSPIRACY

At Counts III and IV, Biros raises a slander of title claim and a conspiracy to slander title claim.  In it, she complains of the filing of a judgment against U Lock, Inc., not Biros.  In addition, Biros cites a *writ of summons* and *lis pendens*. Obviously, Shanni Snyder believes she was a creditor of U Lock and had a plausible claim as the Pennsylvania Uniform Voidable Transactions Act, 12 Pa.C.S. 5101, et. seq.  Indeed, Shanni Snyder purchased the claims from the bankruptcy trustee and an action to void the transaction remains pending. *Snyder as assignee of Slone, Trustee, v. Biros*, 23-ap-2020 (Bk.W.Pa.).

Regardless, Biros fails to make a claim for for slander to title.  Slander, or disparagement, of title is the —the false and malicious representation of the title or quality of another's interest in goods or property   *Pro Gold Mfg. v. Tribune Review Newspaper Co*., 809 A.2d 243, 247 (Pa. 2002). To plead a valid slander of title claim, a plaintiff must allege: (1) a false statement; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity. *Pro Golf Mfg*., 809 A.2d at 246 (*citing Restatement (Second) of Torts* § 623(A) (1977)); *accord Lincoln v. Magnum Land Servs., LLC,* 2013 WL 2443926, at *5 (M.D. Pa. June 5, 2013).

Biros alleges no facts from which this Court can infer that the judgment itself or a writ of summons coupled with a lis pendens was disparaging, false, or done with malice. *See In re Bennett*, 531 B.R. 68, 79 (Bankr. E.D. Pa. 2015) (holding that a debtor did not state a plausible claim against mortgagee for slander of title when he did not state facts to support malice element).

Moreover, Biros does not allege, with any specificity, that she suffered special damages as a result of the actions.. Allegations of pecuniary loss cannot be speculative. See *Zerpol Corp v. DMP Corp*., 561 F. Supp. 404, 409 (E.D. Pa. 1983) (plaintiff alleging disparagement or slander of title must —plead and prove pecuniary loss); *Surgical Laser Tech., Inc. v. Heraeus Lasersonics, Inc.*, 1994 WL 637353, at *1 (E.D. Pa. Nov. 10, 1994) (noting that, under Pennsylvania law, a slander of title claim requires proof of special damages and must be pled with specificity).

Indeed, Biros at all times maintained a remedy as to the *lis pendens*.  All she needed to do was file a petition to strike it.  As to the *writ of summons*, Biros merely had to file a rule upon Shanni Snyder to file a complaint.

Because the allegations do not give rise to a *slander of title* action, Counts III and IV must fail.

## I.  COUNT IV FAILS TO STATE AN OVERT ACT OR A CLAIM

Even if Count III can proceed, Pennsylvania requires more than just a meeting of the minds to advance a conspiracy claim. In this case, none of the

other defendants appeared in the litigations that Biros aver affected her title.

Biros must plead:  (1) a combination of two or more persons acting with a

common purpose to do an unlawful act or to do a lawful act by unlawful means or

for an unlawful purpose; (2) an overt act done in pursuance of the common

purpose; and (3) actual legal damage. Proof of malice or an intent to injure is

essential to the proof of a conspiracy. *Strickland v. University of Scranton*, 700

A.2d 979, 987-88 (Pa.Super.Ct.1997); *see also Skipworth v. Lead Indus. Ass'n,*

*Inc*., 547 Pa. 224, 690 A.2d 169, 174 (Pa.1997).

While Biros makes boilerplate allegations, considering Pennsylvania's

requirement that special damages be pled with specificity, none of it is sufficient.

## J.  COUNTS III AND IV ARE BARRED BY THE STATUTE OF LIMITATIONS

The undersigned seeks judgment on the pleadings as to this issue.  Biros

attaches the documents to her Complaint.  This Court can take judicial notice

pursuant to F.R.E. 201(d) that these events occurred over one year prior to Biros'

first Complaint.  Therefore, the action is barred pursuant to 42 Pa.C.S.A. § 5523;

*Pro Golf Manufacturing v. Tribune Review Newspaper Company*, 570 Pa. 242,

809 A.2d 243 (2002).

## K.  COUNTS V AND VI FAIL TO STATE A CLAIM

First, Biros fails to allege with particularity any economic damage resulting

from the alleged fraud.  "[I]ntentional misrepresentation claims are generally

preempted by the economic loss rule," except where "a defendant committed

fraud to induce another to enter a contract." *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F. Supp. 2d 643, 658 (E.D. Pa. 2002).  In this case, Biros fails to explain her economic loss except to aver some attorney fees as a result of litigating.

Second, Biros cites Rule 11, F.R.Cv.P.  as a basis for her fraud claim. However, Rule 11 does not create a private cause of action.  *Hofmann v. Fermilab NAL/URA*, 205 F. Supp. 2d 900, 904 (N.D. Ill. May 30, 2002) ("Rule 11 affords no private right of action."); *New York News, Inc. v. Newspaper and Mail Deliverers' Union*, 139 F.R.D. 291, 293 n.1 (S.D.N.Y. 1991), aff'd, 972 F.2d 482 (2d Cir. 1992). See also *In re 72nd St. Realty Assocs.*, 185 B.R. 460, 473 (Bankr. S.D.N.Y. 1995) (same analysis applies under Bankruptcy Rule 9011).

Third, Biros failed to plead the elements of fraud which are:  (1) a representation was made; (2) that is material to the transaction; (3) made falsely, with knowledge of falsity or with recklessness regarding its truth or falsity; (4) with the intent leading another to rely on it; (6) which is justifiably relied upon; and, (7) the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 559 (Pa. 1999).  Specifically, Biros did not allege that she justifiably relied on any representations.

Therefore, the claim must be dismissed.

A1127

### L.  BIROS FAILS TO PLEAD ABETTING FRAUD

At Count VI, Biros sues for aiding and abetting fraud.  This is a recently recognized tort by Pennsylvania's Supreme Court.  *Marion v. Bryn Mawr Trust Co.*, No. 72 MAP 2021, 2023 WL 308110 (Pa. Jan. 19, 2023).

To sue for aiding and abetting fraud, Biros must "allege a scienter of actual knowledge" which strikes the right balance between permitting redress for fraud victims on the one hand and protecting defendants from excessive costs and liability on the other.  *Id*.

The Pennsylvania Supreme Court noted that *The Restatement (Second) of Torts* recognizes aiding and abetting fraud as a cause of action, holding a person liable where he `knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself….," something that Biros does not fully aver in her Complaint.

The only thing Biros accuses the defendants of is not responding to a lawsuit, something that is their prerogative to do.  In other words, mere silence is not fraud if there is no duty to speak. *Wilson v. Donegal Mutual Insurance Co*., 410 Pa. Super. 31, 598 A.2d 1310 (1991); *Smith v. Renaut*, 387 Pa. Super. 299, 564 A.2d 188 (1989). Biros fails to plead what duty the defendants had to respond to the lawsuit.

The other allegations, relating to filing documents, were all done with Biros having an opportunity to be heard and cannot plausibly aid a specific fraud since she had a full and fair opportunity to litigate the matter.

Therefore, Count VI must be dismissed.

## M.  THE ABUSE OF PROCESS AND CONSPIRACY CLAIMS FAIL

At Counts VII and VIII, Biros sues for abuse of process and conspiracy to abuse process.  To establish a claim for abuse of process it must be shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff. Abuse of process is, in essence, the use of legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process. Thus, the gravamen of this tort is the perversion of legal process to benefit someone in achieving a purpose which is not an authorized goal of the procedure in question. *Werner v. Plater-Zyberk*, 799 A.2d 776, 785 (Pa. Super. 2002) (citations omitted). See *Weiss v. Equibank,* 460 A.2d 271, 276 (Pa. Super. 1983 ("If the plaintiff sues the defendant on a valid cause of action but brings the suit, for example, not to collect his just debt but for a collateral purpose such as blackmail the action is a malicious abuse of process").

Unlike this RICO action, the documents filed were clearly done so for the purpose on their face.  It is true that perhaps Shanni Snyder sought an advantage by racing to the courthouse– something that she probably should have been done even faster– but that is the law of judgments.  *United States v. Estate of Romani*, 523 U.S. 517 (1998)(Pennsylvania judgment creditor's lien valid and with priority if filed prior to other liens, even tax liens).

As to conspiracy, again Biros fails to allege the elements of civil conspiracy, particularly what overt acts are attributable to which defendants. *Strickland v. University of Scranton*, 700 A.2d 979, 987-88 (Pa.Super.Ct.1997); *see also Skipworth v. Lead Indus. Ass'n, Inc.*, 547 Pa. 224, 690 A.2d 169, 174 (Pa.1997).

### N. COUNTS IV, VI, AND VIII FAIL BECAUSE THE ALLEGATIONS SHOW A BENEFIT TO DEFENDANTS' BUSINESS INTERESTS

As explained by Biros, the purpose of Shanni Snyder's filings were to advance her position that she was owed money and entitled to a lien. U Lock obviously had a business interest in reorganization under the bankruptcy code and challenging what it construed as improper conduct. This is obvious from the legal pleadings.

To proceed under civil conspiracy, the Plaintiff must show actual malice. If the facts show that the defendant acted to advance his or her own professional or business interests, "[t]his necessary proposition is negated." *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. Sept. 3, 2009); see also *Spitzer v. Abdelhak*, 1999 U.S. Dist. LEXIS 19110, at *9 (E.D. Pa. 1999)(granting motion to dismiss civil conspiracy claim where the plaintiff alleged that the purpose of the conspiracy was for the defendant to benefit itself personally and professionally). Thus, where a plaintiff's case relies on the theory that the defendants "acted for their business advantage and benefit" a civil conspiracy claim is "not [] tenable because [p]laintiffs' evidence belies the notion that

[d]efendants acted without a business motive, but purely out of malice." Id. (dismissing civil conspiracy claim); see also *Guaranty Towers, LLC v. Cellco Partnership,* Civ. No. 1:CV-07-0554, 2007 U.S. Dist. LEXIS 65819, at *6 (M.D. Pa. Sept. 6, 2007) (granting motion to dismiss civil conspiracy claim where the plaintiffs' theory of the claim stated that the defendants acted to obtain more revenue).

Because the documents show the parties were advancing their business purposes, the civil conspiracy claims must fail.

## V. CONCLUSION

Based on the above, to allow this action to proceed would be inappropriate considering that Christine Biros has been sanctioned for very similar conduct she sues for and these adjudications were not appealed and are *res judicata*. In addition, the RICO action cannot proceed due to technical defects and the state law claims fail to state a claim upon which relief can be granted. Therefore, the Complaint must be dismissed or judgment granted on the pleadings.  In the alternative, the  impertinent material must be stricken.

Respectfully submitted,

*/s/  J. Allen Roth, Esq.*
J. Allen Roth, Esq. (PA 30347)
805 S. Alexandria Street
Latrobe PA  15650
lawmatters@yahoo.com
(724) 537-0939

COUNSEL FOR DEFENDANT
J. ALLEN ROTH

A1131

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINE BIROS, | ) | |
| Plaintiff | ) | 2:23 cv 00297 |
| | ) | |
| v. | ) | |
| | ) | |
| SHANNI SNYDER and others, | ) | |
| Defendants. | ) | |

## **MOTION TO DISMISS THE AMENDED COMPLAINT**

George Snyder moves to Dismiss the Amended Complaint in this matter.

I don't need to repeat and restate the arguments why this flapdoodle case should be dismissed, instead I incorporate by reference the motions to dismiss and briefs of the defendants. I see Allen Roth's brief and I incorporate that. I guess Shanni and Kash will file a brief if they didn't already. I will contact Kash and remind him. Shanni, I don't want to get blamed for conspiring so I won't call her and see what's up, but if she has some good arguments that Allen didn't cover, I incorporate them.

As for the lawsuit filing enterprise, I did not have anything to do with my parents tax case from 1988 where they claimed millions in gold was buried in Monroeville and, unfortunately, I never found that gold. I am not <u>that</u> George Snyder. I am George Snyder Jr. Let's be clear about that I get blamed for enough.

I know the bankruptcy judge found that I acted strangely in court, clutching the rail, so I am not credible. The judge said, "this was a different George. From the minute he took the witness stand, George awkwardly clutched the back rail as if holding on for dear life. He was visibly nervous and flushed, constantly shifting in his seat. It seemed George was testifying against his will." <u>I was testifying against my will!!!!!! Biros issued a subpoena for my presence!!!!</u> But the reason I was clutching is because I had severe back pain from an accident where I fell off the roof. I also was diagnosed with heart problems and told I needed open heart surgery, which I recently survived. I am not sure why the judge didn't ask me if he thought I was having a problem and having a heart attack or

A1132

something. Nobody asked me, I didn't even realize my credibility was based on that type of stuff. But it wasn't my heart condition, it was the back pain. Some days are good, some aren't. I don't know what caused the flushing, I have no idea. Might have been the circulation problem, but I didn't notice. Can't explain something I didn't know.

The statements though are consistent. I have been saying the same thing over and over and over. I said it repeatedly at the creditor meeting, in the declarations, at the hearing where BIROS subpoenaed me to attend: Shanni Snyder was not an employee on the payroll of U Lock. We didn't have employees who got paychecks, John Biros didn't want that. We had about 20 people who helped, we gave them food mostly, some cash. We didn't give Shanni cash. She watched the video, I hope she watched it a lot, I assume she paid attention. Maybe the judge is right and she didn't watch it constantly, she said she watched. I learned from this litigation that an employee doesn't need get a salary to be an employee and a volunteer might be an employee, sisterly love might be an employee under the labor law. I determined after hearing all this that I was an employee to cuz I worked for 8 years, cutting grass, shoveling snow, electrical, dirt movement, and didn't get a penny for working on what I guess is Biros' land. Shanni'd have gotten more than minimum wage if we were able to develop the property, but we couldn't because John and Christine had their illegal gambling enterprise and the Attorney General of Pennsylvania was trying to find their cash stash.

U Lock defaulted on the Shanni Snyder thing. U Lock didn't have anything, so what was the point. Without developing the property, it was with just under $1000 or so. I am not supposed to spend money for U Lock just to make Biros happy. It's not my job. I don't know if shanni's video watching was worth the $262,000 this court awarded, but we can't pay it anyway. I'm not sure why this court doubled the money.

Then Biros is complaining in her lawsuit that we didn't file the certiorari. There wasn't no point, while the stay existed, biros snagged the deeds. Why do I have to pay to file certiorari $300 filing fee just because I said I planned to do it. I am not sure how that creates the conspiracy, it doesn't

make sense. If I would have filed the certiorari then it'd have been delayed more, not less, so I helped Biros and she says its a conspiracy because I did her a favor. If I filed the certiory Biros would say the certiorari was to delay her.  I guess her attorneys wanted the certiorari thing filed so they could get more fees.

*IF I UNDERSTOOD BANKRUPTCY I WOULD HAVE FILED FOR U LOCK IN 2018 THEN BIROS NEVER WOULD HAVE HAD A TRIAL.  I WISH SHANNI WOULD HAVE TOLD ME HOW TO DO THAT THEN INSTEAD OF HER DOING IT IN 2022.*

In addition to the cases Allen Roth cites that suing under RICO for litigation does not state a claim, I point out other cases on point.   *See, e.g., von Bulow v. von Bulow,* 657 F. Supp. 1134, 1145 (S.D.N.Y. 1987) ("a complaint based on nothing more than a party's filing of unjustified suits cannot fulfill the requirement that a RICO plaintiff plead a predicate act"); *Nakahara v. Bal,* No. 97 Civ. 2027(DLC), 1998 WL 35123, at *8 (S.D.N.Y. Jan. 30, 1998) (same); *Auburn Medical Center, Inc. v. Andrus,* 9 F. Supp. 2d 1291, 1299 (M.D. Ala. 1998) (same). As the Eight Circuit noted in dicta, Judges and lawyers often complain that the courts are inundated with a flood of litigation, but the fact remains that litigation is as American as apple pie. *I.S. Joseph Co. v. J. Lauritzen*, 751 F.2d 265, 267-68 (8th Cir. 1984).

<u>Conclusion</u>

This case needs to be dismissed as not stating a claim and for being vindictively mean and flapdoodly.  It's a Strategic Lawsuit Against Public Participation.  It's not a proper RICO.  There's no jurisdiction.  It doesn't state a claim.  It's FLAPDOODLE!

Respectfully submitted,

/s/ George Snyder

_____

George Snyder
Box 15
Irwin PA 15642

A1134

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINE BIROS, | ) | 2:23-cv-00297 RJC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SHANNI SNYDER, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION TO DISMISS; AND, MEMORANDUM IN SUPPORT

Defendant Shanni Snyder, *pro se*, moves this Court pursuant to
Federal Rule of Civil Procedure 12 to dismiss the Amended Complaint:

### I. **Defendant Shanni Snyder Incorporates the Other Motions to Dismiss**

Defendant Shanni Snyder incorporates the motions to dismiss filed by
the other defendants.  As this Court sees from the Complaint and the
motions to dismiss, the Plaintiff alleges that Shanni Snyder operates an
enterprise consisting of Shanni Snyder.  Obviously, this legal dispute
amongst the parties does not give rise to RICO.  All of the raised arguments
relating to RICO and RICO Conspiracy equally apply to Count I and well as
Count II.

### II. **This Lawsuit Constitutes Retaliation in Contravention of the FLSA and this Use RICO to Retaliate is Incompatible with the FLSA**

Section 15(a)(3) of the FLSA states that it is a violation for any person
to "discharge or in any other manner discriminate against any employee
because such employee has filed any complaint or instituted or caused to be

instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." *See* 29 USC 215(a)(3).

The Third Circuit explained, "Congress included in the FLSA an antiretaliation provision . . . to encourage employees to assert their rights without 'fear of economic retaliation [which] might often operate to induce aggrieved employees to quietly accept substandard conditions," that the FLSA "must not be interpreted or applied in a narrow, grudging manner." *Uronis v. Cabot Oil,* 49 F.4th 263, 269 (3d Cir. 2022). The FLSA protects employees who have "filed any complaint." *Id.*

Because section 15(a)(3) prohibits "any person" from retaliating against "any employee", the protection applies to all employees of an employer even in those instances in which the employee's work and the employer are not covered by the FLSA. Section 15(a)(3) also applies in situations where there is no current employment relationship between the parties; for example, it protects an employee from retaliation by a former employer. *See* Exhibit A, U.S. Department of Labor Fact Sheet 77a.

The Plaintiff was a silent partner and/or control creditor of the employer. Even if Plaintiff is correct that errors were made under the FLSA's interpretation, the agency interpretation, which is a reasonable standard, explains that it applies to all employees even if not covered by the FLSA.

As labor disputes are governed by the FLSA, to the extent the Plaintiff seeks to use RICO to overturn or retaliate against Snyder, RICO is incompatible and preempted by the FLSA. *Danielson v. Burnside–Ott Aviation, Training Center,* 746 F. Supp. 170 (D.D.C. 1990); (RICO claims

preempted by the Service Contract Act); *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637–638 (2nd Cir.1989) (RICO claim dismissed where Energy Reorganization Act provided exclusive remedy for plaintiff's claims); *Bodimetric Health Servs., Inc. v. Aetna Life & Casualty*, 903 F.2d 480, 486–87 (7th Cir. 1990) (RICO claim preempted by the Social Security Act's administrative benefits determination procedure).

An employee cannot invoke RICO where the FLSA applies, *Choimbol v. Fairfield Resorts, Inc.*, 2006 WL 2631791, at *7 (E.D. Va. Sept. 11, 2006); *DeSilva v. N. Shore–Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 515 (E.D.N.Y. 2011); *Eldred v. Comforce Corp.*, 2010 WL 812698, at *10 (N.D.N.Y. Mar. 2, 2010), so certainly a person cannot use RICO to retaliate in contravention of the FLSA.

Because allowing a partner or control creditor of an employer to retaliate using RICO in contravention of 29 USC 215(a)(3) is incompatible with the provisions of the FLSA, allowing this RICO action to move forward appears improper at best.

Additionally, the common law claims also constitute retaliation and are preempted and prohibited by 29 USC 215(a)(3).

### III.    The Slander to Title Claim Lacks Essential Elements and Constitutes Retaliation

As explained above, the FSLA prevents retaliation for filing complaints (or derivative judgments) from wage matters.  As the Plaintiff's Complaint admits, Shanni Snyder's FLSA judgment created certain lien rights. Therefore, by Plaintiff's own admission, a plausible theory for a *lis pendens*

existed at the time of filing.  The Court must remember, a *lis pendens* does nothing.

Disparagement of title is the false and malicious representation of the title or quality of another's interest in goods or property. *Triester v. 191 Tenants Association,* 272 Pa. Super. 271, 277, 415 A.2d 698, 701 (1979). In order to prevail in an action for slander of title, a plaintiff must show malice by the defendant. *Hygienic Fleeced Underwear Co. v. Way,* 35 Pa. Super. 229 (1908). Malice may be understood as the lack of good faith belief in the right to publish the allegedly slanderous utterance. *Id.* at 233.

A person is conditionally privileged to disparage another's property in land, chattels or intangible things by an assertion of an inconsistent legally protected interest in himself. *See* Restatement, Second, Torts § 647 (1977). Comment (b) to section 650A of the Restatement explains the meaning of "malice" required for a finding of an abuse of that conditional privilege. That comment states:

> The exception stated in § 647 deals with the conditional privilege
> of a rival claimant to disparage another's property by an honest
> assertion of his own claim, even though he has no reasonable
> ground for believing his claim to be valid. Since the privilege itself
> extends to an action based upon a reasonable belief, it is not
> abused when the publication is made without reasonable grounds
> for belief in its truth, but is abused only when the claimant does
> not believe honestly or in good faith believe that there is a
> substantial chance of his claim being sustained.

A *lis pendens* does nothing more than perpetuate notice to third parties that the property is subject to litigation. Contrary to Biros' assertion, the *lis pendens* does not command or prevent any action from any party. *Barak v. Karolizki,* 196 A3d 208, 221-22 (Pa.Super. 2018).  Nor does a *lis*

*pendens,* in and of itself, prevent the owner from selling or disposing of the property. A *lis pendens* is nothing more than notice to potential buyers that the result of a pending lawsuit may potentially affect their interest in a property. *See id.* at 221.

Therefore, Biros cannot proceed on the slander to title claim.

## IV. <u>Conclusion</u>

For the reasons set forth by the other defendants, and because this lawsuit constitutes retaliation in contravention of 29 USC 215(a)(3), the action must be dismissed with prejudice.

Respectfully submitted,

*/s/ Shanni Snyder*
Shanni Snyder
14390 Route 30
Irwin PA 15642
shannis@pm.me

DEFENDANT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINE BIROS, | ) | |
| Plaintiff | ) | 2:23 cv 00297 |
| | ) | |
| v. | ) | |
| | ) | |
| SHANNI SNYDER et al, | ) | |
| Defendants. | ) | |

## <u>MOTION AND BRIEF IN SUPPORT OF THE MOTION TO DISMISS AMENDED COMPLAINT, MOTION FOR JUDGMENT ON THE PLEADINGS, AND MOTION TO STRIKE REDUNDANT, IMMATERIAL, IMPERTINENT, OR SCANDALOUS MATERIAL</u> *

AND NOW COMES Defendant KASH SNYDER, and files this, his Brief in Support of the Motion to Dismiss, Motion for Judgment on the Pleadings, or, in the alternative, Motion to Strike redundant, immaterial, impertinent, or scandalous matter.

**I. THIS COURT MUST END WHAT THE BANKRUPTCY COURT DESCRIBED AS AN "ENDLESS SLOG OF LITIGATION" AND DISMISS THE AMENDED RICO SUIT FOR UNCLEAN HANDS BECAUSE CHRISTINE BIROS ENGAGED IN THE EXACT SAME CONDUCT THAT SHE ALLEGES THE DEFENDANTS ENGAGED IN.**

Before we begin with the deficiencies found in the Amended RICO lawsuit filed by Christine Biros, this Court must consider whether to allow the lawsuit to proceed considering the equitable doctrine of unclean hands and the fact that the bankruptcy court rendered multiple decisions – none of which Biros appealed and which are now *res judicata* – declaring that she engaged in the precise misconduct that she sues for.

-------------------------------------

* As I agree with Attorney Roth, I have copied his memorandum. The only this is I do not plan to file the duelling RICO action.

A1140

Suing legal professionals for RICO without their having ownership in or managing the enterprise fails, *see Muskegan Hotels, LLC v. Patel,* 986 F.3d 692 (7th Cir. 2021)*,* and filing lawsuits and even submitting false declarations do not give rise to RICO. *See Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) and *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016).

Even without this general prohibitions to this type of RICO, allowing Biros' suit to move forward will invite duelling RICOs to be filed by the parties and the possibility of a trial where the jury is asked to determine which party is bad, which party is badder, and which party is the baddest.

Biros moreless uses this case to reimburse her attorney fees in the bankruptcy, but as the bankruptcy court explained, "*there are no angels here. Every party played a role in transforming an otherwise simple chapter 7 case that should have been fully administered within a few months into an endless slog of litigation*." *In re: U Lock*, 2024 WL 3154602 at *2 (Bk. W. Pa. June 24, 2024)*. This novel RICO case continues that "endless slog of litigation" and if allowed to proceed will necessarily result in additional RICOs to offset Biros' claims and more "slog of litigation."

The crux of Biros' claim is that Shanni Snyder lodged a false and exaggerated bankruptcy claim in the *In re: U Lock*, 22-20823 (Bk. W.Pa.), but if there was a conspiracy why would U Lock need Snyder to file an involuntary bankruptcy when it could just file itself? As the bankruptcy court recognized at 2024 WL 3154602**,** *3, it declined to consider dismissal until after U Lock

answered the involuntary petition, noting that "consent to an order for relief would seemingly moot Ms. Biros' challenges" to Shanni Snyder's alleged bad faith petition.

In addition, Biros' RICO claim asserts that various alleged misrepresentations to the bankruptcy court by Shanni Snyder and George Snyder constituted RICO predicates for corruptly obstructing the proceeding. As shown below, Biros indisputably did exactly the same – and not just once.

As to so-called fraudulent bankruptcy claims, the Bankruptcy Court *sua sponte* issued a Rule 9011 show cause and declared that Biros filed an exaggerated administrative claim for $144,000.[1] *In re: U Lock*, 2023 WL 308210 (Jan. 17, 2023); Exhibit 1. The Order explained at *4 that, "an administrative expense claim in the amount of $144,000 is patently absurd." The Court held, "the claimed amount is grossly unreasonable. * * * neither Ms. Biros nor Attorney Bernstein could have plausibly believed that $144,000 as requested by the *Motion* was an actual, necessary cost of preserving the estate." *Id.*

On June 24, 2024, the bankruptcy court sustained its finding that the $144,000 claim was grossly exaggerated, but found its opinion and findings were enough and that Biros' counsel caused the inflation, so further money sanctions were not appropriate. *In re: U Lock*, 22-20823, Entry 593 (Exhibit 2). Biros did not appeal the findings of a grossly inflated claim and it is now *res judicata*.

---

[1] The difference between Biros' claim and Shanni Snyder's is Biros' claim would receive partial payout since it was an administrative claim and Shanni Snyder's claim was unsecured and would receive nothing due to an insolvent estate.

Ironically, it is the same law firm that encouraged the fraudulently inflated claim and took responsibility for it that now prosecutes this RICO.

The situation is much worse than a single inflated claim.  On June 24, 2024, the bankruptcy court sanctioned Christine Biros for egregious conduct and taking the Estate assets and moving them.  The court awarded $15,000 in punitive damages to the trustee, required Biros to reimburse the United States Marshals Service $1,000, pay a $500 fine to the Clerk of Court, reduced her administrative claim (the one that was inflated at $144,000 but was ultimately reduced to $18,000) by $2,000, and directed payment of compensatory damages of $2,800 for the trustee's time.  *In re:  U Lock*, 2024 WL 3154602 (June 24, 2024). *See* Exhibit 3.  Biros did not appeal this Order and it constitutes *res judicata*.

In that instance, the Bankruptcy Court found that Biros "that she willfully and contemptuously violated the automatic stay by *removing scheduled assets from the Property*." *Id* at *14.  Ms. Biros fraudulently concealed this information from the court.  *Id* at *10; *17 ("When the Court scheduled on-site due diligence for prospective bidders, [Biros] knew or should have known that the Court and parties expected the scheduled assets to be on the Property. Yet Ms. Biros said nothing even though she knew that most scheduled assets were already relocated to the McKeesport Property.   Her silence is telling, as is her decision to not explain it").      At *18, the court explained, "Ms. Biros probably figured that her stay violation still had a chance of escaping detection. The Court also

suspects she was emboldened by her substantial claims, her view that she was the only legitimate creditor, and the likelihood that she would prevail at auction. In fact, Ms. Biros only came clean when the Court directly asked whether she had removed scheduled assets from the Property."

At footnote 190, the bankruptcy court found that, "It is now apparent that Attorney Otto was aware in early November [2022] that Ms. Biros relocated the scheduled assets," and broached without finding the possibility he violated his ethical duties of candor to the Bankruptcy Court, meaning her counsel most probably abetted these fraudulent concealments.

Biros provided testimony and responses to the court under oath. The court found that her "lobbing accusations over measures explicitly allowed by a court order undermines her credibility and indicates how carefully she and counsel read [the Court Order]." The court stated, "Ultimately, the Court finds Ms. Biros' 'estate protection' justification nothing more than an effort to muddy the waters and create a false equivalence for her transgressions." *Id* at *16.

In additional litigation misconduct the bankruptcy court found to be "beyond the pale," Biros misused the discovery process in the bankruptcy and sought school records of Shanni Snyder's minor children and bank records of third parties, resulting in Court Orders prohibiting her from using subpoenas without leave of court. See Exhibit 5 pages 8-9 ("Oh, I think we're way beyond overbreadth now. I think the wheels have completely fallen off on this. I mean, going after the minor child of a party in this litigation is beyond the pale"); *Id* page

21 ("I am continuously engaged in exercises such as this which are a complete waste of the Court's time, the parties' time, it's a waste of your client's resources, it's driving up the expense for an Estate that has no value to it. And you know I've got to be candid, I think this is doing damage to your firm's reputation. I don't know if this is being internally generated by your firm or if it's at the insistence of your client, but think long and hard about what this is going to do to your firm long-term in view of credibility and reasonableness because this is certainly not a measured approach. *This is scorched earth. This is beyond the pale*"); Exhibit 6 (Order Quashing Subpoena and Directing Biros to Return All Records Acquired), and Exhibit 7 (Quashing Subpoena to education institution).

But again, this RICO seeks damages of attorney fees incurred during the bankruptcy – a litigation Biros engaged in abusive "beyond the pale" waste of her own resources. This RICO action continues the "scorched earth" litigation plan.

Another instance of time wasting and misconduct, Biros misused the bankruptcy court's proceeding notes to gain an upper advantage calling the police on a tenant, which the court rebuked her counsel for doing and had to make it clear that litigation notes were not Court Orders. *See* Exhibit 4, pages 95-98.

This matter must be ended. "[H]e who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The defense "applies when the party seeking relief is guilty of fraud, unconscionable conduct, or bad faith directly related to the matter at issue

that injures the other party and affects the balance of equities." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 n.12 (3d Cir. 1999).

In this case, the entire premise of Biros' lawsuit – both the federal and state claims – are to sue for attorney fees in a case where she engaged in misconduct deliberately running up her own bill. The "predicate acts" all involve alleged inflated claims filed and misleading testimony and wrongful conduct primarily in the bankruptcy case. Yet, Biros engaged in the same conduct, filing inflated claims, providing misleading information and concealment, and providing non-credible testimony to support them. Biros never appealed these determinations and they are *res judicata*. *They affect the same proceeding and the same parties.*

Biros substitutes this RICO action for a motion for sanctions in those cases, yet acted no differently in the bankruptcy proceedings and engaged in similar conduct to what she alleges the defendants did. She invites the Snyder defendants to file RICO counterclaim for the same identical shenanigans.

This Court must stop this paper war, all of which serves only to provide an avenue for the parties to eventually obtain a judicial declaration of who the baddest litigant is that cost the other party more attorney fees and time.

Therefore, at the outset, this Court needs to end Biros' "endless slog of litigation" as this RICO litigation is just a continuation of her gripes in the bankruptcy court – gripes and frivolousness that apply equally against her

conduct.  In other words, Biros cannot distinguish herself and her misconduct from what she alleges Shanni Snyder did.

## II.  **THE AMENDED COMPLAINT**

Christine Biros ("Biros") filed an Amended Complaint in response to this Court's Order dismissing her RICO lawsuit without prejudice.  The Complaint mirrors the prior one except she added allegations of an "enterprise" consisting not of businesses or money-making activity but  litigations filed by members of the Snyder family that she avers creates a litigation enterprise:

- Biros points out that "thirteen years ago" Shanni Snyder "advised" this Court that she had already "filed over 90 state and federal lawsuits." *Amended Complaint, ¶228.*

- In 1996 and 1998, Shanni, Kash and Mark (but not George) Snyder executed various promissory notes, defaulted in 2003, filed bankruptcies in 2003 and 2004, and then attempted to invoke 11 USC 362's automatic stay provisions to delay state court foreclosures.  *Amended Complaint, ¶¶231-263.*

- In 1988 – while Shanni was a minor child and Kash and George just turned 18 – their parents challenged certain tax assessments using arguments found incredible.  As a result, the parents of the defendants were assessed millions of dollars in taxes and penalties. *Amended Complaint, ¶¶264-286.*

- Shanni Snyder included an alleged equitable interest in a property formerly owned by her parents in bankruptcy schedules filed in 2022 and when a purchaser of the property from a Sheriff's deed filed a motion for relief from stay, Shanni did contest the motion.

These cited motions and proceedings are not related and would constitute wholly separate enterprises – of they constituted an "enterprise" at all. The participants are completely different.  Litigations and personal individual disputes themselves are not a profit-creating enterprises, the RICO predicate offenses are neither cognizable nor adequately alleged, are barred by claim and issue preclusion, and worse, Biros herself is engaging in the exact same conduct that she sues for inviting duelling RICO actions and endless litigation that serves no purpose other than to do just that– litigate endlessly.

III. **STANDARD OF REVIEW**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must make allegations with sufficient factual detail under Rule 8(a) that, if those allegations were assumed to be true, the Court could reasonably infer liability. See *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombl*y, 550 U.S. 544, 556, 570 (2007)). Dismissal is appropriate if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556); *see also Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (requiring a complaint to set forth information from which each element of a claim may be inferred).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal,* 129 S. Ct. at 1949 (*citing Twombly*, 550 U.S. at 557);

A complaint that alleges mere "'labels and conclusions,'" "'a formulaic recitation of the elements of a cause of action,'" or "'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal,* 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. 555, 557).

In deciding a motion to dismiss, the Court properly considers the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc*., 998 F.2d 1192, 1196 (3d Cir. 1993).

The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, see *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions,'" *Morse v. Lower Merion Sch. Dis*t., 132 F.3d 902, 906 (3d Cir. 1997) (*quoting In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1429-30 (3d Cir. 1997)). "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." Iqbal, 129 S. Ct. at 1950.

As to allegations of fraud, which this RICO action primarily consists of, require allegations with particularity pursuant to Fed. R. Civ. Proc. 9(b).  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *see also Lum v. Bank of Am.*,

361 F.3d 217, 223 (3d Cir. 2004) ("Where, as here, plaintiffs rely on mail and wire fraud as a basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity."), *abrogation on other grounds recognized by In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3d Cir. 2010).

A RICO conspiracy claim cannot survive where the plaintiff fails to provide evidence of "'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense.'" In re Ins. Brokerage, 618 F.3d at 373 (quoting Salinas, 522 U.S. at 65) (alteration in the original); see also Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993).

IV.   **DISCUSSION**

### A. THE AMENDED COMPLAINT FAILS TO SHOW A RICO ENTERPRISE

Count I of the Amended Complaint is *only* against Shanni Snyder.  The new litigations cited by Biros do not show any form of continuous RICO Enterprise, let alone a continuous Enterprise.  Rather, Biros merely places her own spin on various civil disputes and legal cases that she located through the PACER.  Biros cite litigation not involving the defendants, but their parents, occurring when the Snyder Defendants were either minor children or just turned 18 years old.  Biros cites a civil rights 42 USC 1983 lawsuit to show that Shanni Snyder *personally* filed over 90 lawsuits, state and federal, and that (prior to new rules stating that a *pro se* litigant need not disclose so-called legal drafter

A1150

attorneys) the judge ordered her to disclose any attorneys, but that is not an "enterprise" but an individual situation. Biros cites a property jointly owned by family members (but not George Snyder) where non-parties to this action *individually* filed *personal* bankruptcies in 2003 and 2004. These actions are all *individual*, not a separate RICO enterprise. This is why Count I is against Shanni Snyder only. Because she is Shanni Snyder, but she is not an Enterprise.

As this Court recognized, Biros must show a RICO Enterprise, see *Biros v. Snyder,* 2024 WL 1346691 at *4 (*W.D.Pa. Mar. 29, 2024). Yet Biros fails to do that, grasping at lawsuits from generations ago.

The Amended Complaint lacks particularized facts about the decision-making structure of the alleged enterprise. Yet such factual detail is required for a valid RICO enterprise. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 728 (5th Cir. 2019). The enterprise is not the pattern of racketeering activity. Plaintiffs must plead specific facts, not mere conclusory allegations which establish the enterprise. *Id.*

A RICO "enterprise" must constitute an entity distinct from the RICO "person." The United States Supreme Court has held that "to establish liability under § 1962 one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001). In other words, Defendant must be the "person" who conducts the "enterprise's" affairs through a pattern of racketeering activity, and the

person/defendant must be separate and distinct from the "enterprise." *Schwartz v. Lawyers Title Ins. Co*., 680 F.Supp.2d 690,704 (E.D.Pa. 2010). The alleged "person" who is "subject to liability [for a RICO violation] cannot be the same entity as the 'enterprise.' *Gordon v. Pasquarello*, No. CV 22-1565, 2023 WL 2505538 *16 (E.D. Pa. Mar. 14, 2023).

Courts may "'reasonably assume that individuals and corporations have an organizational structure, are continuous, and have an existence separate and apart from any alleged pattern of racketeering activity.'" *Freedom Medical v. Gillespie,* 634 F. Supp. 2d 490, 504 (E.D. Pa. 2007) (quoting *Price v. Amerus Annuity Group Co.,* MDL No. 1712, 2006 U.S. Dist. LEXIS 35980, at *9 (E.D. Pa. June 2, 2006)). If, however, the alleged RICO enterprise has no legal existence and is instead an association-in-fact, it "cannot reasonably be assumed to satisfy the elements of an enterprise and the allegations of the complaint must therefore receive greater scrutiny." *Id*. at 505.

A review of the Amended Complaint makes it clear that every predicate act involve legal filings made by Shanni Snyder or testimony in support of them. If successful, as Biros states, only Shanni Snyder would receive the benefit of the lien instrument. Therefore, it is clear that no enterprise exists, only Shanni Snyder exists. Similarly, the past wholly separate enterprises were not enterprises but individual actions.

"[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.' "

*Boyle v. United States,* 129 S.Ct. 2237, 2245 (2009). If, for example, "several individuals, *independently and without coordination,* engaged in a pattern of crimes listed as RICO predicates [,] ... [p]roof of these patterns would not be enough to show that the individuals were members of an enterprise." *Id.* (emphasis added). Nor would proof of a conspiracy to commit a RICO predicate offense "necessarily establish that the defendant[s] participated in the affairs of an ... enterprise through a pattern of ... crimes." *Id.* at 2246. Individuals' separate and uncoordinated commission of RICO predicate acts does not automatically create an enterprise. *Id*, n. 4.

While "a conspiracy is an inchoate crime that may be completed in the brief period needed for the formation of the agreement and the commission of a single overt act in furtherance of the conspiracy," § 1962(c) "demands much more: the creation of an 'enterprise'—a group with a common purpose and course of conduct—and the actual commission of a pattern of predicate offenses." *Id.*

### A(1). BIROS' NEW ALLEGATIONS FAIL BECAUSE OF THE LACK OF CONTINUITY AND NO PATTERN OF RACKETEERING

In the Amended RICO Complaint, Biros alleges sporadic events starting with the parents of the Snyder Defendants who had a tax issues when they were still minor children or just became adults. The tax case certainly has nothing to do with nothing. Then Shanni Snyder advised this Court over thirteen years ago that she filed over ninety (90) legal cases. This has nothing to do with nothing.

Between 2003 and 2005– that's right, over 20 years ago– there existed a

A1153

note from 1996 or 1998 on the family house and the family members allegedly filed bankruptcy to try to delay foreclosure.

And as an honorable mention, Shanni Snyder recently included that she may maintain an equitable interest on a tax foreclosed house, but did not challenge a buyer's motion for relief from the automatic stay.

These are not enterprises, but litigations. Even if they were frivolous, fraudulent, or baseless litigations, "allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act." *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018); see also *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016).

Biros simply fails to allege any continuity in the enterprise or a long term business. In its opinion in *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229 (1989), the Supreme Court set out its second analysis of the requirements of civil RICO. The Court examined the statute and its legislative history in an attempt to determine the elements of the pattern requirement. From this review, the Court concluded that "to prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239.

Under the first, or "relatedness," requirement of the RICO statute, as interpreted in *H.J. Inc.,* predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated

events." *Id.* at 240, 109 S.Ct. at 2901.

As for the second, or "continuity," prong of the analysis, the Court in *H.J. Inc.* attempted to promulgate a somewhat flexible approach, based upon a "commonsense, everyday understanding of RICO's language and Congress' gloss on it." *Id.* at 241, 109 S.Ct. at 2902. With this analytical approach in mind, the Court decided that "[w]hat a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter.*" *Id.*

In explicating how a plaintiff could make this continuity showing, the Court described continuity as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* "It is, in either case, centrally a temporal concept," *id.* at 241–42, 109 S.Ct. at 2902, so that a party may establish continuity as a closed-ended concept by "proving a series of related predicates extending over a *substantial* period of time." *Id.* at 242, 109 S.Ct. at 2902 (emphasis added).

Thus, *H.J. Inc.* makes clear that the continuity requirement can be met by establishing long-term criminal conduct but does not define what length of time qualifies as "substantial" for this purpose. The Court in *H.J. Inc.* also gave examples of how the threat of continued racketeering activity might be demonstrated. One example is that of a hoodlum who sells "insurance" to storekeepers to prevent the breaking of their shop windows. *Id.*

Since *H.J. Inc.,* the Third Circuit faced the question of continued

racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for closed-ended continuity. *See Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 610–11 (3d Cir.1991) (fraudulent conduct lasting twelve months does not establish closed-ended continuity); *Hindes v. Castle,* 937 F.2d 868, 875 (3d Cir.1991) (eight month period of predicate acts without a threat of future criminal conduct does not satisfy continuity requirement); *Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1413 (3d Cir.1991) (same); *Banks v. Wolk,* 918 F.2d 418, 422–23 (3d Cir.1990) (same); *Marshall–Silver Constr. Co. v. Mendel,* 894 F.2d 593 (3d Cir.1990) (seven month single-victim, single-injury scheme does not satisfy continuity requirement).

The Third Circuit concluded that a scheme lasting over three years extends over a "substantial" period of time and therefore constitutes the type of "long-term criminal conduct" that RICO was enacted to address. *See United States v. Pelullo,* 964 F.2d 193, 209 (3d Cir.1992) (holding that a jury could find a nineteen month period of racketeering activity sufficient to satisfy continuity requirement).

The Supreme Court cautions, however, in *H.J. Inc.,* that the existence of continuity may not always be apparent. 492 U.S. at 243, 109 S.Ct. at 2902–03. For example, the statutory definition of pattern is "at least two acts of racketeering activity" within a ten year period. 18 U.S.C. § 1961(5). It is clear that ten years is a period of long duration.  Indeed, Justice White noted in a footnote that, while § 1961(5) defines a pattern of racketeering activity as requiring at

least two acts of racketeering activity, two acts may not be sufficient. *Id.* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

In *H.J. Inc.* the Court states that open-ended continuity is established when the commission of the predicate acts is "a regular way of conducting defendant's ongoing legitimate business." 492 U.S. at 243, 109 S.Ct. at 2902.

In the present case, the alleged actions of Shanni Snyder in filing Court documents does not appear to be the pattern of racketeering, but single isolated occurrences and not a business at all.

As the Supreme Court noted in *Boyle v. United Statees,* 556 US 938 (2019), an enterprise necessarily must have "'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity.'" 556 U.S. at 946 (quoting 18 U.S.C. § 1962(c)).  *Boyle* confirmed that, although a pattern of illegal activity may be sufficient to satisfy both the enterprise and racketeering elements of a RICO claim, "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" 556 U.S. at 947.

Certainly, it appears evidence that Biros failed to demonstrate continuity and a pattern of racketeering.

### A(2).  BIROS CANNOT SHOW RICO WHEN THE SOLE PURPOSE OF THE PRESENT ENTERPRISE WAS TO DEFRAUD HER

Biros can repackage it with stories of other litigations from the 1980s and 1990s, but the only *current* enterprise is the allegation that Shanni Snyder

somehow tried to beat Biros to courthouse to preserve her claims and which Biros suggests was based on embellished claims.

A RICO enterprise requires that the common activities of the enterprise extend beyond the minimal association necessary to sustain the pattern of racketeering. *Diamonds Plus, Inc. v. Kolber,* 960 F.2d 765, 770 (8th Cir.1992) ("The focus of the inquiry is whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense.").

"[A]n enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts." *Stephens, Inc. v. Geldermann,* Inc., 962 F.2d 808, 815 (8th Cir.1992) (citation omitted) (holding that plaintiff insufficiently pled a RICO enterprise because although "each member of th[e] group carried on other legitimate activities, these activities were not in furtherance of the common or shared purpose of the enterprise, and thus, were not acts of the enterprise"). That each member of a group carries on activities distinct from the pattern of racketeering is insufficient; *the group as a whole must have a common link other than the racketeering activity. McDonough v. National Home Ins. Co.,* 108 F.3d 174,177 (8th Cir.1997) (citations omitted) (emphasis added).

"Proof the enterprise conducts lawful activity unrelated to the pattern of racketeering will often serve to prove the enterprise is separate from the pattern of racketeering." *Diamonds Plus, Inc.,* 960 F.2d at 770, 770 n. 5 (citations omitted).

"In deciding whether an alleged RICO enterprise has an ascertainable structure distinct from the pattern of racketeering activity," the court must "determine if the enterprise would still exist were the predicate acts removed from the equation." *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 354-355 (8th Cir. 2011) (quoting *Handeen v. Lemaire,* 112 F.3d 1339, 1352 (8th Cir.1997)).

As the Eighth Circuit noted in *Crest Constr. II,* where "the only common factor that linked" the individually named defendants "and defined them as a distinct group was their direct or indirect participation" in a scheme to defraud the plaintiff, plaintiff had not adequately pled a RICO enterprise,  660 F.3d at 355 (citing *Stephens,* 962 F.2d at 815–16).

For this reason, Biros' RICO claim that alleged the enterprise consisted of nothing but an alleged plan to defraud her fails to allege a RICO enterprise.

Therefore, the Complaint at Counts I and II fail because Biros failed to show an association in fact or that the enterprise was distinct from Shanni Snyder.

## B. RICO CANNOT BE USED TO COLLATERALLY ATTACK THE ORDER FOR RELIEF ENTERED IN THE BANKRUPTCY COURT AND BIROS FAILED TO INTERVENE IN THE DISTRICT COURT LABOR ACTION TO PURSUE A RULE 60 MOTION

Paragraph 338 of the Amended Complaint states "Shanni committed a predicate act of fraud connected with a case under Title 11 of the United States Code on April 27, 2022, when she filed the Involuntary Petition."  However, prior to Shanni's involuntary petition being ruled on by the bankruptcy court, Biros

appeared, objected based on the validity of Shanni's claim, and moved to dismiss. The bankruptcy court expressly granted Shanni's bankruptcy petition and issued an Order for Relief. This Order for Relief constitutes *res judicata* and would require a collateral attack. The Order for Relief constituted a final judgment on the merits of Snyder's claim and nobody, including Biros, appealed or sought reconsideration. Therefore, it is *res judicata* as to Biros who was before the bankruptcy court. See *Gratiot County State Bank v. Johnson*, 249 U.S. 246 (1919)(Order for Relief *res judicata*). An Order for Relief is an appealable adjudication requiring Rule 60-type relief to vacate it. *In re: Robert J. Mason*, 709 F2d 1313 (9th Cir. 1983). It is also noted that the bankruptcy court recognized that Biros challenged the filing of the involuntary petition, but explained that it declined consider dismissal until after U Lock answered the involuntary petition, noting that "consent to an order for relief would seemingly moot Ms. Biros' challenges" to Shanni Snyder's alleged bad faith petition. *See In re: U Lock,* 2024 WL 3154602**,** *3. This holding is fairly simple to understand, U Lock did not need Snyder to file bankruptcy. U Lock could have filed at any time.

Biros did not appeal the Order for Relief and, therefore, it constitutes an unassailable adjudication eliminating any collateral attack in this RICO case.

As to the predicate act at paragraph 336 averring that the July 14, 2021, filing of a Civil Complaint constituted wire fraud, Biros cannot use RICO to collaterally attack the judgment. The proper method is for Biros to intervene and file a Rule 60 motion. Biros knows this because, as shown by Exhibit 8, she

specifically stated that she intended to do just that. *See In re: Shanni Snyder*, 18-21983 (Bk. W.D.Pa.), Entry 72 ("33. Movant has filed this Motion for Relief from Stay to seek to vacate the Judgment received by the [Shanni Snyder] against U-Lock * * * 35. Accordingly, Movant requests relief from the automatic stay to take the necessary action to vacate the Judgment obtained by [Shanni Snyder] against U-Lock [...]").

However, as a matter of litigation strategy, and despite timeliness of a Rule 60 motion being important, she chose to use this RICO to collaterally attack the judgment. This is not the proper procedure. Biros, unless she waited too long, has a right to file a Rule 60 motion in the *U Lock* civil action before this Court if her "interests are strongly affected." *Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 940 (6th Cir. 2013)(collecting cases showing that a non-party can file a Rule 60 motion); *Grace v. Bank Leumi Tr. Co. of N.Y.*, 443 F.3d 180, 188 (2d Cir. 2006)(same).

It is improper to use RICO to collaterally attack judgments and, prior to suing for these two predicate acts because Biros first needs to have the decisions vacated.

## C. THE PREDICATE ACTS DO NOT INCLUDE THE NECESSARY ELEMENTS

In a RICO Conspiracy, Biros is required to present a viable claim under another subsection of 18 USC 1962. *Howard v. American Online Inc.*, 208 F.3d 741, 751 (9th Cir.), cert. denied, 531 U.S. 828 (2000). To state a claim for RICO conspiracy, one must successfully allege all the elements of a RICO violation, as well as an illicit agreement to violate the substantive RICO provision. *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 806 (6th Cir. 2016). Parties cannot be found guilty of conspiring to commit an act that is not itself against the law. *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1220 (11th Cir. 2020).

Biros' Count II simply refers to Count I and implies the conspiracy, except she adds one additional predicate act of alleged violations of corrupt obstruction in violation of 18 USC 1503. These predicate acts all fail.

### C(1). VIOLATIONS OF 18 USC 157 ARE EXEMPT FROM RICO

As to Count I, Biros cites as predicate acts at Paragraphs 338 and 339 that Shanni "committed a predicate act of fraud connected with a case under Title 11 of the United States Code." Biros does not reveal the statute that forms the offense. Rather, she just states, "fraud under Title 11." Biros must plead fraud with particularity, not simply claim some unknown "offense" of fraud. F.R.Cv.P. 9(b).

Congress included bankruptcy crimes to stop people who, like Biros, took the physical scrap property of the Estate and moved it to her own property near a

scrap yard.  What Congress did not want was people suing people for filing

claims in bankruptcy cases or alleging that the bankruptcy petitions were fraud.

Therefore, Congress specifically exempted any predicate act derived from 18

USC 157.  The statute states RICO offenses include, "any offense involving fraud

connected with a case under title 11 (<u>except a case under section 157 of this

title</u>)."  The first bankruptcy predicate act is allegedly committing fraud by filing

the involuntary petition.  This is specifically exempted as it is found at 18 USC

157(1).  Next, Biros claims that Shanni committed an act through filing her proof

of claim.  But that would fall under 18 USC 157(2) and (3) and are exempt from

RICO.

Perhaps this is why Biros cited no specific bankruptcy offense and just

states "fraud."  Regardless of the reason, as the alleged conduct falls within 18

USC 157, it cannot form the basis of a RICO offense.

### C(2).  BIROS FAILS TO PLEAD FEDERAL WIRE FRAUD

First, Biros is subject to the heightened pleading standard under Rule 9,

Fed. R. Civ. Proc. as to her wire fraud claims.  The sole basis of the wire fraud

predicate act is that Shanni Snyder filed a lawsuit against U Lock Inc.

Paragraph 336 of the Amended Complaint states:

Shanni committed a predicate act of wire fraud pursuant to 18 U.S.C. 1343
on July 14, 2021, when, with the intent to defraud or with intent to obtain
property by means of false or fraudulent pretenses, she used the internet
to transmit her complaint in the Wage Case to the District Court.  Pursuant
to Rule 11 of the Federal Rules of Civil Procedure, her signing and filing

that complaint constituted her certification that the allegations of her complaint had factual support. In fact and on information and belief, many of Shanni's allegations were false and had no evidentiary support. These allegations included Shanni's assertion that she had been an employee of U Lock, that she had performed work for U Lock ten hours per day, every day, for more than four years, that U Lock had agreed to pay her for this work, and that she was entitled to payment of wages, straight and overtime, for this non-existent work."

However, The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud. *See* 18 U.S.C. §§ 1341, 1343. *Lum v. Bank of Am.*, 361 F.3d 217 223 (3d Cir. 2004) .

The mail and wire fraud statutes require a fraud to the ordinary property rights to an individual. The statutes do not protect intangible rights, the so-called "right to control" assets theory, the right to honest services, or the right to information. *Ciminelli v. United States,* 598 US 306 (2023). Biros fails to explain how filing a lawsuit meets the *Ciminelli* requirement that the statute be used only for depriving one of their property.

Moreover, Biros fails to allege any use of interstate commerce in Shanni uploading a document from her residence in Pennsylvania to a court in Pennsylvania. *See* e.g., *Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988) (affirming dismissal of RICO claim where there were no interstate telephone calls alleged in support of wire fraud predicate act); *McCoy v. Goldberg*, 748 F. Supp. 146, 154 (S.D.N.Y. 1990) (dismissing RICO claim where there were no interstate

telephone calls alleged in support of wire fraud predicate act); *Hall v. Tressic*, 381 F. Supp. 2d 101, 109 (N.D.N.Y. 2005) (same); *Meier v. Musburger*, 588 F. Supp. 2d 883, 907 (N.D. Ill. 2008) (same).

Finally, Biros simply cannot sue under RICO wire fraud on the basis of what she believes are baseless civil complaints. *See Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) and *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016).

Biros cites Rule 11, Fed. R. Civ. Proc., to justify the wire fraud claim. However, that rule does not equate to wire fraud, and Biros has no standing to enforce compliance with this statute.

### C(3). BIROS FAILED TO PLEAD FACTS TO SUPPORT VIOLATIONS OF 18 USC 1503

Biros lodges claims at paragraph 337 and 340 of the Amended Complaint that Shanni Snyder violated 18 U.S.C. 1503 by testifying falsely. In addition, in Count II, at Paragraph 352, Biros alleges that George and Kash Snyder violated 18 U.S.C. 1503 by testifying falsely.

Congress specifically excluded perjury from the RICO offenses. *See* 18 USC 1961(1) because it did not want this type of case. So Biros invokes 18 U.S.C. 1503 that prohibits "corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede" judicial officers or the administration of justice.

Biros does not explain the element of "corruptly" in her RICO lawsuit when, in reality, she is merely stating that Shanni Snyder somehow committed perjury or exaggerated her claim.

The term "corruptly" implies that this statute prohibits bribery.  Recently, the Supreme Court decided *Snyder v. United States*, 144 S.Ct. 1947,1959 (2024).  In that case, the Supreme Court repeatedly referred to the term "corruptly" and noted that it is used in bribery statutes.  Biros cites no facts to support her suggestion that Shanni Snyder or Kash and George Snyder acted "corruptly" in the proceeding.

In *Fischer v. United States,* 144 S.Ct. 2176, 2188 (2024), the Supreme Court made it clear that the term corruptly constitutes part of the mens rea of the offense.  It distinguished between mere "wrongful" and "corruptly."  In the present case, Biros offers no explanation and no facts – of which she must comply with Rule 9 – to explain how the alleged misrepresentations rise to the level of "corruptly."

Moreover, Biros offers no clear facts to show that the testimony constituted a falsehood.  Rather, a bankruptcy judge simply did not believe Shanni Snyder's testimony because she was fidgety and arrogant.  He found it implausible that Ms. Snyder watched a video ten (10) hours a day.  However, this seems to contradict the *Fair Labor Standards Act*.  There clearly was no smoking gun evidence that showed Ms. Snyder – or George and Kash to the extent they supported the argument – actually lied.  Even though the bankruptcy opinion

states, "She lied," in the body it appears that he found that the work she did just did not give rise to a full-time employment because she only sporadically watched the cameras. The bankruptcy court then engaged in speculation about Ms. Snyder's knowledge of *lis pendens* proceedings and noted that nobody – including the judge – bothered to ask her.

It is noted that the bankruptcy court is an inferior court and this Court indeed witnessed the testimony of Ms. Snyder and concluded her allegations were sufficient to enter the judgment it did. This differing result does not give rise to the element of "corruptly" influencing this Court.

This Court should remember, proof of perjury alone is insufficient to sustain a section 1503 violation. *United States v. Perkins,* 748 F.2d 1519, 1528 (11th Cir. 1984). In this case, we have merely a suspicion of perjury by a bankruptcy judge improperly reviewing the decision of a district judge.

Perjury is governed by 18 USC 1621. Certainly, 18 USC 1503, with its "corruptly" requirement as an element, needs more. Congress excluded perjury from RICO for a reason, and simply stating a person may have committed perjury does not rise to the level required.

The term corruptly requires some form of coercive action. *United States v. Farrell,* 126 F.3d 484, 486 (3d Cir. 1997) (in interpreting 18 USC 1512, holding "corrupt persuasion" does not apply to acts that are noncoercive in nature).

Therefore, Biros' failure to distinguish between mere perjury and actual corrupt influence of a judge is fatal to her RICO claims.

### C(4).  BIROS FAILS TO ALLEGE BANKRUPTCY FRAUD

Biros fails to allege any form of bankruptcy fraud not found in 18 USC 157. She cannot merely allege that "some" unknown statute was violated and there existed a "fraud."  Congress specifically exempted Section 157's conduct to avoid this type of action, yet that statute is what Biros – assuming she could prove it – alleges was violated.

### D. BIROS LACKS RICO STANDING TO BRING A RICO ACTION FOR DERIVATIVE CLAIMS AGAINST U LOCK BECAUSE SHE FAILED TO SHOW PROXIMATE CAUSE FOR ANY INJURY

Biros' lawsuit asserts indirect damage in that she avers she has been "deprived of the possessory interest in her real property. She has been denied the ability to enjoy that property. The Defendants' scheme delayed her ability to record her title to the Subject Property. Since Biros recorded that title, the Defendants' scheme has forced her to expend money and other resources to defend her interests in the Subject Property against the Defendants' attacks." *See* RICO Case Statement, Entry 50, Page 8.

The documents attached by Biros indicate she received an obviously objectionable *ex parte* Order to receive the deeds on January 20, 2022.  She filed the deeds on January 25, 2022.  It appears unclear how any of the predicate acts "delayed" her ability to record her title considering she did.  The post-January 25, 2022, actions merely attacked the legality of her actions.   With respect to Biros taking possession, the United States Bankruptcy Court

specifically granted Shanni Snyder's bankruptcy petition and Biros received partial possession through that proceeding.

Biros' claims are merely speculative and infer only a lost opportunity. See *In re Taxable Mun. Bond Securities Litigation*, 51 F.3d 518, 521-522 (5th Cir. 1995)(farmer's "lost opportunity" to obtain loan insufficient to constitute injury for RICO standing); *First Nationwide Bank v. Gelt Funding Corp*, 27 F.3d 763, 768-70 (2d Cir. 1994) ("risk of loss" is not injury ripe for RICO claim); *Grantham & Mann, Inc. v. Am. Safety Prods., Inc.*, 831 F.2d 596, 604-06 (6th Cir. 1987) (plaintiff failed to show actual lost profits).

Indeed, to have standing under § 1964(c), a plaintiff must allege: (1) "that his alleged harm qualifies as injury to his business or property;" and (2) "that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

In connection with the first requirement, the necessary injury to business or property requires tangible and concrete financial loss, rather than speculative or uncertain harm. *Guerrero v. Gates*, 442 F.3d 697, 707 (9th Cir. 2006); *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 71 (9th Cir. 1994). With respect to causation, "[t]he civil RICO statute requires plaintiffs 'to show that a RICO predicate offense not only was a 'but for' cause of [their] injury, but was the proximate cause as well.' " *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 349 F. Supp. 3d 881, 905 (N.D. Cal. 2018) (quoting *Hemi Grp., LLC v. City of*

*New York*, 559 U.S. 1, 9 (2010)), *aff'd*, 842 F. App'x 112 (9th Cir. 2021). Reliance "on an 'attenuated chain of conjecture' " is insufficient to support proximate causation under § 1964(c). *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1228 (9th Cir. 2008) (citation omitted). The "central question" a court must ask when evaluating proximate causation with respect to RICO claims is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

In this case, Biros moreless avers that if Shanni Snyder did not obtain a judgment and file an involuntary bankruptcy petition, she would not have been affected by the automatic stay and would have had access to her property sooner. However, U Lock could have filed its own bankruptcy and the bankruptcy court repeatedly upheld the propriety of keeping the automatic stay in place. The bankruptcy court held, "consent to an order for relief would seemingly moot Ms. Biros' challenges" to Shanni Snyder's alleged bad faith petition.  *See In re: U Lock,* 2024 WL 3154602**,** *3.

 Biros' position that the automatic stay would not have occurred and that she would have had the property sooner is conjecture and nothing more than a "a highly attenuated chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), that are insufficient for Article III standing and requiring dismissal under Rule 12(b)(1).

Biros must plead sufficient facts for proximate causation to obtain RICO standing. *In re Taxable Mun. Bond Secs. Litig.,* 51 F.3d 518, 521 (5th Cir. 1995) (for RICO standing one must plead facts sufficient for proximate causation).

Biros "lacks standing to assert a fraud on the court claim based on a secondary effect of an injury to the Debtors (pre-petition) or their estates (post-petition). *In re SunEdison, Inc.*, Case No. 16-10992 (SMB), 2019 WL 2572250, *6 (Bankr. S.D.N.Y. June 21, 2019).   By asserting such derivative claims, Biros lacks prudential standing and dismissal under Rule 12(b)(6) is appropriate. *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009).

Biros primarily alleges a personal injury – she avers that the Defendants engaged in an abuse of process, malicious prosecution, or a misuse of civil proceedings causing her to incur attorney fees.   Biros bootstraps that – despite having a full and fair opportunity to litigate against the automatic stay in the bankruptcy case, it constituted some harm to her.   As to the automatic stay, the bankruptcy court has explained, repeatedly, that it sustained the automatic stay over Biros' objections and that  *In re: U Lock,* 2024 WL 3154602 .  Biros never appealed these findings.  Thus, the claims she has are for attorney fees is a personal injury type lawsuit, not a direct injury to her business or property.

RICO permits a plaintiff "injured in his business or property by reason of" the defendant's racketeering activity to sue for treble damages and attorneys'

fees. 18 U.S.C. § 1964(c). That "business or property" requirement "exclud[es] … personal injuries." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 350 (2016).

Because only plaintiffs "injured in [their] business or property by reason of a violation of section 1962" may sue civilly. 18 U.S.C. § 1964(c). Though courts sometimes refer to that requirement as "RICO standing," it is simply an element of civil RICO claims. *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 129-30 (2d Cir. 2003).

Recognizing that Congress did not impose boundless liability, the Supreme Court Court has cautioned against giving RICO an overly "expansive reading." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266 (1992). Thus, the Court held that a RICO plaintiff's injury must have been proximately caused by—i.e., "by reason of"—the defendant's RICO violation. Id. at 268. And, of particular relevance here, the Supreme Court has recognized that the phrase "business or property" "cabin[s] RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries." *RJR Nabisco*, 579 U.S. at 350.

As the en banc Sixth Circuit has warned, permitting such lawsuits would deprive RICO's "business or property" requirement of "restrictive significance." *Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556, 565 (6th Cir. 2013) (en banc).

"Lost earnings or wages are not recoverable" in a civil RICO suit "if they flow from a personal injury." *Jackson*, 731 F.3d at 565-66; *Evans v. City of Chicago*, 434 F.3d 916, 926-27 (7th Cir. 2006), overruled on other

grounds by *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013); and *Grogan v. Platt*, 835 F.2d 844, 848 (11th Cir. 1988)).

"The terms 'business or property' are, of course, words of limitation which preclude recovery for personal injuries and the pecuniary losses incurred therefrom." *Doe v. Roe*, 958 F.2d 763, 767 (7th Cir. 1992); accord Ryder v. Hyles, 27 F.4th 1253, 1257 (7th Cir. 2022); Evans, 434 F.3d at 925-26. "Most personal injuries … will entail some pecuniary consequences," that court explained. Doe, 958 F.2d at 770.  Thus, treating "the economic aspects of such injuries … as injuries to 'business or property'" would evade RICO's limitation on qualifying injuries. Id.

 The Seventh Circuit denied civil RICO recovery for "malicious prosecution and false imprisonment"—"traditional tort claims which result in a personal injury." Evans, 434 F.3d at 927. While that plaintiff focused his claim on "[t]he loss of income as a result of being unable to pursue employment opportunities while allegedly falsely imprisoned," that lost income was "an indirect, or secondary effect, of the personal injuries." Id. at 926-27. So the lost income was not "a cognizable injury to 'business or property'" under RICO. Id. at 927.

The Eleventh Circuit also precludes "recovery for the economic aspects of personal injuries." *Grogan*, 835 F.2d at 845; accord *Blevins v. Aksut,* 849 F.3d 1016, 1021 (11th Cir. 2017); *Pilkington v. United Airlines*, 112 F.3d 1532, 1536 (11th Cir. 1997). As that court has explained, "the ordinary meaning of the phrase

'injured in his business or property' excludes personal injuries, including the pecuniary losses therefrom." *Grogan*, 835 F.2d at 847. Had Congress wanted to cover all financial losses, Congress "could have enacted a statute referring to injury generally, without any restrictive language." Id. (citation omitted). Instead, Congress limited civil RICO's reach to injuries in "business or property." Id. at 846.

An "injury" is a "wrong or damage done to another, either in his person, rights, reputation, or property." Black's Law Dictionary 924 (Rev. 4th ed. 1968). "Business" includes "means of material being and livelihood." Id. at 248. And "property" is an "exclusive right" "guaranteed and protected by the government." Id. at 1382. As the Supreme Court has noted in the context of the Clayton Act, the phrase "business or property" is thus "restrictive." *Reiter v. Sonotone Corp*., 442 U.S. 330, 338 (1979). That language necessarily excludes "particular kinds of injur[ies]," including "personal injuries." *RJR Nabisco*, 579 U.S. at 350.

To decide whether a plaintiff has suffered a qualifying injury, courts do not look at "the injury … in isolation." *Yegiazaryan v. Smagin*, 599 U.S. 533, 545 (2023). They examine "the circumstances surrounding the injury," including how it "arose." *Id.*

Here, Plaintiff merely avers that she has been civilly wronged being subject to the effects of litigation (not against her, but against U Lock). Her damages are attorney fees and speculation that she would not have been subject to an automatic stay. This does not provide her with RICO standing.

## E. THE AMENDED COMPLAINT CONTAINS ONLY INFERENCES AS TO KNOWLEDGE AND AGREEMENT

To allege a RICO conspiracy, the complaint must allege facts to support both the defendant's agreement and his or her knowledge. *Glessner v. Kenny*, 952 F.2d 702, 714 (3d Cir. 1991), *overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.,* 46 F.3d 258, 260-261 (3d Cir. 1995*)*. Thus, in *Glessner* the Court upheld the dismissal of the plaintiffs' § 1962(d) claims where the plaintiffs did not allege agreement and knowledge, but instead argued that agreement and knowledge could be inferred. *Id.* In other words, the plaintiff must show that a defendant in a RICO conspiracy action "was aware of the essential nature and scope of the enterprise and intended to participate in it." *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir. 1988).

In this case, it is alleged that Shanni Snyder committed various RICO predicate acts by filing legal papers. However, the alleged conspiracy contains no factual support, only inferences. Bald and unsupported allegations do not satisfy the pleading requirements for a RICO conspiracy. See *Glessne*r, 952 F.2d at 714.

Most of the paragraphs are on "information and belief" without citing any source of the information. "Belief" certainly is not acceptable in this type of RICO case. A pleading offering vague or ambiguous assertions based upon "information and belief"—as in this Complaint— does not legally suffice.

*Shannon v. Hamm*, No. 5:15-CV-082-C, 2015 WL 13185992, at *5 (N.D. Tex.

May 5, 2015).

As to ATTORNEY ROTH, the only allegations about participation in

the purported enterprise is:

> 322. Roth participated in the Fake Lien Scheme in several ways: a) by, on information and belief, participating in the planning and organization of the same; b) by, on information and belief, advising George, Kash, and U Lock not to respond to Shanni's complaint in the Wage Case; c) by filing U Lock's application to the Supreme Court of Pennsylvania to stay remand of the Ownership Action even though he knew that U Lock did not intend to seek review in the U.S. Supreme Court; d) by filing and arguing the Petition to Strike in the Ownership Action and arguing to the Westmoreland County Court that it should not have released to Biros the deeds to the Subject Property and that the Westmoreland County Court should instead follow a procedure that would have exposed the Subject Property to the Fake Lien but could not under any circumstances have left his client with title to the Subject Property; e) by delaying the filing of the notice of bankruptcy in the Ownership Action for three weeks after Shanni filed the Involuntary Petition and commenced the U Lock Bankruptcy Proceeding; and f) by delaying the filing of that notice until two minutes after Shanni had entered her appearance in the Ownership Action and filed her notice of appeal in that action to the Superior Court. 323. On information and belief, Roth thereby continued the role of the legal face of the Snyder Family Enterprise that Crawford had previously filled.

All of the "on information and belief" conjecture of privileged conversations

and work product constitutes nothing but an inference and is certainly not

sufficient.

There is absolutely not a single fact that implies that legal counsel

participated in any planning of Shanni Snyder's litigations – U Lock could have

filed its own bankruptcy at any time. U Lock had no obligation to file a Notice of

Bankruptcy – that obligation was on Biros as creditor to stop her legal actions.

As to paragraph 323, it appears to be cut and pasted from a different RICO litigation. U Lock's reason for not filing the certiorari was not because of some vast conspiracy, but was a decision of the client AFTER learning that Biros already received the deeds pursuant to an *ex parte* communication with the state judge. The theory that Shanni Snyder and the undersigned drove to the courthouse together is logistically absurd as the courthouse is in Greensburg, Snyder lives West of Greensburg (North Huntingdon), Roth's offices are East of Greensburg (Latrobe). Such a car pool would turn the five-minute filing into an all day affair.

The absurdity of this vast conspiracy theory is that U Lock could have filed a voluntary bankruptcy at any time under Chapter 7. It did not need Shanni Snyder to do it. Nobody needed to enter into the dreamed up conspiracy.

Similarly, the bankruptcy could have been filed earlier by U Lock and it would have achieved the goals Biros alleges could have happened. In other words, if U Lock filed bankruptcy in December 2021, or even on January 16, 2023, it would have reorganized and it would have the property. The alleged conspiracy only served to help Biros.

There exists no factual allegations in the Complaint to support the inference and conjecture that the undersigned told U Lock's officers not to respond to the labor Complaint. Rather, as the officers stated after being goaded into providing attorney-client communications that it not admissible, is that the non-specific question as to pricing of a federal suit would be at least $10,000 to

A1177

defend. This allegation, if true, does not support the inference that the undersigned told the client not to respond or that a vast RICO conspiracy existed.

"Lawyers look at allegations every time they are engaged to respond to a lawsuit. They are not obliged to treat those allegations as true; to the contrary, they recognize that a plaintiff is asserting only that it proposes to prove them, and they evaluate the complaint to see what kind of a defense can be raised." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 480  (7th Cir. 2017) .  The *Domanus* Court stated, "Faced with a similar situation, the D.C. Circuit reached this commonsense conclusion in a case in which the plaintiff alleged that a defendant law firm knew about its client's wrongdoing. *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043 (D.C. Cir. 2012). There the plaintiff had alleged that the law firm knew about its client's bribery conspiracy from news reports about the bribery and embezzlement scheme, the client's reputation for wrongdoing, and a prior criminal conviction. *Id.* at 1048–50. The court concluded that '[t]hese allegations are insufficient to establish a plausible inference that [the defendant law firm] was aware of anything corrupt relevant to its provision of legal services…' *Id.* at 1050."

 "The fact that someone should have known about a scheme or fraudulent activity is not enough to show that the person actually knew. *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 870–71 (7th Cir. 2001).

An inference of knowledge through willful blindness requires that the defendant "believe that there is a high probability that a fact exists" and "take

deliberate actions to avoid learning of that fact." *Global–Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769, (2011). Only a subjective belief that there is a high probability that the fact is true, coupled with deliberate steps to avoid learning the fact, is equivalent to knowledge. See *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 240 (5th Cir. 2010) ("Neither awareness of *some* probability of illegal conduct nor a showing that the defendant *should* have known is enough" to constitute the legal equivalent of knowledge).

Even if there existed some knowledge, there would need to be an agreement. The Complaint is also deficient on the question of agreement—a critical element of a RICO conspiracy case. See *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000).

In order to raise an allegation of a conspiracy prohibited by section 1962(d), the plaintiff must allege (1) that the defendant agreed to conduct or participate in the affairs of an "enterprise," and (2) that he agreed to the commission of two predicate acts. *Frost Nat. Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 869(7th Cir. 2001). *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998), *holding modified by Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000). The absence of either of these is fatal to the claim.

Claims that lawyers have conspired with their clients are insufficient in the absence of allegations that the arrangement involves more than standard legal

representation. See *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP,* 682 F.3d 1043, 1051-1052 (D.C. Cir. 2012).

The allegations in the Complaint, subject to Rule 9's requirement of specificity, fail to allege knowledge and agreement needed to move forward on a RICO or RICO conspiracy claim.

## F. THE RICO CONSPIRACY LACKS THE REQUIRED INTERSTATE COMMERCE NEXUS

Count II is a conspiracy claim against the undersigned and others. 18 USC 1962(d) prohibits a conspiracy to violate the RICO provisions of 18 USC 1962(c) apparently what was set out in Count I. However, 18 USC 1962(c) explains that, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

As this Court recognized in *Biros v. Snyder,* 2024 WL 1346691 at *4 (W.D.Pa. Mar. 29, 2024), the person sued must be associated with an enterprise engaged in interstate commerce.

The word "interstate" is not used in the Amended Complaint.

In the RICO Case Statement, Biros states:

> The Subject Property contains a self-storage space which, on information and belief, rents space to individuals residing in multiple states. Further, the Subject Property is ripe for further development

A1180

that would affect commerce, including interstate commerce, if it were in the hands of Biros, its proper legal owner. This commerce has been prevented by the predicate acts and pattern of racketeering engaged in by the Defendants.

First, the property, and the self-storage business, is not the enterprise that Biros alleges that the defendant engage in. Second, Biros made no claim that the actions affected the self-storage business of U Lock. Third, Biros had a full and fair opportunity to litigate the automatic stay from the bankruptcy court and, as shown, subverted it. *U Lock*, 2024 WL 3154602 (Pa. W. Bank. June 24, 2024). Once the stay ended, Biros maintained the ability to develop the property in any manner she wanted.

However, these allegations do not involve the so-called lien enterprise, they involve the U Lock and Biros enterprises which are not alleged enterprise that forms the basis of the conspiracy.

On the contrary, the statute requires the enterprise to specifically engage in or have activities of which affect interstate commerce. By Biros' own admissions, the sole activity of the enterprise was to file documents with various courts all located in Pennsylvania.

Indeed, Biros need to allege specific facts which "must show that the conspiracy, if completed, would involve an enterprise that affected interstate or foreign commerce." *United States v. Ernst*, 502 F. Supp. 3d 637, 658 (D. Mass. 2020). To state that Biros might, if they possessed the property, engage in interstate commerce appears merely speculative.

### G. PURSUANT TO RULE 12(f) THIS COURT MUST STRIKE THE ALLEGATIONS PERTAINING TO THE "LEGAL DRAFTERS"

Throughout Biros' Amended Complaint, she repeatedly alleges that "Legal Drafters" may have assisted Shanni in drafting various legal documents. *See Amended Complaint,* at ¶¶72, 96, 110, 123, 126, 142, 171, 326, 327, 329. This is nothing but Biros seeking an opportunity to obtain discovery and interfere with the work product of all of the parties by opening the door to having someone testify about every step they took in drafting legal papers. Indeed, in the related bankruptcy documents, Biros' counsel subjected her to various questions about the software she uses, the databases she accesses, etc. Worse, George Snyder and Kash Snyder have pointedly been asked about their conversations with the undersigned, why certain legal decisions were made, and other protected matters. This must stop because in Pennsylvania so-called "legal drafters" without disclosure to the Court is authorized.

In Pennsylvania, *pro se* litigants may receive help with legal research and drafting legal pleadings from attorneys without any disclosure to the parties or the Court. *See Pennsylvania Bar Association Committee on Legal Ethics and Professional Responsibility and Philadelphia Bar Association Professional Guidance Committee Joint Formal Opinion* 2011-100. In that opinion, the Committee held that, "A Lawyer Is Not Required Under the Rules of Professional

Conduct to Disclose a Limited Scope Engagement to an Opposing Party or to the Court in a Litigation Matter."

This practice of anonymously drafting documents for pro se litigants is called "legal ghostwriting," and the American Bar Association (ABA) Standing Committee on Ethics and Professional Responsibility has recognized it as a form of "unbundling" of legal services, or limited scope representation. *ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Op.* 07-447 (2007).   The committee stated that "[l]itigants ordinarily have the right to proceed without representation and <u>may do so without revealing that they have received legal assistance in the absence of a law or rule requiring disclosure.</u>" Id. at 2.

The Amended Comples goes so far as to directly infer wrongdoing by Shanni Snyder through not disclosing any help or advice– which is her work product – notwithstanding the ethical opinions from Pennsylvania since 2011 that specifically hold that disclosure to the other parties is not necessary.

For these reasons, a RICO lawsuit certainly is not the place to test the validity of advice provided by ethics committees within Pennsylvania that both attorneys and litigants are entitled to reasonably rely upon.

This Court needs to strike these paragraphs to take how a person writes their legal pleadings out of the inquiry.

## H. BIROS FAILS TO STATE A CLAIM AS TO SLANDER TO TITLE OR CONSPIRACY

At Counts III and IV, Biros raises a slander of title claim and a conspiracy to slander title claim. In it, she complains of the filing of a judgment against U Lock, Inc., not Biros. In addition, Biros cites a *writ of summons* and *lis pendens*. Obviously, Shanni Snyder believes she was a creditor of U Lock and had a plausible claim as the Pennsylvania Uniform Voidable Transactions Act, 12 Pa.C.S. 5101, et. seq. Indeed, Shanni Snyder purchased the claims from the bankruptcy trustee and an action to void the transaction remains pending. *Snyder as assignee of Slone, Trustee, v. Biros*, 23-ap-2020 (Bk.W.Pa.).

Regardless, Biros fails to make a claim for for slander to title. Slander, or disparagement, of title is the —the false and malicious representation of the title or quality of another's interest in goods or property *Pro Gold Mfg. v. Tribune Review Newspaper Co*., 809 A.2d 243, 247 (Pa. 2002). To plead a valid slander of title claim, a plaintiff must allege: (1) a false statement; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity. *Pro Golf Mfg*., 809 A.2d at 246 (*citing Restatement (Second) of Torts* § 623(A) (1977)); *accord Lincoln v. Magnum Land Servs., LLC,* 2013 WL 2443926, at *5 (M.D. Pa. June 5, 2013).

Biros alleges no facts from which this Court can infer that the judgment itself or a writ of summons coupled with a lis pendens was disparaging, false, or done with malice. *See In re Bennett*, 531 B.R. 68, 79 (Bankr. E.D. Pa. 2015) (holding that a debtor did not state a plausible claim against mortgagee for slander of title when he did not state facts to support malice element).

Moreover, Biros does not allege, with any specificity, that she suffered special damages as a result of the actions.. Allegations of pecuniary loss cannot be speculative. See *Zerpol Corp v. DMP Corp.*, 561 F. Supp. 404, 409 (E.D. Pa. 1983) (plaintiff alleging disparagement or slander of title must —plead and prove pecuniary loss); *Surgical Laser Tech., Inc. v. Heraeus Lasersonics, Inc.*, 1994 WL 637353, at *1 (E.D. Pa. Nov. 10, 1994) (noting that, under Pennsylvania law, a slander of title claim requires proof of special damages and must be pled with specificity).

Indeed, Biros at all times maintained a remedy as to the *lis pendens*. All she needed to do was file a petition to strike it. As to the *writ of summons*, Biros merely had to file a rule upon Shanni Snyder to file a complaint.

Because the allegations do not give rise to a *slander of title* action, Counts III and IV must fail.

## I. COUNT IV FAILS TO STATE AN OVERT ACT OR A CLAIM

Even if Count III can proceed, Pennsylvania requires more than just a meeting of the minds to advance a conspiracy claim. In this case, none of the

other defendants appeared in the litigations that Biros aver affected her title. Biros must plead:  (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. Proof of malice or an intent to injure is essential to the proof of a conspiracy. *Strickland v. University of Scranton*, 700 A.2d 979, 987-88 (Pa.Super.Ct.1997); *see also Skipworth v. Lead Indus. Ass'n, Inc.*, 547 Pa. 224, 690 A.2d 169, 174 (Pa.1997).

While Biros makes boilerplate allegations, considering Pennsylvania's requirement that special damages be pled with specificity, none of it is sufficient.

## J.  COUNTS III AND IV ARE BARRED BY THE STATUTE OF LIMITATIONS

The undersigned seeks judgment on the pleadings as to this issue.  Biros attaches the documents to her Complaint.  This Court can take judicial notice pursuant to F.R.E. 201(d) that these events occurred over one year prior to Biros' first Complaint.  Therefore, the action is barred pursuant to 42 Pa.C.S.A. § 5523; *Pro Golf Manufacturing v. Tribune Review Newspaper Company*, 570 Pa. 242, 809 A.2d 243 (2002).

## K.  COUNTS V AND VI FAIL TO STATE A CLAIM

First, Biros fails to allege with particularity any economic damage resulting from the alleged fraud.  "[I]ntentional misrepresentation claims are generally preempted by the economic loss rule," except where "a defendant committed

fraud to induce another to enter a contract." *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F. Supp. 2d 643, 658 (E.D. Pa. 2002). In this case, Biros fails to explain her economic loss except to aver some attorney fees as a result of litigating.

Second, Biros cites Rule 11, F.R.Cv.P. as a basis for her fraud claim. However, Rule 11 does not create a private cause of action. *Hofmann v. Fermilab NAL/URA*, 205 F. Supp. 2d 900, 904 (N.D. Ill. May 30, 2002) ("Rule 11 affords no private right of action."); *New York News, Inc. v. Newspaper and Mail Deliverers' Union*, 139 F.R.D. 291, 293 n.1 (S.D.N.Y. 1991), aff'd, 972 F.2d 482 (2d Cir. 1992). See also *In re 72nd St. Realty Assocs.*, 185 B.R. 460, 473 (Bankr. S.D.N.Y. 1995) (same analysis applies under Bankruptcy Rule 9011).

Third, Biros failed to plead the elements of fraud which are: (1) a representation was made; (2) that is material to the transaction; (3) made falsely, with knowledge of falsity or with recklessness regarding its truth or falsity; (4) with the intent leading another to rely on it; (6) which is justifiably relied upon; and, (7) the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 559 (Pa. 1999). Specifically, Biros did not allege that she justifiably relied on any representations.

Therefore, the claim must be dismissed.

## L.  BIROS FAILS TO PLEAD ABETTING FRAUD

At Count VI, Biros sues for aiding and abetting fraud.  This is a recently recognized tort by Pennsylvania's Supreme Court.  *Marion v. Bryn Mawr Trust Co.*, No. 72 MAP 2021, 2023 WL 308110 (Pa. Jan. 19, 2023).

To sue for aiding and abetting fraud, Biros must "allege a scienter of actual knowledge" which strikes the right balance between permitting redress for fraud victims on the one hand and protecting defendants from excessive costs and liability on the other.  *Id.*

The Pennsylvania Supreme Court noted that *The Restatement (Second) of Torts* recognizes aiding and abetting fraud as a cause of action, holding a person liable where he `knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself….," something that Biros does not fully aver in her Complaint.

The only thing Biros accuses the defendants of is not responding to a lawsuit, something that is their prerogative to do.  In other words, mere silence is not fraud if there is no duty to speak. *Wilson v. Donegal Mutual Insurance Co.*, 410 Pa. Super. 31, 598 A.2d 1310 (1991); *Smith v. Renaut*, 387 Pa. Super. 299, 564 A.2d 188 (1989). Biros fails to plead what duty the defendants had to respond to the lawsuit.

The other allegations, relating to filing documents, were all done with Biros having an opportunity to be heard and cannot plausibly aid a specific fraud since she had a full and fair opportunity to litigate the matter.

Therefore, Count VI must be dismissed.

## M.  THE ABUSE OF PROCESS AND CONSPIRACY CLAIMS FAIL

At Counts VII and VIII, Biros sues for abuse of process and conspiracy to abuse process.  To establish a claim for abuse of process it must be shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff. Abuse of process is, in essence, the use of legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process. Thus, the gravamen of this tort is the perversion of legal process to benefit someone in achieving a purpose which is not an authorized goal of the procedure in question. *Werner v. Plater-Zyberk*, 799 A.2d 776, 785 (Pa. Super. 2002) (citations omitted). See *Weiss v. Equibank,* 460 A.2d 271, 276 (Pa. Super. 1983 ("If the plaintiff sues the defendant on a valid cause of action but brings the suit, for example, not to collect his just debt but for a collateral purpose such as blackmail the action is a malicious abuse of process").

Unlike this RICO action, the documents filed were clearly done so for the purpose on their face.  It is true that perhaps Shanni Snyder sought an advantage by racing to the courthouse– something that she probably should have been done even faster– but that is the law of judgments.  *United States v. Estate of Romani*, 523 U.S. 517 (1998)(Pennsylvania judgment creditor's lien valid and with priority if filed prior to other liens, even tax liens).

As to conspiracy, again Biros fails to allege the elements of civil conspiracy, particularly what overt acts are attributable to which defendants. *Strickland v. University of Scranton*, 700 A.2d 979, 987-88 (Pa.Super.Ct.1997); *see also Skipworth v. Lead Indus. Ass'n, Inc.*, 547 Pa. 224, 690 A.2d 169, 174 (Pa.1997).

### N.  COUNTS IV, VI, AND VIII FAIL BECAUSE THE ALLEGATIONS SHOW A BENEFIT TO DEFENDANTS' BUSINESS INTERESTS

As explained by Biros, the purpose of Shanni Snyder's filings were to advance her position that she was owed money and entitled to a lien.  U Lock obviously had a business interest in reorganization under the bankruptcy code and challenging what it construed as improper conduct.  This is obvious from the legal pleadings.

To proceed under civil conspiracy, the Plaintiff must show actual malice.  If the facts show that the defendant acted to advance his or her own professional or business interests, "[t]his necessary proposition is negated." *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. Sept. 3, 2009); see also *Spitzer v. Abdelhak*, 1999 U.S. Dist. LEXIS 19110, at *9 (E.D. Pa. 1999)(granting motion to dismiss civil conspiracy claim where the plaintiff alleged that the purpose of the conspiracy was for the defendant to benefit itself personally and professionally). Thus, where a plaintiff's case relies on the theory that the defendants "acted for their business advantage and benefit" a civil conspiracy claim is "not [] tenable because [p]laintiffs' evidence belies the notion that

[d]efendants acted without a business motive, but purely out of malice." Id. (dismissing civil conspiracy claim); see also *Guaranty Towers, LLC v. Cellco Partnership,* Civ. No. 1:CV-07-0554, 2007 U.S. Dist. LEXIS 65819, at *6 (M.D. Pa. Sept. 6, 2007) (granting motion to dismiss civil conspiracy claim where the plaintiffs' theory of the claim stated that the defendants acted to obtain more revenue).

Because the documents show the parties were advancing their business purposes, the civil conspiracy claims must fail.

### V. CONCLUSION

Based on the above, to allow this action to proceed would be inappropriate considering that Christine Biros has been sanctioned for very similar conduct she sues for and these adjudications were not appealed and are *res judicata*. In addition, the RICO action cannot proceed due to technical defects and the state law claims fail to state a claim upon which relief can be granted. Therefore, the Complaint must be dismissed or judgment granted on the pleadings. In the alternative, the impertinent material must be stricken.

Respectfully submitted,

*/s/ KASH SNYDER*

KASH SNYDER
PO BOX 111
IRWIN PA
15642

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTINE BIROS,                    )
          Plaintiff           )   2:23 cv 00297
                              )
    v.                              )
                              )
SHANNI SNYDER et al,                )
          Defendants.         )

## **ORDER**

AND NOW, this _____ day of _____, 2024, it

is hereby ORDERED, ADJUDGED, and DECREED that the Amended Complaint

is hereby DISMISSED WITH PREJUDICE for the reasons set forth in the brief

filed by Defendant KASH SNYDER

                              By the Court:

                              _____
                              U.S. District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTINE BIROS,               )
                  Plaintiff    )    2:23 cv 00297
                               )
        v.                     )
                               )
SHANNI SNYDER et al,           )
                  Defendants.  )

**REPLY BRIEF IN SUPPORT OF THE MOTION TO DISMISS AMENDED COMPLAINT, MOTION FOR JUDGMENT ON THE PLEADINGS, AND MOTION TO STRIKE REDUNDANT, IMMATERIAL, IMPERTINENT, OR SCANDALOUS MATERIAL**

AND NOW COMES Defendant J. Allen Roth, Esq., and files this, his Brief in Support of the Motion to Dismiss, Motion for Judgment on the Pleadings, or, in the alternative, Motion to Strike redundant, immaterial, impertinent, or scandalous matter.

I.    **BIROS FAILS TO SHOW THAT THIS COURT SHOULD CONTINUE THE "ENDLESS SLOG OF LITIGATION" THROUGH RICO**

Biros cites this Court's opinion in *Sparks v. Speedy Kleene*, 2020 U.S. Dist. Lexis 130427 *12-13 (W.D.Pa. 2020) to suggest that this Court should ignore non-appealed findings of fact that she herself substantially increased the cost of litigation in the lawsuits she sues over where her damages are attorney fees. *Speedy Kleene* referred to unsubstantiated attacks on a party and did not involve a case where a party actually sued because of litigations and sought damages comprised of attorney fees invoking RICO.

The defect with Biros' continuation of the "endless slog of litigation" is that RICO is not supposed to be used for this purpose – especially where Biros herself engaged in the same conduct she complains about.

A1193

Most courts have concluded "that various actions in litigation could be the substance of malicious prosecution torts but could not sustain RICO liability." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016).   "[T]he fact remains that litigation is as American as apple pie. If a suit is groundless or filed in bad faith, the law of torts may provide a remedy. Resort to a federal criminal statute is unnecessary." *I.S. Joseph Company, Inc. v. J. Lauritzen A/S*, 751 F.2d 265, 267-68 (8th Cir. 1984).

To allow this type of RICO "would result in the inundation of federal courts with civil RICO actions that could potentially subsume all other state and federal litigation in an endless cycle where any victorious litigant immediately sues opponents for RICO violations." *Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 173 (E.D.N.Y. 2010).

The RICO statute provides for private enforcement actions and treble damages, which can be threats that chill the right to petition the courts. See *Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) (Easterbrook, J.) (applying the antitrust *Noerr-Pennington* doctrine to RICO claims); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933-42 (9th Cir. 2006) (same).

Indeed, "allegations of mail fraud [were], in fact, merely artfully pled claims of malicious prosecution," and that such claims could not serve as RICO predicates.  *Auburn Med. Ctr., Inc. v. Andrus*, 9 F.Supp.2d 1291, 1297–99 (M.D. Ala. 1998).

Yet, that is what we have here– a disgruntled and sanctioned litigant interposing a RICO lawsuit to recover attorney fees that her legal counsel churned in this litigation.

## II.  THE AMENDED COMPLAINT FAILS TO SHOW A RICO ENTERPRISE

Biros continues to press the 1988 tax scheme by the parents of Shanni Snyder to assert a RICO enterprise when Ms. Snyder was still a minor child and Kash and George Snyder may have either been 17 years old or just turned 18.  In other words, a tax scheme by non-parties occurring 36 years ago is the basis of the allegation of the Biros' claim to an "enterprise."  Similarly, the separate claim of a litigation by family members of Shanni Snyder occurring some 20 years ago constitutes the next claim that there exists an enterprise.

RICO requires an enterprise, not acts of an individual.  "A 'person' and an 'enterprise' that is not simply the same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).

The enterprise is "proved by evidence of an ongoing organization . . . and by evidence that various associates function as a continuing unit," while the pattern of racketeering activity is proved by evidence of at least two racketeering acts committed by participants in the enterprise.  *United States v. Turkette*, 452 U.S. 576, 583 (1981).

In the present case, Biros merely regurgitates litigations that make it appear that non-parties, and sometimes parties, engaged in litigation tactics that are viewed as improper.  However, they do not give rise to RICO.

## III.  BIROS IS WRONG THAT THE ORDER FOR RELIEF DOES NOT PRECLUDE HER CLAIMS

Biros asserts that even though she moved to dismiss the bankruptcy case for fraud before the Order for Relief, and despite her not appealing the Order for Relief, it does not

A1195

preclude her from asserting that the bankruptcy case itself constituted some RICO element of "bankruptcy fraud."

In *Continental Illinois Nat. Bank and Trust Co. of Chicago v. Windham,* 668 F.Supp. 57 (E.D. Tex. 1987), citing *Mason v. Integrity Insurance Co.,* 709 F.2d 1313 (9th Cir.1983), the district court thoroughly analyzed the *res judicata* effect of an Order for Relief and found that a claim within the involuntary petition could not be attacked as invalid or subject to a *bona fide* dispute. Otherwise, the bankruptcy court could not have granted the petition.

Similarly, in *In re Centre de Tricots De Gaspe, Ltee.,* 10 B.R. 148, 149 (Bk. S. Fl. 1981), the bankruptcy court found that an Order for Relief constituted *res judicata* as to the alleged bad faith of the petition. Specifically, it stated, "The principle of *res judicata* also bars the Plaintiffs from re-litigating the Defendants alleged 'bad faith' in instituting the involuntary bankruptcy proceedings. The Plaintiffs' responses to the involuntary petitions raised the same basic issues of bad faith and illegality of the Defendants' acts." In that case, the Order for Relief was taken by default and the court noted that no appeal was taken, similar to what occurred here in the bankruptcy court where Biros appeared and pled bad faith and fraud.

IV. **BIROS FAILED TO SHOW SHE CAN BRING A CLAIM FOR RICO TO ACHIEVE DAMAGES FOR HER LITIGATION ATTORNEY FEES**

Biros asserts she has standing to bring this RICO because the actions of the so-called Enterprise caused her damage. However, the damage she claims to have been caused is having to engage in litigation and incurring attorney fees from that litigation. In *Hemi Group LLC v. City of New Tork,* 559 U.S. 1 (2010), the Supreme Court made it clear that: To establish that an injury came about "by reason of" a RICO violation, a plaintiff must

show that a predicate offense "not only was a `but for' cause of his injury, but was the proximate cause as well." *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 268 (1992). Proximate cause for RICO purposes should be evaluated in light of its common-law foundations; it thus requires "some direct relation between the injury asserted and the injurious conduct alleged." *Ibid.* A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient. *Id.,* at 271, 274.

In this case, Biros' claims are clearly "too remote," "purely contingent," and "indirect." In other words, she suffered no direct harm and her attorney fees are personal injuries caused by what she perceives as an abuse of process.

## V.  **CONCLUSION**

Based on the above, and the brief in support of the motion to dismiss, this case must be dismissed with prejudice.

Respectfully submitted,

*/s/  J. Allen Roth, Esq.*
J. Allen Roth, Esq. (PA 30347)
805 S. Alexandria Street
Latrobe PA  15650
lawmatters@yahoo.com
(724) 537-0939

COUNSEL FOR DEFENDANT
J. ALLEN ROTH

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the within

VOL IV OF IV APPENDIX OF APPELLANT, CHRISTINE BIROS was served this

22nd  day of August 2025, via the Court's CM/ECF

*Stuart C. Gaul, Jr.*